IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE:<br><br>ATLAS MINING COMPANY,<br>SECURITIES LITIGATION | Case No. CV 07-428-N-EJL-MHW<br><br><br>**REPORT AND**<br>**RECOMMENDATION** |

## REPORT

### I.
### Introduction

Currently pending before the Court is Defendant Chisholm, Bierwolf & Nilson, LLC's Motion to Dismiss (Docket No. 77), filed October 8, 2008, and Lead Plaintiffs' Motion to Strike All References to CBN's Exhibit 4 (Docket No. 86), filed November 24, 2008.

### II.
### Procedural History

The first lawsuit in this consolidated action was filed on October 11, 2007 by Jeff Benson. (Docket No. 1). Pursuant to 15 U.S.C. § 78u-4(a)(3)(A), on October 12, 2007, a notice that a class action had been initiated against defendants was published over a widely circulated

national business-oriented wire service, *Market Wire*, advising members of the proposed class of their right to move the Court to serve as lead plaintiff within 60 days. Subsequent to the first lawsuit being filed, two other lawsuits were filed by Paul Berger and Daniel J. O'Hern, Sr. on October 19, 2007 and November 26, 2007, respectively.

On December 11, 2007, motions to consolidate the cases as well as to be appointed lead plaintiff and have lead counsel approved were filed by four different investors/investor groups. On January 22, 2008, Judge Lodge entered an order consolidating the three lawsuits into a lead case captioned *In re Atlas Mining Securities Litigation*, Case No. CV 07-428-N-EJL. On March 25, 2008, the Court appointed the O'Hern Group as Lead Plaintiff (Docket No. 48). The First Amended Consolidated Class Action Complaint for Violation of Federal Securities Laws ("FAC") was filed on July 28, 2008 (Docket No. 57). Named as defendants were: Atlas Mining Company ("Atlas"); Nano Clay and Technologies, Inc. ("Nano Clay"), a subsidiary of Atlas; four individuals (former officers and directors of Atlas and Nano Clay); and of relevance to this motion, Chisholm, Bierwolf & Nilson, LLC ("CBN").

The FAC alleges that during the class period, CBN was employed as Atlas's independent auditor to prepare financial statements. The Plaintiffs allege that the financial statements for the years 2004, 2005, and 2006 were false, inaccurate and misled investors by improperly recognizing $250,000 in revenue from a sale of halloysite clay that never occurred. The FAC seeks relief against CBN pursuant to Section 10b of the Securities and Exchange Act of 1934 and Rule 10b-5 adopted thereunder.

### III.
### Background

Atlas is a natural resources company based in Osborn, Idaho, that engages in the

acquisition, exploration, and development of its mineral, timber and resource properties in Idaho and Utah.  Atlas owns and operates the Dragon Mine in Juab County, Utah which was to be principally exploited for halloysite clay.  Halloysite is used in the manufacturing of bone china, fine china and porcelain products.  Atlas also provides contract mining services and specialized civil construction services for mine operators, exploration companies, and construction and natural resource industries.  Atlas owns approximately 900 acres of fee-simple property and patented mining claims and 260 acres of mineral rights and unpatented claims in the Coeur d'Alene mining district in Shoshone County, Idaho.  It also harvests timber on approximately 420 acres of its properties that primarily consist of pine, fir, and larch.  FAC ¶¶ 3, 6.

CBN provided audit opinions on Atlas's financial statements for the years ended December 31, 2004 through December 31, 2006.  In each of its audit opinions, CBN opined that Atlas's financials fairly represented the financial condition of the company and complied with Generally Accepted Accounting Principles ("GAAP").  FAC ¶ 129.

In 2004, Atlas recorded as revenue $250,000 it had received for the purported sale of 500 tons of halloysite clay to NaturalNano, Inc.  However, Atlas never delivered the 500 tons of clay to NaturalNano.  FAC ¶¶ 39, 129.

On October 9, 2007, before market open, Atlas reported that its prior financial statements for the fiscal years ended December 31, 2004, 2005, and 2006, along with its quarterly reports issued for March 31, June 30, and September 30, for the years 2005, 2006, and 2007 had to be restated.  Atlas admitted that the restatements were necessary because it had inflated its revenues and under-reported net losses and long-term liabilities by improperly recognizing as current revenues $250,000 based on future deliveries of halloysite clay from Atlas's Dragon Mine that

were never delivered. FAC ¶ 10. Atlas also announced that its previously reported net losses for the quarter and fiscal year ended 2004 were misstated with net losses being $1,196,274, instead of the reported net losses of $946,274. Additionally, Atlas stated that its long-term liabilities should be increased as follows: for the year ended December 31, 2004, from $30,055 to $280,055; for 2005, from $37,188 to $287,188; and for 2006, from $216,721 to $466,721. FAC ¶ 109.

These disclosures caused Atlas's stock prices to fall. On October 8, 2007, Atlas's stock closed trading at $1.64 per share, with 52,700 shares trading that day. On October 9, 2007, the day of the press release, Atlas's stock opened the day trading at $1.06 and closed the day at $.80 a share, or down over 51% from the previous day's close. Over 6,418,299 shares were traded that day. FAC ¶ 13.

## IV.
## Allegations Against Defendants

As to its general allegations against the officers and directors of Atlas, the Plaintiffs allege that Atlas represented that the Dragon Mine was the only known commercial source of halloysite clay outside of New Zealand and that the mine was a rich cache of unique quality halloysite. Plaintiffs allege that the facts fail to support these assertions. According to Plaintiffs, Atlas sought to create the illusion of a healthy and viable business through wholly improper accounting machinations and false representations to the market. Specifically, they allege that Atlas fraudulently represented to the market that it was already selling halloysite to customers and had bright prospects of selling even more halloysite. The Plaintiffs focus on one specific event; a January 19, 2005 press release in which Atlas claimed to have sold halloysite to NaturalNano, Inc. when in fact, this sale never occurred. This press release referenced a

transaction that occurred in 2004 in which Atlas Mining recorded as revenue $250,000 that was given to it for future deliveries of 500 tons of clay to NaturalNano. According to Plaintiffs, the recognition of this revenue was improper because Atlas did not and could not deliver the clay to NaturalNano. Additionally, Plaintiffs allege that Atlas Mining issued warrants to NaturalNano to acquire 750,000 shares of Atlas Mining at $.40 a share, for no consideration. NaturalNano allegedly sold the warrants, realizing cash proceeds of over $500,000. FAC ¶¶ 4-13.

As to CBN, the focus is much narrower, and relates to the accounting treatment of a single item on the audited financial statements. The Plaintiffs charge that CBN's statements that Atlas's 2004, 2005, and 2006 financials statements fairly presented the financial condition of the company were materially false and misleading because Atlas's financial statements did not comply with GAAP and did not comply with Generally Accepted Auditing Standards ("GAAS"). Specifically, the Plaintiffs allege that CBN either ignored or recklessly failed to investigate the questionable $250,000 halloysite sale made by Atlas to NaturalNano. They further allege that a basic audit would have detected that Atlas did not sell any of the halloysite it claimed to have sold and the audit should have detected the suspicious grant of warrants to NaturalNano for no consideration. FAC ¶¶ 129-131.

There is no evidence that CBN knew of the January 2005 press release announcing the sale of the halloysite clay or that it in any manner participated in the dissemination of information to the market through any press release.

**Report and Recommendation - Page 5**

## V.
## Discussion

**A.     Motion to Strike**

Attached to CBN's Motion to Dismiss as Exhibit 4 is Atlas's August 27, 2008 8-K form.[1] CBN wants the Court to consider this form in connection with the motion to dismiss based on its argument that its treatment of the $250,000 as income in 2004 was not as implausible from an accounting standpoint as Plaintiffs now suggest. The 2008 8-K form represents the third approach, including how it was originally recorded, that Atlas has taken in trying to properly account for the $250,000.

The Plaintiffs move to strike this document because it was filed with the SEC after the First Amended Complaint had been filed. They argue that this extrinsic evidence is improper and should not be considered on a motion to dismiss. They also contend that the 8-K actually confirms CBN's own scienter due to the suspicious circumstances surrounding Atlas's firing of CBN and the retention of a new auditor to re-do the work CBN should have done in the first place.

CBN submits that under Fed. R. Evid. 201, a court may take judicial notice of public records outside the pleadings. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir.

---

[1] On October 9, 2007, the same day that Atlas issued a press release correcting its financial statements, it filed an 8-K with the SEC announcing that it would have to restate its financial statements for each of the reporting periods from 2004 through present as a result of improper revenue recognition practices and other violations of GAAP. Atlas stated that although it had received $250,000 in cash, because it had not delivered the clay, the funds should have been classified as unearned revenue and reported as a liability in its balance sheet. Accordingly, its recorded revenue for 2004 should have been reduced by $250,000 and its long-term liabilities increased by that amount. Then on August 27, 2008, Atlas filed another 8-K. This document affirmed its position that the accounting treatment for the $250,000 received from NaturalNano was incorrect but also that the statement made in its October 2007 8-K was incorrect as well. According to this 8-K, during the two-year term of the contract with NaturalNano, from 2004 to 2006, the $250,000 should have been treated as a deposit, and after the expiration of the contract in 2006, it should have been recognized as revenue.

1999) (concluding that a court should take judicial notice of documents legally required by and publicly filed with the Securities Exchange Commission when deciding a motion to dismiss). CBN contends it would be unfair to allow Plaintiffs to support their allegations of falsity based upon the October 9, 2007 8-K while rejecting any consideration of other SEC filings. The Plaintiffs note that while the Ninth Circuit has suggested that taking judicial notice of SEC filings may be proper, it not clear whether it is appropriate to consider such filings made *after* the complaint was filed.

As a general rule, if the court considers matters outside the complaint when deciding a motion to dismiss, the motion shall be converted to a Rule 56 motion for summary judgment. F.R.C.P. 12(b). Federal Rule of Evidence 201, however, provides the basis for an exception. Subsection (f) of the rule provides that "judicial notice may be taken at any stage of the proceeding." Matters of public record are appropriate for judicial notice; thus, the court may take notice of public records and consider them in deciding a motion to dismiss without converting the motion into one for summary judgment. *U.S. v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008).

Public documents that are required to be filed and are actually filed with the Securities Exchange Commission may be judicially noticed when deciding a motion to dismiss, even if the filings are not cited in the complaint. *Dreiling v. American Exp. Co.*, 458 F.3d 942, 946 n. 2 (9th Cir. 2006); *Glenbrook Capital Ltd. Partnership v. Kuo*, 525 F. Supp. 2d 1130, 1137 (N.D. Cal. 2007); *Finisar Corp. v. Derivative Litig.*, 542 F. Supp. 2d 980, 989 (N.D. Cal. 2008); *In re Amgen Inc. Secs. Litig.*, 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008), *Cf. DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1219 (S.D. Cal. 2001) (failing to take judicial notice of new drug

application filed with the Food and Drug Administration because it was not available to the public and not relied on by plaintiffs in forming allegations in their complaint).  The rationale for taking judicial notice of SEC filings stems from the reasoning behind converting a Rule 12(b) motion to dismiss to a Rule 56 motion for summary judgment; specifically, that the nonmovant must receive notice of the movant's submissions so that the nonmovant may address their relevance.  *Bryant v. Avado Brands, Inc*., 1817 F.3d 1271, 1277-78 (11th Cir. 1999).  When the movant's submissions are those that have been publicly filed with the SEC, the plaintiff has notice and an opportunity to rely upon those submissions in forming the allegations in his complaint, so the necessity of giving notice to the nonmovant has already been satisfied.  *Id*.

The August 2008 8-K was publicly filed with the SEC, although it was done so after the First Amended Complaint had been filed.  Plaintiffs do not strongly object to the consideration of this document so long as the *entire* filing is considered.  Because it is a public filing, the Court will take judicial notice of the document and will consider it in its entirety.

**B.      Motion to Dismiss**

CBN moves to dismiss the complaint against it on the grounds that it fails to plead fraud with particularity as required by Fed. R. Civ. P. 9(b) and fails to comply with the requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA").  To state a claim under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10(b)5, Plaintiffs must allege: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which the plaintiffs relied (5) which proximately caused their injury.  *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir. 2002).

The first three elements are at issue in this case.  Was the accounting treatment of the

$250,000 sale of the halloysite clay a misstatement or omission?  If so, was it a material misstatement when viewed against the other information contained in the financial statements?  Finally, and most importantly, was is made with the requisite scienter?

Before addressing these three elements, it is important to place into context that this claim is being made against outside auditors.  Over the years, various circuit courts have articulated the general standards that apply to outside auditors, because they stand in a different position than officers and directors of corporations who often stand to financially gain from the manipulation of revenues and earnings.  The Sixth Circuit, citing many Ninth Circuit cases, summarized it as follows:

> The same PSLRA pleading standards . . . apply to the allegations against [outside auditor] Andersen. However, the meaning of recklessness in securities fraud cases is especially stringent when the claim is brought against an outside auditor.  *In re SmarTalk Teleservices, Inc. Secs. Litig.*, 124 F. Supp. 2d 505, 514 (S.D. Ohio 2000). Recklessness on the part of an independent auditor entails a mental state so culpable that it "approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982); *Pegasus Fund, Inc. v. Laraneta*, 617 F.2d 1335, 1341 (9th Cir. 1980) (auditor's recklessness "must come closer to being a lesser form of intent (to deceive) than merely a greater degree of ordinary negligence") (internal quotations omitted). Scienter "requires more than a misapplication of accounting principles. The [plaintiff] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)).
>
> "When the standard of recklessness for an auditor is overlaid with the pleading requirements of the PSLRA, a simple rule emerges: to allege that an independent accountant or auditor acted with

> scienter, the complaint must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud." *SmarTalk*, 124 F. Supp. 2d at 514 (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1570 (9th Cir. 1990) and *In re Software Toolworks, Inc.*, 50 F.3d 615, 628 (9th Cir. 1994)). "[T]o allege that an independent accountant or auditor acted with scienter, the complaint must identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately or recklessly." *SmarTalk*, 124 F. Supp. 2d at 515.

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693-94 (6th Cir. 2004).

### 1. Misstatements or Omissions

Plaintiffs argue that CBN improperly accounted for the $250,000 as revenue in 2004 and that this affected subsequent audited statements for the years in question. Plaintiffs allege that it is "inconceivable" that CBN failed to detect Atlas's improper accounting.

CBN persuasively argues that if there was an "omission" or "misstatement" on the audited financial statements, it certainly is not a clear cut violation of GAAP like the Plaintiffs seek to argue, particularly when one looks at the various ways that Atlas has treated this same line item. The Plaintiffs' argument that CBN violated GAAP rests on the premise that income cannot be "earned" until goods are produced and delivered and there is evidence of: (1) an arrangement; (2) delivery; (3) price; and (4) collectibility. In making this argument, Plaintiffs rely heavily on the October 9, 2007 8-K form when Atlas announced its intent to restate it 2004 financial statements with respect to the $250,000 received from NaturalNano. The 8-K had an attached press release, which advised that following a meeting of Atlas's newly appointed senior management, it learned that the money was a deposit for future delivery of clay. Because the clay had not been delivered, the new management believed that the money should not have been

**Report and Recommendation - Page 10**

reported as revenue, as it was initially, but rather been classified as unearned revenue and reported as a liability on Atlas's balance sheet. It was determined to account for it as a deposit of funds, thus reducing recorded revenues and increasing long-term liabilities. This was the first reclassification by Atlas of the funds in question.

The second reclassification by Atlas occurred on August 27, 2008 when another 8-K was filed, replacing the October 9, 2007 determination. This report to the SEC was made after Atlas had hired outside counsel and independent accountants to again review the transaction. This time Atlas stated that the $250,000 should have been treated as a deposit for the two years of the contract, 2004 and 2005, and in the year 2006 recognized as income. CBN argues that if there was any fault on its part, it was in recognizing the $250,000 as income two years earlier than when Atlas now concludes it should have been treated as income.

Even Atlas, with the help of other accountants and auditors, eventually took different views of how the contract proceeds should be treated under GAAP. There appears to be ambiguity on how the $250,000 should have been treated from the various accountants and auditors who have now looked at it. Because of the varying treatments and classifications of the $250,000, both initially and in the subsequent 8-K's, it is difficult to find that CBN's treatment of the transaction amounted to a misrepresentation or omission that would be sufficient to satisfy the PSLRA's heightened pleading standard.

    **2.**    **Material Fact**

In assessing the magnitude of alleged GAAP violations, one needs to look to see if the violations were "minor or technical in nature" or "material in light of the company's overall financial condition." *In re Daou Systems*, 411 F.3d 1006, 1017-18 (9th Cir. 2005). In *Daou*, the

**Report and Recommendation - Page 11**

plaintiffs alleged the specific accounting method that the company's officers had violated and that the company systematically recognized revenue in a manner inconsistent with a specific method, as well as recited information from witnesses to show that defendants were knowingly violating GAAP procedures. *Id*. at 1012-13, 1019.  Here, Plaintiffs allege that CBN's audits were materially false and misleading because Atlas's financial statements did not comply with GAAP, CBN's audits did not comply with GAAS and had CBN even performed the most "rudimentary" audit, it would have discovered that Atlas did not sell any of the halloysite it claimed to have sold.

Although Plaintiffs allege that the revenue improperly recognized in 2004 represented 24% of Atlas's revenue for that year, Plaintiffs fail to allege how that improper recognition affects Atlas's overall financial position.  Plaintiffs must allege enough facts to give a full picture of the company's financial position so that the Court may discern whether CBN's actions were intentionally misleading and the pattern of overstatements significant and widespread.

As CBN notes, the single revenue recognition at issue in this case resulted in an understatement of Atlas's net losses by $250,000.  Thus, had the revenue not been recognized in 2004, the net losses would have shown $1,196,274 instead of $946,274.  So, though the $250,000 recognized as revenue in 2004 made up 24% of Atlas's overall revenue in that fiscal year, Atlas's overall financial position was still showing a significant net loss.

CBN argues that since this is a class action covering a number of years, this single transaction should be analyzed for the class period from January 19, 2005 through October 8, 2007, during the time that the financial statements for the years 2004, 2005, and 2006 were issued.  During this period, Atlas reported revenues of $5,463,609 and the sale to NaturalNano

represented only 4.5% of the total revenue. Looking at the other side of the ledger, the financial statements showed net losses of $6,727,461, of which the $250,000 would be 3.7% of the total losses. In this context, the alleged violation takes on far less significance as to the overall health of Atlas.

Accepting Plaintiffs' argument that the losses would have been higher if the $250,000 had been treated as a liability, it still must be considered in light of Atlas's overall financial condition. CBN included the following qualification in its audit report, "the Company has suffered recurring losses from operations which raises substantial doubt about its ability to continue as a going concern." CBN's Motion to Dismiss, Exhibit 1 (Docket No. 77-2). It is hard, based on these facts, to draw an inference of fraud against an outside auditor who includes a going-concern opinion in the financial statements, and reports a loss of, approximately, $950,000, rather than $1.2 million.

Because the improper revenue recognition related to only one transaction and did not result in a gross overstatement of Atlas's revenue, but rather an understatement of its net losses, Plaintiffs fail to allege that CBN's GAAP and GAAS violations are significant and widespread in misrepresenting Atlas's overall financial condition, in other words, the violations are not material.[2]

---

[2] This is not a case where Plaintiffs can argue that CBN's analysis was the equivalent of no audit at all. *See In re World of Wonder Secs. Litig.*, 35 F.3d 1407 (9th Cir. 1994). As discussed under the Background section, Atlas had many different operations, including contract mining operations, construction services and contracting out timber harvest on its properties. Pages F-4 through F-11 of Atlas's 2004 SEC filings list the many areas involved in the audit, such as accounts receivable, deposits, property, equipment, depreciation, examination of liabilities and revenues, and the sale of stock. The $250,000 was just one of the hundreds of line items encompassed by the audit.

**Report and Recommendation - Page 13**

### 3. Scienter

To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference" was recently defined by the Supreme Court to mean that a complaint will only survive a Rule 12(b)(6) motion to dismiss, "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc., v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2510 (2007). A court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* at 2509. A court must also compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive if the malicious inference is at least as compelling as any opposing innocent inference. *Zucco Partners LLC., v. Digimarc Corp.,* 552 F.3d 981, 991 (9th Cir. 2009).

The Plaintiffs insist that particularized allegations of GAAP violations support an inference of scienter. They submit that recognizing a quarter of a million dollars that was not "earned" violated the basic tenets of GAAP. The Plaintiffs also contend that CBN failed to comply with GAAS by not investigating the "red flags." These alleged "red flags" include: (1) Atlas had never sold any halloysite prior to 2004; (2) the halloysite sales were suspiciously timed at the year-end of 2004; (3) Atlas's claimed halloysite sale was a staggering 24% of its total revenue in 2004; (4) Atlas's gross profit in 2004 increased sixteen fold, due in part to the sales of halloysite. Lastly, it is argued that the gross overstatements of revenue and the very fact that

Atlas had to restate its financials are strong evidence of scienter.

To satisfy the required state of mind under the PSLRA, a complaint must allege that the defendants made false of misleading statements intentionally or with deliberate recklessness.  *In re Daou Systems, Inc.*, 411 F.3d at 1014-15.  Deliberate recklessness is a form of intentional or knowing misconduct.  *Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999).  It is not sufficient to plead facts that merely suggest motive, opportunity or recklessness.  *Id*. at 980.  Rather, a plaintiff must plead a "highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id*. at 976 (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)).

In *Zucco Partners,* the Ninth Circuit recognized that following the Supreme Court's ruling in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the court must make a dual inquiry: first, it must determine whether any of a "plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, [the court shall] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness."  552 F.3d at 992.  *See also Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1165 (9th Cir. 2009).

The mere failure by an accountant to follow GAAP, such as improper revenue recognition, is not enough to establish scienter.  *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994).  Scienter on the part of an accountant requires "more than a

misapplication of accounting principles;" rather, a plaintiff must allege particular facts that suggest the audit "amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id*. (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)). When the alleged GAAP violation involves an overstatement of revenue, the plaintiff must plead with particularity as to how the overstatement affected the company's financial statements so the court may discern whether the alleged GAAP violations were widespread and significant in light of the company's overall financial position. *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1018 (9th Cir. 2005); *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000). The plaintiff thus must allege specific facts that establish that the accountant knew or must have known about a widespread and significant practice of improperly recognizing revenue, such that the accountant acted to intentionally falsify the financial statements. *Id*.

As noted, here we are dealing with only one alleged "omission" or "misrepresentation" by the auditor, which is far less egregious than the conduct before the Ninth Circuit when it found that the defendant's motion to dismiss was properly granted because the plaintiffs failed to allege scienter. *See DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002). In that case, the auditors filed a Form 10-K with the SEC which reflected approximately $2.4 million of net income for the year in question. *Id*. at 388. About a year later, the accounting firm discovered that it had recognized revenues that it should not have recognized. *Id*. The plaintiffs alleged that the recognition of revenue from software sales violated an

industry-specific GAAP. *Id*.

The plaintiffs also alleged that the accountants failed to see three "red flags" that should have alerted the accountants that transactions involving start up fees had been improperly recorded. *Id*. at 386. Start-up fees were normally in the $5,000 range, but the fees on the books were in the range of $250,000 to $385,000 and plaintiffs argued this should have been an obvious red flag since they were grossly exorbitant. *Id*. at 389. The other alleged red flags were that the start-up fees were recorded on the last day of the year and were described as "special." *Id*. Rather than under reporting losses by $250,000 as is the case here, the effect of the errors in *DSAM* resulted in the reversing of $4.9 million in previously recognized revenue. *Id*. at 388. This caused the financial statement to change from showing $2.4 million in net income to showing a $2.5 million loss. *Id*.

The accounting firm in *DSAM* acknowledged it did not comply with GAAP, but argued that the facts as pleaded at best showed only negligence, not the strong inference of scienter required to plead a case of fraud under the securities laws. *Id*. at 390. The Ninth Circuit agreed that the trial court had properly rejected plaintiffs' argument that because the auditor had access to the documents that revealed the improper recognition of revenue at the time it conducted the audit, it had consciously disregarded the improper revenue recognition. *Id*. at 390. Though the auditor conceded that it did not comply with GAAP, the court nonetheless found that, at best, the auditor acted negligently in failing to closely review files or follow GAAP. *Id*. Because negligence is not sufficient to plead scienter, the court upheld the dismissal of the plaintiff's complaint, stating plaintiffs had "failed to allege any facts to establish that [the auditor] knew or must have been aware of the improper revenue recognition, intentionally or knowingly falsified

**Report and Recommendation - Page 17**

the financial statements or that the audit was such 'an extreme departure' from reasonable accounting practice that [the auditor] 'knew or had to have known' that its conclusions would mislead investors." *Id*. at 390-91 (quoting *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1426-27 (9th Cir. 1994)).

While the Plaintiffs have argued alleged red flags, they are similar to those before the Ninth Circuit in *DSAM*. Additionally, the alleged red flags, without more, do not suggest that CBN was deliberately reckless, because they do not "come close[] to demonstrating intent, as opposed to mere motive and opportunity." *Id.* at 389. Even taking a holistic review of the allegations, including allegations of GAAP violations and red flags as well as the hiring of new outside auditors, Plaintiffs fail to meet the requirements of pleading scienter; thus, CBN's motion to dismiss the complaint for failure to plead fraud with particularity should be granted. Even if the Court found there to be a material misrepresentation or omission, there is no scienter. Nothing demonstrates that CBN was aware of the improper revenue recognition or intentionally or knowingly falsified the financial statements.

As for the leave to amend, Plaintiffs do not point to any additional facts they would allege that lead the Court to believe that they could properly allege the claims for fraud against CBN with the particularity required by Rule 9 and the PSLRA. However, if the Plaintiffs object to this Report and Recommendation, the District Court may be in a better position to determine if leave to amend should be granted.

## RECOMMENDATION

Based upon the foregoing, the Court being otherwise fully advised in the premises, the Court **hereby RECOMMENDS that:**

1)      Plaintiffs' Motion to Strike All References to CBN Exhibit 4 (Docket No. 86), filed November 24, 2008, be **DENIED**;

2)      Defendant CBN's Motion to Dismiss (Docket No. 77), filed October 8, 2008, be **GRANTED**.

Written objections to this Report and Recommendation must be filed within ten (10) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1, or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.



DATED: June 2, 2009

_____
Honorable Mikel H. Williams
United States Magistrate Judge

**Report and Recommendation - Page 19**