Ellen Maycock (*Pro Hac Vice*)
Steven G. Loosle (*Pro Hac Vice*)
KRUSE LANDA MAYCOCK & RICKS, LLC
136 East South Temple
Twenty-First Floor
P.O. Box 45561
Salt Lake City, UT 84155-0561
Telephone:  (801) 531-7090
Facsimile:  (801) 531-7091
Email:  emaycock@klmrlaw.com; sloosle@klmrlaw.com

Kim C. Stanger, ISB No. 5783
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  (208) 344-6000
Facsimile:  (208) 342-3829
Email: kcs@hteh.com

*Attorneys for Chisholm, Bierwolf & Nilson, LLC*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

(BOISE)

| | | |
|---|---|---|
| IN RE: | ) | Civil Action No. 07-428-N-EJL |
| | ) | |
| ATLAS MINING COMPANY, | ) | **CBN'S RESPONSE TO LEAD** |
| SECURITIES LITIGATION | ) | **PLAINTIFFS' OBJECTION TO** |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Plaintiffs James O'Hern and John O'Hern ("Lead Plaintiffs" or "Plaintiffs") have

objected to the Magistrate's Report and Recommendation (the "Report") dated June 2, 2009,

which recommends dismissal, without leave to amend, of Plaintiffs' claims against Defendant

Chisholm, Bierwolf & Nilson ("CBN").  Pursuant to 20 U.S.C. § 636(b)(1) and Local Rule

72.1(d)(1), CBN submits this response to Plaintiffs' objection.

## INTRODUCTION

In this class action, Plaintiffs purport to seek relief on behalf of the purchasers of the stock of Atlas Mining Company ("Atlas" or the "Company") for the time period of January 19, 2005 through October 8, 2007.  (Complaint ¶ 1.)  CBN acted as the auditor for the Company's financial statements for the years 2004, 2005 and 2006.

Plaintiffs attempt to plead an accounting fraud claim against CBN pursuant to § 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5) thereunder.  Plaintiffs allege that one transaction totaling $250,000 in the financial statements audited by CBN failed to comply with generally accepted accounting principles ("GAAP").[1]  Based upon CBN's alleged erroneous opinion concerning this one of hundreds of transactions, Plaintiffs allege that CBN, a small accounting firm acting as the outside auditor, became a participant in the Company's alleged fraudulent scheme.  The Report correctly concludes that Plaintiffs' allegations of accounting fraud, based on an alleged single accounting error, fail to comply with FED. R. CIV. P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA").  This Court should adopt the Magistrate's recommendation and dismiss the claim against CBN.

## DISCUSSION

**A.    The Report Correctly Concludes that Plaintiffs have Failed to Sufficiently Plead Falsity and Materiality.**

The PSLRA outlines the standard for pleading falsity, requiring that a complaint "specify each statement alleged to have been misleading," along with "the reason or reasons why the

---

[1] GAAP are principles approved by the American Institute of Certified Public Accountants that "establish guidelines for measuring, recording and classifying the transactions of a business entity."  *Reiger v. Price Waterhouse Coopers, LLP*, 117 F. Supp. 2d 1003, 1010 (S.D. Cal. 2000).

statement is misleading."   15 U.S.C. § 78u-4(b)(1).   In the Report, the Magistrate addresses falsity and concludes:

> Because of the varying treatments and classifications of the $250,000, both initially and in the subsequent 8-Ks, it is difficult to find that CBN's treatment of the transaction amounted to a misrepresentation or omission that would be sufficient to satisfy the PSLRA's heightened pleading standard.

(Report, p. 11.)   In the objection, Plaintiffs disagree with the Report, asserting, "there is no doubt whatsoever that a restatement of an audited financial statement constitutes an admission of falsity and materiality. . . ."   (Objection, p. 7.)   Plaintiffs' objection is not well taken for several reasons.

First, as is elsewhere admitted in Plaintiffs' objection, there has been no restatement of the Company's audited financial statements.   Rather, the Company has merely stated its intent to issue restated financials.   In the Form 8-K filed by Atlas on October 9, 2007, Atlas stated that management had determined that the $250,000 received from Natural Nano in 2004 should not have been recognized as revenue, and Atlas intended to restate its financials.   The Company further stated that "[o]nce independent sources have reviewed the information, quantification of the accounting matters will be defined and reported."   (October 9, 2007 Form 8-K, Item 4.02, CBN Exhibit No. 5.)   In another Form 8-K filed August 27, 2008, the Company reported that a special committee, assisted by independent counsel and an independent accountant, had concluded that the $250,000 received from Natural Nano should in fact be recognized as income, albeit in the year 2006 rather than in the year 2004.   (August 27, 2008 Form 8-K, pp. 3 and 5, CBN Exhibit No. 4.)   Notably, although the Company has stated its intent to restate its financials and has proposed multiple treatments for the $250,000 received from Natural Nano, the Company has never filed restated financial statements with the Securities and Exchange Commission.

In short, contrary to Plaintiffs' position, there are no restated financial statements to which Plaintiffs can look as "an admission of falsity and materiality." Rather, Atlas has merely discussed multiple proposed treatments of the $250,000 received from Natural Nano.

Second, even if Atlas had filed restated financial statements, Plaintiffs are in error in asserting that a restatement of financial results, alone, is sufficient to plead falsity and materiality. As one court noted:

> Plaintiffs make a gross misrepresentation of their own when they assert "[a] restatement of financial results raises a *presumption* of both falsity and materiality for pleading purposes. . . ."
>
> Plaintiffs . . . argue that because Generally Accepted Accounting Principles, and specifically, P 38 of Accounting Principles Board Opinion 20, require restatement of a material error in the company's financial statements, that this is sufficient to make GMAC's misrepresentations material here. Essentially, Plaintiffs argue that, because GMAC restated revenues and net income, those changes must have been material. While these changes may have been material from an *accounting* perspective, plaintiffs' brief is bereft of any *legal* authority to support its attempted alchemy of transforming an accounting standard into a principle of federal securities law, so this argument is without merit.

*J&R Marketing, SEP v. General Motors Corporation*, 2007 U.S. Dist. Lexis 13227, p. 8 (E.D. MI 2007), affirmed 549 F.3d 384 (6th Cir. 2008) (citations omitted) (emphasis in original).[2] Clearly, the mere restatement of a company's financial results is not enough to plead falsity and materiality. This should especially be the case when a company has merely announced proposed alternative treatments for a transaction rather than actually issuing restated financial statements.

Third, Plaintiffs simply fail to meet the plain standard set forth in the PSLRA for pleading falsity. The standard is twofold--namely, plaintiff must first identify the statement that is allegedly false, and then specify the reasons that it is false. Arguably, Plaintiffs meet the first prong of this standard by identifying the transaction with Natural Nano. Plaintiffs fall short,

---

[2] A copy of this case is attached hereto as Exhibit A.

however, in that they cannot specify the reasons the accounting treatment for this transaction was false.  Plaintiffs can merely point to various proposed alternative treatments for this transaction.  In this context, the Magistrate properly concluded that the Complaint fails to satisfy the heightened standard for pleading falsity and materiality under the PSLRA.

**B.     The Report Properly Concludes that the Complaint Fails to Sufficiently Plead Materiality and Scienter.**

The Report concludes that because the alleged improper revenue recognition related to only one transaction, which merely understated net losses, Plaintiffs have failed to allege that the GAAP violation is "significant and widespread in misrepresenting Atlas's overall financial condition."  (Report, p. 13.)  The Report also concludes that in the context of this case one alleged accounting error could not sustain a finding of scienter.  (*Id.* at p. 16.)  Plaintiffs object to the Magistrate's conclusions.

Plaintiffs argue that materiality is an issue which should not be resolved in a motion to dismiss, but should be resolved by the trier of fact.  (Objection, p. 12.)  This assertion, however, is contrary to Ninth Circuit cases that outline what a court should look at in assessing whether a party can rely upon accounting errors to plead a fraud claim under the requirements of the PSLRA.

Ninth Circuit cases provide that a mere failure to comply with GAAP does not constitute fraud.  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002); *Software Tool Works, Inc. v. Paine Webber, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994); *In re: Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1426 (9th Cir. 1994).  Ninth Circuit cases further require that in order to infer scienter from GAAP violations, a plaintiff must plead facts demonstrating whether GAAP violations "constituted widespread and significant inflation of revenue" and whether the violations were "minor or technical in nature" and "material in light of the company's overall financial condition."  *In re: Daou Systems, Inc.*, 411 F.3d at 1016-18.

Thus, cases interpreting and applying the PSLRA include a materiality standard in assessing whether a strong inference of scienter can be inferred from a GAAP violation.  The Report properly addresses this standard in assessing whether the Complaint satisfies the PSLRA's stringent standards.

In the objection, Plaintiffs assert that:

> The Report's finding that Plaintiffs have not demonstrated materiality because the improper accounting "did not result in the gross overstatement of Atlas' revenue, but rather an understatement of net losses" is disingenuous.

(Objection, p. 11) (citation omitted).  Contrary to Plaintiffs' argument, the Report merely addresses, in an appropriate manner as required by Ninth Circuit case law, whether the alleged GAAP violation is widespread and significant or minor or technical in light of the Company's overall financial condition.  The Report concludes, in a persuasive manner, that a single GAAP violation that merely reduces the Company's net loss from approximately $1.2 million to $950,000 was not adequate to provide a strong inference of scienter.  As the Report properly notes, even with the additional $250,000 in alleged, improperly recognized revenue, CBN's audit report warned that "the Company has suffered recurring losses from operations which raise a substantial doubt about its ability to continue as a going concern."  (Report, p. 13.)

In short, the Report rejects a very novel position taken by Plaintiffs—namely, that a single failure to comply with standards promulgated by the American Institute of Certified Public Accountants gives rise to a strong inference of scienter against an outside accountant.  Not surprisingly, cases require much more before the requirement of widespread and significant GAAP violations is satisfied.  *See, e.g., In re: Daou*, 411 F.3d at 1017 (particularity requirement satisfied as to officers of company when they allegedly "systematically" recognize millions of dollars in revenue before earned); *In re: HomeStore.com, Inc.*, 252 F. Supp. 2d 1018, 1022-24, 1044 (C.D. Cal. 2003) (scienter pled with particularity when allegations included numerous

transactions and seven quarters of revenue totaling $193 million); *In re: McKesson HBOC, Inc.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) (numerous transactions involving a variety of customers during the class period); *In re: Phillips Services Corp.*, 383 F. Supp. 2d 463, 467 (S.D.N.Y. 2004) (claims based upon "multiple violations" of GAAP); *In re: Microstrategy, Inc.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) (scienter pled by alleging the "pervasiveness and repetitiveness" of GAAP violations).

As the Report accurately notes, the scienter of an accountant can only be inferred when the accounting errors are widespread, significant, and egregious such that the audit is deemed to be "no audit at all."  (Report, p. 16 (quoting *In re: Worlds of Wonder*, 35 F.3d 1407, 1426 (9th Cir. 1994)).  This standard simply cannot be met when Plaintiffs only complain about one accounting error in an audit that encompassed hundreds of transactions.

The Report properly declined to conclude that a single GAAP violation satisfied the materiality requirement of widespread and significant, or that scienter could be inferred from such an isolated accounting error.

## C.  Plaintiffs Cannot Infer Scienter on the Part of CBN Based Upon Facts Unknown to CBN.

As noted above and in the Report, a complaint cannot infer fraudulent intent from accounting errors unless the accounting errors satisfy the materiality or magnitude requirements as set forth in Ninth Circuit cases.  In addition, a complaint must identify specific facts or "red flags" that provide a strong inference that the outside auditor acted with fraudulent intent. *DSAM*, 288 F.3d at 390; *Reiger*, 117 F. Supp. 2d at 1012; *see also* Report, pp. 16-17.

In the objection, as well as repeatedly in other pleadings filed in this matter, Plaintiffs attempt to identify as red flags various facts unknown to CBN.  For example, in the objection, Plaintiffs assert that CBN should have known that recognizing the funds from Natural Nano as revenue was improper because of suspicious warrants granted to Natural Nano at or around the

time of receipt of the funds from Natural Nano.  (Objection, pp. 3-4, 14, 15 and 16.)  Plaintiffs also argue that the alleged GAAP violation is material and fraudulent when viewed in the context of the Company's "statements about halloysite sales prospects in its press releases, SEC filings, and other public statements."  (*Id.*, p. 12.)  Plaintiffs further assert that red flags were present in connection with the purported GAAP violation because the Company represented that halloysite clay operations were "at the very core of Atlas' business."  (*Id.* at pp. 14-15.)

Nowhere, however, is there a single allegation in the Complaint that suggests that CBN had any knowledge of these facts.  The facts only show that CBN rendered an opinion concerning Atlas' financial statements.  No facts have been pled which demonstrate that CBN knew of or participated in any other representations made by the Company in its SEC filings or press releases.  Indeed, the financial statements for which CBN rendered an opinion do not even mention halloysite clay.  From the standpoint of CBN, as an auditor, the $250,000 received from Natural Nano was merely "one of the hundreds of line items encompassed by the audit." (Report, p. 13, n. 2.)  It defies common sense to suggest that the Complaint could demonstrate CBN's fraudulent intent by reference to facts of which CBN had no knowledge.

D.     **The Complaint's Allegations Do Not Exceed the Evidence of Fraud in *DSAM*.**

In the Report, the Magistrate relies upon the case of *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002), in concluding that the Complaint fails to adequately plead fraud.  Plaintiffs assert in their objection that *DSAM* is distinguishable because the Complaint's allegations of fraud exceed those in *DSAM*.  Plaintiffs assert that *DSAM* is distinguishable for two reasons.  First, Plaintiffs argue that unlike the present case, *DSAM* addresses numerous GAAP violations and the repeated failure to follow GAAP.  Second, Plaintiffs assert that unlike the present case, *DSAM* involved recognizing revenue in circumstances where there was significant uncertainty as to whether the company would get

paid.  These alleged distinctions, however, merely highlight and strengthen the soundness of the Report's conclusions.

As noted by the Report, GAAP violations cannot be used to infer scienter unless the violations are widespread and significant and material in light of the Company's overall financial condition.  Obviously, numerous and repeated GAAP violations will be far more likely to meet this standard than a single GAAP violation as is alleged in the present case.  In *DSAM*, the court held that the allegations of fraud were inadequate, despite the fact that the GAAP violations in that case were far more widespread and significant than in the present case.

In addition, as noted above, in assessing whether to infer scienter from a GAAP violation, a court is required to take into account whether the GAAP violations are minor or technical.  In the *DSAM* case, the company recognized revenue from numerous and repeated transactions for which it was never paid and for which there was significant uncertainty concerning whether it ever would get paid.  In contrast, in the present case the Company actually was paid by Natural Nano in the transaction which Plaintiffs argue constitutes improper revenue recognition in violation of GAAP.  Moreover, in its most recent public announcement, the Company takes the position that revenue should be recognized from this transaction, albeit in the year 2006 rather than in the year 2004 as originally was done.  In other words, in the present case the question is how to comply with technical accounting standards promulgated by the American Institute of Certified Public Accountants with respect to funds actually received from Natural Nano.  The alleged violation in the present case appears far closer to comprising a minor and technical accounting error than in *DSAM*.

In *DSAM*, the heart of plaintiffs' argument was that if the accountants had performed their job properly and reviewed all the relevant documents, they would have known of the company's accounting errors in wrongfully recognizing revenue.  The Ninth Circuit soundly

rejected such a theory as a means of inferring fraudulent intent to an outside auditor because a negligent—or even a grossly negligent—audit is not enough to infer fraudulent intent. *DSAM*, 288 F.3d at 387, 390.

In the present case, when the Complaint is examined carefully, it is clear that Plaintiffs rely on the same theory rejected in *DSAM*, although in a context far weaker than in *DSAM*. Specifically, Plaintiffs' position is that if CBN would have done its job properly, it would have discovered the single accounting error about which Plaintiffs complain. (*See* Complaint ¶¶ 154-55.) The Ninth Circuit has rejected this position, and this Court should do so as well.

**E.      The Court Should Not Permit Leave to Amend.**

In a cursory manner, Plaintiffs assert that if the Court finds the Complaint to be deficient, the Court should identify the deficiencies and afford the Plaintiffs opportunity to amend. Plaintiffs' position is not well taken.

The Report already describes the deficiencies in the Complaint.  At the heart of the Complaint's failings is the great difficulty in pleading a claim for accounting fraud based upon a single GAAP violation.  Case law provides that dismissal without leave to amend is proper when plaintiff "points to no additional facts that it might allege to cure . . . deficiencies" in the complaint. *Metzler v. Corinthian*, 540 F.3d 1049, 1072 (9th Cir. 2008).  In the objection, Plaintiffs describe in a very conclusory, general manner additional matters that could be addressed in an amended pleading, but fail to identify any specific facts that would cure the deficiencies in the Complaint.  As such, leave to amend should not be granted.

## CONCLUSION

For the reasons set forth above, the Court should adopt the Magistrate's recommendation and dismiss the Complaint, without leave to amend.

DATED this 31st day of July, 2009.

                                          KRUSE LANDA MAYCOCK & RICKS, LLC


                                          /s/Steven G. Loosle
                                          Steven G. Loosle
                                          *Attorneys for Chisholm, Bierwolf & Nilson LLC*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of July, 2009, I electronically filed the

foregoing **CBN'S RESPONSE TO LEAD PLAINTIFFS' OBJECTION TO REPORT AND**

**RECOMMENDATION** with the Clerk of the Court using the CM/ECF system which sent a

Notice of Electronic Filing to the following persons:

**Charles Matthew Andersen**
cma@winstoncashatt.com

**Thomas A. Banducci**
tbanducci@bwslawgroup.com,kgarcia@bwslawgroup.com,rsoni@bwslawgroup.com,lhar
ris@bwslawgroup.com,wwoodard@bwslawgroup.com,ssmith@bwslawgroup.com

**Courtney R Beaudoin**
crb@winstoncashatt.com

**Bruce S Bistline**
bbistline@gordonlawoffices.com

**Angelo J Calfo**
acalfo@yarmuth.com,srasmussen@yarmuth.com

**Katrina Carroll**
kcarroll@ldgrlaw.com

**Matthew A Carvalho**
mcarvalho@yarmuth.com,smeyer@yarmuth.com

**Joseph J. DePalma**
jdepalma@ldgrlaw.com

**William G Dryden**
wgd@elamburke.com,buff@elamburke.com

**W. Adam Duerk**
aduerk@bigskylawyers.com

**Philip Howard Gordon**
pgordon@gordonlawoffices.com,bbistline@gordonlawoffices.com

**Philip M Guess**
philg@klgates.com,rhonda.hinman@klgates.com,SEDocketing@klgates.com

**Lewis S Kahn**
lewis.kahn@kgscounsel.com

**Richard A Kirby**
richard.kirby@klgates.com

**Nathan M Longenecker**
longenecker@twhlaw.com,fisk@twhlaw.com

**Kim E Miller**
kim.miller@kgscounsel.com

**Ted C. Murdock**
tmurdock@hollandhart.com,jlcalhoun@hollandhart.com,
boiseintaketeam@hollandhart.com

**Bryan A Nickels**
ban@hallfarley.com,kat@hallfarley.com

**Laurence M. Rosen**
lrosen@rosenlegal.com

**Jennifer Sarnelli**
jsarnelli@ldgrlaw.com

**Kevin J Scanlan**
kjs@hallfarley.com,klm@hallfarley.com

**Jennifer F Sherrill**
jfs@federmanlaw.com

**B Newal Squyres**
nsquyres@hollandhart.com,sdalonzo@hollandhart.com,
boiseintaketeam@hollandhart.com

**Kim C Stanger**
kstanger@hawleytroxell.com,sclark@hawleytroxell.com

**Stephen R Thomas**
srt@moffatt.com,cld@moffatt.com,moffattthomas@hotmail.com,ecf@moffatt.com,
tmh@moffatt.com,sec@moffatt.com

**Thomas G Walker**
twalker@cosholaw.com,pcarson@cosholaw.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-

CM/ECF Registered Participants via first class mail, postage prepaid, addressed as follows:

Michael A. Swick
Kahn Gauthier Swick, LLC
12 East 41st Street, 12th Floor
New York, NY 10017

/s/Lynn Javadi

EXHIBIT A

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Out | ? Help

My Lexis™ \ Search \ Research Tasks \ Get a Document \ Shepard's® \ Alerts \ Total Litigator \ Transactional Advisor \ Counsel Selector \ Dossier | History

FOCUS™ Terms                    Search Within  Original Results (1 - 1)      Go ▶  Advanced...

Source: Legal > / ... / > § MI Federal District Courts ⓘ
Terms: number(06-10201)  (Edit Search | Suggest Terms for My Search)

*2007 U.S. Dist. LEXIS 13227, \**

J&R MARKETING, SEP, et al., Plaintiffs, v. GENERAL MOTORS CORPORATION, et al., Defendants.

Case No. 06-10201

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

2007 U.S. Dist. LEXIS 13227

February 27, 2007, Decided
February 27, 2007, Filed

**SUBSEQUENT HISTORY:** Affirmed by J&R Mktg., SEP v. GMC, 2008 U.S. App. LEXIS 4648 (6th Cir.) (6th Cir. Mich., 2008)

**CORE TERMS:** issuer's, financial information, credit rating, debt securities, misleading, disclose, disclosure, investor, offering, rating, misstatement, financing, Securities Act, cash flow, net income, misrepresentation, issuance, registration statement, downgrade, omission, material fact, immaterial, billion, duty to disclose, prospectus, senior, coupon rate, securities law, financial condition, financial statements

**COUNSEL:** **[\*1]** For J and R Marketing, SEP, Plaintiff: Jacob A. Goldberg, LEAD ATTORNEY, Faruqi & Faruqi, Elkins Park, PA; Stephen F. Wasinger ✓✓, LEAD ATTORNEY, Stephen F. Wasinger (Royal Oak), Royal Oak, MI.

For Alex Mager, Consolidated case 06-10727, Consol Plaintiff: Deborah R. Gross ▾, LEAD ATTORNEY, Philadelphia, PA; Stephen F. Wasinger ✓✓, LEAD ATTORNEY, Stephen F. Wasinger (Royal Oak), Royal Oak, MI.

For General Motors Corporation, General Motors Acceptance Corporation, Eric Feldstein, William F. Muir, Linda K. Zukauckas, Richard J.S. Clout, John E. Gibson, W. Allen Reed, Walter G. Borst, John M. Devine, Gary L. Cowger, G. Richard Wagoner, Jr., Defendants: Dennis M. Barnes ✓✓, LEAD ATTORNEY, Barris, Scott, Detroit, MI; Robert J. Kopecky ✓✓, LEAD ATTORNEY, Kirkland & Ellis (Chicago), Chicago, IL; Timothy A. Duffy ✓✓, LEAD ATTORNEY, Kirkland & Ellis (Chicago), Chicago, IL; Matthew R. Millikin ▾, Barris, Scott, (Detroit), Detroit, MI.

For ABN Amro Financial Services, Incorporated, A. G. Edwards and Sons, Incorporated, Charles Schwab and Company, Incorporated, Citigroup Global Markets, Incorporated, Edward D. Jones and Company, L. P., Fidelity Capital Markets, A Division of National Financial Services, **[\*2]** L. L. C., Merrill Lynch, Pierce, Fenner and Smith, Incorporated, Morgan Stanley and Company, Incorporated, UBS Financial Services, Incorporated, Wachovia Securities, Limited, Defendants: Jill M. Wheaton ✓✓, LEAD ATTORNEY, Dykema Gossett (Ann Arbor), Ann Arbor, MI; Thomas M. Schehr ▾, LEAD ATTORNEY, Dykema Gossett (Detroit), Detroit, MI.

For Milton Brafman, Michael A. Ramsay, Movants: Jacob A. Goldberg, LEAD ATTORNEY, Faruqi & Faruqi, Elkins Park, PA; Stephen F. Wasinger ✓✓, LEAD ATTORNEY, Stephen F. Wasinger (Royal Oak), Royal Oak, MI.

For Zielezienski, Movant: Stephen F. Wasinger ✓✓, LEAD ATTORNEY, Stephen F. Wasinger (Royal Oak), Royal Oak, MI.

**JUDGES:** Honorable Nancy G. Edmunds, United States District Judge.

**OPINION BY:** Nancy G. Edmunds

**OPINION**

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [41]**

Pending before this Court is Defendants' Motion to Dismiss, filed on September 26, 2006. Plaintiff J&R Marketing, SEP, Plaintiff Alex Mager, Plaintiff Milton Brafman, Plaintiff Michael Ramsay, and Plaintiff Stanley Zielezienski (collectively, "Plaintiffs") filed a class action lawsuit against Defendant General Motors Corp. ▾("GM"), Defendant General Motors ▾Acceptance Corp. ("GMAC"), and individuals **[\*3]** who are officers and directors of GMAC, [1] (collectively, "Defendants") claiming that Defendants violated federal securities law in making sales of certain GMAC debt securities to Plaintiffs between July 28, 2003 and November 9, 2005. [2] Plaintiffs allege that Defendant GMAC and the Individual Defendants violated §§ 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77l(a)(2), by making material misstatements as well as failing to disclose information in offering materials for the securities that Plaintiffs purchased. Plaintiffs also claim that Defendant GM and the Individual Defendants are liable as control persons of GMAC, pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o.

**FOOTNOTES**

1 These include Eric A. Feldstein, William F. Muer, Linda K. Zukauckas, Richard J.S. Clout, John E. Gibson, W. Allen Reed, Walter G. Borst, John M. Devine, Gary L. Cowger, and G. Richard Wagoner, Jr. (collectively, the "Individual Defendants").

2 Plaintiffs filed their Amended Complaint on July 28, 2006. (Docket No. 37.) Any citation to the "Complaint" in this Order refers to the Amended Complaint.

[*4]  In support of the instant motion to dismiss, Defendants assert that (1) Plaintiffs only have standing to sue based upon the registration statement for the particular debt issuance that they purchased shares in, (2) GMAC had no obligation to disclose information about its parent company, GM, in its offering materials, (3) any misstatements of GMAC financial results were either immaterial or did not affect decisions to downgrade GMAC's credit rating, so these could not have caused Plaintiffs' losses, (4) § 12(a)(2) does not apply because Defendants did not sell these securities directly to Plaintiffs, and (5) § 15 provides for derivative liability, so Plaintiffs have no claim here once their §§ 11 and 12(a)(2) claims are dismissed. For the reasons set forth below, the Court GRANTS Defendants' motion to dismiss, and this case is DISMISSED.

**I. FACTS**

Defendant GMAC is a company in the financial services industry that provides a wide range of financing products, including "financing wholesale and retail automobile purchases for GM dealers and customers, mortgage lending, and commercial and consumer insurance and banking services." (Defs.' Mot. to Dismiss at 2 (hereinafter,  [*5]  "Defs.' Mot.").) At all times relevant to this lawsuit, GMAC was a wholly-owned subsidiary of Defendant GM. 3 (Id. n.2.) The Individual Defendants all are officers and/or directors of GMAC, and signed various registration statements on its behalf for the debt securities issuances that are at issue in this lawsuit. Of the ten Individual Defendants, six are also senior executives of GM. (Pls.' Resp. at 1-2.)

**FOOTNOTES**

3 GM is in the process of completing a transaction that will result in private investors purchasing a 51% interest in GMAC. As Defendants note in their motion to dismiss, however, this transaction is immaterial to the instant lawsuit.

Among other financing sources, GMAC issues debt securities like those that Plaintiffs purchased to fund its lending business. In general, debt securities, or bonds, have a fixed coupon rate of interest that is set prior to issuance. This gives the security's owner a right to receive periodic interest payments at the coupon rate throughout the life of the security, with the  [*6]  return of principal at its maturity date. (Compl. P 31.) Although the face value or "par value" of a debt security is the amount that an initial purchaser pays for it, there is often a secondary market for such securities, so that their price (and the associated yield) will fluctuate in the future based upon the market's perception of the issuer's default risk. (Id. at PP 32-33.) A security's yield reflects the individual issuer's likelihood of not being able to cover its obligations, also known as its default risk. The yield is calculated in reference to risk-free securities, thus allowing investors to value a security that is being traded in a secondary market. 4 (Id. at PP 34-36.)

**FOOTNOTES**

4 As Defendants note in their motion to dismiss, assume that a company issues individual units of a debt security with a $ 1,000 par value and a 6% coupon rate, payable annually. The initial purchaser would pay $ 1,000 for each unit, and would receive $ 60 per year in interest. The initial yield of 6% ($ 60/ $ 1,000) would equal the coupon rate. Now assume, however, that the issuer's financial condition worsens, or general market factors become less favorable, and the yield increases to 6.67% to compensate for the issuer's increased default risk. Since the interest payment of $ 60 is fixed, the new price for the security would be $ 60/6.67%, or $ 900. Conversely, if the yield decreases to 5.45%, the price would increase to $ 1,100 ($ 60/5.45%). (Defs.' Mot. at 3 n.3.) Thus, as an issuer's default risk rises, so does the yield on its debt securities, causing a corresponding decrease in the securities' value.

[*7]  One way to assess the default risk of a particular security is reviewing publications of various credit rating agencies. These agencies issue recommendations that are based upon investigative underwriting of a particular issuer's credit quality. (Defs.' Mot. at 3.) GMAC's debt securities are rated by such agencies, which include Standard & Poors ("S&P"), Fitch Ratings, Inc. ("Fitch") and Moody's Investor Services, Inc. ("Moody's"). (Defs.' Mot. at 3; Compl. P 40.) By influencing an issuer's yield in the market, credit ratings affect both the coupon rate that an issuer has to offer in order to sell its debt securities in the initial offering, as well as the future prices of the securities in secondary markets. In general, the lower an issuer's credit rating, the higher coupon rate it must offer, (Compl. P 38) so it is in an issuer's best interest to minimize its borrowing costs by maintaining a higher credit rating. (Compl. P 4.)

GMAC's fiscal year ("FY") 2002 10-K report, and many of its other SEC filings, recognized the relationship between credit ratings and coupon rates for its debt securities, and noted that its own credit ratings could be affected by "cash flow and financial  [*8]  resource concerns at the Company's parent, General Motors. " (Compl. PP 20, 41.) The tie to GM affects GMAC in two main ways: (1) GMAC's primary source of revenues is financing GM car dealers' purchases of new vehicles, so a sales decline or other operational difficulties at GM could reduce financing revenues at GMAC, and (2) as 100% owner of GMAC, GM could elect to take a cash dividend, which would reduce GMAC's cash flow position. (Compl. P 46.)

Of particular importance to debt security investors is an issuer's equity cushion, which represents the difference between the value of a company's assets and its debt. (Compl. P 37; Defs.' Mot. at 6 n.4.) This is because debt holders typically hold a more senior position than equity holders if a company is unable to meet all of its payment obligations. Thus, in theory, all of a company's equity value would have to be eroded before debt holders' principal would be at risk. Therefore, a larger equity surplus will result in higher credit ratings for an issuer's debt securities because of the reduced risk of the company being unable to meet its debt obligations. Although primarily affected by the value of a company's assets and its liabilities,  [*9]  the equity cushion also incorporates the company's cash flows from operations, as those are an issuer's primary source of debt repayment.

Plaintiffs purchased varying amounts of GMAC debt securities between March 2004 and March 2005 from a single issuance referred to as the "Second SmartNotes." (Defs.' Mot. at 5.) The registration statement for this offering was filed on September 30, 2003, and was a shelf registration, which allowed GMAC to sell the securities over a period of time rather than all at once. (Id. at 4-5.) As this case was brought as a class action, the Complaint lists a total of eleven separate debt issuances whose registration statements contained

the allegedly misleading or false information, including the Second SmartNotes issuance that the named plaintiffs purchased securities from. The period of purchases for the alleged class plaintiffs as a whole is from July 28, 2003 to November 9, 2005.

Both parties admit that GMAC disclosed its heavy reliance on GM for financing business, as well as the concomitant impact that GM's own performance and credit rating would have upon GMAC's credit rating. (Defs.' Mot. At 6; Compl. P 6.) While the Second SmartNotes offering **[*10]** materials referred to GMAC's other SEC filings, no reference was made to GM's public reports or financial information.

Plaintiffs claim that GM's misrepresentation of its own financial information caused that entity's credit rating to fall, which lowered GMAC's credit rating, causing the yield on GMAC's debt securities to rise, and, finally, lowering the effective market price of GMAC's debt securities which had already been issued. Plaintiffs also argue that GMAC's failure to disclose this information allowed it to maintain a higher credit rating than it otherwise would have while the securities at issue were sold, effectively lowering the coupon rate that had to be offered on the securities from the outset.

Specifically, Plaintiffs claim that GMAC failed to disclose the following information about GM: (1) that actual operating cash flows were overstated by (a) $ 4.4 billion in fiscal year FY 2002 and $ 4.6 billion in FY 2003, [5] (b) $ 6.8 billion for the first six months of FY 2004, [n6] and (c) GM reduced its projected FY 2005 operating cash flows by $ 4 billion, from a $ 2 billion surplus to a $ 2 billion deficit, [7] (Compl. PP 69-73) (2) that GM's guarantee of Delphi's pension **[*11]** liabilities could be up to $ 12 billion, [8] (Id. at P 85), and (3) credits from suppliers were misapplied that resulted in GM's FY 2001 net income being $ 300-400 million (50-75%) over actual levels, had the credits been reported properly. [9] (Id. P 91.)

**FOOTNOTES**

[5] Both disclosed March 16, 2005 in GM's FY 2004 10-K.

**FOOTNOTES**

[7] Disclosed in March 2005.

[8] Disclosed October 8, 2005, after Delphi filed for bankruptcy.

[9] Disclosed November 9, 2005 in GM's Form 8-K filing with the SEC.

As to GMAC's own results, Plaintiffs assert that it misstated financial information in each of its three quarterly reports during FY 2004 as follows: [10] (1) restated net revenues decreased by $ 26 million (0.5%), $ 12 million (0.2%) and $ 41 million (0.8%) for the first ("1Q"), second ("2Q") and third quarters ("3Q"), respectively, and (2) restated net income decreased by $ 22 million (2.8%), $ 14 million (1.6%) and $ 36 million (5.5%) for the same respective **[*12]** periods. (Id. P 96.)

**FOOTNOTES**

[10] All disclosed March 14, 2005 in GMAC's Form 8-K filing with the SEC.

During this time, GMAC and GM's credit ratings were both downgraded on several occasions.

## II. STANDARD OF REVIEW – MOTION TO DISMISS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a Complaint. In a light most favorable to Plaintiff, the court must assume that Plaintiff's factual allegations are true and determine whether the Complaint states a valid claim for relief. See Albright v. Oliver, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994); Bower v. Federal Express Corp., 96 F.3d 200, 203 (6th Cir. 1996); Forest v. United States Postal Serv., 97 F.3d 137, 139 (6th Cir. 1996).

This standard of review "requires more than the bare assertion of legal conclusions.'" In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997) (quoting Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995)). **[*13]** The Complaint must include direct or indirect allegations "respecting all the material elements to sustain a recovery under some viable legal theory." See In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir. 1993) (citations omitted). A court should not grant a 12 (b)(6) motion unless the movant shows "beyond doubt that the plaintiff can prove no set of facts in support of his claim." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

## III. ANALYSIS

### A. Standing Under 11 and 12(a)(2) of the Securities Act

Plaintiffs claim that Defendant GMAC and the Individual Defendants violated § 11, which provides, in relevant part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may, either at law or in equity, in any court of competent jurisdiction, sue--

(1) every person who signed the registration statement;

(2) every person who was a director of . . . the issuer **[*14]** at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

15 U.S.C. § 77k(a). Plaintiffs also assert a violation of § 12(a)(2):

> [Any person who] offers or sells a security . . ., by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . ., shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction . . . .

15 U.S.C. § 77l(a)(2).

Defendants' standing argument focuses on the fact that courts have interpreted the provisions of §§ 11 and 12(a)(2) to limit standing to those individuals who actually purchased securities that were related to the *particular* registration statement or prospectus that contained a misleading statement of fact or omission. *See Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005) (limiting "putative [§ 11] plaintiffs [*15] to the 'narrow class of persons' consisting of 'those who purchase securities that are the direct subject of the prospectus and registration statement.") (quoting *Barnes v. Osofsky*, 373 F.2d 269, 273 (2nd Cir. 1967)); *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 344 (2nd Cir. 1987) (same result under § 12(a)). Therefore, Defendants assert that Plaintiffs only have standing to sue for misstatements or omissions contained in the registration statement and prospectus for the Second SecuredNotes, and not the additional ten issuances listed in the Complaint, as Plaintiffs admit that they only purchased securities from the Second SecuredNotes issuance.

In response, Plaintiffs cite a plethora of cases to support their position that the instant situation should be viewed differently because it is a potential class action. Plaintiffs argue that all named plaintiffs need not have purchased securities from each of the offerings that were affected by the same misrepresentation or omission in order to assert the rights of putative class members who may have actually purchased securities in those other offerings. (Pls.' Resp. at 27-28.) A review of these cases [*16] discloses, however, that two did not even involve securities law, and others focused on issues of a class representative's ability to adequately represent other members of the class, rather than the threshold standing issue before this Court. [11] Finally, Plaintiffs' argument that *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d. 477, 497 (S.D.N.Y. 2004) supports its position is expressly refuted by a later part of that opinion confirming that, in a securities case, "the selection of lead plaintiffs does not remove the basic requirement that at least one *named* plaintiff must have standing to pursue each claim alleged." *Id.* at 496 (emphasis in original).

**FOOTNOTES**

[11] Although Plaintiffs placed heavy reliance on *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 421-24 (6th Cir. 1998) at oral argument, that case is inapplicable here because it only discussed Article III standing and certification of a class action under Rule 23 of the Federal Rules of Civil Procedure. Nothing in *Fallick* addressed the issue at bar here, namely, whether Plaintiffs have *statutory standing under the Securities Act*.

[*17] The Court finds that the relevant issue was squarely addressed in *Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 891-92 (N.D. Ill. 2004):

> Plaintiffs lack standing to sue on their own behalf with respect to the 3/12/02 and 5/21/02 Offerings since they never purchased any securities in those offerings. [The named *Ong* plaintiffs only purchased securities in the 6/21/02 offering.] *The fact that they have filed a class action lawsuit that includes putative class members who did purchase the relevant securities does not confer the necessary standing in this case because none of those putative class members is a named plaintiff.* Thus, Plaintiffs' claims with respect to the 3/12/02 and 5/21/02 Offerings are dismissed without prejudice to their naming additional plaintiffs with the requisite standing.

(citations omitted, emphasis and explanatory text added). The Complaint here suffers from the same deficiency, in that the named Plaintiffs only purchased securities from the Second SmartNotes offering. The fact that Plaintiffs assert that Defendants "engaged in a common course of wrongful conduct that injured Plaintiffs and other members of the putative [*18] class in a substantially similar manner" (Pls.' Resp. at 29) is insufficient to create standing in light of clear statutory language and legal precedent to the contrary. Defendants' motion is GRANTED with regards to Plaintiffs' claims relating to the other ten offerings besides the Second SmartNotes, and these claims are DISMISSED for lack of standing.

**B. Misrepresentation or Omission of Material Facts--§§ 11 and 12(a)(2)**

As noted above, §§ 11 and 12(a)(2) prohibit an issuer from affirmatively misstating or omitting a material fact related to a particular issuance of securities. [12] In order to be actionable under either section of the Securities Act, any omitted material fact must have been required to be disclosed under the law, or disclosure would have been made necessary in order to ensure that other statements in the filing were not misleading. Plaintiffs claim that Defendant GMAC and the Individual Defendants violated §§ 11 and 12(a)(2) by both (1) omitting certain GM financial information in GMAC's filings, [13] and (2) misstating GMAC's financial information in those same filings. Both parties recognize that a defendant has virtually strict liability for any misrepresentations [*19] or omissions under §§ 11 and 12(a)(2).

**FOOTNOTES**

[12] These provisions prohibit essentially the same conduct, except that § 11 governs registration statements, while § 12(a)(2) covers statements made in a prospectus.

[13] Namely, that (1) GM's cash flows from operations were overstated from 2003 to 2005, (2) its pension obligations to Delphi could be as high as $ 12 billion, and (3) GM improperly booked supplier credits, resulting in 2001 net income being overstated.

**1. Failure to disclose GM's financial information**

Defendants argue that Plaintiffs have failed to state a claim under §§ 11 and 12(a)(2) for GMAC's omission of GM's financial information from its SEC filings because (1) GMAC was not required to disclose financial information about its parent company, and

(2) failure to disclose GM's financial information did not make any of GMAC's other statements misleading. Defendants do not dispute Plaintiffs' assertion that the GM financial information at issue was material. Although Plaintiffs Response **[\*20]** to Defendants' Motion to Dismiss treats both of these issues in one section, they are separate avenues to liability under the Securities Act, so the Court will address them in turn. The issue of a wholly-owned subsidiary's duty to disclose financial information of its parent company is apparently an issue of first impression.

**a. GMAC had no duty to disclose GM's financial information**

The Sixth Circuit has indicated that a duty to disclose could arise in situations where (1) insider trading is involved, (2) a statute or regulation mandates disclosure, or (3) disclosure is necessary to correct an otherwise misleading statement. [14] *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (citing *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n.10 (3rd Cir. 2004)). The duty that applies in any case is dependant upon the particular facts and circumstances involved, as some courts have recognized that this is not an exhaustive list. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202 n.3 (1st Cir. 1996). Although a key purpose of the securities laws is encouraging disclosure, it is nevertheless **[\*21]** important to place reasonable limits on what must be disclosed, as a disclosure regime that is too expansive would simply "'deluge investors with marginally useful information.'" *City of Monroe*, 399 F.3d at 669 (quoting *In re Sofamor Danek Group*, 123 F.3d at 403).

**FOOTNOTES**

[14] Despite Plaintiffs' assertion that this case is analogous to insider trading, they offer no legal support for that proposition. (Pls.' Resp. At 17-18.) Thus, only the latter two situations are applicable here.

Generally, in the absence of any SEC regulation or legal authority requiring that an issuer disclose certain information, there is no duty to do so under §§ 11 or 12(a)(2). *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249 (S.D.N.Y. 2003). Plaintiffs have not cited any portion of the applicable SEC regulations that cover required disclosures, Regulation S-K, 17 C.F.R. § 229.10, et seq., that would support a duty to disclose **[\*22]** a parent company's financial information. [15] On the other hand, Defendants note that 17 C.F.R. § 229.101(c)(1)(vii) mandates that an issuer disclose the identity of certain major customers, but stops short of requiring that any financial information about those customers be disclosed. Defendants argue that they met this requirement by disclosing GMAC's reliance upon GM as a key revenue source, and further argue that since nothing in Regulation S-K requires actual disclosure of an outside entity's financial statements, this indicates that Defendants met their duty here.

**FOOTNOTES**

[15] Plaintiffs do make a general citation to 17 C.F.R. § 229.303, and quote part of the instructions to paragraph 303(a) to argue that GM-specific information should be included as "other statistical data that the registrant believes will enhance a reader's understanding of its financial condition." Nothing in this regulation can be read to specifically create a duty upon GMAC to disclose its parent's information, however, as a review of the surrounding text confirms that this particular provision is discussing the *registrant's* financial condition.

**[\*23]** In terms of case law citations, Plaintiffs' authority involves situations where the defendant misrepresented a material fact by not adequately explaining statements that were made in its SEC filings. Put another way, Plaintiffs' cases on this point more appropriately address the question addressed in the next subsection--whether GMAC's non-disclosure of GM financial results made its other statements misleading. Therefore, Plaintiffs have not stated any regulatory or judicial authority specifically supporting their proposed duty to disclose. [16]

**FOOTNOTES**

[16] Still, Defendants admit that the securities laws mandate disclosure of firm-specific information that is peculiarly within the knowledge of a corporation. (Defs.' Mot. at 15.) See *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989); *Epstein v. Washington Energy Co.*, No. C94-245D, 1994 WL 561075 at \*4 (W.D. Wash. July 25, 2004), *aff'd*, 83 F.3d 1136 (9th Cir. 1996). In disputing that these conditions are not met with regards to GM's financial information, Defendants assert that this information is non-firm-specific as to GMAC, and that it was "peculiarly within the knowledge of GM, not GMAC." (Defs.' Mot. At 15, emphasis removed.) This position completely disregards the fact that at least six of GMAC's senior executives and directors were also high-ranking officers of GM, and presumably had access to financial information about that entity. Therefore, it is not beyond peradventure that at least some of GMAC's senior officers had knowledge of GM's financial information.

Even if the overlap in senior executives between GMAC and GM meant that GM's financial information was known to GMAC, however, Plaintiffs' theory of liability still contains a disconnect in its attempt to show that GM financial information was firm-specific to GMAC. Despite the corporate parent-subsidiary relationship here, it is a stretch of the common meaning of the term "firm-specific information" to claim that this would include financial information about a related company that is in a completely different line of business from GMAC in most respects. To hold that firm-specific information also comprises that of other affiliated entities would dramatically enlarge the scope of required disclosures under federal securities law, and this would not comport with the general focus of Regulation S-K, which is on the *registrant* itself, not all of its corporate affiliates.

**[\*24]** In conclusion, Plaintiffs have not introduced regulatory or judicial authority that indicates that they have a viable claim under §§ 11 and 12(a)(2) for Defendants' failure to uphold a duty of disclosure, under what appears to be a novel theory for attaching liability. Plaintiffs repeatedly assert the position that because the GM financial information was likely within the knowledge of several of GMAC's senior executives, that this should support a duty to disclose. The significant number of interlocking officers and directors between GMAC and GM, as well as the strong correlation between each others' credit ratings, provide a unique situation that might support an expansion of existing disclosure duties on these facts. Since Plaintiffs are claiming liability under §§ 11 and 12(a)(2), which essentially impose strict liability upon issuers for material misstatements or omissions, however, some legal authority beyond mere assertions that a duty should lie is crucial here. At bottom, Plaintiffs have not shown that they have a claim based upon Defendants' affirmative duty to disclose under §§ 11 and 12(a)(2).

**b. Failure to Disclose GM's financial information did not make GMAC's statements [*25] misleading**

In the alternative, Plaintiffs assert that Defendants were obligated to disclose GM's financial information in order to make other statements in GMAC's SEC filings not misleading. Defendants contend that any GM-related statements made in their filings simply referred to the correlation between GM's financial condition and that of GMAC, and never indicated that GMAC was somehow warranting GM's financial statements.

As noted previously, Plaintiffs cite a number of misrepresentation cases to confirm that subsidiary relationships can impose disclosure requirements under certain circumstances, and that issuing companies may need to disclose additional information that they know of in order to make other statements not misleading. *See City of Monroe*, 399 F.3d at 672 (holding that a reasonable jury could find that subsidiary-Firestone 's statement that "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires," could be seen as misleading given that Firestone did not disclose other data that cut the other way); *In re F & M Distribs. Sec. Litig.*, 937 F. Supp. 647, 653-54 (E.D. Mich. 1996) [*26] (Cook, C.J.) (finding that the plaintiffs stated a valid claim for relief by alleging that the defendant's statement that profitable "'deal' buying" opportunities would continue was misleading in light of the fact that the defendant did not disclose known information that such buying opportunities were, in fact, decreasing at the time the statement was made).

These cases, along with others that Plaintiffs cite, confirm that the proper focus rests on the *particular* statements that GMAC made related to GM, and whether those statements could be made misleading without specific disclosure of GM's accounting misstatements. Plaintiffs' Complaint lists the following statements that GMAC made concerning GM (any emphases removed from originals):

As the financing of GM manufactured vehicles comprises a substantial portion of [GMAC's] financing operations, any protracted reduction or suspension of GM's production or sales resulting from a decline in demand, work stoppage, governmental action, adverse publicity or other event could have a substantial unfavorable effect on [GMAC's] results of operations.

(Compl. P 46 (quoting GMAC's FY 2002 10-K).)

S&P indicated [*27] that the downgrade [in GMAC's credit rating during October 2002] was driven by cash flow and financial resource concerns at the Company's parent, General Motors.

(*Id.* P 47 (quoting GMAC's FY 2002 10-K).)

The downgrade of GMAC's ratings reflect the substantial linkages that exist between it and GM. These ties are both operational and financial. GMAC provides financing for GM dealers and their customers, and the quality of its portfolio is influenced by its parent. . . . Therefore, GMAC's ratings are tied to its parent's. GMAC's ratings were downgraded as a result of the downgrades of GM's obligations.

(*Id.* P 48 (quoting GMAC's June 13, 2003 Form 8-K).)

In April 2003, [S&P] lowered its debt rating outlook on GMAC to negative from stable. S&P indicated that the change in rating outlook was caused by concerns with how GM will fund its multibillion-dollar pension and retiree health care liabilities. . . . [Another bond rating agency] downgraded GMAC's senior debt from A to A(low), citing concerns with GM's profitability and financial profile.

(*Id.* P 56 (quoting GMAC's 1Q 2003 10-Q).)

[o]ur credit ratings are an assessment [*28] of our ability to pay our obligations. Consequently, real or anticipated changes in our credit ratings will generally affect the market value of your notes.

(*Id.* P 58 (quoting the Second SmartNotes Prospectus).)

While GMAC's asset levels remain at record highs, the Company, beginning in the third quarter of 2003, has benefitted from a significant reduction in unsecured borrowing spreads consistent with the overall improvement in the capital markets and GM as an issuer, in particular. The outlook for GM improved partially due to the significant progress made in funding GM's pension and postretirement obligations.

(*Id.* P 62 (quoting GMAC's FY 2003 10-K).)

One of the most important aspects of GMAC's Financing operations is supporting the sale of GM vehicles through "wholesale" or "floor plan" financing, primarily to finance purchases by dealers of new and used vehicles manufactured or distributed by General Motors . . .

(*Id.* P 75 (quoting GMAC's FY 2003 10-K).)

[Moody's Spring 2005] downgrade of GMAC's ratings reflects the significant business and financial ties between GM and GMAC that influence GMAC's auto finance operations [*29] -- its origination volumes, asset mix, and asset quality -- and its capitalization.

(*Id.* P 103 (quoting GMAC's April 6, 2005 Form 8-K).)

During 2004 and the first quarter of 2005, the Company continued to experience volatile unsecured credit spreads caused by negative credit rating agency actions related to the financial outlook of GM, its overall market position in the automotive industry and its burdensome health care obligations.

(*Id.* P 106 (quoting GMAC's 1Q 2005 10-Q).)

Moody's Investors Service is reviewing for possible downgrade [several credit ratings of GM and GMAC]. Moody's said that the review is prompted by its concern that escalating incentives, shifting customer preference to more fuel efficient vehicles, and long-term pressure on GM's US market share will make it increasingly difficult for the company to deliver credit metrics that are consistent with [GM's current rating] by year end 2007.

* * *

Moody's is also reviewing GMAC's ratings for possible downgrade, reflecting concerns at the GM level. Significant business and financial ties between GM and GMAC link GMAC's ratings to those of its parent.

(*Id.* P **[*30]** 108 (quoting a July 7, 2005 GM and GMAC press release).)

[GMAC's credit rating downgrades during 2005] were a continuation of credit rating actions over the past few years caused by concerns as to the financial outlook of GM, including its overall market position in the automotive industry and its burdensome health care obligations, as well as the uncertainty surrounding the auto parts supplier Delphi and its impact on GM's financial condition. As a result of these ratings actions, our unsecured credit spreads widened to unprecedented levels in 2005.

(*Id.* P 111 (quoting GMAC's FY 2005 10-K).)

While large in number, these disclosures are consistent in one particular respect--they simply refer to the ties between GMAC and its parent, GM, and disclose general risks in the latter's business that could affect GMAC's credit ratings. To be sure, GMAC's statements identify the importance of cash flow, the potential Delphi pension liability and GM's operating profitability as specific factors that could affect the credit ratings of both entities. Still, GMAC's disclosures are devoid of any further comment or representation as to the accuracy, validity, or even the amount, **[*31]** of any of these figures.

As the *City of Monroe* and *In re F&M* cases demonstrate, in order to maintain a claim for omission of a fact that would make other statements not misleading, any undisclosed information must relate to a particular disclosure that the defendant made. In *City of Monroe*, the specific statement from defendant Firestone that "objective data clearly reinforce[d]" the company's position that its tires were safe was rendered misleading by the omission of known studies that came to the opposite conclusion. Similarly, in *In re F&M*, the defendant took it upon itself to tout the company's ability to "'deal' buy" as a competitive advantage in the marketplace. The court held that a failure to disclose internal knowledge that market factors would make deal buying more difficult in the future meant that a reasonable jury could find the first statement to be misleading without giving investors the true picture by also disclosing the second.

Defendants cite an additional case that further elucidates the point in the context of alleged non-disclosure of financial information. *See In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) **[*32]** (holding that UBS, a third-party underwriter that issued securities whose value depended entirely on the financial fortunes of WorldCom, was not liable for WorldCom's misstatements of its financial results because UBS never represented the accuracy of those financial statements). The instant case is somewhat distinct from *WorldCom*, given the close ties between GMAC and GM that were not present in the arms' length relationship between UBS and WorldCom, but the main point regarding this issue of liability under §§ 11 and 12(a)(2) remains applicable.

To be clear, this particular avenue of §§ 11 and 12(a)(2) liability is markedly different from that discussed in the preceding subsection, where an issuer has an automatic duty of disclosure. Here, an issuer need not disclose adverse information that it is aware of *so long as it never raises a potentially misleading topic in the first place.* Therefore, since none of GMAC's statements included in the Complaint evince any intent to warrant GM's financial statements, or any particular figures within them, Plaintiffs have failed to state a claim for which relief can be granted under this alternative ground for non-disclosure liability **[*33]** under §§ 11 and 12(a)(2).

Accordingly, Defendants' motion to dismiss is GRANTED with regards to GMAC's non-disclosure of GM financial information concerning that entity's cash flows, its Delphi pension liability, and supplier credits.

## 2. Misrepresentation of GMAC's financial information

Turning from GMAC's non-disclosure of GM's financial information, Plaintiffs claim that Defendant GMAC and the Individual Defendants are also liable under §§ 11 and 12(a)(2) for misrepresenting GMAC's own revenues and net income during FY 2004. In response, Defendants contend that (1) these misstatements were not actionable because they were not material, and (2) the misstatements did not cause Plaintiffs' losses because any downgrades to GMAC's credit ratings were based solely upon GM's financial troubles.

As noted previously, GMAC admits that it misrepresented its FY 2004 financial results as follows: (1) once restated, net revenues decreased by $ 26 million (0.5%), $ 12 million (0.2%) and $ 41 million (0.8%) for 1Q, 2Q and 3Q, respectively, and (2) restated net income decreased by $ 22 million (2.8%), $ 14 million (1.6%) and $ 36 million (5.5%) for the same respective periods. (Compl. P **[*34]** 96.) Simply because a fact is misstated does not lead to a violation of §§ 11 and 12(a)(2), however, as the Supreme Court has explained that such statements are only actionable if the plaintiff can "show that the statements were *misleading as to a material fact*. *Basic, Inc. v. Levinson*, 485 U.S. 224, 238, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) (emphasis in original). A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1987)). Since materiality is an objective standard, this usually raises a disputed issue of fact that would render dismissal as a matter of law inappropriate. The Sixth Circuit, along with a number of its sister circuits, however, have recognized that this issue can be decided on a motion to dismiss. *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 608-09 (6th Cir. 2005). *See also Greenhouse v. MCG Capital Group*, 392 F.3d 650, 657 (4th Cir. 2005) **[*35]** (collecting cases from the Third and Fourth Circuits); *DeMaria v. Andersen*, 318 F.3d 170, 182 (2nd Cir. 2003); *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997).

In framing the relative importance of the particular figures that GMAC misrepresented to a debt securities investor, Defendants assert that such investors are typically focused more on the issuer's cash flow rather than income statement items such as revenues or net

income. This contrasts with a situation involving an equity investor, where otherwise small adjustments to these categories might be material due to their importance in valuing the issuer's equity securities. As noted by the Second Circuit in a case involving a company inflating its net income figures:

> [This] would be relevant to purchasers and holders of equity securities interested in earnings per share and price/earnings ratios, but [] would be less relevant to sophisticated purchasers of privately-placed debt securities.

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 231 (2nd Cir. 2000). **[*36]** Similarly, the Third Circuit has stated:

> The market price of [a] bond, assuming the issuer is solvent, will be primarily a function of the market interest rate. A prospectus containing representations about earnings potential which might be of material interest to a stockholder would, in all likelihood, be of no interest to the bondholder. This is because the bondholder will be paid his principal and interest regardless, and the market price of his security will be determined by factors external to the corporation's earnings.

*Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234, 1237 (3rd Cir. 1976).

Plaintiffs are correct in noting that the *Kusner* court was not directly addressing the issue of materiality that is at bar here. In addition, that court's discussion involved an example designed to differentiate the convertible debt securities at issue in that case with traditional bonds that are not convertible into equity, such as those that GMAC issued. Furthermore, Plaintiffs assert that *AUSA Life Insurance* is also distinguishable, because the district court below based its finding on expert testimony that had been presented, while no expert **[*37]** testimony is on the record here.

Regardless of the specific scenario in which the Second and Third Circuits made these observations, the main point about the general information of interest to investors in two distinct classes of securities remains applicable. Additionally, the basic valuation methodologies for equity and debt securities (i.e. that equity securities derive their value primarily from the issuer's future earnings potential, but debt securities depend on an issuer's credit rating and market interest rates) are not something that necessitates expert testimony in each case. Even the Complaint recognizes that "[a] critical component to any assessment of a debt security's yield [and therefore, its value,] is the credit quality of the issuer. The credit quality of an issuer is based, in large part, on the difference between the market value of its assets and its debt -- sometimes described as the 'equity cushion.'" (Compl. PP 36-37.) [17]

**FOOTNOTES**

17 Income figures would certainly affect an issuer's equity cushion in some manner, but they would not be a "critical component" or "large part" of this metric.

**[*38]** Numerous courts have found that certain percentage changes to a company's reported financial statements were immaterial as a matter of law. *See Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2002) (holding that a $ 2.3 million restatement amounting to a 1.1% reduction in quarterly revenues and 14.6% decline in quarterly net income was immaterial to equity investors); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir. 1996) (finding that a quarter-to-quarter change in the defendant's backlog was immaterial to investors in a mixed debt and equity offering because the change only constituted 3% of quarterly revenues); *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 594 (N.D. Tex. 2004) (holding that a 1.5% reduction in quarterly revenues was immaterial to equity investors).

In response, Plaintiffs make a gross misrepresentation of their own when they assert "[a] restatement of financial results raises *a presumption* of both falsity and materiality for pleading purposes." (Pls.' Resp. at 19, emphasis in original) (citing *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005)). A review of that **[*39]** case, made more difficult by Plaintiffs' failure to include a pin cite, indicates that the court was only discussing the question of whether an alleged statement was "false and misleading," and not whether it was material. *Id.* The court did discuss "material accounting errors," but made no mention of the materiality standard covered in *Basic* and at issue here.

Plaintiffs also argue that because Generally Accepted Accounting Principles, and specifically, P 38 of Accounting Principles Board Opinion 20, (Defs.' Mot., Ex. E) require restatement of a material error in a company's financial statements, that this is sufficient to make GMAC's misrepresentations material here. Essentially, Plaintiffs argue that, because GMAC restated revenues and net income, those changes must have been material. While these changes may have been material from an *accounting* perspective, Plaintiffs' brief is bereft of any *legal* authority to support its attempted alchemy of transforming an accounting standard into a principle of federal securities law, so this argument is without merit.

Under the reasoning of the applicable cases already mentioned, GMAC's misrepresentations relating to its quarterly **[*40]** revenue figures were immaterial as a matter of law, as none of them exceeded 0.8%. While the discrepancies in GMAC's net income numbers for these periods were off by as much as 5.5%, which would arguably be material to an equity investor, the fact that Plaintiffs in this action invested in debt securities convinces the Court that these misstatements would not be material to a reasonable investor in Plaintiffs' position. Therefore, GMAC's motion to dismiss is GRANTED as to Plaintiffs' §§ 11 and 12(a)(2) claims that are based upon GMAC's misstatement of its own FY 2004 financial results. [18]

**FOOTNOTES**

18 As a misstatement is not actionable once it is immaterial, the Court need not address Defendants' alternative argument that the GMAC misrepresentations did not cause Plaintiffs' losses.

**C. Whether Defendants Were Statutory Sellers of the Second SmartNotes**

In their motion to dismiss, Defendants assert that Defendant GMAC and the Individual Defendants were also not liable under § 12(a) (2) because they were not "sellers, **[*41]** " as defined by the Securities Act, due to the fact that the securities at issue were sold through firm commitment underwritings. Although this alternative defense is irrelevant now that the Court has dismissed Plaintiffs' §§

11 and 12(a)(2) claims on the merits, Defendants admit in their Reply Brief that some of the debt securities issuances listed in the Complaint, including the Second SmartNotes, were, in fact, sold directly to the initial purchasers. (Defs.' Reply at 14 n.6.) This means that Defendants were statutory sellers of the relevant securities, so their argument is without merit anyway after this admission.

**D. Control Person Liability Under § 15 of the Securities Act**

Plaintiffs final claim, against Defendant GM and the Individual Defendants, is for control person liability under § 15. Both parties' briefs in this matter note that a § 15 claim is wholly derivative of a defendant's primary liability under §§ 11 or 12(a)(2), and that if no other Securities Act claim exists under either of these sections, then the § 15 claim fails automatically as a matter of law. As the Court has determined that Plaintiffs have not stated valid §§ 11 and 12(a)(2) claims, their § 15 **[*42]** claim must also be DISMISSED.

**IV. CONCLUSION**

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows: Defendants' motion to dismiss is GRANTED and this case is DISMISSED.

SO ORDERED.

s/ Nancy G. Edmunds

United States District Judge

Dated: February 27, 2007

Source: Legal > / ... / > $ MI Federal District Courts ⓘ
Terms: number(06-10201) (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Tuesday, July 28, 2009 - 7:52 PM EDT

* Signal Legend:
⚫ - Warning: Negative treatment is indicated
🅀 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Out | Help

 LexisNexis® About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2009 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.