B. Newal Squyres (ISB #1621)
Ted C. Murdock (ISB #5431)
HOLLAND & HART LLP
101 S. Capitol Blvd., Suite 1400
P.O. Box 2527
Boise, ID 83701
Telephone: (208) 342-5000
nsquyres@hollandhart.com
tmurdock@hollandhart.com

Joseph J. DePalma (*Pro Hac Vice*)
Katrina Carroll (*Pro Hac Vice)*
Jennifer Sarnelli *(Pro Hac Vice)*
LITE DEPALMA GREENBERG & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
jdepalma@ldgrlaw.com
kcarroll@ldgrlaw.com
jsarnelli@ldgrlaw.com

**Attorneys for Lead Plaintiffs**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| IN RE:<br><br>ATLAS MINING COMPANY,<br>SECURITIES LITIGATION | Civil Action No. 07-428-N-EJL |

### LEAD PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF LEAD PLAINTIFFS' OBJECTION TO THE MAGISTRATE'S REPORT AND RECOMMENDATION

Lead Plaintiffs, through their undersigned attorneys, provide notice to the Court

and counsel for Defendant Chisholm Bierwolf & Nilson ("CBN") of the following

supplemental authority, attached hereto and relevant to: (1) Lead Plaintiffs' pending

Objection to the Magistrate's Report and Recommendation (Docket No. 110); (2) CBN's

Motion to Dismiss (Docket. No. 77), and; (3) CBN's Notice of Supplemental Authority

(Docket No. 112).   In *Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, 576

F.3d 172, 192-196 (4th Cir. 2009), the Fourth Circuit addressed the issue of the plaintiffs'

request for leave to amend a complaint dismissed with prejudice pursuant to the PSLRA.

Dated:  September 16, 2009                                    Respectfully submitted,

                                             **By:**    */s/ Ted C. Murdock*
                                                      B. Newal Squyres (ISB #1621)
                                                      Ted C. Murdock (ISB #5431)
                                                      HOLLAND & HART LLP
                                                      101 S. Capitol Blvd., Suite 1400
                                                      P.O. Box 2527
                                                      Boise, ID 83701
                                                      (208) 342-5000

**LITE DEPALMA GREENBERG
& RIVAS LLC**
Joseph J. DePalma
Katrina Carroll
Jennifer Sarnelli
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
(973) 623-3000

*Attorneys for Lead Plaintiffs*

4614268_1.DOC

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

**H**

United States Court of Appeals,
Fourth Circuit.
MATRIX CAPITAL MANAGEMENT FUND, LP;
Matrix Capital Management Fund II, LP; Matrix
Capital Management Fund (Offshore), Limited,
Plaintiffs-Appellants,
and
Karen Gautreau, Individually and on behalf of all
others similarly situated; Louisiana School Employee
Retirement System; Richard Beasley; TDH Partners,
LLP; Daniel Sutton; BDM, LLC, Individually and on
behalf of all others similarly situated; Detectives En-
dowment Association Annuity Fund, On behalf of
itself and on behalf of all others similarly situated,
Plaintiffs,
v.
BEARINGPOINT, INCORPORATED; Robert S.
Falcone; Randolph C. Blazer, Defendants-Appellees,
and
Roderick C. McGeary; Pricewaterhouse Coopers,
LLP, Defendants,
and
General Retirement System of The City of Detroit;
Pension Trust Fund for Operating Engineers; Massa-
chusetts Pension Fund Group; Public Employees'
Retirement System of Mississippi; Secure Trading
Group, Incorporated; Matrix Capital Management,
LP, Movants.
No. 08-1035.

Argued: Jan. 29, 2009.
Decided: July 31, 2009.

**Background:** Shareholders brought securities fraud
action against corporation, corporation's former
president, and corporation's chief financial officer
(CFO). The United States District Court for the East-
ern District of Virginia, Liam O'Grady, J., 525
F.Supp.2d 759, dismissed the complaint with preju-
dice, and later denied shareholders' motion to amend
or alter the judgment. Shareholders appealed.

**Holdings:** The Court of Appeals, Michael, Circuit
Judge, held that:
(1) alleged facts did not support strong inference of
scienter required to plead fraud under the Private
Securities Litigation Reform Act (PSLRA), but

(2) district court abused its discretion in denying
shareholders' motion to alter judgment.

Affirmed in part, and reversed, vacated, and re-
manded in part.

King, Circuit Judge, filed a concurring opinion.

West Headnotes

**[1] Federal Courts 170B ⟡776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial De Novo. Most
Cited Cases
A court of appeals reviews de novo a district court's
decision to dismiss for failure to state a claim.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Securities Regulation 349B ⟡60.51(1)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.51 In General
            349Bk60.51(1) k. In General.
Most Cited Cases
To survive a motion to dismiss, private securities
fraud actions must clear the hurdle of the Private Se-
curities Litigation Reform Act (PSLRA), which im-
poses a heightened pleading standard for private se-
curities fraud complaints. Private Securities Litiga-
tion Reform Act of 1995, § 101(b), 15 U.S.C.A. §
78u-4(b).

**[3] Securities Regulation 349B ⟡60.34**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

349Bk60.34 k. Existence of Private Cause of Action. Most Cited Cases

Section 10(b) affords, by implication, a right of action to securities purchasers or sellers injured by its violation. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[4] Securities Regulation 349B ⚞60.18**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
            349Bk60.18 k. In General. Most Cited Cases

A plaintiff in a § 10(b) private action must typically prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[5] Securities Regulation 349B ⚞60.45(1)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
            349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
            349Bk60.45(1) k. In General. Most Cited Cases

Pleading recklessness is sufficient to satisfy the scienter requirement in a § 10(b) private action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[6] Securities Regulation 349B ⚞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
            349Bk60.51 In General
            349Bk60.51(2) k. Scienter. Most Cited Cases

A plaintiff bringing a private securities fraud action under the Private Securities Litigation Reform Act (PSLRA) must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference. Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u-4(b)(2).

**[7] Securities Regulation 349B ⚞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
            349Bk60.51 In General
            349Bk60.51(2) k. Scienter. Most Cited Cases

In reviewing a motion to dismiss a § 10(b) action for failure to state a claim, a court must ask whether, when the allegations are accepted as true and taken collectively, a reasonable person would deem the inference of scienter at least as strong as any opposing inference. Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u-4(b)(2); Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[8] Securities Regulation 349B ⚞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
            349Bk60.51 In General
            349Bk60.51(2) k. Scienter. Most Cited Cases

To the extent a plaintiff alleges corporate fraud under § 10(b), the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation; additionally, to the extent a plaintiff alleges fraud claims against individual defendants, the plaintiff must allege facts supporting a strong inference of scienter as to each defendant. Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u-4(b)(2); Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

**[9] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 In General
                  349Bk60.51(2) k. Scienter. Most
Cited Cases
Plausible non-culpable statements were at least as likely as an inference that corporate defendants acted knowingly or recklessly with respect to misstatements in corporation's 2003 and 2004 financial statements, and thus facts did not support strong inference of scienter required to state a § 10(b) fraud claim under the Private Securities Litigation Reform Act (PSLRA); despite the unreliability of statements about internal controls and financial information, there were no additional allegations that the corporate defendants had knowledge that the financial information was inaccurate, and when corporate management discovered that its accounts receivable and understated unbilled revenue by the same amount, the company filed a Form 10-Q/A to correct that error. Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u-4(b)(2); Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[10] Securities Regulation 349B ☞60.45(1)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
               349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
                  349Bk60.45(1) k. In General. Most Cited Cases

**Securities Regulation 349B ☞60.46**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses

to Liability
               349Bk60.46 k. Materiality of Violation. Most Cited Cases
As a general matter, courts should be wary when defendants in a § 10(b) fraud case focus on the size of revenues in an effort to minimize the materiality of misstatements of income or to suggest the defendant lacked motive to misstate income. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[11] Securities Regulation 349B ☞60.45(1)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
               349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
                  349Bk60.45(1) k. In General. Most Cited Cases
A disclosure that meaningfully alerts investors to the risk that financial information is not accurate may suggest that the individuals responsible for the disclosure did not knowingly, or perhaps not even recklessly, misstate the underlying financial information, in a § 10(b) fraud case. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[12] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 In General
                  349Bk60.51(2) k. Scienter. Most Cited Cases
A court evaluates a plaintiff's allegations in a § 10(b) fraud case holistically, recognizing that allegations of scienter that would not independently create a strong inference of scienter might compliment each other to create an inference of sufficient strength to satisfy the Private Securities Litigation Reform Act's (PSLRA) heightened pleading requirement. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u-4(b)(2).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

**[13]** Securities Regulation 349B ☞60.51(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
A strong inference of scienter might arise, for purposes of satisfying the Private Securities Litigation Reform Act's (PSLRA) heightened pleading requirements in a § 10(b) fraud case, when there are sufficient red flags to alert senior officers to the unreliability of statements about internal controls and financial information. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u-4(b)(2).

**[14]** Securities Regulation 349B ☞60.51(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
A complaint that alleges facts giving rise to a strong inference that at least one corporate agent acted with the required state of mind satisfies the Private Securities Litigation Reform Act's (PSLRA) pleading requirements even if the complaint does not name the corporate agent as an individual defendant or otherwise identify the agent. Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u-4(b)(2).

**[15]** Securities Regulation 349B ☞60.51(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases

Plausible non-culpable statements were at least as likely as an inference that corporate defendants acted knowingly or recklessly with respect to the allegedly misleading nature of corporation's Form 8-K, filed March 17, 2005, regarding the magnitude of goodwill impairment charges that corporation would ultimately record for the quarter ending December 31, 2004, and thus facts did not support strong inference of scienter required to state a § 10(b) fraud claim under the Private Securities Litigation Reform Act (PSLRA); in light of corporate agents providing investors a range as to the amount of the impairment charge on April 20, 2005, the most likely inference was that corporate agents lacked sufficient information to report a range of impairment until the April disclosure. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u-4(b)(2).

**[16]** Federal Civil Procedure 170A ☞1840

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1839 Vacation
                    170Ak1840 k. Grounds and Objections. Most Cited Cases
District court abused its discretion in denying shareholders' motion to alter judgment dismissing their securities fraud action against corporate defendants in order to allow amended complaint adding specificity to scienter allegations, absent evidence of bad faith, that an amended complaint would have prejudiced corporate defendants, or that the amendment would have been futile. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

**[17]** Federal Courts 170B ☞817

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk817 k. Parties; Pleading. Most Cited Cases

**Federal Courts 170B** ☞829

170B Federal Courts

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)4 Discretion of Lower Court
170Bk829 k. Amendment, Vacation, or
Relief from Judgment. Most Cited Cases
Court of appeals would review district court's decision to dismiss plaintiffs' securities fraud action with prejudice rather than granting leave to amend, and its decision to not grant plaintiffs' motion to alter or amend the judgment in order to allow them to file a second amended complaint for abuse of discretion.

**[18] Federal Civil Procedure 170A ☜840**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak839 Complaint
170Ak840 k. Time for Amendment.
Most Cited Cases

**Federal Courts 170B ☜932.1**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(L) Determination and Disposition
of Cause
170Bk932 Reversal or Vacation of Judgment in General
170Bk932.1 k. In General. Most Cited
Cases
A district court may not grant a post-judgment motion to amend a complaint unless the judgment is vacated; a conclusion that the district court abused its discretion in denying a motion to amend, however, is sufficient grounds on which to reverse the district court's denial of a motion to alter or amend the judgment. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

**[19] Federal Civil Procedure 170A ☜833**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak833 k. Liberality in Allowing
Amendment. Most Cited Cases
A post-judgment motion to amend is evaluated under the same legal standard as a similar motion filed before judgment was entered, which directs that leave to amend shall be freely given when justice so re-

quires. Fed.Rules Civ.Proc.Rules 15(a), 59(e), 28 U.S.C.A.

**[20] Federal Civil Procedure 170A ☜834**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak834 k. Injustice or Prejudice. Most
Cited Cases

**Federal Civil Procedure 170A ☜851**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak851 k. Form and Sufficiency of
Amendment. Most Cited Cases
Leave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[21] Federal Civil Procedure 170A ☜834**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak834 k. Injustice or Prejudice. Most
Cited Cases
Whether an amendment is prejudicial, so as to warrant denial of leave to amend, will often be determined by the nature of the amendment and its timing. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[22] Federal Civil Procedure 170A ☜824**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak824 k. Time for Amendment in General. Most Cited Cases

**Federal Civil Procedure 170A ☜834**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

170Ak834 k. Injustice or Prejudice. Most Cited Cases

Delay alone is an insufficient reason to deny a motion to amend; however, when a post-judgment motion to amend is made, the further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant or that a court will find bad faith on the plaintiff's part. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[23] Federal Civil Procedure 170A** ☞821

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak821 k. In General. Most Cited Cases
Nothing in the Private Securities Litigation Reform Act (PSLRA) affects the standards governing either the pre- or post-judgment amendment of pleadings. Fed.Rules Civ.Proc.Rules 15(a), 59(e), 28 U.S.C.A.

**[24] Federal Civil Procedure 170A** ☞849

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak849 k. Proceedings for Allowance. Most Cited Cases
A district court's failure to articulate its reasons for denying leave to amend does not amount to an abuse of discretion so long as its reasons are apparent. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**\*175 ARGUED:** Solomon B. Cera, Gold, Bennett, Cera & Sidener, L.L.P., San Francisco, California, for Appellants. Richard Louis Brusca, Skadden, Arps, Slate, Meagher & Flom, L.L.P., Washington, DC; Robert A. Van Kirk, Williams & Connolly, LLP., Washington, D.C., for Appellees. **ON BRIEF:** Pamela A. Markert, Kenneth A. Frost, Gold, Bennett, Cera & Sidener, L.L.P., San Francisco, California; Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., for Appellants. Jennifer L. Spaziano, Skadden, Arps, Slate, Meagher & Flom, L.L.P., Washington, DC, Charles Wm. McIntyre, McGuireWoods, L.L.P., Washington, D.C., for Appellees BearingPoint, Inc., and Robert S. Falcone; Steven M. Pyser, Williams & Connolly, L.L.P., Washington, D.C., for Appellee Randolph C. Blazer.

Before MICHAEL, KING, and AGEE, Circuit Judges.

**\*176** Order reversed, judgment vacated, and case remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge AGEE joined. Judge KING wrote a separate opinion concurring in the judgment.

**OPINION**

MICHAEL, Circuit Judge:

Matrix Capital Management Fund, LP, Matrix Capital Management Fund II, LP, and Matrix Capital Management Fund (Offshore), Ltd. (collectively, plaintiffs) represent the class of persons or entities who bought or otherwise acquired the securities of BearingPoint, Inc. between August 14, 2003, and April 20, 2005, and who were damaged as a result. Plaintiffs brought this action against BearingPoint, Randolph Blazer (BearingPoint's former President, Chief Executive Officer, and Chairman of the Board), and Robert Falcone (BearingPoint's former Executive Vice President and Chief Financial Officer) (collectively, defendants). Plaintiffs allege violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission (SEC) Rule 10b-5.

This appeal centers on the adequacy of plaintiffs' allegations under the Private Securities Litigation Reform Act of 1995 ( **PSLRA**) § 101(b), 15 U.S.C. § 78u-4. The district court concluded that plaintiffs failed to adequately plead scienter under the **PSLRA's** heightened pleading standard and dismissed the complaint with prejudice. The court later denied plaintiffs' Rule 59(e) motion to alter or amend the judgment in which plaintiffs argued that, even if dismissal was appropriate, the court should have dismissed without prejudice and granted plaintiffs **leave** to **amend** the complaint. Plaintiffs appeal these determinations.

On March 6, 2009, after this appeal was argued, we received notice that BearingPoint had filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq., in the Southern District of New York. Thereafter, on March 10, 2009, by reason of the automatic stay provision of § 362(a) of the Bankruptcy Code, we entered an order staying proceedings in this appeal. The bankruptcy court modified the automatic stay on May 7,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

2009, to permit us to render our decision. We therefore lift our stay and issue this decision.

We agree with the district court's conclusion that plaintiffs failed to adequately plead scienter under the PSLRA, but we reverse the district court's order denying plaintiffs' Rule 59(e) motion to alter or amend the judgment to permit amendment of the complaint. Accordingly, we vacate the judgment. On remand plaintiffs will have the opportunity to file an amended complaint against the non-debtor defendants. In addition, plaintiffs may take action, consistent with bankruptcy law and procedure, with respect to their claims against BearingPoint, a chapter 11 debtor.

I.

In reviewing the district court's dismissal under Rule 12(b)(6), we "accept all factual allegations in the complaint as true," and we "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Formerly known as KPMG Consulting, LLC, BearingPoint is a publicly traded management and technology consulting company. It completed an initial public offering in February 2001 and thereafter *177 grew rapidly, acquiring more than thirty consulting businesses around the world in 2002. BearingPoint struggled to integrate its acquisitions; many were foreign concerns that had operated as private partnerships with no obligation to adhere to accounting standards applied to publicly held companies. BearingPoint also lacked the information technology infrastructure to manage its expanded business and keep track of client accounts. In short, BearingPoint lacked internal controls that were adequate to maintain reliable financial reporting and ensure compliance with applicable laws and regulations. BearingPoint has since acknowledged its failings in this regard.

In 2004 BearingPoint introduced a new financial accounting system known as "OneGlobe." FN1 OneGlobe proved unreliable and aggravated BearingPoint's problems with its internal controls. Bearing-

Point personnel did not receive the training necessary to operate the system. The lack of training led employees to select the wrong billing categories, which in turn led to inaccurate hourly billing rates. Employees manually bypassed the OneGlobe system on a routine basis, presumably correcting some errors but also creating the risk of human error and dishonesty.

> FN1. BearingPoint's financial reports are somewhat ambiguous about the precise timeline for OneGlobe's implementation. *See* Quarterly Report (Form 10-Q), at 33 (May 10, 2004) (indicating that company expects to "further implement a new North American financial accounting system during the second quarter of calendar year 2004"); Annual Report (Form 10-K), at 7 (Jan. 31, 2006) (indicating that OneGlobe system was bypassed on numerous occasions in order to close the second quarter of 2004).

Certain of BearingPoint's foreign acquisitions created special challenges that further strained its internal controls. In 2004 regional management of BearingPoint China and Japan directed employees to inflate their utilization rates (the percentage of consultant time actually charged to customers) and other financial data. Additionally, BearingPoint Australia recorded revenue in 2004 for contracts that were not completed until 2005. Finally, the values of certain of Bearing-Point's foreign acquisitions decreased during the class period (August 14, 2003, to April 20, 2005), causing the impairment of goodwill.

BearingPoint filed annual and quarterly financial reports with the SEC on SEC Forms 10-K and 10-Q and otherwise made public its financial information during the class period. At the end of each fiscal quarter BearingPoint typically issued a press release and filed an SEC Form 8-K with anticipated financial information. It would subsequently issue a Form 10-K or 10-Q with complete financial information.FN2 Along with each Form 10-K and 10-Q, the individual defendants signed Sarbanes-Oxley certifications indicating that the reports*178 did "not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made." *See, e.g.*, J.A. 372. Plaintiffs allege that the foregoing financial statements were materially false and misleading because, among other things, they

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

misstated BearingPoint's revenues, net income, earnings per share, and goodwill.

> FN2. The following Forms 10-K and 10-Q were filed during the class period and are in the record: Annual Report (Form 10-K) (Sept. 29, 2003) (for fiscal year ended June 30, 2003); Amended Quarterly Report (Form 10-Q/A) (Oct. 6, 2003) (for quarterly period ended September 30, 2002); Quarterly Report (Form 10-Q) (Nov. 14, 2003) (for quarterly period ended September 30, 2003); Annual Report (Form 10-K) (Apr. 16, 2004) (for transition period from July 1, 2003, to December 31, 2003); Quarterly Report (Form 10-Q) (May 10, 2004) (for quarterly period ended March 31, 2004); Quarterly Report (Form 10-Q) (Aug. 6, 2004) (for quarterly period ended June 30, 2004); Quarterly Report (Form 10-Q) (Nov. 8, 2004) (for quarterly period ended September 30, 2004); Amended Quarterly Report (Form 10-Q/A) (Nov. 18, 2004) (for quarterly period ended September 30, 2004). In late 2003 BearingPoint changed its fiscal year end from June 30 to December 31 and thus filed the transition report on Form 10-K for the six-month period ending December 31, 2003.

In late 2003 BearingPoint reported problems, "primarily [in] the Germanic region," with respect to its internal controls over financial reporting. Annual Report (Form 10-K), at 85 (Sept. 29, 2003). In addition, the company's Form 10-K for the fiscal year ending June 30, 2003, disclosed that an independent accountant reported material weaknesses in certain aspects of its internal controls.<sup>FN3</sup> It reiterated those warnings in statements filed for periods ending September 30, 2003 (filed November 14, 2003), and December 31, 2003 (filed April 16, 2004). BearingPoint nevertheless expressed its confidence in the capability of its internal controls to provide for reliable financial reporting and in the accuracy of all financial statements previously reported. And the Form 10-K filed for the period ending December 31, 2003 (filed April 16, 2004), indicated that BearingPoint had "resolved the material weaknesses reported in its last Annual Report on Form 10-K.... [T]hese are no longer material weaknesses, but are considered to be reportable conditions." Annual Report (Form 10-K),

at 100 (Apr. 16, 2004).

> FN3. BearingPoint defined a material weakness in internal controls as "a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." Annual Report (Form 10-K), at 173 (Jan. 31, 2006). In contrast, reportable conditions are less serious deficiencies: "Reportable conditions are ... significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements." Current Report (Form 8-K), ex. 99.1, at 2 (Dec. 16, 2004).

On November 8, 2004, BearingPoint filed financial information for the quarter ending September 30, 2004. But shortly thereafter BearingPoint management discovered that the Form 10-Q overstated its accounts receivable by $92.9 million. BearingPoint corrected that error by filing a Form 10-Q/A on November 18, 2004, that otherwise affirmed the financial information reported in the original Form 10-Q. The Form 10-Q/A acknowledged, however, that internal controls had failed to timely identify the accounts receivable error and recognized that this failure amounted to a material weakness. BearingPoint further acknowledged that the company's internal controls as of September 30, 2004, "were not effective to ensure that information required to be disclosed" to the SEC "is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms." Amended Quarterly Report (Form 10-Q/A), at 48 (Nov. 18, 2004).

On November 10, 2004, Blazer stepped down as Chairman of the Board of Directors and Chief Executive Officer of BearingPoint. A few days later, on November 30, 2004, Falcone stepped down as Executive Vice President and Chief Financial Officer.

BearingPoint reiterated problems with its internal controls in a December 16, 2004, Form 8-K, filed in connection with a convertible debenture offering. The Form 8-K noted that BearingPoint had not yet cor-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

rected the material weaknesses and reportable conditions previously identified. It continued to warn that those weaknesses might adversely affect Bearing-Point's **\*179** ability to accurately report financial information. In late December 2004 and early January 2005 BearingPoint raised $450 million by issuing subordinated convertible debentures.

BearingPoint was unable to file a timely Form 10-K for the fiscal year ending December 31, 2004. This tardiness was announced in a Form 8-K filed March 17, 2005, in which the company reiterated that it had identified material weaknesses in internal controls and warned that it might discover additional material weaknesses. BearingPoint also disclosed that recent downgrades in the company's credit rating, changes in senior management, and underperforming foreign operations had caused the company to perform a goodwill impairment test. The results of the test, the company said, would require it to take a material impairment charge for the period ending December 31, 2004. It declined to estimate the amount of the charge.

On April 20, 2005, BearingPoint published a Form 8-K warning that recent company financial statements were not reliable. Specifically, BearingPoint warned that financial statements filed with Forms 10-K for the periods ending June 30, 2003, and December 31, 2003, and Forms 10-Q for each of the three quarters of 2004 were not reliable. BearingPoint suggested that a restatement of its financial statements would likely be necessary and that "the ultimate net adjustments w[ould] be material." Current Report (Form 8-K), at 3 (Apr. 20, 2005). BearingPoint further revealed that it would likely take a goodwill impairment charge of $250 million to $400 million in the fourth quarter of 2004. It did not offer an expected date for the restatement of its financial data; indeed it predicted further delay in the filing of its already tardy 2004 Form 10-K and delays in the filing of Forms 10-Q that would be coming due in 2005. The April 20, 2005, Form 8-K also disclosed that Bear-ingPoint was the target of an informal SEC investigation into its accounting and financial reporting and that nine of twenty individuals in senior management positions had left BearingPoint or were in the process of leaving. These disclosures resulted in an immediate thirty-two percent drop in BearingPoint stock prices, from a close of $7.77 per share on April 20, 2005, to a close of $5.28 per share on April 21, 2005.

This drop occurred on a one-day trading volume of more than forty-six times the stock's average daily trading volume for the year preceding the disclosures. *In re BearingPoint, Inc. Sec. Litig.*, 525 F.Supp.2d 759, 763 (E.D.Va.2007).

In the following weeks several securities fraud actions were filed against BearingPoint and its officers in the Eastern District of Virginia. *See In re Bearing-Point, Inc. Sec. Litig.*, 232 F.R.D. 534, 537 (E.D.Va.2006). These actions were consolidated, and plaintiffs were selected as lead plaintiffs pursuant to the PSLRA, 15 U.S.C. § 78u-4. The consolidated action was initially assigned to Judge T.S. Ellis, III, who entered a scheduling order that, among other things, required plaintiffs to file an amended complaint by October 7, 2005, on the basis of Bearing-Point's representation that it expected to file its delinquent 2004 Form 10-K and a restatement of earlier financial information by September 21, 2005. When BearingPoint was unable to meet the September 21, 2005, target, it informed the district court that it anticipated being able to file the form and restatement by late October. BearingPoint requested that the scheduling order deadlines be postponed accordingly. The district court refused to amend the scheduling order, but indicated that it would permit plaintiffs to amend their complaint when BearingPoint made SEC filings with its 2004 financial statement and any restatement. In the meantime, on October **\*180** 7, 2005, plaintiffs filed a complaint alleging that defendants knowingly or recklessly misrepresented Bearing-Point's financial condition by overstating earnings and assets in violation of federal securities laws. The district court granted plaintiffs' motion for class certification on January 17, 2006.

BearingPoint ultimately filed its Form 10-K for the fiscal year ending December 31, 2004, on January 31, 2006, after spending more than $100 million to review 6,500 contracts and other data. Included as part of the 2004 Form 10-K filing was the company's restatement of previous financial statements (together, the 2004 Form 10-K and restatement). Much of the company's financial information published in SEC filings in 2003 proved inaccurate. For example, Bear-ingPoint's 2003 Form 10-K had represented that net income for that year was $41.3 million (or $0.22 per share), but the 2004 Form 10-K and restatement revealed that it was actually $32.7 million (or $0.18 per share). The Form 10-Q for the first quarter of 2004

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
(Cite as: 576 F.3d 172)

had represented net income of $1.6 million ($0.01 per share), but BearingPoint had actually incurred a net loss of $17 million (($0.09) per share). The Forms 10-Q for the second and third quarters of 2004 had similarly misstated (or overstated) net income by $37.6 million and $7.4 million, respectively. The 2004 Form 10-K and restatement further disclosed that BearingPoint suffered goodwill impairment of $397.1 million during 2004.

Plaintiffs moved to file a first amended complaint to incorporate the additional information provided in BearingPoint's 2004 Form 10-K and restatement. The motion was granted, and on March 10, 2006, plaintiffs filed the first amended complaint, the operative complaint that we consider in this appeal. Incorporating the restated financial information, plaintiffs alleged that defendants knowingly or recklessly misstated BearingPoint's financial condition during the class period in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. After defendants filed a motion to dismiss pursuant to Rule 12(b)(6), the district court stayed the action pending the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), which was expected to address the pleading standard for scienter allegations under the PSLRA. Following the June 21, 2007, decision in *Tellabs,* the district court lifted the stay and directed the parties to submit briefs on the impact of the new decision.

This action was reassigned to Judge Liam O'Grady on July 13, 2007. Thereafter, on September 12, 2007, the court granted defendants' motion to dismiss, concluding that plaintiffs' complaint failed to meet the scienter pleading requirements of the **PSLRA.** The court also concluded that granting leave to **amend** the complaint would be futile. *In re BearingPoint,* 525 F.Supp.2d at 761-62. The complaint was dismissed with prejudice.

Plaintiffs filed a Rule 59(e) motion to alter or amend the judgment on September 26, 2007. They argued that the district court had erred in dismissing the complaint and, alternatively, in failing to grant leave to amend. Plaintiffs lodged a proposed second amended complaint with the district court on November 16, 2007. On November 19, 2007, the court denied the Rule 59(e) motion, again concluding that

the operative complaint failed to adequately plead scienter. The court also declined to permit post-judgment amendment of the complaint. Plaintiffs appeal the September 12, 2007, order dismissing the complaint and the November 19, 2007, *181 order denying the Rule 59(e) motion to alter or amend the judgment.

II.

[1][2] We review de novo the district court's decision to dismiss under Rule 12(b)(6). *In re PEC Solutions, Inc. Sec. Litig.,* 418 F.3d 379, 387 (4th Cir.2005). "[T]o survive a motion to dismiss, private securities fraud actions must clear the hurdle of the Private Securities Litigation Reform Act of 1995 ('PSLRA'). 15 U.S.C. § 78u-4(b)." *Id.* The PSLRA imposes a heightened pleading standard for private securities fraud complaints. *Teachers' Ret. Sys. of La. v. Hunter,* 477 F.3d 162, 172 (2007).

[3] Plaintiffs allege violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and of SEC Rule 10b-5. Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements § 10(b) by making it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 10(b) affords, by implication, a right of action to securities purchasers or sellers injured by its violation. *Tellabs,* 551 U.S. at 318, 127 S.Ct. 2499.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
(Cite as: 576 F.3d 172)

[4] A plaintiff in a § 10(b) private action must typically prove: "(1) a material misrepresentation or omission by the defendant; (2) *scienter;* (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation" (that is, the economic loss must be proximately caused by the misrepresentation or omission). *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008) (emphasis added).

[5] Pleading recklessness is sufficient to satisfy the scienter requirement. *See Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP,* 551 F.3d 305, 313 (4th Cir.2009). "We have defined a reckless act in the § 10(b) context as one 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Id.* (quoting *Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 343 (4th Cir.2003)). In the present case the district court dismissed the operative complaint under Rule 12(b)(6) because it concluded that plaintiffs had failed to adequately plead scienter with respect to any of the alleged misstatements. *In re BearingPoint,* 525 F.Supp.2d at 761-62.

[6][7] The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499. The plaintiff must "plead facts rendering an inference of **\*182** scienter *at least as likely* as any plausible opposing inference." *Tellabs,* 551 U.S. at 328, 127 S.Ct. 2499 (emphasis in original). According to *Tellabs,* a Rule 12(b)(6) motion to dismiss a § 10(b) action is to be analyzed as follows:

> *First,* ... courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true....

> *Second,* courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss.... The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

> *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.... The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? ... [T]he inference of scienter must be more than merely "reasonable" or "permissible"-it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs,* 551 U.S. at 322-24, 127 S.Ct. 2499. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326, 127 S.Ct. 2499.

[8] Moreover, "corporate liability derives from the actions of its agents." *Teachers',* 477 F.3d at 184. To the extent a plaintiff alleges corporate fraud, the plaintiff "must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation." *Id.* This court has not yet discussed the extent to which a plaintiff must identify that agent. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 710 (7th Cir.2008) (concluding that corporate scienter requires that a corporate agent acted with scienter, but that a plaintiff need not name the corporate agent who acted with scienter). Additionally, to the extent a plaintiff alleges fraud claims against individual defendants, the plaintiff must allege facts supporting a strong inference of scienter as to each defendant. *Teachers',* 477 F.3d at 184.

### III.

The operative complaint (the first amended complaint) alleges that a number of BearingPoint statements made throughout the class period were mis-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

leading, including Forms 8-K, 10-K, and 10-Q. Plaintiffs argue that these statements were misleading because they contained financial information, including data about revenue, net income, and goodwill charges, that BearingPoint has since acknowledged was erroneous. *In re BearingPoint,* 525 F.Supp.2d at 768.[FN4] Plaintiffs allege that **\*183** defendants acted intentionally or recklessly in making misleading statements.

> FN4. The district court also considered possible misstatements and material omissions concerning the adequacy of internal controls. Because plaintiffs indicated in their brief to this court that they are not challenging the truthfulness of statements made during the class period about internal controls, we do not review allegations of scienter as to those statements.

### A.

[9] Much of the financial information defendants published in Forms 10-K and 10-Q during the class period was erroneous, as acknowledged in the 2004 Form 10-K and restatement. A Form 10-K filed April 16, 2004, stated, for example, that BearingPoint had incurred a net loss of $165.8 million ($0.86 per share) during the six-month transition period ending December 31, 2003. In fact, the company had suffered a $176.6 million net loss ($0.91 per share). Similarly, Forms 10-Q overstated BearingPoint's net income by $18.6 million for the first quarter of 2004, $37.6 million for the second quarter, and $7.4 million for the third quarter.[FN5] Plaintiffs allege that defendants acted knowingly or recklessly with respect to the falsity of these financial statements.

> FN5. Annual Report (Form 10-K), at 168 (Jan. 31, 2006).

To evaluate whether plaintiffs' factual allegations give rise to a strong inference of scienter, we first discuss whether they permit an inference of scienter, and if so, the persuasiveness of that inference. While we ultimately evaluate plaintiffs' allegations of scienter holistically, we only afford their allegations the inferential weight warranted by context and common sense. *See Cozzarelli v. Inspire Pharm. Inc.,* 549 F.3d 618, 625-26 (4th Cir.2008) (explaining that courts should evaluate allegations of scienter in context).

Next, we will discuss whether "a reasonable person would deem [any] inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499.

### 1.

Plaintiffs point first to their allegations that BearingPoint has admitted that its former senior management was "incompeten[t]" and otherwise contributed to the deficient "tone at the top." J.A. 311-12 ¶¶ 50-52. Plaintiffs argue that the "tone at the top" is a term of art that refers to "an environment which encourages accounting fraud." Appellant's Br. at 29. They contend that admissions about the "tone at the top" satisfy the scienter requirement because "[t]hey necessarily were referring to fraud or, at a minimum, reckless conduct in ... implementing and maintaining adequate internal accounting controls and the resulting financial reporting." *Id.* at 30.

Defendants' state-of-mind with respect to the company's internal controls is a question distinct from the critical question here, which is defendants' state-of-mind with respect to misstating or omitting material financial information in BearingPoint's financial statements. Those questions may align when a plaintiff alleges that corporate officers intentionally created an environment to facilitate their own accounting fraud. But in this case BearingPoint's admissions fail to suggest that defendants intentionally created an environment conducive to accounting fraud; the company simply admits that such an environment existed. Such an admission fails to suggest that defendants acted with scienter when they issued BearingPoint's 2003 and 2004 financial statements.

Plaintiffs further allege that defendants were at least reckless as to the truthfulness of their financial statements because there were a number of red flags that must have alerted them to serious internal control deficiencies and the high risk that financial information derived under those **\*184** internal controls was erroneous. Plaintiffs primarily argue that it was widely known that the OneGlobe financial reporting system responsible for tracking revenues, expenses, and employee time was unreliable and failed to properly integrate accounting systems used in foreign offices. "BearingPoint employees at all levels and in all departments experienced significant problems

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

with the OneGlobe accounting system." J.A. 315 ¶ 61. BearingPoint employees manually bypassed the OneGlobe system, correcting at least some of One-Globe's errors but also presumably creating the risk of human error and fraud. Plaintiffs ask us to infer from the breadth and gravity of OneGlobe problems that high level corporate agents (including Blazer and Falcone) must have been aware of the problems and, consequently, could not have believed their internal controls adequate to produce reliable financial information. Moreover, plaintiffs allege that Blazer in fact spoke with a then-executive vice president on more than one occasion about OneGlobe errors relating to her billing rate and the practice of manually bypassing the system.

Plaintiffs do not include a timeline for their allegations or otherwise allege facts that imply defendants were aware of OneGlobe problems prior to making or approving financial statements. And the financial reports submitted to the SEC indicate that OneGlobe was still being implemented as of the second quarter of 2004. Even if BearingPoint began introducing OneGlobe earlier, problems may not have become obvious until after the program was fully implemented and was functional for some amount of time. Further, it is relevant that defendants understood that BearingPoint employees were manually *correcting* OneGlobe errors in some instances. We nevertheless recognize that the allegations permit an inference-although the weight of the inference is limited by the factors just mentioned-that OneGlobe deficiencies and other internal control problems identified by the plaintiffs may have become sufficiently severe at some point during 2004 to raise a red flag about the reliability of BearingPoint's financial information.

Plaintiffs also point to the magnitude of the restatement. *See In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 635-36, 638 (E.D.Va.2000) (noting that a strong inference of scienter may arise from a dramatic misstatement). BearingPoint overstated net income and other financial data throughout the class period by significant amounts. It reported net income of $1.6 million for the first quarter of 2004, but it had actually suffered a net loss of $17 million. It similarly indicated net income of $15.2 million for the second quarter of 2004, but it had actually suffered a net loss of $22.4 million. In total the 2004 Form 10-K and restatement extinguished more than $97 million in reported profits. BearingPoint had to pay more than

$100 million (and review nearly 6,500 contracts) to identify and correct these errors-an enterprise that resulted in approximately 35,000 lines of adjustments to previous financial statements.

[10] Inferential weight may be attributed to the magnitude of these errors but only in the context of BearingPoint's financial position. BearingPoint is a global corporation that produced revenues of $823.7 million to $888.6 million for each of the first three quarters of 2004. As a general matter, courts should be wary when defendants focus on the size of revenues in an effort to minimize the materiality of misstatements of income or to suggest the defendant lacked motive to misstate income. *See Crowell v. Ionics, Inc.,* 343 F.Supp.2d 1, 18 (D.Mass.2004) (characterizing the "focus on revenue" as "an old **\*185** chestnut that securities fraud defendants frequently try on judges and juries"). But the size of BearingPoint's revenue stream does bear on whether the misstatements of net income were of a size that BearingPoint officers must have known about them. In other words, an individual is more likely to realize that she is missing $10 if she has $50 in her bank account than if she has $50,000 in her bank account.

Plaintiffs further argue that the breadth of Bearing-Point's financial reporting problems ought to have alerted Blazer and Falcone to inaccuracies in the company's financial reporting and other statements. *See In re MicroStrategy,* 115 F.Supp.2d at 637-38 (noting that "inference of scienter becomes more probable as the violations [of accounting rules] become more obvious"). BearingPoint over-billed and under-billed clients and violated contract terms, including agreed upon rates and charges. A consultant who helped review BearingPoint's accounting reported that "every single contract that he reviewed, 20-30 contracts, were [sic] incorrect with regard to revenue recognition in some material way." J.A. 322 ¶ 78. We afford these allegations substantial weight, although we note that the company was in the middle of integrating the financial accounting information for thirty newly acquired consulting components worldwide.

Plaintiffs also highlight accounting fraud within the Asia Pacific region throughout 2004. BearingPoint Australia fraudulently recorded $8.8 million in revenue in 2004 that should not have been recorded until 2005. And senior regional management in China and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

Japan units directed employees to falsify utilization rates. However, there are no allegations that Blazer, Falcone, or other senior officers at BearingPoint headquarters directed the accounting fraud that occurred in the Asia Pacific region. Instead, plaintiffs ask us to infer that senior officials like Blazer and Falcone would have known of the fraud and falsification.

Plaintiffs also ask us to infer scienter from the fact that BearingPoint announced in its April 20, 2005, disclosure that nine out of twenty of its high-level officers had left or were leaving the company. Plaintiffs further note that the SEC is formally investigating and has subpoenaed information about Bearing-Point. *But see Cozzarelli, 549 F.3d at 628 n. 2* (indicating that allegation that SEC is investigating defendants is "too speculative to add much, if anything, to an inference of scienter"). Finally, plaintiffs argue that BearingPoint had a motive for falsifying information because it was able to issue $450 million in subordinated convertible debentures in late December 2004 and early January 2005. Plaintiffs allege that BearingPoint sought to suppress information about its actual financial information and internal control problems in order to complete these private offerings. *But see id. at 627* (noting that "the motivations to raise capital ... are common to every company and thus add little to an inference of fraud").

Defendants, for their part, point to BearingPoint's disclosures concerning its internal controls during the class period, arguing that those disclosures weigh against an inference of scienter. It is appropriate to consider such disclosures, which in some contexts will indicate that the defendants were acting in good faith, but in other contexts will indicate that the defendants had knowledge of operational risks (suggesting a lack of good faith). BearingPoint made several relevant disclosures during the class period. The Form 10-K filed for the fiscal year ending June 30, 2003 (filed September 29, 2003), disclosed material weaknesses and reportable conditions in Bearing-Point's internal controls, but only in seven limited areas.[FN6] Importantly,**186** the Form 10-K moderated the weight of that disclosure by suggesting that BearingPoint had already put in place measures to correct identified weaknesses and by stating its confidence in the accuracy of financial statements contained in the Form 10-K notwithstanding internal control deficiencies. The Form 10-Q for the period ending September 30, 2003 (filed November 14, 2003), similarly mentioned and then moderated the import of certain limited internal control deficiencies. And the Form 10-K filed for the six-month transition period ending December 31, 2003, represented that BearingPoint had "resolved" all previously reported material weaknesses (although the underlying conditions were still considered reportable conditions) and most of the deficiencies previously considered reportable conditions. Annual Report (Form 10-K), at 100 (Apr. 16, 2004). It did identify one new material weakness.[FN7]

> FN6. Specifically, the Form 10-K stated as follows:
>
>> Management and PricewaterhouseCoopers LLP ("PwC"), our independent accountants, have reported to our Audit Committee certain matters involving internal controls that PwC considers to be material weaknesses or reportable conditions under standards established by the American Institute of Certified Public Accountants. The identified material weaknesses relate to financial review and analysis at the corporate/consolidation and certain local reporting levels, primarily with respect to the Germanic region. The identified reportable conditions relate to protocol and documentation for reviewing and assessing contract revenue recognition; monitoring of unusual Work in Process activity; lack of a formal documented policy relating to evidence of a contractual arrangement with respect to revenue recognition based on local legal requirements; cross-training of employees for key finance and accounting positions; and documentation for certain critical, significant and judgmental accounting areas.
>
> J.A. 589.

> FN7. The Form 10-K indicates that PwC "identified, as of December 31, 2003, a material weakness relating to the timely accrual of certain costs associated with subcontractors." *Id.*

The Forms 10-Q filed during the first three quarters of 2004 represented that aside from the several re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

maining reportable conditions and the single material weakness discussed in the December 31, 2003 Form 10-K, "the Company's disclosure controls and procedures are adequately designed to timely notify [the Chief Executive Officer and Chief Financial Officer] of material information relating to the Company required to be disclosed in the Company's SEC filings." *See, e.g.,* Quarterly Report (Form 10-Q), at 37 (May 10, 2004).

It was not until BearingPoint amended its Form 10-K for the period ending September 30, 2004, in a Form 10-Q/A filed November 18, 2004, that the company disclosed that internal control deficiencies might compromise the reliability of financial reporting. Specifically, the Form 10-Q/A stated that:

the Company's internal controls relating to overall financial review and analysis in the context of the closing process did not identify the error [overstating accounts receivable] in time to preclude a misstatement of the balance sheet items referred to above and related cash flow statement items. The Company believes that this weakness in its internal controls relating to overall financial review and analysis in the context of the closing process is a material weakness. The Company is evaluating the steps that must be taken to improve its procedures and controls in this area.

... [T]he Chief Executive Officer and the Chief Financial Officer have concluded that as a result of the material weakness discussed above and certain reportable*187 conditions that were disclosed in our Transition Report on Form 10-K for the six months ended December 31, 2003, the Company's disclosure controls and procedures as of September 30, 2004 were not effective to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

Amended Quarterly Report (Form 10-Q/A), at 48 (Nov. 18, 2004). This disclosure more meaningfully calls into question the reliability of financial information "recorded, processed, summarized and reported" under internal controls in place as of September 30, 2004. *Id.* A subsequently filed December 16, 2004,

Form 8-K included similar disclosures.[FN8]

> FN8. The Form 8-K first described material weaknesses and reportable conditions previously disclosed to investors in prior financial statements. It then added that:
>
> > as of September 30, 2004, our disclosure controls were not effective to ensure that information required to be disclosed by us in the reports that we file or submit [to the SEC] is timely recorded, processed, summarized and reported.
>
> > We are in the process of implementing changes to address each of the material weaknesses and reportable conditions that we and our independent registered public accounting firm have previously identified. If we are unable to correct these weaknesses in internal controls in a timely manner, or if additional weaknesses are identified that are not corrected in a timely manner, our ability to record, process, summarize and report financial information will be adversely affected. This failure could materially and adversely impact our business, our financial condition and the market value of our securities and expose us to litigation and scrutiny from private litigants or the Securities and Exchange Commission.
>
> > Current Report (Form 8-K), ex. 99.1, at 2 (Dec. 16, 2004).

[11] A disclosure that meaningfully alerts investors to the risk that financial information is not accurate may suggest that the individuals responsible for the disclosure did not knowingly (or perhaps not even recklessly) misstate the underlying financial information. But BearingPoint disclosures made prior to November 18, 2004, continued to represent the reliability of BearingPoint's financial information notwithstanding internal control problems. Those pre-November 18 disclosures do not lend themselves to any inferences one way or the other relating to scienter. Later disclosures that timely raised questions about the reliability of financial information (such as the November 18, 2004, disclosure) lend weight to an inference that contemporaneous financial statements were made in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

good faith. Such disclosures might normally suggest that earlier misstatements were likewise good faith mistakes, but there were changes at BearingPoint between November 8 and November 18, 2004, that limit that inference. In particular, Blazer departed BearingPoint effective November 10, 2004.

2.

[12] Having discussed the relevant allegations of scienter and whether common sense or context diminish the inferential weight owed them, we proceed to evaluate whether a reasonable person would regard the inference that defendants knowingly or recklessly misstated or omitted material information at least as strong as the inference that BearingPoint officers were merely negligent with respect to those statements. *See Tellabs,* 551 U.S. at 326, 127 S.Ct. 2499. We evaluate these allegations holistically, recognizing that allegations of scienter that would not independently create a strong inference of scienter might compliment each other to create an inference*188 of sufficient strength to satisfy the PSLRA.

*2003 and First Quarter 2004 Financial Statements*

[13] A strong inference of scienter might arise when there are sufficient red flags to alert senior officers to the unreliability of statements about internal controls and financial information. *See Ottmann,* 353 F.3d at 351. The red flags alleged in this case-including major internal control problems and large-scale misstatements of income-give rise to a possible inference of scienter for statements made in 2003 and for the first quarter of 2004. But it is also possible to infer that defendants were only acting negligently with respect to the accuracy of the contested statements. During 2003 and 2004 BearingPoint was struggling to integrate thirty world-wide acquisitions that included using a new firm-wide financial reporting system, OneGlobe. Further, BearingPoint officers may not have had reason to know that OneGlobe problems and other internal control deficiencies existed and were sufficiently severe so as to threaten the reliability of financial reporting. To the extent the record speaks to the timeline, it suggests that BearingPoint was still putting OneGlobe into operation during the second quarter of 2004, which ended June 30, 2004. Absent additional allegations that BearingPoint officials had reason to know that the company's financial information was inaccurate, we conclude

that the inference of scienter is not as compelling as competing non-culpable inferences for financial statements made during 2003 and for the first quarter of 2004.

*Second and Third Quarter 2004 Financial Statements*

There is a stronger case for an inference of scienter for the Form 10-Q filed for the second quarter of 2004 (filed August 6, 2004), because the record suggests that OneGlobe problems could have manifested themselves by August 2004, and because the financial report issued for that period misstated net income by a particularly large amount ($37.6 million). Nevertheless, the allegations fail to establish that it is as likely as not that the alleged misstatements and omissions were obvious on August 6, 2004, to BearingPoint officials struggling to integrate recent worldwide acquisitions, manage thousands of employees, and account for billions in revenue. *See Zucco Partners v. Digimarc Corp.,* 552 F.3d 981, 1007 (9th Cir.2009) ("Although the allegations in this case are legion, even together they are not as cogent or compelling as a plausible alternative inference-namely, that although Digimarc was experiencing problems controlling and updating its accounting and inventory tracking practices, there was no specific intent to fabricate the accounting misstatements at issue here. Instead, the facts alleged by Zucco point towards the conclusion that Digimarc was simply overwhelmed with integrating a large new division into its existing business."); *see also In re BearingPoint,* 525 F.Supp.2d at 762 (noting that as of December 31, 2004, BearingPoint had about 16,800 full-time employees worldwide and $3.3 billion in revenue). Absent additional allegations suggesting that BearingPoint officials knew that OneGlobe problems jeopardized the accuracy of their second quarter financial statements, the inference of scienter is not as compelling as competing inferences. The same analysis applies to the Form 10-Q for the third quarter of 2004, filed on November 8, 2004.

*November 18, 2004, Form 8-K*

Soon after filing the November 8 Form 10-Q, BearingPoint management discovered that the form had overstated its accounts receivable by $92.9 million and understated*189 unbilled revenue by the same amount. The company filed a Form 10-Q/A on November 18, 2004, to correct that error but otherwise

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

affirmed the November 8, 2004, announcement that the company had net income of $11.9 million. BearingPoint's net income that quarter was actually $4.5 million, and plaintiffs allege that defendants either knew or were reckless with respect to the financial information in the amended third quarter financial form.[FN9]

> FN9. Defendant Falcone was still Executive Vice President and Chief Financial Officer as of November 18, 2004, and authorized the Form 10-Q/A at issue (along with Roderick McGeary, who was appointed to serve as Chairman of the Board and Chief Executive Officer on an interim basis).

While the recently discovered large error lends some additional weight to an inference of scienter, the Form 10-Q/A also contained a disclosure indicating that BearingPoint officials suspected additional, serious internal control deficiencies. Specifically, BearingPoint's disclosure called into question its ability to timely record, process, summarize, and report financial information given internal controls in place as of September 30, 2004. As discussed above, under these circumstances, the disclosure made about internal control deficiencies lends some weight to the inference that defendants were not acting with scienter but rather were endeavoring in good faith to inform investors of their internal control and financial reporting problems. We decline to conclude that the inference of recklessness is at least as likely as the inference that BearingPoint agents (including Falcone) were negligent or otherwise non-culpable with respect to the accuracy of the net income reported.

*December 16, 2004, Form 8-K*

Plaintiffs also allege that the December 16, 2004, Form 8-K was misleading; it omitted to inform investors that BearingPoint had overstated net income during the first three quarters of 2004. But plaintiffs do not allege that defendants knew the amount of overstatements made in Forms 10-Q at the time the December 16, 2004, Form 8-K was issued. Indeed, the complaint recognizes that it took a great deal of time and resources to produce the restatement of that financial information. Moreover, the Form 8-K warned investors that Bearing-Point had internal control deficiencies that threatened its ability to "record, process, summarize and report financial information." Current

Report (Form 8-K), ex. 99.1, at 2 (Dec. 16, 2004). This disclosure suggests that defendants did not knowingly or recklessly fail to provide investors with complete information about prior misstatements.

[14] Blazer and Falcone had already resigned from BearingPoint by the time this December 16, 2004, statement was issued. Defendants thus question whether plaintiffs have adequately identified a corporate agent who acted with scienter in their allegations. We have held that allegations of *corporate* fraud "must allege facts that support a strong inference of scienter *with respect to at least one authorized agent of the corporation.*" *Teachers',* 477 F.3d at 184 (emphasis added). A complaint that alleges facts giving rise to a strong inference that at least one corporate agent acted with the required state of mind satisfies the PSLRA even if the complaint does not name the corporate agent as an individual defendant or otherwise identify the agent. Most often, the complaint and documents incorporated into the complaint by reference will identify a corporate agent who acted with scienter. *See* \*190*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 195 (2d Cir.2008). But the particularity demanded under the PSLRA requires only that a plaintiff allege sufficient particularized facts "that support a strong inference of scienter with respect to at least one authorized agent of the corporation." *Teachers',* 477 F.3d at 184. As the Seventh Circuit has explained,

> [I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 710 (7th Cir.2008); *see also Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,* 365 F.3d 353, 367 (5th Cir.2004) (indicating that corporate scienter might be alleged by asserting that a corporate agent other than named individual defendants acted with scienter). When plaintiffs also name individual defendants, they must, of course, "allege facts that sup-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

port a 'strong inference' that *each* [individual] defendant acted with at least recklessness in making the false statement." *Teachers'*, 477 F.3d at 184 (emphasis in original); *see also Makor Issues & Rights*, 513 F.3d at 710 (distinguishing what is known as "group pleading doctrine" from possibility that plaintiffs might establish strong inference of corporate scienter without being able to name individuals who concocted the fraud).

3.

Evaluating the "facts alleged, taken collectively," we decline to conclude that a strong inference can be drawn that Blazer, Falcone, or any other corporate agent acted with scienter in issuing any of the challenged financial statements. For each of the financial statements, plausible non-culpable inferences are at least as likely as an inference that any defendant acted knowingly or recklessly with respect to the misstatements. We therefore agree with the district court's scienter conclusions with respect to these statements.

B.

[15] Plaintiffs also challenge a Form 8-K filed March 17, 2005, which they allege was misleading with respect to the magnitude of goodwill impairment charges that BearingPoint would ultimately record for the quarter ending December 31, 2004 (reported January 31, 2006). Accounting standards consider goodwill impaired if the fair value of a reporting unit becomes lower than its carrying amount.[FN10] Goodwill and Other Intangible Assets, Statement of Fin. Accounting Standards No. 142, ¶ 19 (Fin. Accounting Standards Bd.2001) (J.A.1992). Goodwill must "be tested for impairment at least annually using a two-step process that begins with an estimation of the fair value of a reporting unit. This first step is a screen for potential impairment, and the second step measures the amount of impairment, if any." *Id.* at Summary. Accounting standards further require goodwill impairment testing between**191** annual tests if circumstances change that are likely to produce an impairment.

FN10. "The fair value of an asset (or liability) is the amount at which that asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between

willing parties." Goodwill and Other Intangible Assets, Statement of Fin. Accounting Standards No. 142, ¶ 23 (Fin. Accounting Standards Bd.2001).

BearingPoint announced in a March 17, 2005, Form 8-K that "During the fourth quarter of fiscal year 2004, the Company determined that a triggering event had occurred, which caused the Company to perform a goodwill impairment test." Current Report (Form 8-K), at 3 (Mar. 17, 2005). It explained:

As a result of the impairment test, on March 17, 2005, the Company determined that a material charge will be taken as of December 31, 2004 as a result of the impairment of its goodwill with respect to the operations in its Europe, the Middle East and Africa ("EMEA") segment.... We are unable at this time to provide an estimate of the amount or range of amounts of the impairment charge. However, ... the Company may include an impairment charge of up to $230 million [without affecting its credit line]. The actual amount of the impairment charge may be higher or lower than such amount. The Company does not expect that the impairment charge will result in future cash expenditures.

*Id.* Plaintiffs allege that this statement is misleading with respect to the amount of the impairment charge. An April 20, 2005, Form 8-K later estimated that the impairment was $250 million to $400 million, and the 2004 Form 10-K and restatement ultimately recorded a goodwill impairment charge of $397.1 million.[FN11] The March 17, 2005, statement is only misleading in a material respect if BearingPoint agents had reason to know that the goodwill impairment charge would be in a range that would likely exceed $230 million.

FN11. This impairment charge is distinct from a separate $127.3 million impairment charge taken during the six-month transition period ending December 31, 2003.

Plaintiffs submit that BearingPoint agents must have known that BearingPoint goodwill had been impaired by nearly $400 million because BearingPoint had admitted to conducting at least the first step of a goodwill impairment test prior to March 17, 2005. Plaintiffs read the language of the Form 8-K to go

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
(Cite as: 576 F.3d 172)

further to establish that the company had already completed both steps of the goodwill impairment test as of March 17, 2005. The Form 8-K stated that a triggering event "caused the Company to perform a goodwill impairment test" and implied that at least part of the impairment test was completed. *Id.* ("As a result of the impairment test, on March 17, 2005, the Company determined that a material charge will be taken as of December 31, 2004.") This language, in context, does not state that both steps of the goodwill impairment test were necessarily completed, and plaintiffs have not otherwise alleged that Bearing-Point completed the second step of an impairment test by March 17, 2005.

But we agree with plaintiffs that the language of the Form 8-K suggests that BearingPoint had conducted at least the first step of the goodwill impairment test prior to March 17, 2005. Plaintiffs say that the first step of the test necessarily provides the range of any impairment, even if it fails to provide the exact amount of the impairment, which is calculated in the second step of the analysis. Plaintiffs ask us to infer that at least one BearingPoint agent thus acted with scienter in approving the March 17, 2005, Form 8-K.

Defendants contend that the most reasonable inference based on the allegations and documents incorporated by reference is not that BearingPoint officials acted with scienter, but rather that they had insufficient information to disclose a range of impairment.

*192 Evaluating the allegations holistically, we conclude that plaintiffs failed to allege facts sufficient to give rise to a strong inference that any corporate agent acted with scienter in making the March 17, 2005, statement. Even if the first step of the impairment test yielded some sort of range as to the amount of the impairment charge, we decline to infer (based on the limited allegations and materials before us) that corporate agents in fact knew or that it was obvious to them that the goodwill impairment charge would be within a meaningfully narrow range and likely to exceed $230 million. Further, the company provided investors a range the following month on April 20, 2005. It is certainly not dispositive that BearingPoint eventually reported accurate information. But we do consider that plaintiffs' alleged motive-that BearingPoint was seeking to avoid a default on its credit agreements-is weakened by the fact that BearingPoint clarified the allegedly misleading

statement one month later. The impairment charge was based on events occurring in 2004, and neither its range nor other relevant considerations were likely to change between March and April 2005. On these facts, the most likely inference is that corporate agents lacked sufficient information to report a range of impairment until the April disclosure. In any event, evaluating the complaint holistically, non-culpable inferences are more likely than any inference that BearingPoint agents knew that goodwill was impaired by more than $230 million or recklessly disregarded information indicating an impairment of that magnitude.

### C.

For the foregoing reasons we agree with the district court's conclusion, in its initial opinion and in its order denying relief under Rule 59(e), that plaintiffs failed in the operative complaint to adequately allege scienter under the PSLRA pleading requirements. The district court also dismissed plaintiffs' claims under § 20(a) of the Exchange Act, which imposes liability on each person who "controls any person liable under any provision of this chapter." 15 U.S.C. § 78t(a). Because the complaint fails to withstand a Rule 12(b)(6) motion with respect to the predicate violation of § 10(b), it also fails with respect to the § 20(a) claims. Our agreement with the district court's analysis of the allegations in the operative complaint does not dispose of this case, however, as we demonstrate next.

### IV.

[16][17] We turn finally to the district court's dismissal of the operative complaint with prejudice and its treatment of plaintiffs' efforts to file a second amended complaint. Plaintiffs argue that the district court erred by dismissing their complaint with prejudice rather than granting leave to amend. Alternatively, they argue that the district court erred when it did not grant their Rule 59(e) motion to alter or amend the judgment in order to allow them to file a second amended complaint. We review both determinations for abuse of discretion. *See Laber v. Harvey,* 438 F.3d 404, 428 (4th Cir.2006) (en banc); *In re PEC Solutions,* 418 F.3d at 387.

In challenging the dismissal with prejudice, plaintiffs argue that they filed an adequate motion for **leave to**

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

amend their complaint prior to dismissal by (1) requesting permission to amend in a footnote in their memorandum opposing the motions to dismiss, and (2) indicating in oral argument that they were in a position to "significantly bolster [their] allegation [of scienter]," J.A.2008. Plaintiffs also argue that, irrespective of whether they properly moved to amend their complaint, the district*193 court erred in granting a dismissal with prejudice because the court failed to make a necessary determination: a dismissal that operates with prejudice is warranted only when the trial court determines that "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.' " *Belizan v. Hershon,* 434 F.3d 579, 583 (D.C.Cir.2006) (quoting *Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C.Cir.1996)); *see also Ostrzenski v. Seigel,* 177 F.3d 245, 252-53 (4th Cir.1999) (noting that a plaintiff should have "every opportunity to cure a formal defect in [a] pleading"); *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003) (suggesting that these principles hold special force in the context of the PSLRA). Because we conclude that the district court should have granted plaintiffs' motion to vacate the judgment and allowed them to amend their complaint, we decline to decide whether the court erred in refusing to allow an amendment earlier in the proceedings.

After the district court dismissed their claims with prejudice, plaintiffs filed a motion to alter or amend the judgment in order to allow them to amend their complaint. Thereafter, plaintiffs lodged a proposed second amended complaint with the district court, indicating they were "prepared to immediately file this pleading in the event the Court permits the filing of an amended complaint." J.A. 2240. The district court denied plaintiffs' motion to alter or amend the judgment, thereby refusing to allow amendment of the complaint. The court also struck the proposed second amended complaint from the docket.

[18] In *Laber v. Harvey,* 438 F.3d 404 (4th Cir.2006), our en banc court outlined the framework and standards for considering a post-judgment motion to amend a complaint. To begin with, we noted that "[t]here is one difference between a pre-and a post-judgment motion to amend: the district court may not grant the post-judgment motion unless the judgment is vacated pursuant to Rule 59(e) or [Rule] 60(b)." *Id.* at 427. "A conclusion that the district court abused its

discretion in denying a motion to amend, however, is sufficient grounds on which to reverse the district court's denial of a Rule 59(e) motion." *Id.* at 428.

[19][20][21][22][23] We made clear in *Laber* that "a post-judgment motion to amend is evaluated under the same legal standard"-grounded on Rule 15(a)-"as a similar motion filed before judgment was entered." *Id.* Rule 15(a) directs that leave to amend shall be freely given when justice so requires. Fed.R.Civ.P. 15(a). This directive "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber,* 438 F.3d at 426. Our court therefore reads Rule 15(a) to mean that leave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile. *Id.* In *Laber* we offered guidance for evaluating these factors. First, "[w]hether an amendment is prejudicial will often be determined by the nature of the amendment and its timing." *Id.* at 427. Second, delay alone is an insufficient reason to deny a motion to amend; however, when a post-judgment motion to amend is made, "the further the case progressed before judgment was entered, the more likely it is that the amendment will prejudice the defendant or that a court will find bad faith on the plaintiff's part." *Id.* Nothing in the PSLRA affects the standards governing either the pre- or post-judgment amendment of pleadings. *See Belizan,* 434 F.3d at 583-84.

*194 [24] In denying plaintiffs leave to amend, the district court merely repeated the reasons it had previously offered for dismissing the operative complaint. The district court made no determinations about prejudice, bad faith, or futility with respect to the proposed second amended complaint. That alone may constitute an abuse of discretion. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("[T]he grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.") Of course, a district court's "failure to articulate [its] reasons [for denying leave to amend] does not amount to an abuse of discretion" so long as its reasons "are apparent." *In re PEC Solutions,* 418 F.3d at 391. Here, however, the only reasons men-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
(Cite as: 576 F.3d 172)

tioned by the district court-those reasons the court had previously given for dismissing the operative complaint with prejudice-did not justify denying plaintiffs post-judgment leave to amend.

The district court's reiterated reasons largely appear to be related to the bad faith factor. It expressed concern that "[t]his case was filed nearly two and one half years ago, and [plaintiffs have] had more than ample opportunity to plead [their] allegations with sufficiency." J.A. 2347. Plaintiffs, however, were not responsible for any delay, and certain circumstances worked to their disadvantage as they attempted to conclude their work on a complaint. After the district court appointed plaintiffs as lead plaintiffs on July 26, 2005, the court ordered them to file an amended complaint by October 7, 2005, based on Bearing-Point's representation that it expected to file its delinquent 2004 Form 10-K and restatement by September 21, 2005. When BearingPoint realized that it would be unable to meet the September 2005 target, it asked the district court to extend the scheduling deadlines. The court refused, and plaintiffs were required to file their amended complaint on October 7, 2005, without the benefit of critical information not yet disclosed by BearingPoint. See In re BearingPoint, 525 F.Supp.2d at 764 (describing 2004 Form 10-K and restatement as "long overdue"). After BearingPoint filed its 2004 Form 10-K and restatement on January 31, 2006, plaintiffs, with leave of court, promptly filed a first amended complaint on March 10, 2006. BearingPoint and the individual defendants filed motions to dismiss on March 31, 2006, and the parties filed supporting briefs in accordance with a schedule set by the court. The motions to dismiss were under consideration by the district court until March 23, 2007, when the court, on its own initiative, stayed the case pending the Supreme Court's decision in Tellabs.

After the Tellabs decision in late June 2007, the district court lifted the stay, ordered and received briefing on the impact of Tellabs on the motions to dismiss, heard oral argument, and dismissed the operative complaint on September 12, 2007. Thus, the case had only been reactivated for a little over two months when the district court dismissed it with prejudice. Nothing in the case history suggests that plaintiffs were responsible for any of the delay or wasted any opportunity to plead with the required specificity.

The district court also faulted plaintiffs for failing to

file a formal motion to amend and said that plaintiffs did not identify additional allegations of scienter at oral argument on the motions to dismiss. Here, the district court's rationale does not take into account that the controlling decision, Tellabs, was both new and challenging.*195 Tellabs was meant to resolve the disagreement among the circuits about how competing inferences should be evaluated in deciding whether allegations give rise to a strong inference of scienter. Tellabs, of course, provided instruction, but when the motions in this case were argued, lawyers and courts alike were just beginning to explore how to follow Tellabs' instructions-instructions that do not generate easy conclusions. See Tellabs, 551 U.S. at 322-24, 127 S.Ct. 2499.

Against this backdrop, the district court, near the beginning of oral argument on the motions to dismiss, asked plaintiffs' counsel whether he would offer additional allegations with respect to scienter if the court said at the end of the hearing, "You don't have it." J.A.2006. Plaintiffs' counsel replied that he would proceed to explain why he believed the current allegations were sufficient, but that he was in a position to "significantly bolster" the allegations. J.A.2008. Also, in their memorandum that was before the district court, plaintiffs had asked that amendment be permitted if the court concluded that the complaint was insufficient. Plaintiffs' counsel's strategy of not submitting a formal motion to amend and instead arguing that the operative complaint was adequate can, of course, be questioned. Nevertheless, the strategy does not in any way amount to bad faith, and it did not provide the district court with a basis for declining to examine the additional allegations offered in connection with the Rule 59(e) motion to set aside the judgment to permit an amended pleading.

The district court did not consider whether defendants would be prejudiced if plaintiffs were granted leave to amend, and we see no basis for a finding of prejudice. Plaintiffs simply seek to add specificity to scienter allegations in a situation where defendants are aware of the circumstances giving rise to the action. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir.1999) (noting that merely adding specificity to allegations generally does not cause prejudice to the opposing party); Laber, 438 F.3d at 427; see also Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir.1980) ( "Because defendant was from the outset made fully aware of the events giving rise

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
(Cite as: 576 F.3d 172)

to the action, an allowance of the amendment could not in any way prejudice the preparation of defendant's case."). Moreover, in this case the amendment would occur while discovery is stayed pursuant to the PSLRA, 15 U.S.C. § 78u-4(b)(3)(B).

The district court also failed to examine whether amendment of the operative complaint would have been futile. While we reach no conclusion as to whether the proposed second amended complaint satisfies the scienter pleading requirements, we believe that the allegations added to that complaint "changed the analysis [that ought to have been] conducted by the district court." *See Steinburg v. Chesterfield County Planning Comm'n, 527 F.3d 377, 390 (4th Cir.2008).*

Specifically, the proposed amended complaint added allegations relating to the time frame in which red flags became obvious to Blazer and Falcone; it alleges that OneGlobe problems "were well known and frequently discussed by the Company's senior accounting and executive staff *beginning in early 2004.* Defendant Blazer, in particular, was a party to those discussions." J.A. 2278 (emphasis added). Moreover, senior employees, including the communications and content group leader and the public services group leader, refused to sign off on financial statements for their respective segments during the second and third quarters of 2004 "because it was known that the financial data was not accurate due to the problems associated*196 with OneGlobe." J.A. 2279. Blazer and Falcone approved financial reports for those quarters notwithstanding that senior employees had refused to sign off on the same statements-refusals that allegedly alerted Blazer and Falcone to concerns about the accuracy of the statements.

These additional allegations, which the district court did not consider, appear to weigh in favor of an inference that Blazer and Falcone (and thus BearingPoint) acted with scienter. The allegations, as well as others added by plaintiffs to the proposed amended complaint, could therefore affect the analysis of whether plaintiffs can satisfy the heightened pleading requirements for scienter under the PSLRA.[FN12]

> FN12. We recognize that the allegations added to any amended complaint filed on remand will, in the event of a motion to dismiss, require a fresh look at whether *all*

of the complaint's allegations, viewed holistically, establish a strong inference of scienter. None of the analysis in part III of this opinion will preclude this fresh look.

Because (1) plaintiffs did not act in bad faith, (2) their filing of an amended complaint would not prejudice defendants, and (3) amendment would not be futile, the district court abused its discretion in denying plaintiffs' Rule 59(e) motion to alter the judgment in order to allow an amended complaint.

We emphasize that our decision today is not in any way meant to detract from the district court's conscientious and thorough work in this case.

## V.

For the reasons stated, we agree with the district court's determination that the allegations in the operative complaint do not give rise to a strong inference of scienter. We nevertheless reverse the district court's November 19, 2007, order denying plaintiffs' Rule 59(e) motion to alter or amend the judgment for the purpose of allowing plaintiffs leave to file an amended complaint. The judgment is vacated, and the case is remanded. After remand the district court will allow plaintiffs to file an amended complaint against the non-debtor defendants within a reasonable time to be determined by the district court. In addition, plaintiffs may after remand take action, consistent with bankruptcy law and procedure, with respect to their claims against BearingPoint, now a chapter 11 debtor.

*ORDER REVERSED, JUDGMENT VACATED, AND CASE REMANDED*

KING, Circuit Judge, concurring in the judgment:
Although I commend my good friend Judge Michael for his carefully crafted opinion in this case, I write separately to explain my concurrence in the judgment. His opinion for the panel majority reverses the district court's denial of the plaintiffs' request to alter or amend its judgment dismissing their first amended complaint (the "FAC"). As a result, the majority today vacates the court's Rule 12(b)(6) dismissal for failure to plead scienter, and remands so that the plaintiffs can amend the FAC. In my view, the FAC sufficiently alleges scienter, and I would reverse the district court on that basis. Although I would remand for further proceedings on the FAC, I concur in the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
(Cite as: 576 F.3d 172)

judgment.

## I.

### A.

The FAC alleges two claims against the defendants: first, a violation of § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), as well as SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (the " § 10(b) claim"); and second, a violation *197 of § 20(a) of the Act, 15 U.S.C. § 78t(a) (the " § 20(a) claim"). To be legally sufficient, a § 10(b) claim must allege, inter alia, scienter. *See Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008). As the panel majority explains, the resolution of this appeal turns on the scienter element.[FN*]

> FN* Section 10(b) of the Act and SEC Rule 10b-5 together serve "to protect the integrity of the market in securities and prohibit fraud in connection with the purchase or sale of a security." *Cozzarelli v. Inspire Pharms., Inc.,* 549 F.3d 618, 623 (4th Cir.2008). Section 20(a) imposes liability on a person who "controls any person liable under any provision of this chapter." 15 U.S.C. § 78t(a). Because a plaintiff must successfully allege a predicate violation of the Act in order to proceed under § 20(a), failure of the scienter allegations of the § 10(b) claim is fatal to both claims of the FAC.

Significantly, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") "impose[d] heightened pleading requirements" for scienter in § 10(b) actions. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). Pursuant thereto, a plaintiff is obliged to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court has further refined that standard, requiring a § 10(b) claim to allege facts giving rise to a "cogent and compelling" inference of scienter that is "strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Like the district court, the majority concludes that, under *Tellabs,* the FAC failed to sufficiently allege scienter

in the § 10(b) claim, rendering both of the plaintiffs' claims legally insufficient. As explained below, I disagree.

### B.

#### 1.

In evaluating whether a § 10(b) claim should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to sufficiently plead scienter, we proceed according to the following analysis: first, as with any Rule 12(b)(6) motion, we accept the factual allegations of the complaint as true; second, we assess the complaint "in its entirety," including any exhibits incorporated by reference; and third, we take into account any "plausible opposing inferences." *Tellabs,* 551 U.S. at 322-23, 127 S.Ct. 2499; *see also Pub. Employees' Ret. Ass'n v. Deloitte & Touche LLP,* 551 F.3d 305, 312 (4th Cir.2009). We are further obliged, in the words of the Supreme Court, to "assess all the allegations holistically," which requires us to "take [ ] collectively" the allegations in the complaint and refrain from "scrutiniz [ing] each allegation in isolation." *Tellabs,* 551 U.S. at 326, 127 S.Ct. 2499.

After carefully weighing the plausible inferences that flow from the allegations of the § 10(b) claim, we may only reverse the dismissal thereof if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inferences one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499. The inference that the defendants acted with scienter "need not be irrefutable, *i.e.,* of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* (internal quotation marks omitted). Rather, an inference of scienter need only be "cogent and compelling, thus strong in light of other explanations." *Id.* In my view, a reasonable person would readily conclude that the allegations of the § 10(b) claim, viewed holistically, create an inference of *198 scienter at least as compelling as any opposing inferences-including the possibility that the defendants were "merely negligent." *Ante* at 187.

#### 2.

As the Supreme Court has explained, "scienter" is the "intention 'to deceive, manipulate, or defraud.' "

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

*Tellabs,* 551 U.S. at 313, 127 S.Ct. 2499 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Importantly, scienter may "be established by a showing of recklessness." *Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 343 (4th Cir.2003). In the context of a § 10(b) claim, we have defined recklessness as behavior that is

so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.

*Id.* (internal quotation marks omitted); *see also Deloitte & Touche,* 551 F.3d at 313.

The FAC paints a clear picture of deceit, manipulation, fraudulent behavior, and recklessness, by alleging, inter alia, the following:

• "[T]he defendants employed devices, schemes and artifices to *defraud,*" and engaged in practices that "operated as a *fraud* and *deceit* upon the purchasers of BearingPoint's securities," J.A. 396 ¶ 147 (emphasis added);

• "The accounting improprieties were not the result of simple malfeasance or negligence" but "of, at a minimum, *gross recklessness,*" *id.* at 291 ¶ 6 (emphasis added);

• By placing employees with "no competence or experience" into management positions, BearingPoint's conduct, "at a minimum, constitute[d] *gross recklessness,*" *id.* at 294 ¶ 8 (emphasis added);

• BearingPoint's "utter lack of accounting controls also emboldened other acts of *deliberate fraud,*" including, inter alia, false billings, *id.* at 297 ¶ 14 (emphasis added); and

• "At least fifteen former senior managers ... were terminated as a result of the *accounting fraud,*" *id.* at 297 ¶ 15 (emphasis added).

Under the heading "Scienter Allegations," the FAC further particularizes its allegations of fraud, manipu-

lation, deceit, and recklessness, inter alia, as follows:

• BearingPoint made substantial restatements and, due to a massive write-down in goodwill, "went from initially reporting a profit in 2004 to reporting a *half-billion* [dollar ] loss, a staggering financial reversal," J.A. 307 ¶ 40-41;

• "[T]he defendants knew that the Company's systems of internal control were essentially nonexistent or, at a minimum, dysfunctional," such that financial reports were neither accurate nor reliable, *id.* at 307 ¶ 42;

• BearingPoint officials "acknowledged pervasive and severe defects in its internal accounting control systems," due to inadequate communication, training, and management controls, *id.* at 310 ¶ 45;

• An investigation confirmed that BearingPoint "was plagued with corrupt management and lax internal controls," which provided "a perfect springboard" for false financial reporting, *id.* at 310 ¶ 46;

• The defendants "knew, or recklessly disregarded," that deficiencies in internal controls would lead to materially misstated financial reports, and **\*199** OneGlobe problems "permeated [its] entire business," *id.* at 311-12 ¶¶ 53;

• An improper "tone at the top" regarding financial reporting matters cultivated a "corrupt culture" at BearingPoint, *id.* at 317 ¶ 67; and

• Consultants "discovered gross accounting abuses," with one consultant reporting that "every single contract that he reviewed ... w[as] [materially] incorrect with regard to revenue recognition," *id.* at 322 ¶ 78.

Considering the allegations of the FAC holistically, a compelling inference emerges: the defendants acted fraudulently, or at least recklessly. Viewed in the proper light, the FAC demonstrates that BearingPoint was plagued with corrupt management and lax internal controls, which allowed for the cultivation of fraudulent and reckless conduct. The FAC alleges that senior management perpetrated fraud by placing "tremendous pressure" on its employees to attain certain reporting goals, and it "actively encouraged" them to falsify data to achieve these goals. J.A. 310 ¶

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
(Cite as: 576 F.3d 172)

47. More specifically, BearingPoint senior managers "directed the falsification of utilization rates [a key metric used by investors in assessing growth] so that internal reporting goals could be met," which was readily accomplished by overriding BearingPoint's "weak (and largely non-functioning) internal controls." *Id.* at 311 ¶ 49. These allegations are bolstered by specific examples of fraudulent misrepresentations in BearingPoint's monthly, quarterly, and annual reports; the termination or resignation of several management-level officials, including former CEO Blazer and former CFO Falcone, "as a result of the accounting fraud," *id.* at 297 ¶ 15; and an investigation of BearingPoint by the SEC. Furthermore, despite BearingPoint's specialization in systems integration, its own accounting system integration was a spectacular failure. Viewed holistically, the inferences of fraud and recklessness that flow from the FAC are compelling.

Furthermore, as the Supreme Court recognized in *Tellabs,* "motive can be a relevant consideration" with respect to the scienter inquiry, and "personal financial gain may weigh heavily in favor of a scienter inference," depending on "the entirety of the complaint." 551 U.S. at 325, 127 S.Ct. 2499. The FAC specified the motive for the BearingPoint officials' conduct, alleging that, during the relevant period, the company "complete[d] substantial private offerings of BearingPoint securities of at least $450 million." J.A. 323 ¶ 79. Indeed, "[h]ad the fraud alleged herein been timely and fully disclosed [,] BearingPoint would not have been able to complete these offerings." *Id.* Although "motivations to raise capital ... are common to every company," *Cozzarelli v. Inspire Pharms., Inc.,* 549 F.3d 618, 627 (4th Cir.2008), in our holistic analysis of the FAC, the motive of personal financial gain renders the inference of scienter even more compelling.

C.

1.

The majority predicates its ruling, in part, on its view that the FAC fails to create a sufficiently compelling inference that the defendants knew or must have been aware of the misstatements and reporting inaccuracies. For example, the majority observes that the inferential weight attributable to the 2004 reporting errors can only support an allegation of scienter "in

the context of BearingPoint's financial position," implying that its revenue stream was so substantial that its officials neither knew nor were aware of the misstatements of income. *Ante* at 184. Put simply, however, I believe that BearingPoint's reporting discrepancies deserve *200 greater weight than my good colleagues allow. BearingPoint initially reported net income of around $28.7 million for the first three quarters of 2004, when in fact it had experienced a net loss during those quarters of almost $35 million, as disclosed by its April 20, 2005 Form 8-K restatement. Even measured against BearingPoint's revenues of more than $800 million, an overstatement of $63.7 million-specifically when it turns profits into losses-is hardly a trivial sum. Such a discrepancy creates a compelling inference that BearingPoint officials knew or must have been aware of the alleged reporting errors. *Cf. Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir.2000) (concluding that magnitude of write-offs supported "strong inference of recklessness," and therefore scienter).

Notwithstanding the significant discrepancies of the restatements, the FAC yet adequately alleges that BearingPoint officials, including Blazer and Falcone, knew or must have been aware of the inaccurate financial reporting and the sheer enormity of the company's internal failures. *See, e.g.,* J.A. 396 ¶ 147 (indicating that "[e]ach of the defendants employed devices, schemes and artifices to defraud, *while in possession of material adverse non-public information* and each of them engaged in acts, practices, and a course of conduct ... to assure investors of BearingPoint's value and performance and continued substantial growth" (emphasis added)); *id.* at 313 ¶ 56 (alleging that errors appeared in BearingPoint's monthly, quarterly, and annual reports, which were "reviewed by [Blazer and Falcone]"); *id.* at 314 ¶ 58 (indicating that Blazer had spoken to a former executive vice president and thus "was well aware of the material accounting errors"); *id.* at 317 ¶ 66 (alleging that a former BearingPoint managing director indicated that OneGlobe problems were "openly discussed" among management); *id.* at 315 ¶ 59 (explaining that "[e]ach of the defendants had ... *contemporaneous knowledge* or *recklessly disregarded,* that the goodwill associated with [BearingPoint's] acquisitions were materially misstated" (emphasis added)).

Indeed, I am unable to conclude that the absence of a specific timeline or similar allegations renders the

576 F.3d 172, Fed. Sec. L. Rep. P 95,302
**(Cite as: 576 F.3d 172)**

inference of scienter any less compelling than other possible inferences. *See Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 269 (3d Cir.2009)* (concluding that *Tellabs* analysis "will ultimately rest not on the presence or absence of certain types of allegations but on practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter"); *see also South Ferry LP v. Killinger, 542 F.3d 776, 784 (9th Cir.2008)* ("*Tellabs* counsels us to consider the totality of the circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.").

2.

Finally, the defendants' state of mind with respect to the lack of appropriate internal controls bolsters the § 10(b) claim's allegation of recklessness resulting in a significant misstatement of financial status. *See Tellabs, 551 U.S. at 319 n. 3, 127 S.Ct. 2499* ("Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted *intentionally or recklessly ....*" (emphasis added)). In this case, the plaintiffs have alleged substantially more than internal mismanagement or "merely that [the defendants'] statements turned out to be wrong." *Avaya, 564 F.3d at 269.* Indeed, the § 10(b) claim "proffer[s] an array of circumstantial evidence [that gives] rise to a strong inference" that BearingPoint's *201 public misstatements and internal conduct were fraudulent, or were "at least reckless, which is enough to survive a motion to dismiss under the PSLRA." *Id.; cf. Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 87 (1st Cir.2008)* ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." (internal quotation marks omitted)).

II.

The PSLRA was designed to curb perceived abuses of the § 10(b) private action-"nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006)* (internal quotation marks omitted). Simply put, however, the FAC was not in any context a nui-

sance filing, and this case is not characterized by any of the abuses enumerated above. In these circumstances, I would reverse the district court's Rule 12(b)(6) dismissal and remand for further proceedings on the FAC. That said, I concur in the judgment.

C.A.4 (Va.),2009.
Matrix Capital Management Fund, LP v. BearingPoint, Inc.
576 F.3d 172, Fed. Sec. L. Rep. P 95,302

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.