B. Newal Squyres (ISB #1621)
Ted C. Murdock (ISB #5431)
HOLLAND & HART LLP
101 S. Capitol Blvd., Suite 1400
P.O. Box 2527
Boise, ID 83701
Telephone: (208) 342-5000
nsquyres@hollandhart.com
tmurdock@hollandhart.com

Joseph J. DePalma (*Pro Hac Vice*)
Katrina Carroll (*Pro Hac Vice*)
Jennifer Sarnelli *(Pro Hac Vice)*
LITE DEPALMA GREENBERG & RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
jdepalma@ldgrlaw.com
kcarroll@ldgrlaw.com
jsarnelli@ldgrlaw.com

**Attorneys for Lead Plaintiffs**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| _____ ) | |
| ) | Civil Action No. 07-428-N-EJL |
| ) | |
| ) | SECOND AMENDED CONSOLIDATED |
| IN RE: ) | CLASS ACTION COMPLAINT FOR |
| ) | VIOLATION OF FEDERAL SECURITIES |
| ATLAS MINING COMPANY, ) | LAWS |
| SECURITIES LITIGATION ) | |
| ) | JURY TRIAL DEMANDED |
| ) | |
| ) | |
| ) | |
| _____ ) | |

Lead Plaintiffs James O'Hern and John O'Hern ("Lead Plaintiffs"), allege the

following, individually and on behalf of all other persons similarly situated, based upon

the investigation by Lead Plaintiffs' counsel, which included, among other things, a review of Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Atlas Mining Company ("Atlas" or the "Company"), securities analysts' reports and advisories about the Company, information readily available on the Internet, and information obtained from the Company in connection with its cooperation obligation pursuant to the terms of a Settlement Agreement dated September 3, 2009. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a federal class action on behalf of purchasers of the publicly traded common stock of Atlas during the period January 19, 2005 through October 8, 2007 (the "Class Period") who were damaged thereby. Lead Plaintiffs seek to pursue remedies for damages caused by Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and for violations of Section 20 (a) of the Exchange Act.

2.       This case arises out of a widespread fraud perpetrated at Atlas. As has now been confirmed by a Special Committee investigation into the wrongdoing throughout the Class Period, Atlas materially misrepresented both the fundamental nature of its business and its financial results to the detriment of its shareholders. This Complaint sets forth claims under the Exchange Act against Atlas and various Individual Defendants, all of whom were knowing participants in the fraud and were directly responsible for all of the Company's public statements during the Class Period, and

Atlas's auditor, who certified Atlas's financial statements despite the fact that they knew or recklessly disregarded that a main line of Atlas's business was a complete and total sham.

3.     Founded in 1924, Atlas is a natural resources company based in Osburn, Idaho, that engages in the acquisition, exploration, and development of its resource properties in the states of Idaho and Utah.  Atlas owns and operates the Dragon Mine in Juab County, Utah.  Atlas was to exploit its Dragon Mine property for halloysite clay, a rare and high unit value clay mineral.  The Company also provides contract mining services and specialized civil construction services for mine operators, exploration companies, and construction and natural resources industries.   Atlas also owns approximately 900 acres of fee simple property and patented mining claims, and 260 acres of mineral rights and unpatented claims located in the Coeur d'Alene mining district in Shoshone County, Idaho.  In addition, it harvests timber on approximately 420 acres of its properties that primarily consists of pine, fir, and larch.

4.     This action against Atlas, certain Atlas directors and officers, Atlas' auditor Chisholm, Bierwolf & Nilson, LLC ("CBN") and Nano Clay and Technologies, Inc. ("NanoClay"), a division of or a sham subsidiary of Atlas, stems from Atlas's material misstatements in publicly disseminated press releases and Securities and Exchange Commission ("SEC") filings regarding the extent of the halloysite deposit on Atlas property, the availability and quality of halloysite for sale, and claimed sales of halloysite.  The action further alleges the Company's improper accounting manipulations of reported earnings relating to an illusory sale of halloysite.  In addition, Defendants repeatedly represented that the Company's financial statements, which were included in its SEC filings and press releases during the Class Period, were reliable in that they were

prepared in accordance with generally accepted accounting principles ("GAAP") when they were not.

5.      Atlas reported in 2004 that its halloysite business had experienced astronomical growth.  In subsequent public statements and SEC filings, Atlas further reported bright prospects for its halloysite business in the future.  Unbeknownst to investors, however, the seeming success of the Company's halloysite business was not real.  Rather, the Company created the illusion of a healthy and viable business through wholly improper accounting machinations and false representations to the market.

6.      The Atlas Defendants (defined herein) represented that the Company's Dragon Mine was the only known commercial source of halloysite clay outside of New Zealand and that the mine was a rich cache of unique quality halloysite, when, as these Defendants were well aware, they had absolutely no basis to make such statements.  *See* ¶ 64.

7.      Typically, halloysite is used in the manufacturing of bone china, fine china, and porcelain products.  Yet, as represented by the Atlas Defendants, the halloysite in Atlas' possession was determined by Atlas to have a certain tubular quality enabling its use in high end production.  According to the Atlas Defendants, the Dragon Mine's halloysite clay had special uses in manufacturing making it more valuable than other available halloysite.  Further, Atlas represented that it had over 300,000 tons of this valuable halloysite when in fact, it had no information regarding the extent of the halloysite in the Dragon Mine.  *As of the date of this Complaint, Atlas has not ascertained the amount of halloysite in its mine*.

8.      Contrary to their pubic representations, the Atlas Defendants knew that the halloysite at the Dragon Mine was not of the quality represented.  Prior to making these

public representations, Atlas was aware of reputable reports regarding the quality of halloysite at the Dragon Mine, which reports noted significant impurities (including alunite and iron minerals) and contaminants in the Dragon Mine that would prevent the halloysite from being used in high-end production.   To perpetrate fraud on its shareholders, Atlas retained Richard Tschauder to publish findings contrary to these reports.  Mr. Tschauder's findings were false and were tainted with conflicts as he was not independent and had a financial stake in providing misleading information concerning the Dragon Mine's prospects.

9.     While touting the quality and quantity of the halloysite purportedly in its possession based on the conflict-tainted findings of Tschauder, Atlas fraudulently represented to the market that it was actually selling halloysite to customers and had bright prospects of selling even more halloysite.  In a January 19, 2005 press release, Atlas first claimed to have sold halloysite to a customer, NaturalNano, Inc.  This purported sale never occurred and Atlas's public representations were the result of collusion between Atlas and NaturalNano.

10.     Unbeknownst to its shareholders, Atlas never disclosed that, pursuant to its agreement with NaturalNano, NaturalNano was to build a processing facility for Atlas's clay.  Without this processing facility, however, no halloysite could be processed and ultimately sold.  As Atlas later admitted, over a year later on July 28, 2006, NaturalNano did not have a "production or beneficiation capability and no manufacturing facility nor any real intent of establishing one."  Defendants thus knew that NaturalNano clearly had no intention of purchasing halloysite from Atlas and intentionally kept this information hidden from the investing public at large.

11.     To create the illusion that its halloysite business was viable, Atlas never

disclosed its lack of processing capability and colluded with NaturalNano to create the appearance, beginning with its January 19, 2005 press release and its 2004 10-KSB, that NaturalNano had already purchased "500 tons of *processed* halloysite nanotubes" halloysite from Atlas.  In its own SEC filings, NaturalNano reported in its November 14, 2006 10-QSB that it had purchased "500 tons of *processed* halloysite nanotubes" on December 29, 2004.  These representations were patently false and misleading because neither Atlas nor NaturalNano had any processing capability for this clay.

12.     In exchange for NaturalNano's cooperation, Atlas issued warrants to NaturalNano to acquire 750,000 shares of Atlas stock at $0.40 a share.  As of August 9, 2006, those warrants were sold for $562,500 yielding to NaturalNano stockholders net cash proceeds after legal fees of $506,250.00, at the expense of Atlas shareholders.[1] Tschauder, who authored the false reports for Atlas, was a shareholder of NaturalNano. NaturalNano never constructed any processing facility for Atlas's halloysite. *To date, Atlas does not have processing capability for its clay*.

13.     Atlas further orchestrated its fraud through the statements of its purported wholly-owned subsidiary, NanoClay, which was represented to shareholders as a division of Atlas.  Using NanoClay as an additional voicebox, Atlas further issued false and misleading statements concerning the availability, quality and sale of halloysite clay during the Class Period.  As is alleged herein, in a blatant fraud perpetrated on Atlas' shareholders, NanoClay depicted photographs of bales of halloysite being shipped to various customers and touted sales of halloysite by Atlas to the market, when in reality no halloysite was ever shipped.  Indeed, the halloysite could not have been shipped because

---

[1] NaturalNano later filed a form 8-K with the SEC on October 2, 2007, stating that NaturalNano had overstated the value of the Atlas warrant in its SEC filings in the amount of $76,800.

Atlas to this day lacks processing capability for the clay.

14.     The Company's fraud was first revealed to the market on October 9, 2007. On that day, before market open, the Company shockingly revealed that its prior financial statements for the fiscal years ended December 31, 2004, 2005 and 2006 were materially false and misleading and had to be restated.   The restatements were necessary, as admitted by the Company, because Atlas had wrongfully inflated its revenues and under-reported net losses and long-term liabilities by improperly recognizing as revenues speculative, *future* deliveries of halloysite clay from Atlas's Dragon Mine that were never delivered.   In fact, Atlas had never processed or sold any halloysite to the market (other than providing small samples and providing one ton of impure product to NaturalNano) and did not have any viable halloysite business.   Rather, Atlas had created the illusion of a viable halloysite business through this undisclosed accounting fraud.

15.     On January 11, 2008, Atlas's Board of Directors appointed a Special Committee (the "Special Committee") to investigate the wrongdoing at Atlas.   The Special Committee reported its findings to the staff of the SEC in July 2008.   On August 28, 2008, the Special Committee presented its findings and recommendations to Atlas's Board of Directors.   Among other things, the Special Committee found:

a.   That *none* of Atlas's financial statements for all periods beginning in 2002 through the second quarter of 2007 can be relied on (as opposed to the Company's shocking October 9, 2007 disclosure that only indicated that the financial statements starting from 2004 were being restated);

b.   The accounting treatment of the $250,000 received from NaturalNano as revenue for a purported "sale" of halloysite clay in 2004 was incorrect;

c.  That Atlas's internal control over financial reporting and disclosures contained material weaknesses, which led to inadequate and inaccurate disclosures;

d.  That Atlas had issued press releases during the Class Period that contained inaccurate statements regarding the production capabilities and activities at the Dragon Mine; and

e.  That Atlas's auditor, CBN was being fired by Atlas in favor of new auditors, to perform audits of Atlas's financial statements for the years ended December 31, 2005, 2006 and 2007, and that the new audit could result in the need for additional restatements to reconcile the accounting treatment for the halloysite clay sale.

16.    In the aftermath of the Special Committee investigation, Atlas was forced to issue restated financials, which Atlas did on June 15, 2009.  The restatements affected nearly every aspect of Atlas's balance sheet for the year 2006 and reveal a widespread and pervasive scheme of fraud at Atlas and numerous violations of the federal securities laws.  These restatements were far-reaching and affected the entire Class Period as is set forth below.

17.    Thus, as admitted by Atlas itself by virtue of these restatements, each of Atlas's financial statements, press releases and Sarbanes-Oxley certifications issued during the Class Period were materially false and misleading when made.  The true facts, which were concealed from the investing public during the Class Period, are set forth in ¶¶ 47 through ¶¶ 285 below.

18.    Defendants knew or were reckless in not knowing that their public representations and accounting machinations concerning halloysite sales were improper and violated GAAP.

19.     As noted above, CBN, Atlas's auditor, was fired and replaced for its role in the admitted, undisclosed accounting fraud at Atlas.  During the Class Period, CBN's accounting practices were so deficient that the audits amounted to no audit at all, constituted an egregious failure to see the obvious and that its judgments were such that no other reasonable accountant would have made them.

20.     Defendants' intentional malfeasance of manipulating the Company's earnings was catastrophic for Atlas shareholders because Defendants intentionally created a false portrayal of the Company's financial strength and operating results and prospects for halloysite clay.  Defendants' misrepresentations were material to the marketplace: as Atlas first revealed its misconduct to the marketplace by the Company's October 9, 2007 announcement, the price of Atlas shares fell precipitously.  On October 8, 2007, the last day of the Class Period, the Company's stock closed trading at $1.64 per share with 52,700 shares trading that day.  The following day—the day the Company issued its press release—Atlas' stock opened trading at $1.06 per share and closed at $.80 a share, or down over 51% from the previous days' close, on a share trading volume of 6,418,299 shares.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

22.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

23.     Venue is proper in this judicial district pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Atlas maintains its principal executive

offices in this District and many of the acts and transactions alleged herein, including the preparation and dissemination of statements containing materially false and misleading information and omissions of material fact, occurred in substantial part in this District.

24.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

25.     Lead Plaintiffs James O'Hern and John O'Hern, as set forth in the certifications previously filed with the Court, purchased Atlas stock at artificially inflated prices during the Class Period and have been damaged thereby.

26.     Defendant Atlas is an Idaho corporation with its corporate offices located at 1221 Yellowstone, Osburn, Idaho 83849.   At all relevant times, the Company's common stock was listed on the OTC Bulletin Board under ticker "ALMI.OB." Defendant NanoClay is an Idaho corporation located at the same address as Atlas's corporate offices: 1221 Yellowstone, Osburn, Idaho 83849.   According to Atlas, NanoClay was tasked with handling the mining, processing and sale of the halloysite clay from the Dragon Mine.

27.     NanoClay was established as a purported wholly-owned subsidiary of Atlas, yet, it was publically represented as a division of Atlas.   NanoClay's business letterhead represented that NanoClay was "A division of Atlas Mining Company (ALMI)" and the email signature of Defendant Price contained a representation that NanoClay was a division of Atlas.   Further, the NanoClay Web site, from approximately 2006 through September 2007, stated:

NanoClay and Technologies Inc. is a *division* of the Atlas Mining Co. dedicated to the production of quality halloysite clays for technical applications in the controlled release and polymer industries.  In addition we also manufacture halloysite for use in specialty ceramic applications.

(Emphasis added).

28.     Because the NanoClay Web site was linked to the Atlas Web site, visitors to the Atlas site seeking information about the Dragon Mine would "click" on the NanoClay link.  When Atlas Web site users clicked on this link they were directed to NanoClay's homepage wherein NanoClay is represented to be a division of Atlas.

29.     In the event that NanoClay is a division of Atlas, as Atlas represented, NanoClay is not a separate legal entity from Atlas.  As such, NanoClay's statements are the statements of Atlas.  In the event that NanoClay is a wholly owned subsidiary of Atlas, as Atlas has alternatively represented, then NanoClay was at all relevant times controlled by Atlas.  The two companies shared leadership.  Specifically, Atlas President and CEO, Defendant William T. Jacobson, served as the President of NanoClay in 2006 and also served as NanoClay's registered agent.  Later, Defendant Dr. Ron Price, an Atlas Director, served as President of NanoClay while Jacobson was named Vice President. Both Jacobson and Price served as Directors of NanoClay along with Marqueta Martinez, an officer of Atlas.

30.     Apart from shared leadership, Atlas controlled the finances of NanoClay. For example, on each annual report filed by Atlas on form 10-KSB with the SEC during the Class Period (filed by Atlas with the SEC on March 31, 2005, March 31, 2006, April 17, 2007 and May 1, 2007), Atlas included the financials of NanoClay in its consolidated financial statements by titling the statements as those of "Atlas Mining Company and Subsidiary."  Within the consolidated financial statements, however, Atlas did not

designate any of the figures as pertaining to NanoClay.  Because of this intertwining of finances, it is evident that Atlas commingled its funds with NanoClay's, thus eliminating any notion of corporate separateness between the two entities.

31.     Defendant William T. Jacobson, at all relevant times, served as the Chief Executive Officer ("CEO") and President of the Company until he was replaced by Defendant Robert Dumont on July 9, 2007.  Jacobson at all times during the Class Period served as the Company's Chairman.  He also served as Chief Financial Officer ("CFO"), until the appointment of Defendant Suveg on August 8, 2007.  On November 30, 2007, Jacobson was again appointed as CEO and President of Atlas.  As alleged herein, Jacobson frequently spoke to the marketplace regarding the efficacy of the halloysite at the Dragon Mine and continually issued false and misleading statements concerning Atlas' earnings and earning potential throughout the Class Period.  Jacobson again resigned as the Company's President and CEO on June 27, 2008.

32.     As confirmed by the Special Committee, Jacobson committed numerous violations of the federal securities laws and essentially looted the Company by improperly issuing stock and engaging in multiple related party transactions including the issuance of Atlas stock to his wife and children as well as in making loans from Atlas to companies which he owed or controlled.

33.     Defendant Robert Dumont was appointed CEO and President of the Company effective July 9, 2007.  On November 28, 2007, Dumont tendered his resignation which was accepted by the Board on November 30, 2007.  As alleged herein, during his tenure, Dumont signed false and misleading filings submitted to the SEC.

34.     Defendant Dr. Ronald Price was appointed to the Atlas Board of Directors on July 12, 2005.  Dr. Price also served as the President of NanoClay.  Dr. Price made

numerous representations about Atlas to the marketplace through NanoClay press releases regarding the quality and sales of halloysite that were false and misleading. Dr. Price touted his previous position as an inventor of microtublar technology while employed by the Naval Research Laboratory in Washington DC, leading shareholders to believe that representations he made regarding the quality of the halloysite were true and accurate.

35.   Defendant Barbara S. Suveg was appointed as CFO of the Company on August 8, 2007.  As alleged herein, during her tenure, Suveg signed false and misleading filings submitted to the SEC.

36.   Defendant Chisholm, Bierwolf & Nilson, LLC ("CBN"), located at 533 West 2600 South, Suite #25, Bountiful, Utah 84010, is a limited liability company, which at all material times, was engaged in the practice of public accounting in the States of Idaho, Utah and elsewhere. At all material times, although CBN employed only between six (6) and  twelve (12) professionals, CBN performed Securities and Exchange Commission audit work for over sixty seven (67) public companies, a staggering number of clients given CBN's size.  Throughout the Class Period, CBN served as Atlas' independent auditor and issued unqualified audit opinions in Atlas' year-end financial statements for the years ended 2004 through 2006.  CBN opined that the Company's financial statements were presented in accordance with GAAP and that its audits were conducted in accordance with the standards of the Public Accounting Oversight Board and Generally Accepted Auditing Standards ("GAAS") when they were not.

37.   At all material times, Defendant Todd Chisholm ("Chisholm") was engaged in the practice of public accounting in the States of Idaho, Utah and elsewhere, and is licensed as a certified public accountant by the State of Utah.  Chisholm is not

licensed as a certified public accountant by the State of Idaho nor does he currently possess accountant practice privileges in the State of Idaho.  Defendant Chisholm is a shareholder of CBN and personally took part in the acts complained of herein.

38.     At all material times, Defendant Troy Nilson ("Nilson"), a shareholder of CBN, was engaged in the practice of public accounting in the States of Utah, Idaho, and elsewhere, and is licensed as a certified public accountant by the State of Utah.  Nilson has accountant practice privileges in the State of Idaho.  CBN represents that Defendant Nilson qualifies as an "audit committee financial expert" under the rules of the SEC adopted pursuant to the requirements of the Sarbanes-Oxley Act of 2002.  Defendant Nilson personally took part in the acts complained of herein.

39.     CBN, Chisholm and Nilson are referred to collectively in this Complaint as the "CBN Defendants."

40.     Defendants Jacobson, Dumont, Price and Suveg are collectively referred to herein as the "Individual Defendants."

41.     Defendants Atlas, NanoClay and the Individual Defendants are collectively referred to herein as the "Atlas Defendants."

42.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e*., the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that

the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and the result of the collective actions of the Individual Defendants.

43.     Each of the Individual Defendants directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business and operations as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of or recklessly disregarded that false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

44.     As officers, directors and controlling persons of a publicly-held company whose common stock is and was registered with the SEC and was traded on the Bulletin Board and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information.

45.     Atlas is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all of

the wrongful acts complained of herein were done within the scope of their employment with authorization.

46.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Atlas under *respondeat superior* and agency principles.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS**</u>

47.     During the Class Period, Defendants artificially inflated the market price of Atlas stock by issuing and filing materially false and misleading financial statements with the SEC for the fiscal years and quarters ended December 31, 2004, 2005 and 2006 and quarterly reports issued for the quarters March 31, June 30 and September 30, for the years 2005, 2006, and 2007 and by otherwise issuing false and misleading press releases and statements to the marketplace.

48.     Defendants' false and misleading statements concerned the extent of the halloysite deposit existing at the Company's Dragon Mine, the availability and quality of the halloysite clay for sale, claimed sales of the clay, accounting relating to purported deliveries of the clay and representations concerning the business prospects for the Company's halloysite.

49.     With respect to its accounting improprieties, the Company improperly recorded as revenue $250,000 received in 2004, given to Atlas for speculative, future deliveries of halloysite clay.  Because Atlas never delivered the 500 tons of clay it claimed to have sold to NaturalNano, the Company's recognition of these deposit amounts as revenues was improper and the Company's public statements concerning

such improper revenue recognition were materially false and misleading when made and violated GAAP.

50.     In fact, Atlas could not have delivered the clay claimed to have been sold, as the Dragon Mine was not operational or able to process enough clay with the requisite unique qualities to fulfill the clay orders that were purportedly placed.

51.     Unbeknownst to shareholders, the major component of its purported sale transaction with NaturalNano required NaturalNano to construct a processing facility for Atlas's clay.   NaturalNano never constructed any such processing facility and as the Company states to date, no processing capability exists at Atlas.

52.     Throughout the Class Period, the Atlas Defendants continually touted the Company's business prospects for halloysite clay, all the while knowing, that the Company had not delivered the clay claimed as revenue in 2004 and that the Company would be unable to deliver any significant quantity of clay.

53.     The Atlas Defendants also misrepresented the quality of halloysite clay purportedly existing at the Dragon Mine.   These defendants represented that the Company's Dragon Mine was the only known commercial source of halloysite clay outside of New Zealand and that the mine was a rich cache of unique quality halloysite, when in reality it was not. *See* ¶ 64. *To date, Atlas represents that it cannot provide any assurances as to whether a commercially viable deposit of halloysite exists in its possession.*

54.     Historically, halloysite was used in the manufacturing of products for filtration purposes or ceramic products including bone china, fine china, and porcelain. Typically in the industry, these uses would yield between $400-$500 a ton.  The Atlas Defendants represented during the Class Period, however, that the halloysite in Atlas'

possession was determined by Atlas' and other chemists and scientists to have a certain "tubular" quality enabling novel uses.  According to the Atlas Defendants, the special halloysite microtubules from the Dragon Mine (which were similar to grains of rice, but considerably smaller and hollow) could act as time-release capsules, dissolving over time, and could be filled with such things as antifouling paint, antiscalants, herbicides, pest repellents, and other agents which could benefit from a controlled release.  The Atlas Defendants further represented that the unique size and shape of the Dragon Mine halloysite would enable its use as a filler in coatings and composite materials.  According to the Atlas Defendants, these highly advanced uses would allegedly yield over $1,000 a ton, which is at least double the price expected from the sale of typical halloysite.

55.     Defendants knew, however, that the halloysite at the Dragon Mine did not have any unique tubular qualities, due to impurities which could not be removed by commonly used separation techniques.  Thus, Defendants knew that the Company would not be able to reap the extra profits which could be expected from halloysite microtubules.  Thus, the Atlas Defendants' representations concerning expected profits from the sale of halloysite were false and misleading when made.

56.     Defendants' misrepresentations began at least as early as September 24, 2004 when Atlas issued a false and misleading press release wherein Atlas CEO Jacobson told the marketplace: "I'm very pleased to announce that we're now *operational and processing* halloysite."  (Emphasis added).

57.     That same day, September 24, 2004, Atlas issued a press release that was later posted on SiliconInvestor.com – a Web site dedicated to providing "a single source for worldwide financial data, news and discussion."  The posted section of the press release quoted Jacobson: "We currently have *commitments* for about 15,000 tons of clay

per year from traditional markets (at about $450 a ton), but feel if we work the technology side we can triple the demand and potentially increase our margins." (Emphasis added).

58.     Contrary to the representations made on September 24, 2004, however, Defendants were aware that the Dragon Mine was far from operational, and thus, the Company could not have fulfilled any commitments to sell any significant quantities of clay.  Upon information and belief, the mine has not processed any significant quantities of halloysite to date.

**The Retention of Tschauder**

59.     In order to defraud the market, Atlas hired Richard Tschauder, a geologist, in March 2003 to provide a false report regarding the quality of the halloysite at the Dragon Mine, which Atlas used, in turn, to misrepresent the prospects of its halloysite business to the market.

60.     Prior to Atlas' retention of this geologist, Atlas was aware of reputable reports from the United States Geological Survey and Spectral International, Inc. regarding the quality of halloysite clay in the mine.  These reports noted significant contaminants and impurities in the Dragon Mine that would prevent the halloysite from being used in high-end production markets.  The halloysite could not be used for these high end purposes because contaminants could not be removed from halloysite to increase its purity.  Thus, Atlas knew that its halloysite was not of the type represented to the investing public at large.

61.     To defraud its shareholders, Atlas utilized Richard Tschauder's report presumably to dispute the findings of other unbiased reports.  Tschauder was not independent or unbiased, however.  His findings were tainted with conflicts and were

motivated by his own financial interests because Tschauder had a financial stake in misleading the market concerning the Dragon Mine's prospects.

62.     Tschauder was a stockholder of NaturalNano, the purported customer of Atlas' fraudulently booked sales of halloysite in 2004.  As is set forth in detail below, in exchange for enabling Atlas to claim those fraudulently booked sales of halloysite, Atlas gave NaturalNano lucrative warrants in Atlas stock.  Tschauder knew that providing a positive report for Atlas would increase Atlas' stock price, thus making the Atlas warrants more valuable to NaturalNano and ultimately impacting the price of his NaturalNano stock.

63.     With the help of Tschauder, the Atlas Defendants misled the market through a series of public misrepresentations about the extent of halloysite in Atlas' possession, and the availability, quality and sale of this clay.  In a January 5, 2005 Atlas press release, Tschauder represented that the Dragon Mine halloysite was unique and unparalleled: "Under an electron microscope, we have compared the tubular clay from the Dragon Mine to those clay samples which can be found in New Zealand…The clay samples from New Zealand are misshaped, blocky, and quite contaminated with various types of debris including quartz, volcanic ash, and silica."  The Atlas release goes on to say that the "purity and quality of the Dragon Mine halloysite is unmatched anywhere in the world."  Tschauder continues: "I told Bill Jacobson that to use this clay to make ceramic and porcelain products was like using gold or wire to plum your house…The Dragon Mine clay is a one-of-a-kind resource…"

**Continued Misrepresentation**

64.     At the same time as the Company touted the quality of its Dragon Mine halloysite, it began to carefully craft the appearance that it would be able to sell this high

quality clay both domestically and internationally.  To this end, the Company announced yet another prospective purchaser of the clay. On January 5, 2005, Atlas issued another press release announcing that it "entered into a strategic relationship to develop high value applications for the unique hollow microtubules *currently being produced* at the Dragon Mine… NanoDynamics, a leading nanotechnology company headquartered in Buffalo, NY, will begin purchasing Halloysite clay from Atlas *immediately* in order to create commercial applications for this novel material."  (Emphasis added).

65.     All of these representations set the stage for the Class Period, which begins on January 19, 2005, when Atlas falsely represented to its shareholders that it was making specific and extensive sales of halloysite.  On that date, Atlas issued a press release (filed with the SEC on January 21, 2005) announcing sales of halloysite to its customer, NaturalNano.  Specifically, Atlas claimed that it sold 500 tons of halloysite to NaturalNano and obtained an initial payment of $125,000 for that purchase.  This was the first representation by Atlas that it was actually receiving payment for sales of halloysite.

66.     Following its January 19, 2005 announcement of halloysite sales to NaturalNano, Atlas continued to mislead the market in early 2005, allowing investors to believe it was selling halloysite.  In a letter to shareholders dated January 26, 2005 and filed with the SEC on January 28, 2005, Atlas reassures shareholders that the Dragon Mine is in production.  Notably, the letter reads that "we are now to the point where underground production has begun…We now have purchase orders for product and have started to receive some payments."  The letter also represents that halloysite is well-suited to "micro- and nano- tubular" uses.  These statements were knowingly false.

67.     On February 9, 2005 Atlas issued and filed with the SEC a press release, wherein the Company stated that it had entered into a purchase order with

NanoDynamics another customer, to sell 5000 tons of halloysite at $500 a ton.   The release also claimed that NanoDynamics "already remitted a purchase of 500 tons against this purchase order."   Jacobson claimed that Atlas was "excited" about a "relationship" with NanoDynamics because the purchase showed that their halloysite could be used in "the nanotechnology sector."   Moreover, the press release notes that Atlas issued a one-year warrant to NanoDynamics to purchase up to 1 million share of Atlas stock.

68.   What Atlas did not disclose about this purportedly new transaction with NanoDynamics was that NanoDynamics was, on information and belief, an agent or affiliate of NaturalNano and that the new sale was no sale at all.   As detailed herein, on December 29, 2009, the same day that Atlas and NaturalNano executed an agreement for the alleged sale of clay, NaturalNano authorized a purchase order to Atlas "c/o NanoDynamics" (dated December 23, 2004).   The purchase order was for 500 tons of halloysite "processed by NaturalNano" and the processing was to be at the expense and under the direction of NaturalNano.   Atlas's statement concerning a new sale of clay to its new customer NanoDynamics was false and intended to bolster Atlas's carefully crafted appearance that its halloysite business was thriving.

69.   Indeed, the Atlas Defendants were quick to represent sales of halloysite and purported revenue generated from those sales in their SEC filings.   On March 31, 2005, the Company filed with the SEC a materially false and misleading annual report for the fiscal year and quarter ended December 31, 2004 on Form 10-KSB, dated March 25, 2005 (the "2004 10-KSB").   The 2004 10-KSB was signed and certified by Defendant Jacobson pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes").

70.     The Company reported in its 2004 10-KSB that its halloysite operations were profitable, and further reported Atlas' fictitious sale of clay to NaturalNano that year:

> In 2003 we completed a small diamond drilling program to verify location of clay beds at the Dragon Mine. With that information we have been able to formulate development and mining plans. *During 2004 we have worked to develop and bring the Dragon Mine into a production stage. In December 2004 we booked our first sale of halloysite clay.*
>
> Our halloysite clay marketing efforts include contacting potential customers and distributors, which we have done. Each buyer may have a different use for the product and the price and quantity will vary as a result. *The sale of product cannot be formalized until we have verified our ability to provide the quality and quantities as required by the potential buyers.* From results of the product samples distributed *we have numerous potential buyers*.
>
> (Emphasis added).

71.     With respect to revenues, gross profit and other financial information relating to this fictitious sale to NaturalNano, the Company made material misstatements leading the market to believe that it received $250,000 in halloysite sales, accounting for 24% of the total revenue in 2004. The Company further reported in its 2004 10-KSB that its sales of halloysite allowed the Company's gross profit to grow *sixteen fold* and total revenue to increase by a *staggering 239%*:

> REVENUES
>
> *Our total revenues for the period ending December 31, 2004 were $1,035,329, compared to $304,851 for the period ending December 31, 2003, resulting in a 239% increase from the same period the previous fiscal year.* Our contract mining revenue for the period ending December 31, 2004 was $696,264 compared to $298,707 for the period ended December 31, 2003, or an increase of 133%. Our timber revenue for the period ending December 31, 2004 was $89,064 compared to $3,955, for the same period ended December 31, 2003, which is a 21.5 time increase from 2003 to

2004.  *We also received $250,000 from halloysite clay sales in
2004 while there was no revenue from that source in 2003.*

GROSS PROFIT

Our Gross profit for the year ended December 31, 2004 was
$467,784 compared to $(30,253) for the year ended December 31,
2003.  *This is an increase of 16 times greater than the previous
year.  The main reasons for this increased contracting revenues,
timber sales and the sale of halloysite clay in 2004, compared to
2003.*

LIQUIDITY AND CAPITAL RESOURCES

To date our activities have been financed primarily through the
sale of equity securities, borrowings, and revenues from Atlas
Fausett Contracting, logging operations and the *sale of halloysite
clay*.  We intend to continue pursuing contracting work and to log
our timber properties to help pay for our operations.  *We also
intend to sell more halloysite clay*.   In 2004 and 2003 the
contracting work accounted for about 67% and 98% of the total
revenues respectively.  *Halloysite clay sales accounted for 24% of
the revenue in 2004, while there were none in 2003.*

(Emphasis added).

The Company further explained in its 2004 10-KSB that sales of halloysite clay

averaged a dramatic *$20,833 per month* in fiscal year 2004, as compared to the year

2003, where *sales were $0.*

**Fraudulently Booked Halloysite Sale and Collusion Between Atlas And NaturalNano**

72.    As is set forth above, the false income reported by Atlas in the January 19,

2005 press release and its 2004 10-KSB was based upon the purported sale of halloysite

to NaturalNano in 2004.  Contrary to these representations, however, Atlas never sold

any significant quantity of clay to NaturalNano.  In fact, Atlas and NaturalNano forged a

collusive agreement, whereby NaturalNano would enable Atlas to fraudulently claim the

2004 sales of halloysite on its books, in exchange for a grant by Atlas of lucrative

warrants to NaturalNano and an illusory promise to construct a processing facility for

Atlas's halloysite.  Atlas failed to disclose to the market that the fact that it lacked a processing facility to sell halloysite and that a required part of its agreement with NaturalNano was that NaturalNano would construct such a processing facility.  *No processing facility has been built for Atlas's halloysite to date.*

73.     The details of the NaturalNano transaction are as follows.  On December 29, 2004, Atlas and NaturalNano entered into a Memorandum of Understanding ("MOU").  Pursuant to the MOU:

   a.     NaturalNano agreed to "enter into a purchase order with Atlas for the purchase of 500 tons of Dragon halloysite for $700 per ton";

   b.     NaturalNano agreed to build a processing facility at Dragon Mine;

   c.     Atlas agreed to issue NaturalNano a 2-year warrant for the right to acquire 750,000 shares of Atlas common unregistered stock at $0.40 per share;

   d.     Atlas and NaturalNano agreed to "exchange monthly reports outlining technical and commercial progress of each in regards to development.  Such reports shall be prepared and submitted no later than the tenth day following the end of each month."; and

   e.     The term of the agreement was two years.

74.     The agreement between Atlas and NaturalNano was silent as to the quality or delivery of halloysite.  Pure halloysite clay could not be sold from the Dragon Mine until a processing plant was constructed and functioning.  Per the MOU, NaturalNano was responsible to build the processing plant.  In short, the purchase order could not be fulfilled until NaturalNano built the processing plant.

75.     On December 29, 2009, the same day that the parties entered into their MOU, NaturalNano authorized a purchase order to Atlas "c/o NanoDynamics" (dated

December 23, 2004).  The purchase order was for 500 tons of halloysite "processed by NaturalNano as specified, cost of processing borne by NaturalNano, as negotiated with Dragon Mine" at $700 per ton.  The point of delivery was specified as "FOB Point- Mine Site" with the processing of the halloysite clay at the expense and under the direction of NaturalNano.

76.     On  December  30,  2004,  NanoDynamics  issued  an  Order Acknowledgment.  The Order Acknowledgement provides that:

a.  NaturalNano "may not cancel or delay this order"; and

b.  "[S]hipments are FOB… Dragon Mine, Utah."

77.     NaturalNano made two deposits of $125,000 to Atlas for the 500 tons of halloysite clay pursuant to the December 29, 2009 purchase order.  Atlas, in turn, improperly recognized the full amount it received in connection with this transaction ($250,000) as revenue on its financial statements for the year ended December 31, 2004.  Because NaturalNano had not received the halloysite clay, the transaction had not been completed.

78.     The warrants described in the MOU were issued by Atlas to NaturalNano on January 28, 2005.  In its own SEC filings, NaturalNano reported in its November 14, 2006 10-QSB that it had *purchased* "500 tons of processed halloysite nanotubes" on December 29, 2004**.**  NaturalNano further indicated that on January 28, 2005, Atlas issued warrants to NaturalNano enabling NaturalNano to acquire 750,000 shares of Atlas stock at $0.40 per share.  NaturalNano gave no indication that it was required to construct a processing facility for Atlas.

79.     In August 2006, the warrants given to NaturalNano were purchased from NaturalNano by Crestview Capital master, LLC ("Crestview") and later executed by

Crestview in October 2006.  As of August 22, 2006, the warrants to NaturalNano were sold for $562,500 yielding net cash proceeds after legal fees of $506,250.00.

80.     The warrants given to NaturalNano diluted the value of Atlas shares at the expense of Atlas shareholders.  There is no indication that Atlas ever received any consideration for these warrants, apart from NaturalNano's apparent agreement to report purchases from Atlas that they had not made to allow Atlas to falsely report income. Indeed, NaturalNano never built any processing facility for Atlas, and on information and belief, the agreed-upon monthly reports on the progress of the processing facility did not exist or could not be located.  As set forth below, it would become apparent over one year later that NaturalNano had no processing capability for halloysite and no intention of developing such capability.

81.     NaturalNano's form 10-KSB for the period ending December 31, 2005 states that it paid $250,000 to Atlas for 500 tons of processed halloysite nanotubes, with an additional $100,000 payable when shipments in excess of $250,000 are achieved.

82.     NaturalNano's SEC reports touting its halloysite purchases provided the back-up Atlas needed to file its false SEC reports in an effort to mislead the market.

83.     Absent the cooperation of NaturalNano, Atlas would not have been able to book any halloysite revenue.

84.     Atlas used Tschauder as an integral part of this illusory transaction. Indeed, based on Tschauder's representations, the market was led to believe that the Dragon Mine halloysite was unusually valuable, hence, resulting in false confidence of Atlas and inflated Atlas stock prices.  The inflated Atlas stock price allowed NaturalNano to buy and sell the Atlas warrants at a significant profit.  Clearly, Tschauder, a NaturalNano stockholder, issued his conflict-tainted report for the purpose of allowing

both companies to profit, and for his personal stock holdings to become more valuable. NaturalNano did reap profits of approximately half a million dollars as a result of the Atlas warrants, which profits directly benefited Tschauder and NaturalNano's other shareholders to the detriment of Atlas shareholders.

85.     Further, Atlas was well-aware that NaturalNano had no intention of purchasing halloysite from Atlas.  Although Defendant Jacobson stated in the January 19, 2005 press release which first disclosed the halloysite sales that NaturalNano specializes in processing systems, Defendant Price admitted in writing over a year later on July 28, 2006, that NaturalNano does not have a "production or beneficiation capability and no manufacturing facility nor any real intent of establishing one."  Defendants thus knew that NaturalNano clearly had no intention of purchasing halloysite from Atlas in 2005 or 2006, but intentionally kept this information hidden from the investing public at large.

86.     As described in detail below, when a Special Committee was convened to investigate the Atlas fraud, forensic accountants determined that the accounting for the NaturalNano transactions on Atlas's SEC filings was improper.  Atlas should have reported the $250,000 as customer deposits, not revenue, pending actual shipment of clay from the Dragon Mine site.

**Further Misrepresentations Made in the Aftermath of the NaturalNano Fraud**

87.     The Company's public statements concerning the fraudulently booked halloysite sales to NaturalNano in 2004 allowed the Atlas Defendants to further maintain the impression of a viable halloysite business throughout the Class Period.

88.     On May 17, 2005, the Company filed with the SEC a materially false and misleading quarterly report for the first quarter ended March 31, 2005, on Form 10-QSB.

The 10-QSB was signed and certified by Defendant Jacobson pursuant to Sections 302 and 906 of Sarbanes.

89.     On August 15, 2005, the Company filed with the SEC a materially false and misleading quarterly report for the second quarter ended June 30, 2005, on Form 10-QSB.  The 10-QSB was signed and certified by defendant Jacobson pursuant to Sections 302 and 906 of Sarbanes.

90.     On November 17, 2005, the Company filed with the SEC a materially false and misleading quarterly report for the third quarter ended September 30, 2005, on Form 10-QSB.  The 10-QSB was signed and certified by Defendant Jacobson pursuant to Sections 302 and 906 of Sarbanes.

91.     On March 31, 2006, the Company filed with the SEC a materially false and misleading annual report for the fourth quarter and year ended December 31, 2005, on Form 10-KSB.  The 10-KSB was signed and certified by Defendant Jacobson pursuant to Sections 302 and 906 of Sarbanes.

92.     Each of these 2005 quarterly reports outlined in ¶¶ 88-91 above contained materially false and misleading statements concerning the Company's 2004 sales of halloysite to NaturalNano, its exploration operations and prospective future sales of the clay.  For example, in its May 17, 2005 Form 10-QSB, the Company reported:

> The halloysite clay is considered a non-toxic material, and we feel we can produce a sellable product with minimal environmental consequences using proper containment and processing techniques. The intended processing will be the crushing, drying, and packaging of the product for shipment.  In 2003 we completed a small diamond drilling program to verify location of clay beds at the Dragon Mine.  With that information we have been able to formulate development and mining plans.  *During 2004 we have worked to develop and bring the Dragon Mine into a production stage.  In December 2004 we booked our first sale of halloysite clay.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 29

Our halloysite clay marketing efforts include contacting potential customers and distributors which we have done.  Each buyer may have a different use for the product and the price and quantity will vary as a result.  *The sale of product cannot be formalized until we have verified our ability to provide the quality and quantities as required by the potential buyers.*  From results of the product samples distributed *we have numerous potential buyers*.

(Emphasis added).

93.     In closing out 2005, Atlas continued to mislead the market making shareholders believe that the Dragon Mine was operational and processing clay.  On December 6, 2005, Atlas issued a press release announcing the addition of a second shift at Dragon Mine in order to find additional beds of halloysite.

94.     Atlas continued the fraudulent misrepresentations into the new year.  The Atlas Web site, as posted on January 26, 2006, states "The grain size and lack of significant impurity make Dragon Mine halloysite superior to products currently on the market."

95.     In a March 21, 2006 press release, Atlas announced the appointment of Dr. Price as President of NanoClay.  In that release, Atlas represented that NanoClay is the division of Atlas tasked with the development of the halloysite and touted Dr. Price's vast experience in the halloysite field.  Atlas further represented that it would work in conjunction with NanoClay to aggressively form alliances with universities and client companies.

96.     On March 31, 2006, the Company filed with the SEC a materially false and misleading annual report for the fourth quarter and year ended December 31, 2005, on Form 10-KSB.  This report was later amended on May 1, 2007 on Form 10KSB/A

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 30

(the "2005 10KSB/A").   The 2005 10KSB/A was signed and certified by Defendant

Jacobson pursuant to Sections 302 and 906 of Sarbanes.

97.    In this 2005 10KSB/A, the Company again reinforced its prior

representations that the Dragon Mine was in "development" and "production" stages,

touting the business prospects of its clay mining operations:

> We have brought the Dragon Mine from an exploration stage into a
> Development stage.  We intend to find other properties that can be
> acquired, developed and mined with minimal costs, and
> environmental problems.
>
> ---
> The majority of our exploration has been at the Dragon Mine in
> Juab County, Utah.  We have furnished samples of the halloysite
> clay extracted from this property to potential buyers and
> distributors.  The preliminary results of these samples have been
> favorable, and we have received purchase orders as a result; and
> we have received non binding letters of intent from potential
> buyers. *We have moved into the production stage of this property*.
>
> (Emphasis added).

98.    With respect to revenues, gross profit and other financial information, the

Company reported in its 2005 10KSB/A:

> **Revenues**
> *Our total revenues for the period ending December 31, 2005 were
> $628,176, compared to $1,035,329 for the period ending
> December 31, 2004, resulting in a 39% decrease from the same
> period the previous fiscal year.*  Our contract mining revenue for
> the period ending December 31, 2005 was $628,176 compared to
> $696,264 for the period ended December 31, 2004, or a decrease of
> 10%.  Our timber revenue for the period ending December 31,
> 2005 was $0 compared to $89,064, for the same period ended
> December 31, 2004, *and we received $0 from halloysite clay sales
> in 2005 compared to $ 250,000 for the same period ended
> December 31, 2004*, making up the remaining decrease in
> revenues.

**Gross Profit**

Our Gross profit for the year ended December 31, 2005 was $76,917 compared to $467,784 for the year ended December 31, 2004, resulting in a decrease of 83% from the same period the previous year. *The main reason for this decrease was the lack of timber sales and the sale of halloysite clay in 2005, compared to 2004.*

**Liquidity And Capital Resources**

To date our activities have been financed primarily through the sale of equity securities, borrowings, and revenues from Atlas Fausett Contracting, logging operations and the sale of halloysite clay. We intend to continue pursuing contracting work and to log our timber properties to help pay for our operations. *We also intend to sell more halloysite clay.* In 2005 and 2004 the contracting work accounted for about 100% and 67% of the total revenues respectively. *Halloysite clay sales accounted for 24% of the revenue in 2004, while there were none in 2005.*

…

Our principal sources of cash flow are from our timber properties, which averaged $-0- per month in fiscal year 2005 and $7,422 per month in 2004, our contract mining, which averaged $52,348 per month in fiscal year 2005 and $58,022 in 2004, *and halloysite clay sales which were $-0- in 2005 and averaged $20,833 per month in fiscal year 2004.* In addition, we also rely on our credit facilities and any public or private equity issuances we may conduct in the future

(Emphasis added).

99.     The Company's 2005 10-KSB summarized financial information

reflecting its operations as follow:

|  | Year Ended December 31, | |
|  | 2005 | 2004 |
| Net revenues | $  628,178 | $ 1,035,329 |
| Cost of revenues | $  551,258 | $   567,545 |
| Gross profit | $    76,918 | $   467,784 |
| Selling, general and administrative | $ 3,106,027 | $ 1,010,781 |
| Gain (Loss) from operations | $(3,789,456) | $  (883,654) |
| Net gain (loss) | $(3,780,318) | $  (946,274) |

100.    Attempting to persuade the market that its sales had gone global, Atlas issued a press release on April 5, 2006 announcing that it will sell halloysite to the European market.

101.    On May 16, 2006, the Company filed with the SEC a materially false and misleading quarterly report for the first quarter ended March 31, 2006, on Form 10-QSB. The 10-QSB was signed and certified by Defendant Jacobson pursuant to Sections 302 and 906 of Sarbanes.

102.    On August 14, 2006, the Company filed with the SEC a materially false and misleading quarterly report for the second quarter ended June 30, 2006, on Form 10-QSB. The 10-QSB was signed and certified by Defendant Jacobson pursuant to Sections 302 and 906 of Sarbanes.

103.    On November 20, 2006, the Company filed with the SEC a materially false and misleading quarterly report for the third quarter ended September 30, 2006, on Form 10-QSB. The 10-QSB was signed and certified by Defendant Jacobson pursuant to Sections 302 and 906 of Sarbanes.

104.    On April 17, 2007, the Company filed with the SEC a materially false and misleading quarterly report for the fourth quarter and year ended December 31, 2006, on Form 10-QSB. The 10-KSB was signed and certified by Defendant Jacobson pursuant to Sections 302 and 906 of Sarbanes.

105.    In each of these 2006 quarterly reports, outlined in ¶¶ 101-104 above, the Company continued to misrepresent its halloysite clay operations, and acknowledged that sales of clay could not be recognized until Atlas was able to provide the clay:

> Our halloysite clay marketing efforts include contacting potential
> customers and distributors, which we have done. Each buyer may have a
> different use for the product and the price and quantity will vary as a

result.  *The sale of product cannot be formalized until we have verified our ability to provide the quality and quantities as required by the potential buyers.*  From results of the product samples distributed *we have numerous potential buyers.*

(Emphasis added).

106.    In its November 20, 2006 10-QSB, the Company further stated with respect to the Dragon Mine that "we anticipate bringing the Dragon Mine into a positive revenue generating position."

107.    In an October 3, 2006 press release concerning Atlas' application for a large permit to mine 100 acres of previously undisturbed areas at the Dragon Mine, Jacobson discussed the Company's sampling of waste material on the property.  The release noted that "We have an extensive area of waste material on the property which supports no vegetation.  We have done some sampling of these waste piles and have found the material to contain 30% to 60% halloysite.  *With the processing improvements we are making,*" Jacobson stated, "this material becomes a sellable commodity."  However, upon information and belief, halloysite cannot be extracted from waste for viable commercial uses, rendering these statements false and misleading.  Furthermore, as subsequently admitted, Atlas has no processing capability for its clay to date.

108.    In a message issued about a week later to the Company's shareholders, on October 10, 2006, Defendant Jacobson made further representations concerning developments at the Dragon Mine, expected mining capacity and prospects for halloysite sales.  The shareholder message provides, in relevant part, as follows:

**Shareholder Message**

Dear Fellow Shareholders,

It's been an exciting and productive year so far here at Atlas Mining Company (Atlas), and our pace of development looks like it will not slow

down any time soon.  Dr. Price, president of our wholly owned subsidiary, Nano Clay and Technologies, Inc., has aggressively revamped our processing plant to better accommodate the buyers of our halloysite clay. With Dr. Price's efforts we expect to meet the strong demand from the building products, plastics, oil and gas and ceramics industries…

Significant resources have been focused on the development and ultimate commercialization of our Dragon Mine property.  The Dragon Mine currently has 13 employees and the mine is moving forward quite well. One of the more exciting things we have discovered at the Dragon Mine is that *the hundreds of thousands of tons in the waste piles above ground which were left from previous mining activities contain from 30% to 60% halloysite clay.  With Dr. Price's processing system, we intend to reprocess much of this material with very little mining cost to us.  This additional resource will be a great supplement to the over 300,000 tons of material in the underground deposit.*  We are not in the position to estimate the quantity of this additional resource, however, we do know it will add years to our mine life.  Other accomplishments at the Dragon include the installation of power and phone lines to the mine.  We have finally been able to wean ourselves from the generated power that has supported us for the past couple of years.  We have added additional storage space and a shop.  And we have also applied for a large mine permit to accommodate the "mining" of the waste piles, and to give us more freedom to operate.  The main question on everyone's mind is when will we make some sales?  Dr. Price has distributed samples of our product to numerous potential buyers in the plastics, building materials, oil, and the ceramics industry, and he has been guiding them on how best to incorporate our processed halloysite into their products.  For example, a building products manufacturer intends to utilize our processed halloysite in the commercialization of anti-mold applications pending regulatory review.  We have a few open offers from interested buyers and expect to execute some sales in the near future.  Dr. Price's newly installed systems must be tested and calibrated so that large volumes of quality material can be consistently produced.  That said, *our machinery is in place and operational and we expect to be able to make those supply commitments soon*

…

As we move into the final quarter of 2006, we look forward to accomplishing the goals we have set for ourselves.  *We made a strategic decision to forego the traditional ceramic markets and focus our halloysite sales efforts on the more profitable markets available to our unique product.  We believe this strategy will soon be realized and the shareholders will be rewarded for their patience*.  As these goals are achieved, we hope and believe that your commitment to our company will be rewarded through the appreciation of your investment.  The continued

creation of shareholder value is our top priority.   Thank you for your support and patience.

William T. Jacobson
President and Chief Executive Officer

(Emphasis added).

109.     After issuing the October 10, 2006 letter to Atlas shareholders, Defendant Jacobson was interviewed in 2006 by EmergingIssuer.com, an online financial information Web site focused on presenting information on emerging growth companies. During that interview, Jacobson discussed the Company's clay operations and its operations of NanoClay in the processing, quality control and sales of halloysite clay to potential customers.  Jacobson represented that he was "pleased" with the activities of NanoClay and that the Company hit a "home run" with the work of its president, Defendant Price.  Jacobson further expressed his expectation that Atlas might spin-off NanoClay and that, as a result, the Company would "make sure" that Atlas shareholders would reap the benefits of receiving "two companies for the price of one."

110.     During the 2006 interview with EmergingIssuer.com, Defendant Jacobson also expressed clear expectations of profit from the company's halloysite operations, stating that over 300,000 tons of clay existed on the property, with each ton being worth approximately $1,000 to $2,000.  "We feel that we have a very valuable asset," Jacobson represented, and that this asset would serve as a profitable contribution to the Company's "bottom line."  Jacobson also represented that it is Atlas' "mantra" that Atlas would "not put news out unless it is news worthwhile."

111.    In a November 28, 2006 press release entitled, "Alas Mining Determines Production Potential at Dragon Mine," Atlas made further representations concerning the mining and production capabilities of halloysite operations:

Silver City, Utah – November 28, 2006 - Atlas Mining Company (OTCBB: ALMI) disclosed today the Dragon Mine production and processing potential for halloysite clay.  After reviewing the past several months of underground production at the Dragon Mine, the only halloysite mine in the U.S. with commercial production capabilities, *Atlas management has determined its mining operation has the ability to produce over 30,000 tons of raw halloysite material annually with its existing equipment and crew structure*.  The Company's wholly owned subsidiary, Nano Clay and Technologies, Inc., under the direction of Dr. Ron Price, has completed initial runs on the newly improved processing facility.  According to Dr. Price, "We still have some adjustments to make to the plant, but every piece of equipment we have is operating correctly and doing what we expected of it.  *At one shift per day our processing plant has the capacity to produce 12,000 tons of quality halloysite on an annual basis.  Two shifts per day would double this figure and three shifts would bring the plant production up to matching the underground mine production*.  Our need to increase run time by adding shifts will depend on sales as we move into the new year."  Dr. Price went on to say, "Our customers have conducted extensive research and product development using the unique aspects of our halloysite clay.  *We will make sales of our halloysite clay as soon as we have built a stockpile of completed product and can be assured we can match production and quality with sales orders*."

William Jacobson, President and CEO, added, "As we move forward, we, of course, plan to add and replace machinery at both the mining operation and the processing plant in order to enhance the entire production process.  But *overall, right now, I'm very pleased with the capacity we have been able to establish, knowing we will now be able to meet immediate and intermediate demands*."

(Emphasis added).

112.    In 2007, Atlas continued to file false and misleading statements with the SEC.  On May 15, 2007, the Company filed with the SEC a materially false and misleading quarterly report for the first quarter ended March 31, 2007, on Form 10-QSB.  The 10-QSB was signed and certified by Defendant Jacobson pursuant to Sections 302

and 906 of Sarbanes, and contained the same statement as other quarterly filings referenced above that, "[t]he sale of product cannot be formalized until we have verified our ability to provide the quality and quantities as required by the potential buyers."

113.   On July 13, 2007, the Company filed a Form 8-K with the SEC announcing that effective July 9, 2007, Defendant Jacobson was being replaced by Defendant Dumont as Atlas' CEO and President.  The Form 8-K further stated that Defendant Jacobson would, however, continue to serve as the Company's Chairman.

114.   On August 14, 2007, the Company filed with the SEC a materially false and misleading quarterly report for the second quarter ended June 30, 2007, on Form 10-QSB.  The 10-QSB was signed and certified by Defendants Jacobson, Dumont and Suveg pursuant to Sections 302 and 906 of Sarbanes, and made substantially the same statement as in the May 15, 2007 10-QSB referenced above.  The 10QSB also contained a false and misleading representation that the halloysite at the Dragon Mine was of high quality and that "[t]he Company is in the process of extracting this clay to sell to outside parties."

115.   The statements contained in all of the quarterly reports outlined in ¶¶ 112-114 above were materially false and misleading when made because Defendants failed to disclose or indicated the following: (1) that Atlas recognized $250,000 as revenue representing a "sale" of halloysite clay in 2004, which the Company never delivered; (2) that an integral part of the "sale" transaction was for NaturalNano to construct a processing facility for Atlas, without which Atlas could not make the sale it claimed to have made; (3) the Company failed to inform investors that it completely lacked its own processing capability for the clay and was utterly unable to deliver any commercially viable clay; (4) that the Company did not adequately inform investors about the true prospects of the Company's exploration operations; and (5) that Atlas never knew the

true extent of commercially viable halloysite in the mine, despite its representation that there were 300,000 tons.

## FALSE AND MISLEADING STATEMENTS MADE
## THROUGH NANOCLAY, INC.

116.    The Atlas Defendants also used NanoClay, represented by these Defendants to be a division of Atlas responsible for halloysite operations, to orchestrate their fraud.  During the Class Period, Atlas, through NanoClay, issued materially false and misleading statements concerning sales of halloysite.

117.    Notably, in numerous pubic statements, including NanoClay's letterhead, press releases and Web site, Atlas and NanoClay repeated to the public that NanoClay was a "division" of Atlas.  Because NanoClay was represented as a division of Atlas, Atlas and NanoClay were telling the market that NanoClay was under the complete control of Atlas and that all of NanoClay's misrepresentations were the misrepresentations of Atlas.

118.    The NanoClay Web site was a link on the Atlas Web site.  Thus, visitors to the Atlas site seeking information about the Dragon Mine would "click" on the NanoClay link.  When Atlas Web site users click on this link they were directed to NanoClay's homepage wherein NanoClay represents it is a division of Atlas.

119.    NanoClay, led by Dr. Price, who was hired presumably to give consumer false-confidence regarding the potential nano-applications of the halloysite, frequently made false statements to the marketplace.

120.    By way of example, on April 17, 2007, NanoClay and Dr. Price announced sales of halloysite: "What a week, Tuesday is a great day.  For those of you that like to follow nanotechnology, the pictures are of a shipment of HNT (halloysite

nanoclay) to a major New York Customer… A real company shipping a real product!" The Web site showed a photograph of bales of halloysite being loaded onto a truck ready for delivery, creating the illusion that the bales were shipments from Atlas and/or NanoClay.

121.   On May 16, 2007, NanoClay and Dr. Price announced on its Web site that it was "shipping cosmetic grade clay to customers for use in natural cosmetics products."

122.   To further perpetrate fraud by creating the appearance of success in its halloysite business, on July 23, 2007, NanoClay and Dr. Price announced on its Web site that it had been awarded the 2007 World Technology Innovation Award by Frost & Sullivan.  This award was allegedly granted for NanoClay's technological superiority in their industry.  However, Frost & Sullivan has no record of ever granting this award – or any award – to NanoClay.

123.   At the time of these statements Dr. Price was also a director of Atlas, making these statements clearly attributable to NanoClay and Atlas.  Dr. Price's email signature also represented that his position was as President of NanoClay, a division of Atlas.

124.   The statements contained in ¶¶ 116-123 were materially false and misleading when made because: (1) the Company affirmatively misrepresented its halloysite sales and abilities to deliver halloysite clay; and (2) the Company did not adequately inform investors about the true prospects of the Company's exploration operations.

## EVIDENCE OF SCIENTER

125.   Despite the Atlas Defendants' SEC filings and numerous representations to the marketplace regarding sales of halloysite worldwide, these Defendants were aware

that the Company was not selling and could not sell any significant amount of halloysite because Atlas had no processing capability for the clay.  In written correspondence dated March 31, 2006, Jacobson admitted that as of that date, there were no buyers of the Dragon Mine halloysite.

126.    Later, despite the Atlas Defendants' positive representations to the market, Jacobson again admitted in writing that, as of November 29, 2006, "we have yet to sign a major sales contract."  Jacobson explained that: "One thing we will not do – is the same thing the NaturalNano people do, is to put out press releases just for the promotional value, and not anything genuine."  This statement was made notwithstanding the Atlas Defendants' numerous public statements which were issued in an attempt to persuade the marketplace that Atlas had been selling halloysite.  Jacobson noted in the November 29, 2006 writing that he was "sure we will see this market turn around in the next 30 days."

127.    While telling the public that the halloysite is being sold and shipped Jacobson further acknowledged in a September 11, 2007 writing that "Dr. Price has not been able to get any sales and this is what pays the bills."  This same day, the NanoClay homepage disappeared from the World Wide Web.

## THE TRUTH BEGINS TO EMERGE

128.    On October 9, 2007, the Company issued a press release before market open.  The press release revealed that the Company's previously reported financial statements filed with the SEC were materially false and misleading because of accounting improprieties relating to revenue recognition for halloysite clay.  The press release, provides, in relevant part, as follows:

Tuesday October 9, 8:00 am ET

KELLOGG, Idaho--(BUSINESS WIRE)--Atlas Mining Company (OTCBB:ALMI - News) today announced that the company will restate the Company's audited consolidated financial statements and other financial information at and for the fiscal years ended December 31, 2004, 2005, and 2006 and its unaudited consolidated financial statements and other financial information at and for the fiscal quarters ended March 31, June 30, and September 30, for the years 2005, 2006, and 2007, *to correct the Company's accounting for cash received in 2004 as a deposit for future deliveries of halloysite clay from the Company's Dragon Mine in Juab County, Utah*. The correction follows a meeting between members of the Company's newly appointed senior management and a company with which Atlas' former management has had a prior business relationship. At that meeting, current management was informed that the Company had been paid $125,000 in December 2004 and $125,000 paid in June 2005 as a deposit for future deliveries of halloysite clay.

Following a review of this transaction and confirmation of the receipt of such funds, the Company has determined that the Company recorded the funds received as revenues. *Because the Company has not delivered the clay, the Company believes such amounts should have been classified as unearned revenues and reported as liability on the Company's balance sheet*. The Company has therefore determined to account for the transaction as a deposit of funds, thus reducing previously recorded revenues and increasing long-term liabilities.

The Company estimates that as a result, its net loss as originally filed at $946,274 will be increased by approximately $250,000, totaling $1,196,274, for the fourth quarter and year ended December 31, 2004. In addition, long-term liabilities will be increased by approximately $125,000 for the year ended December 31, 2004, and quarter ended March 31, 2005, and $250,000 for the years 2005 and 2006, and for the quarters ended June 30, and September 30, 2005 and 2006, and for the quarters ended March 31, and June 30, 2007. The affect on long-term liabilities of such restatement will be as follows:

| Period Ended | Long-Term Liabilities As Originally Stated | Long-Term Liabilities As Amended (Estimated) |
|---|---|---|
| Year ended Dec. 31, 2004 | $30,055 | $280,055 |
| Quarter ended Mar. 31, 2005 | 29,881 | 279,881 |
| Quarter ended June 30, 2005 | 29,068 | 279,068 |
| Quarter ended Sept. 30, 2005 | 29,068 | 279,068 |

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 42

| Year ended Dec. 31, 2005 | 37,188 | 287,188 |
| Quarter ended Mar. 31, 2006 | 23,688 | 273,688 |
| Quarter ended June 30, 2006 | 172,632 | 422,632 |
| Quarter ended Sept. 30, 2006 | 159,496 | 409,496 |
| Year ended Dec. 31, 2006 | 216,721 | 466,721 |
| Quarter ended Mar. 31, 2007 | 321,237 | 571,237 |
| Quarter ended June 30, 2007 | 344,741 | 594,741 |

*In the course of its review of this transaction, the Company has identified additional potential areas of accounting uncertainty that it is currently investigating. The Company cannot currently say whether the additional items will result in further corrections to the Company's financial statements.*

At this time it does not appear that there are any irregularities with respect to revenue earned or recognized from the Company's contract mining services division, which is currently generating approximately $2.0 million in gross revenues per quarter.

As a result of these issues, the Company is canceling today's investor update conference call. On the call, the Company's newly appointed management intended to discuss the status of the Dragon Mine and provide an update on their activities and discoveries since joining the Company in July and August, 2007. Specifically, on the call, management planned to inform investors that in their opinion, a current lack of a comprehensive, independent, third-party resource evaluation and estimation, insufficient mine planning, and inadequate processing facilities at the Dragon Mine are significant ongoing factors in the Company's inability to enter into definitive contracts for the supply of halloysite clay from the Dragon Mine. *Accordingly, no short or long term contracts for halloysite clay from the Dragon mine are pending or imminent in the near future. New management further intended to inform investors that the Company has suspended mining activities at the site pending an independent, third-party geologic review and detailed evaluation of the nature and extent of the Dragon Mine halloysite deposit, and note that the Company is presently in discussions with potential contractors to begin this process in the near future.*

(Emphasis added).

110.    On October 9, 2007, the Company also filed an 8-K with the SEC announcing that it would have to restate its financial statements for each of the reporting periods from 2004 through that current fiscal quarter as a result of improper revenue recognition practices and other violations of generally accepted accounting principles.

Pursuant to Item 4.02 in the 8-K, titled "Non-Reliance On Previously Issued Financial Statements Or A Related Audit Report Or Completed Interim Review," the Company disclosed that:

> On October 5, 2007 the chief executive officer and chief financial officer of Atlas Mining Company (the "Company") determined that it will be necessary to restate the Company's audited consolidated financial statements and other financial information at and for the fiscal years ended December 31, 2004, 2005, and 2006 and its unaudited consolidated financial statements and other financial information at and for the fiscal quarters ended March 31, June 30, and September 30, for the years 2005, 2006, and 2007.

> The determination to restate resulted from recent discussions with a customer and the subsequent discovery that the Company had not properly accounted for cash received in 2004 as a deposit for the sale of halloysite clay from the Company's Dragon Mine. The deposit was improperly recorded as revenue for the year ended December 31, 2004. *In addition, as a result of an ongoing review of prior period records, other areas of accounting uncertainty involving equity issuances, fixed asset ownership and long-term liabilities have been identified and, at the request of the Company's CFO and CEO, will be investigated by independent, outside accountants. Once independent sources have reviewed the information, quantification of the accounting matters will be defined and reported.*

> As a result of the foregoing, the Company has determined to inform the Securities and Exchange Commission of a delay in filing its Quarterly Report on Form 10-QSB.

129.    The disclosures in made by Atlas in the October 9, 2007 press release and 8-K caused the Company's stock to fall. On October 8, 2007, the Company's stock closed trading at $1.64 per share with 52,700 shares trading hands that day. On October 9, 2007, the Company's stock opened the day trading at $1.06 and closed the day at $.80 per share, or down over 51% from the previous day's opening, on 6,418,299 shares traded.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 44

130.    Later, in its Form 10-QSB filed on November 14, 2007 for the period

ending September 30, 2007, Atlas' partner in fraud, NaturalNano, stated that: "During the

three months ended September 30, 2007, the Company was notified that Atlas Mining

Company suspended mining activities at its mining facility which sources halloysite

pending the completion of a mining study.  Due to this uncertainty, all prepaid amounts

related to Atlas Mining Company have been reclassified as long term until there is

resolution of this uncertainty."

131.    Operations at the Dragon Mine were suspended after the Company's

revelations of October 2007 and remained suspended throughout 2008.

**The Special Committee**

132.    On January 11, 2008, Atlas's Board of Directors appointed a Special

Committee (the "Special Committee") to investigate the conduct of prior management

and to evaluate the business, financial condition, assets, strategy, prospects and

management of the Company and to recommend to the Board of Directors various

alternatives to improve the Company's performance and prospects.

133.    The Special Committee was assisted in the investigation by outside legal

counsel, Blank Rome LLP ("Blank Rome"), and the independent accounting firm,

Heiskell, MacGillivray & Associates retained by Blank Rome (the Special Committee

and its advisors are referred to collectively as the "Investigative Team").

134.    The Investigative Team reviewed and investigated, among other things,

(a) certain of the Company's prior issuances of equity securities and issues related

thereto, (b) the accounting treatment for the $250,000 received by the Company in

connection with the NaturalNano transaction, (c) the Company's accounting for fixed

assets and long-term liabilities, and (d) certain public statements made by the Company regarding the Dragon Mine.

135.     The Special Committee reported its findings to the staff of the SEC in July 2008.    On August 28, 2008, the Special Committee presented its findings and recommendations to the Board of Directors, and after consideration, the Company's Board of Directors accepted the findings and recommendations of the Special Committee.

136.     The Special Committee determined:

a.   That none of Atlas's financial statements for all periods beginning in 2002 through the second quarter of 2007 can be relied upon (as opposed to the Company's shocking October 9, 2007 disclosure that only indicated that the financial statements starting from 2004 were being restated);

b.   That the accounting treatment of the $250,000 received from NaturalNano as revenue for a purported sale of halloysite clay in 2004 was incorrect;

c.   That expenses recorded in 2002 through 2006 relating to the value of issuances of equity stock and the compensation expenses associated with the vesting of certain stock options granted to the Company's officers were not properly recorded on the Company's financial statements;

d.   That Atlas's internal control over financial reporting and disclosures contained material weaknesses, which led to inadequate and inaccurate disclosures;

e.   That Atlas had issued press releases during the Class Period that contained inaccurate statements regarding the production capabilities and activities at the Dragon Mine;

f.  That CBN was being fired by Atlas in favor of new auditors, to perform audits of Atlas's financial statements for the years ended December 31, 2005, 2006 and 2007, and;

g.  That the new audit could result in the need for additional restatements to reconcile the accounting treatment.

137.   The Special Committee thus confirmed that the accounting for the NaturalNano transaction was incorrect and further confirmed that the Company would have to issue restatements for its audited consolidated financial statements and other financial information based on that improper accounting.

138.   The Special Committee determined that during the two year term of the NaturalNano contract, the $250,000 should have been treated as a deposit and not as earned income.  Thus, Atlas was forced to issue restatements for its financial statements for the year ended December 31, 2006 and the quarters ended March 31 and June 30, 2006 and 2007, and September 30, 2006.  The effect of the restatements is described in ¶ 144-145 below.

139.   In addition to the NaturalNano matter, the Special Committee also determined that Defendant Jacobson was responsible for numerous violations of the federal securities laws, both prior and during the Class Period.  Specifically, during 2002 through 2006, approximately 30 million shares of common stock were issued by Atlas in violation of the federal securities laws, including the registration provisions of Section 5 of the Securities Act of 1933.  The violations involved (a) misuse of SEC Registration Form S-8, a short form registration form for compensatory issuances to certain officers, directors, employees and consultants (approximately 16 million shares were issued under Form S-8), (b) transfer of 9.9 million shares to related parties and affiliates that were

purportedly sold under the Company's Registration Statement on SEC Registration Form SB-2 and subsequent resales without compliance with the plan of distribution contained in the Company's SB-2, and (c) grants of at least 2.8 million shares purportedly made pursuant to the exemption from registration set forth in Section 4(2) of the Securities Act.

140.    The Special Committee specifically determined:

a.   Between 2002 and 2006, the Company issued approximately 16 million shares of common stock that were purportedly issued under the Company's registration statements on Form S-8.   Approximately 14.6 million of these shares, with an aggregate market value of approximately $3.6 million were issued to individuals and entities that were ineligible to receive them.   Among other reasons, the recipients of the stock provided the Company with capital raising or stock promotion services and/or did not provide any bona fide consulting services to the Company.  In addition, stock issuances also may have been in excess of the number of shares the Company had registered on Form S-8 and  many of the shares were issued in violation of the Atlas' 2002 Consultant Stock Plan.  Certain shares were issued to family members of the Company's then CEO, Defendant Jacobson, and such transactions appear to have been, among other things, director conflict of interest transactions which did not receive proper approval from the Board of Directors.   Moreover, the values given to the S-8 stock for financial reporting purposes in many cases appear to have been less than market value of the stock on the apparent dates of issuance.

b.  In 2003, the Company registered for sale on SEC Registration Form SB-2 ten million shares of common stock at a fixed price of $0.10 per share on a self-underwritten basis.   Purportedly to avoid filing a post-effective amendment to

update the disclosure in the registration statement, the Company issued 9.9 million shares to related parties and affiliates.  In 2003 and 2004, these shares were provided to third parties for resale and resales were apparently made at times when the market price was greater than $0.10.  Only after such resales did the Company ultimately receive cash payments in the aggregate of approximately $805,000 for these shares, which is less than the $990,000 that would be expected.

c.  In 2003, the Company issued 2.8 million restricted shares for supposed services purportedly in reliance on the private placement exemption from registration set forth in Section 4(2) of the Securities Act.  However, the Company did not determine whether the recipients satisfied a condition of the exemption (that is, that the recipients took with the intent to resell only pursuant to an effective registration statement or an exemption from registration).  In some cases, the Company instructed the Company's transfer agent to transfer these shares prior to the applicable holding period under Rule 144, which is an exemption from registration. 1.4 million of these shares were issued to a family member of Defendant Jacobson and this transaction appears to have been, among other things, a director conflict of interest transaction which did not receive proper authorization from the Board of Directors.

d.  In 2002 through 2006, the Company did not properly record on its financial statements certain compensation expenses associated with the vesting of certain stock options granted to the Company's former officers.

e.  In 2004, Defendant Jacobson received options to purchase 3.5 million shares of Atlas common stock in violation of the Company's existing stock option plans.  The options had an exercise price below the market price of the common stock on the

date of the grant, which violated the terms of the plan under which they were granted.  The Company did not properly account for the compensation expenses related to the grant.

141.    The Special Committee also discovered transactions between the Company and the Company's wholly- or partly-owned subsidiaries or related entities, including stock issuances to those entities that violated Section 5 of the Securities Act and intercompany loans with those entities that appear to have been conflict-of-interest transactions entered into without proper corporate authorization or business purpose.

142.    In the aftermath of the Special Committee's investigation, the Company appointed PMB Helin Donovan LLP ("PMB") as independent auditors for the purposes of auditing the financial statements for the years ended December 31, 2006 and December 31, 2007, and conducting other audit procedures on the financial statements for the year ended December 31, 2005 and 2004, and reviewing financial statements for the first Quarter 2006 through 2009, the second Quarter 2006 through 2009, and third Quarter 2006 through 2008.

143.    In February 2009, Atlas's counsel received a formal order of investigation from the SEC and on March 6, 2009, Atlas disclosed that the investigation would entail "facts with respect to possible violations of the securities laws by the Company and its officers, directors and affiliates for the period of August 2002 through 2006."  The SEC investigation of Atlas is ongoing.

**The Company's Restatements**

144.    On July 15, 2009, Atlas filed an amended Quarterly Report on Form 10-QSB (the "July 15, 2009 10-QSB") for the quarter ended March 31, 2007 (the report was originally filed on May 15, 2007).  In the July 15, 2009 10-QSB, Atlas reported that,

because of the Special Committee's conclusion that restatements of Atlas's financial statements were necessary, Atlas was restating financial information for the year ending December 31, 2006 and the fiscal quarters ended March 31, 2006, March 31, 2007 and June 30, 2007.

145.    The Company summarized the effect of its restatements on its previously issued 2006 financial statements as follows:

*Balance Sheet as of December 31, 2006*

|  | Previously Reported | Increase (Decrease) | Restated |
|---|---|---|---|
| Current Assets (a)(c) | $  1,281,739 | $       (1,108) | $  1,280,631 |
| Property and Equipments (b) | 2,977,933 | (149,113) | 2,828,820 |
| Total Assets | 4,309,881 | (200,430) | 4,109,451 |
| Current Liabilities (d) | 638,368 | 114,009 | 752,377 |
| Long-term Liabilities (e) | 216,721 | (87,240) | 129,481 |
| Total Liabilities | 855,089 | 26,769 | 881,858 |
| Stockholders' Deficit: |  |  |  |
| Accumulated Deficit—December 31, 2005 (f) | (9,649,505) | (1,146,697) | (10,796,202) |
| Net Income (Loss) for 2006 | (1,992,922) | (118,261) | (2,111,183) |
| Accumulated Deficit—December 31, 2006 | (12,789,124) | (118,261) | (12,907,385) |
| Total Liabilities and Stockholders' Equity | 4,309,881 | (1,134,703) | 3,175,178 |

*Statement of Operations and Comprehensive Loss for the Year Ended December 31, 2006*

|  | Previously Reported | Increase (Decrease) | Restated |
|---|---|---|---|
| Revenue – Contract Mining | $ 3,799,204 | $       -0- | $ 3,799,204 |
| Cost of Sales (g) | 2,689,530 | (77,711) | 2,611,819 |
| Gross Profit | 1,109,674 | 77,711 | 1,187,385 |
| Exploration and Mining Production Costs (h) | 2,143,161 | 168,986 | 2,312,147 |
| General & Administrative Expenses (i) | 991,266 | 233,881 | 1,225,147 |
| Loss from Operations | (2,024,753) | (325,156) | (2,349,909) |
| Interest Expense | (20,074) | -0- | (20,074) |
| Interest Income | 30,188 | (112) | 30,076 |
| Realized Loss on Securities (j) | -0- | (39,219) | (39,219) |
| Settlement on contract (k) | -0- | 250,000 | 250,000 |
| Other Income | 21,327 | (3,774) | 17,553 |
| Minority Interest | (510) | -0- | (510) |
| Income (Loss) before Taxes | (1,992,922) | (118,261) | (2,111,183) |
| Provision for Income Taxes | -0- | -0- | -0- |
| Net Loss | (1,992,922) | (118,261) | (2,111,183) |

The financial results presented in this report reflect the restatement of the Company's financial results as follows:

(a, b, e, f) - Correction of an error involving exploration expenses originally classified as the acquisition of land via long-term debt for the year ended December 31, 2006.  Correction of the error included a reduction in land and tunnels in the amount of $169,613, a reduction in long-term debt in the amount of $100,677 and $68,936 expensed as exploration costs.  Correction of the error included an increase in land and tunnels for 100,000 shares of stock issued below fair market value for an additional $20,500 for the year ended December 31, 2005 for a total of $120,500.

(c, f) - Correction of an error of long-term notes receivable – related party in the amount of $50,000 was written off as bad debt for the year ended December 31, 2005.  The additional interest income of $209 was written off at December 31, 2006.

(d, h) – Correction of an error to record an accrual of previously unrecorded liability (exploration and development services) in the amount of   $97,650 for the year ended December 31, 2005.  Accrual of previously unrecorded liability (exploration and development services) in the amount of $7,750 for the year ended December 31, 2006.  Accrual of previously unrecorded liability for wages and associated payroll tax liabilities (mining production costs) in the amount of $22,046 for the year ended December 31, 2006.

(f) – Correction of an error to write-off deposits previously recorded in the amount of $10,138.

(f) – Correction of an error to record deferred revenue in the amount of $250,000 that was previously recorded as earned revenue in 2004, subsequently recorded as settlement on a contract at December 31, 2006.

 (f) – Correction of an error to record $117,308 of realized losses for impairment of available for sale securities that were previously recorded in accumulated other comprehensive income as unrealized losses.

(f) – Correction of an error to record $119,000 and $51,000 for fees paid to a related party at December 31, 2004 and 2003, respectively.

(f) – Correction of an errors in the valuation of stock issued under an S-8 plan issued below fair market value in the amounts of $488,500 for services, 6,523,857 shares for services at $64,358, 1,400,000 shares for $42,000 to related parties for the years ended December 31, 2005, 2004 and 2003, respectively.

(f) – Correction of an error in valuation of vested stock options issued under FAS 123(R) and APB Opinion No. 25 to former officers and directors.   The compensation expense related to vesting of 1,500,000 of vested stock options was under-valued by $200,200, and 650,000 of vested stock options were under-valued by $16,560 for the years ended December 31, 2001 through 2005.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 52

(f) – Correction of an error related to the valuation of 1,224,000 warrants issued to former officers, directors, and others at December 31, 2004 were valued at $160,971.  These warrants were previously recorded in error for the amount of $519,542at December 31, 2005.

(f) – Correction of an error for unrecorded liabilities in the amount of $97,650 during 2005.

(g) - Reclassification of cost of sales to exploration and mining production costs in the amount of $77,711 for the year ended December 31, 2006.

(h) – Reclassification of $161,236 in mining production costs that were originally classified as land acquisition costs at December 31, 2006.

(i) Correction of error in valuation of stock options granted under FAS 123(R) to former officers and directors.  The compensation expenses related to 750,000 stock options were under-valued by $233,881 at December 31, 2006.

(j) – Correction of an error in the recognition of realized losses on the permanent impairment of available for sale securities in amount of $39,219 for the periods ended December 31, 2004, 2005 and 2006.

(k) – Correction of error in recognition of cash received from a customer originally recorded as revenue, but reclassified as a long-term liability (deferred revenue) in the amount of $250,000 for the year ended December 31, 2004.

146.   As illustrated above, the restated financials confirm the widespread accounting fraud at Atlas, which affected nearly every item on its balance sheet and not only corrected for the improper accounting relating to the fictitious sales of halloysite but also accounting for numerous impermissible stock issuances and related party transactions in violation of the federal securities laws.

## ATLAS' FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING WHEN MADE BECAUSE THEY VIOLATED GAAP

147.   At all relevant times during the Class Period, Defendants represented that Atlas' financial statements, when issued, were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules,

conventions and procedures necessary to define accepted accounting practices at a particular time.

148.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 1, *Objectives of Financial Reporting by Business Enterprises* (November 1978), one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decision reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

149.    The SEC requires that public companies file quarterly and annual financial statements that are prepared in conformity with GAAP.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be *presumed* to be misleading or inaccurate," despite footnote or other disclosures.   (Emphasis added). Regulation S-X further requires that interim financial statements must also comply with GAAP, with the exception that an issuer need not include in interim financial statements disclosures that would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

150.    Further, Section 13 of the Exchange Act, 15 U.S.C. § 78(m)(b), requires, in part, that companies like Atlas devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: "transactions are recorded as

necessary (i) to permit preparation of financial statements in conformity with [GAAP] or any other criteria applicable to such statements, and (ii) to maintain accountability for assets…"

151.     According to the Professional Standards of the American Institute of Certified Public Accountants ("AICPA") an issuer's management is responsible for preparing financial statements in conformity with GAAP because the issuer's "transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management."   It is management that must adopt "sound accounting policies" and establish and maintain "internal control that will, among other things, record process, summarize, and report transactions (as well as events and conditions) consistent with management's assertion embodied in the financial statements."

152.     In preparing financial statements, management must take into consideration the fundamental objectives and concepts which GAAP are based, which include:

   a.   The principle that financial reporting should provide information that is useful to
        present and potential investors and creditors in making rational investment
        decisions and that information should be comprehensible to those who have a
        reasonable understanding of business and economic activities. (FASB Statement
        of Concepts No. 1, ¶ 34);

   b.   The principle of materiality, which provides that the omission or misstatement of
        an item in a financial report is material if, in light of the surrounding
        circumstances, the magnitude of the item is such that it is probable that the
        judgment of a reasonable person relying upon the report would have been

changed or influenced by the inclusion or correction of the item. (FASB Statement of Concepts No. 2, ¶ 132);

c.   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (FASB Statement of Concepts No. 1, ¶ 50);

d.   The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1, ¶ 42);

e.   The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting. (FASB Statement of Concepts No. 2, ¶¶ 58-59);

f.   The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2, ¶ 80);

g.   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what

is reported represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶ 95, 97); and

h.   The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies. (FASB Statement of Financial Accounting Standards  No. 5, Accounting for Contingencies).

153.   Throughout the Class Period, the Company used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate reported revenues, net income and earnings per share in the interim quarters and fiscal years during the Class Period, as specified herein.   At a minimum, the Company violated GAAP by materially overstating revenue by recognizing a sale of halloysite in 2004 that never actually took place and further, in failing to adequately disclose the nature of the Company's operations.

### Overstated Revenue

154.   Clear and longstanding GAAP provisions preclude the recognition of revenue and the recording of related accounts receivable from transactions that have no economic substance.

155.   GAAP, in Concepts Statement No. 5: *Recognition and Measurement in Financial Statements of Business Enterprises,* states that revenue "recognition involves consideration of two factors (a) being realized or realizable and (b) being earned…" (CON 5, ¶ 83).   The Concepts Statement describes the concept of "earned'" in relevant part as follows:

> Revenues are not recognized until *earned*.   An entity's revenue earning activities involve *delivering or producing goods*, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. . . .
>
> (CON 5, ¶ 83b).(Emphasis added).

Further, the Concepts Statement states:

> The two conditions (being realized or realizable and being earned) are usually met by the time *product or merchandise is delivered* or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery).
>
> (CON 5, ¶ 84a).(Emphasis added).

156.    Additionally, the SEC provided its views in applying GAAP to selected revenue recognition issues through the issuance of Staff Accounting Bulletin ("SAB") No. 101 – *Revenue Recognition in Financial Statements* on December 3,1999.  SAB 101 states, in relevant part, as follows:

> The staff believes that revenue generally is realized or realizable and earned when *all* of the following criteria are met:
> - Persuasive evidence of an arrangement exists,
> - *Delivery has occurred* or services have been rendered,
> - The seller's price to the buyer is fixed or determinable, and
> - Collectability is reasonably assured.  (Emphasis added)

157.    Atlas violated GAAP by recording revenue from a 2004 sale of halloysite to NaturalNano that it had not yet made.  Atlas knowingly or with deliberately reckless disregarded that the revenue it did not yet receive as a result of its collusion with NaturalNano, as quantified above, was not "earned."

**Failure to Adequately Disclose the Nature of the Operations**

158.   AICPA Statement of Position 94-6, "Disclosure of Certain Significant Risks and Uncertainties ("SOP 94-6"), requires that disclosures regarding an estimate should be made when information is known and available prior to the issuance of the financial statements, indicating that both of the following criteria are met:

a.   It is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events; and

b.   The effect of the change would be material to the financial statements.

159.   The disclosures required by SOP 94-6 "focus primarily on risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term or the near term functioning of the reporting entity." Such risks and uncertainties "can stem from the nature of an entity's operations." Accordingly, SOP 94-6 ¶ 10, requires the following with respect to a Company's disclosure of the nature of its operations:

> Financial statements should include a description of the major products or services the reporting entity sells or provides and its principal markets, including the locations of those markets. *If the entity operates in more than one business, the disclosure should also indicate the relative importance of its operations in each business and the basis for the determination- for example, assets, revenues, or earnings...* Disclosures about the nature of operations need not be quantified; relative importance could be conveyed by use of terms such as predominately, about equally, or major and other.

> (Emphasis added)
.

160.   As detailed above, Atlas repeatedly held itself out as a miner and seller of halloysite clay throughout the Class Period.  Atlas made no mention of the fact that 100%

of the halloysite business touted by Atlas consisted of a sale that never actually took place.  Further, Atlas made no mention of the fact that it totally lacked any processing capability for its clay.  These failures to disclose the truth about the nature of Atlas's halloysite business and its associated risks violated GAAP.

### Materiality of Atlas's GAAP Violations

161.   As first admitted by the Company on October 9, 2007, in each SEC filing during the Class Period, Atlas materially overstated its revenue in violation of GAAP. Specifically, Atlas improperly recorded revenue that was for speculative, future purchases of halloysite.  Accordingly, Atlas was required to restate any previously issued financial statement to correct for revenues improperly recognized.

162.   In view of the "potential dilution of public confidence in financial statements resulting from restating the financial statements of prior periods," according to GAAP, a retroactive restatement of financial statements is reserved for *material* accounting errors that existed at the time the financial statements were prepared.  APB Opinion No. 20, Accounting Changes, ¶¶ 18, 27, 34-38 (July 1971).  This accounting mandate was reaffirmed through the issuance of FASB Statement No. 154 in May 2005. Since GAAP allows only for correction of errors that are *material*, by restating its financial statements, Atlas admitted the materiality of errors in its previously issued financial statements for fiscal years 2004 through 2006.

163.   On January 31, 2002, the SEC, the ultimate authority regarding GAAP and matters of financial reporting (SEC Accounting Series Release Nos. 4 and 150), submitted an Amicus Curiae Brief (*In re Sunbeam Securities Litigation*, 98-8258-Div-Middlebrooks, S.D. FL, Miami Div.)(the "SEC Brief") which unequivocally stated its position with regard to restated financial statements as follows:

… corrected financial statements are highly probative of at least two of the elements of a private action under the federal securities laws: whether there was a misstatement in the original financial statements and whether the misstatement was material. <u>See, e.g., In re Telxon Corp. Secs. Litig.</u>, 133 F. Supp. 2d 1010, 1025 (N.D. Ohio 2000) (when ruling on defendants' motion to dismiss action under PSLRA, court held that company defendant was not in a position to dispute that it misstated material facts in its financial disclosures because company admitted its prior disclosures were materially misstated when it issued the restatements which gave rise to the litigation) (citing <u>In re Peritus Software Servs.,, Inc.</u> <u>Secs. Litig.</u>, 52 F. Supp. 2d 211, 223 (D. Mass. 1999) ("after the fact accounting admissions may suffice to show that material misstatements occurred")). *Restated financial statements are probative of these two issues because under GAAP and GAAS they cannot be filed unless the original financial statements contained material errors as defined in GAAP. See pages 11-12 above. Thus, under GAAP, restated financial statements must constitute an admission of past errors.*

(Emphasis added).

164.    There is no question that by announcing its intended filing of restated financial statements with the SEC and in subsequently filing those restatements, Atlas admitted that it had previously disseminated materially misstated financial statements to the investing public.

## DEFENDANTS' SARBANES-OXLEY CERTIFICATIONS AND OTHER ATTESTATIONS TO THE EFFICACY OF INTERNAL CONTROLS WERE ALSO MATERIALLY FALSE AND MISLEADING WHEN MADE

165.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances

that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

166.    The Atlas Defendants violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  Atlas failed to put into place proper reviews and checks to ensure that its management did not engage in accounting improprieties.  It failed to ensure that transactions were reported in accordance with GAAP.

167.    Atlas's and the Individual Defendants' lack of adequate internal controls, detailed below in ¶ 280, rendered the Company's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.  Nonetheless, during the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

168.    Each Sarbanes-Oxley certification issued during the Class Period, in which Defendants Jacobson, Dumont and Suveg specifically warranted that they had personally designed and implemented internal disclosure control procedures to ensure the disclosure of "any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting" were false and misleading when made for the reasons set forth above.

## CBN'S ROLE IN THE ATLAS FRAUD

169.    Long before the Class Period in this matter, CBN was engaged to perform accounting services and serve as an independent auditor for Atlas on November 17, 2000, and continued their engagement with Atlas until CBN was fired on October 9, 2007- the

very same day the Company revealed its fraud.  CBN audited the Company's financial statements which were subsequently filed with Securities and Exchange Commission.  At the same time, CBN aided Atlas in preparing its financial statements from 2000 through 2004.

170.    From the very beginning, CBN's work at Atlas was conflict-tainted.  CBN was not qualified to serve as Atlas's independent auditor because of its role in preparing Atlas's financial statements for the years 2000 through 2004.  By both preparing the Company's financial statements and serving as the Company's independent auditor, CBN was evaluating the quality and adequacy of their own work.  This was an unquestionable conflict.

171.    CBN's responsibilities were outlined by a series of agreements entered into between CBN and Atlas between November 17, 2000 and August 18, 2006.  Among other things, those agreements required CBN to:

a.   conduct its audits of the Company's financial statements in accordance with GAAS and the standards established by the Public Company Accounting Oversight Board (the "PCAOB");

b.   obtain reasonable assurance as to whether the Company's financial statements were free of material misstatements, errors, fraudulent financial reporting, misappropriation of assets and violations of law or regulations by the Company, management, or employees acting on behalf of the Company;

c.   test documentary evidence supporting the transactions recorded in the accounts;

d.   communicate to the audit committee and management of the Company any errors, fraud, or other illegal acts that came to CBN's attention during CBN's audits; and

e.  evaluate and communicate to the audit committee that CBN possessed the
    necessary independence to perform the task of auditing Atlas's financial
    statements.

172.   When CBN was retained by Atlas, Atlas did not have an accounting
department.  Marqueta Martinez, Atlas's Secretary and a member of the Company's
Board of Directors, was charged with keeping Atlas's books.  CBN knew that Martinez
had no accounting training and no training in the preparation of financial statements
compliant with GAAP and SEC regulations for a publicly held company.  CBN knew of
Ms. Martinez's limitations.  CBN also knew that it was Atlas's only accountant and that
it was to advise the Company of matters relating to accounting, GAAP, SEC regulations,
SEC accounting compliance and the creation of Atlas's financial statements.  CBN knew
that, as a public company, Atlas's shareholders relied on information prepared by CBN
and disseminated to the marketplace.

173.   On its Web site, CBN represents that its "expertise ranges from basic tax
management and accounting services to more in-depth services such as audits, financial
statements, and financial planning."

174.   CBN further represents on its Web site that the company offers "three
levels" of financial statement services, with audits "offer[ing] the *highest level* of
assurance to third parties, and include *in-depth examination* and confirmation of account
balances, inventories, and selected transactions."  (Emphasis added).

175.   During the Class Period, the CBN Defendants did not perform the "highest
level" of "in-depth examination." To the contrary, the CBN Defendants violated GAAP,
GAAS, and the standards of the PCAOB in auditing the financial statements of Atlas in
preparation for filing with the SEC.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS - 64

176.    During the Class Period, CBN had a professional staff of between six (6) and twelve (12) professionals to represent a remarkable sixty-seven (67) public entities. This volume of reporting company clients is unheard of for such a small company as CBN.  Some of the largest auditing firms in the world, with hundreds or thousands of employees, have many fewer clients than CBN.  For example, according to 2005 annual rankings published in "Who Audits America," by Spencer Harris, Data Financial Press (53rd Ed., June 2005), the audit firms ranked 9th through 14th in the nation were listed as having only a range of between 1 and 59 clients, most of whom fall into the category of smaller businesses, with annual sales of between $1 million and $25 million.  This stands in marked contrast to CBN, a firm with between 6 and 12 professional employees who conducted audits and performed SEC compliance-related activities for *67 clients*.

177.    Not surprisingly, CBN has been investigated *twice* by *the PCAOB and both of these investigations revealed material deficiencies in the CBN's auditing and accounting practices*.  These deficiencies include consistent departures from GAAS; failure on multiple occasions to sufficiently test revenue recognition; failure to sufficiently test goodwill for impairment; and failure to evaluate the impact of opening balances on financial statements and the consistency of accounting principles for the period covered by CBN's audit reports.

178.    CBN's business model relies on a "high volume" business approach. CBN performs services almost exclusively for small public companies or public shells at cut-rate prices.  Because of this business model, CBN has recklessly and consistently fallen afoul of PCAOB standards as it is imperative that the firm perform as many audits as feasible in the shortest time possible.

**CBN'S AUDIT OPNIONS WERE MATERIALLY FALSE AND MISLEADING
WHEN MADE BECAUSE ATLAS' FINANCIAL STATEMENTS DID NOT
CONFORM TO GAAP AND CBN'S AUDITS DID NOT CONFORM TO GAAS**

179.   Throughout the Class Period, CBN directly and indirectly, by use of means and instrumentalities of interstate commerce and the United States mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Atlas, including its true financial results.

180.   CBN made untrue and misleading statements of material fact and omitted to state material facts necessary in order to make its statements not misleading. Specifically, CBN knew or but for their reckless disregard should have known that Atlas had fundamentally misrepresented the nature of its business and that its financial statements for the fiscal years ended December 31, 2004 through December 31, 2006 were materially misstated and not presented in conformity with GAAP.  In addition, CBN's audit of those financial statements was not performed in accordance with GAAS.

181.   The specific false and misleading statements for which CBN is charged with liability under Section 10(b) are certain statements contained in the Forms 10-K, including but not limited to Atlas's financial statements and the notes thereto, as well as CBN's unqualified audit opinions on the Company's financial statements for the fiscal years ended December 31, 2004 through December 31, 2006.  For each of these, CBN represented that "[i]n our opinion, the consolidated financial statements referred to … present fairly, in all material respects, the consolidated financial position of Atlas Mining Company … and the results of its operations and cash flows for the years then ended in conformity with U.S. generally accepted accounting principles."  Yet, the financial statements did not fairly present the financial condition of the Company as was represented by CBN.  In fact, CBN's audit opinions were materially false and misleading

because Atlas' financials statements did not comply with GAAP and CBN's audits did not comply with GAAS.

182.   CBN's audits represented an extreme departure from GAAS and, therefore, it had no reasonable basis to support its opinion that Atlas's financial statements fairly presented the Company's financial position and results of operations in conformity with GAAP.

183.   As is particularized herein, CBN either identified and ignored, or recklessly failed to investigate the extremely questionable halloysite sale made by Atlas to NaturalNano and Atlas's representations for halloysite prospects, and made audit judgments that no reasonable auditor would have made if confronted with the same facts.

184.   Unlike many large audits consisting of millions of transactions, CBN was only tasked to review a *single* halloysite sale in one of the Company's main lines of businesses.  Atlas never claimed any revenue previously from the sale of halloysite, yet, as claimed by the Company, the 2004 sales of halloysite increased Atlas' gross profit *sixteen fold*.  Even the most rudimentary of audits would have examined this sale which so dramatically increased Atlas' revenues.  Had such an audit been performed, it would have revealed that Atlas did not sell any of the halloysite it claimed to have sold.

185.   Further, a basic audit would have detected that a main component of the fictitious halloysite sale transaction with NaturalNano was that NaturalNano was required to construct a processing facility for Atlas.  Knowing that Atlas had no processing capability, no reasonable auditor would have allowed the Company to claim this sale of halloysite.

186.   Still further, if CBN had even given the most cursory review of the agreement between Atlas and NaturalNano, it would have noticed that the contract

required the parties to exchange monthly reports on the progress of NaturalNano's development of processing capabilities for Atlas.  CBN, had it performed its required function, should have examined these records or noted that no such records existed.

187.    Yet, CBN's audits did not reveal any of these crucial, material facts. Indeed, CBN's work papers did not contain any relevant documentation to substantiate the fictitious sale of halloysite: it did not have in its possession a copy of the contract, purchase order, records of shipment, records of delivery and/or any of the reports that NaturalNano had promised to provide Atlas to report on the progress of its development of processing capability for halloysite.  CBN reckless failure to examine this crucial transaction demonstrates that CBN's audits were so deficient that they amounted to no audit at all.

188.    As discussed above, Atlas restated its previously issued financial statements to correct its prior improper accounting for halloysite clay sales that were not earned.  As alleged herein, the restatements also corrected a host of other accounting improprieties at Atlas including improper stock issuances and related transactions in violation of the securities laws.  These accounting issues were material to Atlas' financial statements and they were not disclosed during the Class Period.

189.    Atlas failed to recognize obvious accounting improprieties and CBN failed to qualify their Class Period audit opinions as a result of flagrant violations of GAAP as required by GAAS (*See* AU Section 508.10 "Reports on Audited Financial Statements").

190.    Each and every *unqualified* audit opinion which CBN expressed during the Class Period stated that its audit assessed the accounting principles used by Atlas and that CBN's audits provided reasonable bases for their opinions.  These representations were materially false and misleading because CBN either failed to assess the propriety of

the accounting principles used by the Company and to consider the Company's use of non-GAAP accounting as specified above, or did so in an egregiously reckless matter.

191.    CBN's failure to disclose the truth about the audits and its audit opinions had the effect of maintaining the artificially high price of the Atlas stock throughout the Class Period.  As a result, Lead Plaintiffs and members of the Class sustained damages when the truth about the accounting improprieties became known on October 9, 2007.

192.    In its unqualified audit opinion dated January 28, 2005, CBN opined on the consolidated financial statements of Atlas as of December 31, 2004 and 2003.  The audit opinion, contained in CBN's report as reproduced in the Company's 10-KSB for the year ended December 31, 2004 which was filed with the SEC on March 31, 2005 with the written consent of CBN, stated:  "In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Atlas Mining Company as of December 31, 2004 and 2003 and the results of its operations and cash flows for the years then ended in conformity with U.S. generally accepted accounting principles."

193.    In its unqualified audit opinion dated January 26, 2006, CBN opined on the consolidated financial statements of Atlas as of December 31, 2005 and 2004.  The audit opinion, contained in CBN's report as reproduced in the Company's 10-KSB for the year ended December 31, 2005 which was filed with the SEC on March 31, 2006 with the written consent of CBN, stated:  "In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Atlas Mining Company as of December 31, 2005 and 2004 and the results of its operations and cash flows for the years then ended in conformity with U.S. generally accepted accounting principles."

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS - 69

194.    In its unqualified audit opinion dated February 2, 2007, CBN opined on the consolidated financial statements of Atlas as of December 31, 2006 and 2005.  The audit opinion, contained in CBN's report as reproduced in the Company's 10-KSB for the year ended December 31, 2006 which was filed with the SEC on April 17, 2007 with the written consent of CBN, stated:  "In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Atlas Mining Company as of December 31, 2006 and 2005 and the results of its operations and cash flows for the years then ended in conformity with U.S. generally accepted accounting principles."

195.    On or about April 17, 2007, CBN issued an updated and still unqualified audit opinion on the consolidated financial statements of Atlas as of December 31, 2005 and 2004.  The audit opinion, contained in CBN's report as reproduced in the Company's 10-KSB/A for the year ended December 31, 2005 which was filed with the SEC on May 1, 2007 with the written consent of CBN, stated:  "In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Atlas Mining Company as of December 31, 2005 and 2004 and the results of its operations and cash flows for the years then ended in conformity with U.S. generally accepted accounting principles."

196.    CBN's unqualified audit opinions on the financial statements of the Company for the years ended December 31, 2004 through December 31, 2006, were materially false and misleading because these financial statements were not presented in accordance with GAAP nor were they audited in accordance with GAAS.

197.    GAAS are the auditing standards that an auditor must follow in planning, conducting and reporting the results of an audit.  "Auditing standards provide a measure

of audit quality and the objectives to be achieved in an audit."  *See* AICPA Professional

Standards Volume 1, U.S. Auditing Standards ("AU") SAS No. 95, AU § 150.01.

198.    GAAS, as set forth in section AU 411, describes "The Meaning of Present

Fairly in Conformity With Generally Accepted Accounting Principles in the Auditor's

Report."  It states:

> The auditor's opinion that financial statements present fairly an entity's
> financial position, results of operations, and cash flows in conformity with
> generally accepted accounting principles should be based on his judgment
> as to whether (a) the accounting principles selected and applied have
> general acceptance; (b) the accounting principles are appropriate in the
> circumstances; (c) the financial statements, including the related notes, are
> informative of matters that may affect their use, understanding, and
> interpretation…; (d) the information presented in the financial statements
> is classified and summarized in a reasonable manner, that it, neither too
> detailed nor too condensed…; and (e) the financial statements reflect the
> underlying events and transactions in a manner that presents the financial
> position, results of operations, and cash flows within a range of acceptable
> limits, that is, limits that are reasonable and practicable to attain in
> financial statements.

*See* AU 411.04

199.    During the Class Period, the audited financial statements of the Company,

which were publicly disseminated, were not presented "fairly in conformity with

generally accepted accounting principles" because the:

a.    Accounting principles selected and applied did not have general acceptance.

b.    Accounting principles were not appropriate in the circumstances.

c.    Financial statements, including the related notes, were not informative of matters

       that affected their use, understanding and interpretation.

d.    Financial statements did not reflect the underlying events and transactions in a

       manner that presented the financial position and the results of operations within a

range of acceptable limits that were reasonable and practicable to attain in financial statements.

200.     CBN knew it was required to adhere to standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP.  CBN, in issuing its unqualified audit opinions, as alleged herein, knew that by doing so it was engaging in a gross departure from GAAS, or issued such certification with reckless disregard for whether or not GAAS was being complied with.

201.     In the introductory portion of Accounting Series Release 173, the SEC made the following comments pertaining to economic substance:

> Another problem… is the need for emphasizing the importance of substance over form in determining accounting principles to be applied to particular transactions and situations.  In addition to considering substance over form in particular transactions, *it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.*

> We believe that the auditor must stand back from his resolution of particular accounting issues and assess the aggregate impact of the particular issues upon a reasonable investor's perception of the economic substance of the enterprise for which the financial statements are being presented.

(Emphasis added).

202.     In opining on the fairness of the financial statements of the Company, CBN failed to assess the propriety of the principles used by the Company to account for the purported sale of halloysite in 2004, which was no sale at all.  CBN failed to consider the importance of substance over form in determining accounting principles to be applied.  The substance of this halloysite transaction was crucial given that it was the Company's first recognized sale in a product that had never previously been sold before. More importantly, however, as alleged herein, halloysite clay was touted by Atlas as a

virtual pot of gold.  This valuable product was to be the very future of the Company.

203.    Due to the failure of the Atlas to account for the halloysite transaction in accordance with its substance rather than form, *the overall impression created by the financial statements was inconsistent with the business realities of the Company's financial position and operations*, and as a result they were deceptive and materially misleading.

204.    CBN knew and recklessly disregarded, or was reckless in not knowing, the facts set forth herein concerning the non-GAAP accounting for 2004 halloysite sale and the materially false and misleading disclosures which were contained in the Company's filings with the SEC during the Class Period.  CBN further knew and disregarded, or was reckless in not knowing that such non-GAAP accounting and the materially false and misleading disclosures resulted in material misstatements of the Company's financial position, results of operations and future business prospects.

205.    CBN's unqualified audit opinions were also false and misleading because the following GAAS (section AU 150 entitled, "Generally Accepted Auditing Standards") were knowingly or recklessly violated:

a.  General Standard No. 1 was violated, which standard required that the examination is to be performed by a person or persons having adequate technical training and proficiency as an auditor. AU §150.02;

b.  General standard No. 3 was violated, which standard requires "[d]ue professional care is to be exercised in the performance of the audit and the preparation of the [audit] report."  AU § 150.02;

c.   Standard of Field Work Nol. 1 was violated, which standard requires that "[t]he work [of the audit] is to be adequately planned and assistants, if any, are to be adequately supervised." AU § 150.02;

d.   Standard of Field Work No. 2 was violated, which standard requires that "[a] sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed." AU § 150.02;

e.   Standard of Field Work No. 3 was violated, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination. AU § 150.02;

f.   Standard of Reporting No. 1 was violated, which standard requires that "[t]he [audit] report shall state whether the financial statements are presented in accordance with [GAAP]." AU § 150.02; and

g.   Standard of Reporting No. 3 was violated, which standard requires that "Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report." AU § 150.02.

206.   CBN acted with scienter in violating these most fundamental principles of GAAS and in expressing its materially false and misleading unqualified audit opinions on Atlas's financial statements in that CBN either had actual knowledge or recklessly disregarded the fact that Atlas's financial statements were materially false and misleading as set forth herein.  Indeed, as detailed below, CBN's audits were so deficient that they amounted to no audit at all and, as a result, CBN had no reasonable basis to issue its unqualified audit opinions upon which it knew investors would rely.

207.    CBN's failure to investigate numerous red flags at Atlas (set forth in detail below) and to undertake even the most basic audit procedures, as detailed below, violated the most fundamental principles of GAAS.  CBN totally shirked its GAAS-mandated duty to gain an understanding of the nature of Atlas's halloysite business.  With respect to the purported "sale" of halloysite to NaturalNano, CBN did not even perform the most rudimentary of examination as no records concerning the transaction were found in CBN's work papers.

**CBN VIOLATED GAAS IN THAT IT FAILED TO EXERCISE DUE PROFESSIONAL CARE IN THE PERFORMANCE OF ITS AUDITS**

208.    AU § 230, *Due Professional Care in the Performance of Work*, sets forth the general requirements with respect to an auditor's obligation to plan and perform audit work with the requisite degree of professional care.  "Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting."   AU § 230.02.   Among the requirements of due care is that an auditor exercise "professional skepticism."

209.    "Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence."  AU § 230.07.  In exercising professional skepticism, "[t]he auditor neither assumes that management is dishonest nor assumes unquestioned honesty.  *In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest*."  AU § 230.09 (emphasis added)

210.    In conducting the audit, the auditor must obtain "reasonable assurance that the financial statements are free from material misstatement, whether caused by error or fraud."  AU § 230.10.    In this case, the misstatements concerning Atlas's sale of

halloysite clay was material because it was the first recognized sale of a product in a main line of Atlas's business, where no sale had ever been recognized before.   Such a transaction would have been material to the investing public at large and should have triggered heightened scrutiny by CBN, as further explained herein.

211.   As clarified by the SEC, a "material misstatement" is not necessarily one of numerical magnitude, but rather, involves the consideration of qualitative factors by the auditor.

212.   In Staff Accounting Bulletin No. 99 ("SAB 99"), entitled "Materiality," issued August 12, 1999, the SEC provided guidance in interpreting the concept of materiality to the preparation of financial statements and the performance of audits of those financial statements.  In SAB 99, the SEC made the following pronouncements

- "Quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations.  *Materiality concerns the significance of an item to users of a registrant's financial statements.  A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important*." (Emphasis added).

- "an assessment of materiality requires that one views the facts in the context of the 'surrounding circumstances,' as the accounting literature puts it, or the 'total mix' of information, in the words of the Supreme Court.  In the context of a misstatement of a financial statement item, while the 'total mix' includes the size in numerical or percentage terms of the misstatement, *it also includes the factual context in which the user of financial statements would view the financial statement item*.  The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality."

213.   SAB 99 sets forth a list of "considerations that may well render material a quantitatively small misstatement of a financial statement," and one of those

considerations is "*whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitabili*ty." (Emphasis added).

214.   As further confirmed by SAB 99:

> The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. *'A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity' is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important.* In assessing the materiality of misstatements in segment information - as with materiality generally - situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole.

(Emphasis added).

215.   In conducting the audit, the auditor's objective is "to obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion." AU § 230.11. As required by AU 311.03, Planning, an auditor should consider, among other things, the following in planning the audit:

a.   Matters relating to the company's business and the relevant industry.

b.   The company's accounting policies and procedures.

c.   The methods used by the company to process significant accounting information.

d.   The planned assessed level of control risk.

e.   Preliminary judgment about materiality levels.

f.   Financial statement items likely to require adjustment.

g.   Conditions that may require extension or modification of audit tests, such as the risk of material error or fraud or the existence of related party transactions.

h.   The nature of the audit reports expected to be rendered.

AU § 311.03.

216.   Also, the auditor should acquire "knowledge [that] should enable him to obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements.   AU § 311.06.   This "[k]nowledge of the entity's business helps the auditor in identifying areas that may need special attention…, evaluating the reasonableness of estimates, such as… the allowance for doubtful accounts…, and evaluating the reasonableness of management's representations. *Id.*

217.   An auditor is required to "assess audit risk and materiality… in determining the nature, timing and extent of audit procedures and in evaluating the results of those procedures."   AU § 312.01.   In considering audit risk, "the auditor should *specifically assess* the risk of material misstatement of the financial statements due to fraud and "should consider the effect of these assessments on the overall audit strategy and the expected conduct and scope of the audit" AU § 312.16 (emphasis added).

218.   If the auditor concludes that there is a heightened risk of material misstatement due to fraud or otherwise, the auditor must take whatever steps are necessary to ensure that the financial statements are not materially misleading.   *See generally* AU § 312 (requirement an auditor to limit audit risk to a low level, that is, a level appropriate for expressing an opinion on the financial statements).   This is true in terms of the number and types of audit procedures that must be performed, the time that

must be spent on the audit, the number and experience of personnel that must be involved, and the level of supervision that should be employed.  AU § 312.17.

219.    AU § 329.01, *Analytical Procedures*, "requires the use of analytical procedures in the planning and overall review stages of all audits."  AU § 329.01. "Analytical procedures are an important part of the audit process and consist of evaluation of the financial information made by a study of the plausible relationships among both financial and nonfinancial data."  AU § 329.02.  Further, "[p]articular conditions can cause variations in these relationships [and] include, for example, specific *unusual transactions or events… business changes… of misstatements." Id.* (Emphasis added).   GAAS specifically warns that "[u]nderstanding financial relationships is essential in planning and evaluating the results of analytical procedures, and generally requires knowledge of the client and the industry… in which the client operates."  AU § 329.03.

220.    CBN knowingly or recklessly violated GAAS by failing to exercise due professional care in connection with its audits of Atlas 2004-2006 financial statements in that it failed to satisfy the standards of field work and reporting as set forth below.

**CBN VIOLATED GAAS BY FAILING TO ADEQUATELY PLAN ITS AUDITS AND ASSESS THE TRUE NATURE OF ATLAS'S HALLOYSITE BUSINESS AND PROSPECTS FOR THE SALE OF HALLOYSITE**

221.    As set forth herein, the first standard of field work requires that "the work is to be adequately planned and assistants, if any, are to be properly supervised."  AU § 311.01.  In devising a plan, the auditor must consider, among other things, matters relating to the entity's business and the industry in which it operates.  AU § 311.03, AU § 311.06

222.    The auditor should review records relating to the entity and engage in discussions "with other firm personnel and personnel of the entity."  AU § 311.04.

223.    Similarly, in connection with obtaining confirmations of transactions with third parties, AU § 330.25 provides that

> The auditor's understanding of the client's arrangements and transactions with third parties is key to determining the information to be confirmed. *The auditor should obtain an understanding of the substance of such arrangements and transactions to determine the appropriate information to include on the confirmation request*.  The auditor should consider requesting *confirmation of the terms of unusual agreements or transactions*, such as bill and hold sales, in addition to the amounts.  The auditor also should consider whether there may be oral modifications to agreements, such as unusual payment terms or liberal rights of return. When the auditor believes there is a moderate or high degree of risk that there may be significant oral modifications, he or she should inquire about the existence and details of any such modifications to written agreements. One method of doing so is to confirm both the terms of the agreements and whether any oral modifications exist

AU § 330.25 (Emphasis added).

224.    CBN failed to adequately plan its audit of Atlas insofar as it failed to gain even the most basic understanding that the Company lacked a viable halloysite business. CBN thus failed to consider the implausibility of the Company's reported halloysite sale and prospects for future sales.   As Lead Plaintiffs subsequently learned through cooperation with the Company, CBN's work papers did not even contain any of the relevant documentation for the NaturalNano transaction.

225.    Had CBN adequately planned its audit of Atlas, it would have taken steps to obtain verification of the viability of Atlas's claimed halloysite business.  Such steps would have necessarily involved: a review of the contract and relevant documentation concerning the contract (here, this would have included steps to make inquiries concerning the monthly reports which were to have been exchanged in connection with

NaturalNano's development of processing capabilities for Atlas); a review of processing and shipping cost records; a review of employee payroll associated with employees working to mine the clay, and; a site visit by CBN to Atlas's mine to inspect the operations being conducted there.   CBN did none of these things.

226.    As detailed herein, Atlas's financial statements and public filings in which those statements were included during the Class Period materially misrepresented the fundamental nature of Atlas's business.  They represented that Atlas was in the business of mining and selling halloysite clay, when, in fact, the Company had not mined any halloysite and could not sell the clay because it lacked any processing capability.  The NaturalNano transaction had no economic substance whatsoever, and was undertaken for the sole purpose of allowing Atlas to recognize revenues from a fictitious sale of clay.  In view of these facts, CBN was either extremely reckless in failing to gain a fundamental understanding of Atlas's business, or it knowingly defrauded investors by intentionally allowing Atlas to misrepresent the nature of its halloysite business and bright prospects for that business in the future.

227.    A review of Atlas's statements concerning its halloysite business, contained within the 2004-2006 10-K forms, as well as the financial statements included in those documents, raises a strong inference that CBN acted with scienter when they permitted the Company to materially misstate the nature of its halloysite business.

228.    As set forth herein, the Company reported in its 2004 10-KSB that it had functioning halloysite operations, that those operations were in a profitable "production stage," and that Atlas was in a position to make future sales of halloysite to its "numerous potential buyers":

> *During 2004 we have worked to develop and bring the Dragon Mine into a production stage. In December 2004 we booked our first sale of halloysite clay.*
>
> Our halloysite clay marketing efforts include contacting potential customers and distributors, which we have done. Each buyer may have a different use for the product and the price and quantity will vary as a result. *The sale of product cannot be formalized until we have verified our ability to provide the quality and quantities as required by the potential buyers.* From results of the product samples distributed *we have numerous potential buyers*.

(Emphasis added).

229. The Company further reported astronomical growth in its 2004 10-KSB, owed largely to its "sale" of halloysite, which accounted for 24% of the Company's total revenue in 2004, contributed to a *sixteen fold* increase in the Company's total gross profit and an astronomical 239% increase in total revenue when compared to the past year.

230. Thus, Atlas held itself out to be a miner and seller of halloysite clay. Atlas made utterly no mention of the fact that it had no processing capability to enable it to sell halloysite clay and that the transaction with NaturalNano was wholly fictitious.

231. CBN was the Company's auditor from 2000 until the company was fired after the Atlas fraud was revealed. At the outset of CBN's engagement, CBN not only served as the Company's auditor, but it also prepared the Company's financial statements and thus was intimately acquainted with the Company's books and records. Even a cursory review of the contract concerning the NaturalNano transaction or Atlas's books, shipping records and/or invoices would have revealed that the halloysite business touted by Atlas was a total sham.

232. Under GAAS, CBN was obligated to review the information contained in the documents that contained the audited financial statements (such as the description of the business and MD&A sections contained in the Forms 10-K) and to consider whether

that information was materially inconsistent with information appearing in the financial statements.  CBN had audited Atlas's financial statements and knew or but for their reckless disregard should have known the true nature of Atlas's halloysite operations. *See* SAS No. 8, "Other Information in Documents Containing Audited Financial Statements."

233.    In the subsequent years following Atlas's claimed sale of halloysite at year-end 2004, Atlas did not make any further sales of halloysite.  Yet, CBN still continued to issue clean audit opinions to Atlas.  Had CBN not recklessly performed its duties, it would have responded to this highly suspicious circumstance and should have acted to mitigate its wrongdoing.  CBN ultimately did nothing on its own initiative, however, and was fired once the fraud at Atlas was revealed.

234.    Had CBN satisfied its obligations as Atlas's auditor, it would have known that the 2004-2006 financial statements and related public filings did not adequately represent Atlas's business and were, therefore, materially false and misleading.

**CBN VIOLATED GAAS BY FAILING TO OBTAIN REASONABLE ASSURANCE THAT THE FINANCIAL STATEMENTS WERE FREE FROM MATERIAL MISSTATEMENT CAUSED BY FRAUD**

235.    As noted above, auditors are required to obtain reasonable assurance that a Company's financial statements are free of material misstatement, whether caused by error or fraud.  AU § 110.02, AU § 316.01.  AU § 316.11 provides that "[a]lthough fraud is usually concealed … the presence of certain conditions may suggest to the auditor the possibility that fraud may exist.  For example, an important contract may be missing, a subsidiary ledger may not be satisfactorily reconciled… or the results of an analytical procedure performed during the audit may not be consistent with expectations."

236.    In making an assessment of the risk of material misstatements due to fraud, auditors are required to thoroughly investigate "fraud risk factors"- that is, "red flags"- that are apparent from the financial statements themselves or from the characteristics of the company.   The Appendix at AU § 316.85 entitled, *Examples of Fraud Risk Factors*, contains a non-exhaustive list of fraud risk facts, classified by three recognized conditions generally present when material misstatements due to fraud occur: (a) incentive/pressures to perpetrate fraud, (b) an opportunity to carry out the fraud, and (c) attitude/rationalization to justify the fraudulent action.   Such fraud risks include, but are not limited to the following:

Incentives/Pressures

a.    Financial stability or profitability is threatened by economic, industry, or entity operating conditions

b.    Management or the board of directors' personal financial situation is threatened by the entity's financial performance (significant financial interests in the company, significant portions of compensation being contingent upon stock price, operating results, etc.)

Opportunities

c.    Significant *related-party transactions* not in the ordinary course of business or with related entities not audited or audited by another firm

      d.      Significant, unusual, or highly complex transactions, *especially those close to period-end* that pose difficult "substance over form" questions

      e.      There is ineffective monitoring of management as a result of conditions including: *domination of management by a single person* or small group without compensating controls and/or ineffective board or audit committee oversight over the financial reporting process and internal control.

      f.      Internal control components are deficient as a result of various conditions including ineffective accounting and information systems.

Attitudes/Rationalizations

      g.      Ineffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards.

      h.      Excessive interest by management in maintaining or increasing the entity's stock price or earnings trend.

      i.      Management failing to correct known reportable conditions on a timely basis.

AU § 316.85

    237.    All of the aforementioned fraud risks were present at Atlas, evidenced by the red flags set forth herein and as follows:

    a.    Prior to Atlas's alleged sale of halloysite in 2004, Atlas had *never sold any*

*halloysite clay to anyone* (apart from providing some small samples).

b.  The recognition of revenues from the 2004 halloysite sale dramatically increased *Atlas's total revenue by 24%*, and contributed to a *sixteen fold increase in Atlas's gross profit* and a staggering 239% increase in total revenue.

c.  The 2004 halloysite sale was very suspiciously timed at year-end, a mere two days before the end of the year, at which time auditors know that companies are under pressure to present positive financial results to their shareholders.

d.  On January 28, 2005, just nine days after Atlas issued its January 19, 2005 press release announcing its 2004 sale of clay to its customer, NaturalNano, Atlas also issued very lucrative warrants to that same customer for no disclosed business purpose.  Atlas never disclosed that it had issued these warrants to NaturalNano in exchange for NaturalNano's agreement to construct a processing facility for Atlas.

e.  The contract with NaturalNano called for the sale of "processed" halloysite, yet because Atlas had no ability to sell processed clay, the recognition of revenue from this sale was improper on its face.  Because Atlas failed to actually mine any halloysite and did not have any capability to process halloysite, its reported earnings based on supposed sales were presumptively improper.

f.  Following the fictitious 2004 sale, Atlas made no further sales of halloysite clay, yet CBN continued to issue clean audit opinions for two subsequent years without taking any steps to mitigate its wrongdoing.

g.  Halloysite clay operations purported to be at the very core of Atlas's business and a veritable pot of gold ensuring future prosperity to the Company.

h.  As further detailed herein, Atlas's CEO had strong motivations to engage in fraud

and had made many fraudulent stock issuances and engaged in numerous related party transactions in violation of the federal securities laws.

i.   There were significant discrepancies in Atlas's accounting records and documentation substantiating the NaturalNano transaction.

j.   Atlas had no accounting department and the person in charge of keeping the books and records was not experienced enough to perform these tasks.

238.   CBN knowingly or recklessly failed to adequately address the possibility of fraud in conducting its audit of Atlas.  Had it done so, it would have increased its professional skepticism and extended its audit procedures in response to the many glaring red flags that were readily apparent at the Company.  At the very least, it would have increased its focus on material transactions and relationships, for example, by thoroughly investigating the one customer- NaturalNano- that represented the *entirety* of Atlas's purported halloysite business; it would have requested documentation to substantiate the 2004 halloysite sale, including the monthly reports that the parties agreed to exchange concerning the progress of the development of processing capabilities for Atlas; it would have undertaken extended procedures to corroborate the representations of management, including conducting interviews of Ms. Marquez, the employee at Atlas responsible of the Company's internal accounting; and it would have thoroughly investigated the possibility of related party transactions and the sources of financial resources supporting the Company's, accounts receivable and the like.  *See* AU § 316.25-29.

239.   In sum, had CBN conducted any adequate audit procedures, as required by GAAS, it would have discovered that Atlas's halloysite business, which represented astronomic revenues and growth in 2004 (and prospects for further growth in the subsequent years during the Class Period), was a complete and total fiction concocted by

Atlas and the other Defendants for the sole purpose of artificially inflating Atlas's revenues.

**FRAUD RISK FACTORS IGNORED BY CBN**

    **A.**    **Atlas's Reported Growth In Its Halloysite Business Was Virtually Impossible**

240.    In Atlas's case, the most obvious and glaring red flag was its claim in 2004 of astronomical revenues due to a sale of halloysite clay, *in a main line of Atlas's business, where Atlas had never sold the product before*.  This sale was suspiciously timed, at year-end 2004 and suspicious in circumstance because it involved Atlas's grant of lucrative warrants to its customer for no disclosed business purpose.

241.    As confirmed by AICPA Practice Alert 98-3, *Revenue Recognition Issues*, such conditions were red flags of fraud that CBN should have recognized.  The Practice Alert specifically alerts auditors to be on the lookout for "[s]ignificant sales or volume of sales that are recorded at or near the end of the reporting period."  Further, according to the Practice Alert, this is *particularly* important where, as here, "*the company has new product* or service instructions…" *Id.*  (Emphasis added).

242.    As set forth above, CBN knew that Atlas reported astronomical growth in revenues at year-end owed to halloysite sales that were never before made.  These circumstances were a glaring red flag of fraud of which CBN would have been aware had it performed its required role as auditor.

    **B.**    **The Characteristics and Influence of Management Presented a Glaring Red Flag**

243.    As noted above, among the fraud risk factors that an auditor should consider are those factors relating to a company's management and controls, many of which were present at Atlas but wholly ignored by CBN.  For example, Atlas's

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS - 88

management was dominated by a very small number of people, in fact, only one person, Defendant William Jacobson.   Defendant Jacobson had extraordinary motivation to commit fraud and did commit a widespread fraud against Atlas's shareholder.   As was subsequently revealed, Mr. Jacobson's livelihood was dependent on the stock price and operating results of the company.   Both before and during the Class Period, Defendant Jacobson engaged in improper stock issuances and related party transactions in violation of the federal securities laws.   All of these transactions, specifically detailed below, were totally and recklessly ignored by CBN.

**Unauthorized Stock Issuances**

**S-8 Issuances**

244.   While CBN served as Atlas's auditor, from 2002 through 2006, Atlas improperly issued approximately 15.1 million shares of S-8 stock and filed incorrect financial statements with the SEC concerning those stock issuances.

245.   As Atlas's independent auditor, CBN was charged with testing the fair value of Atlas securities and to evaluate whether the disclosures related to these transactions were adequate.   Had CBN not recklessly performed its audits of Atlas, it would have recognized the fraud risk at the Company and the numerous violations of the securities laws committed by Atlas.

246.   Through Defendant Jacobson, Atlas improperly issued stock to individuals and entities related to Jacobson, making his net worth dependent on the Company's stock price.   Jacobson's unauthorized issuances of Atlas stock are detailed in the following paragraphs.

247.   S-8 is the short-form registration statement for offers and sales of securities under an employee benefit plan by a public company to its directors, officers,

employees, consultants or advisors.  Consultants and advisors are eligible to receive S-8

stock if: (a) they are natural persons; (b) they provide actual services to the issuer; and (c)

the services are not related to the offer or sale of securities in a capital-raising transaction

and do not promote or maintain, directly or indirectly, the market for the issuer's stock.

248.    On August 27, 2002, Atlas filed a Registration Statement (the "S-8

Registration") with the SEC for 5,000,000 shares of S-8 stock under the Atlas 2002

Consultant Stock Plan.  On July 8, 2003, Atlas registered an additional 8,000,000 shares

by Post Effective Amendment to the S-8 Registration.  On September 15, 2004, Atlas

again registered 5,000,000 shares of stock by Post Effective Amendment to the S-8

Registration.

249.    Defendant Jacobson personally issued much of Atlas's S-8 stock.

Although the issuance of S-8 stock was to be pre-approved by Atlas's Board of Directors,

Jacobson commonly issued S-8 stock without Board approval.  At times, Jacobson would

request approval from the Board of S-8 stock issuances long after he had already issued

the stock, which is improper.

250.    Jacobson improperly valued the shares of S-8 stock he issued. Because S-8

stock is freely tradeable when issued, his improper valuation of the shares allowed

Jacobson to provide a windfall to those he issued stock to, including his friends and

family.  Between 2002 and 2006, Atlas improperly issued stock to the following:

a.      Individuals and/or entities engaged to promote or maintain a market for Atlas's

        common stock or who raised capital for Atlas;

b.      Clearwater Mines, a related entity controlled by Jacobson;

c.      Individuals who performed no actual services to the Company, including

        Jacobson's wife and children; and

d.      An individual in connection with the purchase of milling equipment from First

American Scientific Corporation.

251.    As Atlas's auditor, CBN was required by GAAP, GAAS and PCAOB

standards to test the fair value of S-8 securities issued by Atlas, evaluate whether the

stock was properly issued by Atlas's Board, and also to determine whether Atlas's

disclosures related to the issuance of these securities was adequate.  Had CBN performed

its required function, it would have discovered the fraud carried out by Jacobson and

would have discovered the fraud risk posed by the Company to the investing public at

large.

## SB-2 Stock Issuances

252.    In February 2003, Atlas filed an SB-2 Registration Statement offering

10,000,000 shares (the "SB-2 Shares") of Atlas common stock at a fixed price of $0.10

per share.  The Registration Statement stated that the offering would be open for a period

of 180 days and the SB-2 Shares would be sold directly by the Company.

253.    Between February and August 2003, Jacobson "parked" 9.9 million SB-2

Shares with friends, family and related entities until purchasers could be located.  The

individuals with whom the SB-2 Shares were parked did not make any form of payment

in exchange.

254.    The entities issued SB-2 Shares by Atl as were to hold those shares until

an outside buyer could be found.  While the SB-2 Shares were eventually resold, Atlas

did not receive the full amount owed for the SB-2 Shares.  Of the $940,000 expected,

only $871,000 was received by Atlas.  PC&G, Inc. (a related company controlled by

Jacobson) was unable to account for $45,000 owed to Atlas and a further $24,000 has

also been unaccounted for.

255.    Defendant Jacobson directed the Company's bookkeeper, Martinez, to register the SB-2 shares as a receivable of $990,000 even though Jacobson knew that all of the entities and individuals who received the shares could not, or would not, make payment for the shares. Further, in accordance with GAAP issuances of stock are not to be reported as receivables.

256.    As Atlas's independent auditors, CBN was tasked to investigate the sources of Atlas's receivables and had to give an opinion on collectability.  Had CBN properly investigated Atlas's receivables in accordance with GAAP, GAAS and PCAOB standards, it would have learned of this wrongdoing and the fraud risk at Atlas.

**Jacobson's Related Party Transactions**

257.    Defendant Jacobson engaged in multiple related party transactions including the issuance of Atlas stock to his wife and children a well as loans to companies which he owned and/or controlled.

258.    The S-8 stock was issued to various entities and persons, including, but not limited to: Clearwater Mines, Inc. (a company owned and/or controlled by Jacobson);PC&G, Inc. (a company owned and/or controlled by Jacobson); and MaryAnn Jacobson (Jacobson's wife);

259.    The shares of S-8 stock issued by Defendant Jacobson were undervalued in Atlas's financial reporting, in some cases by more than 100 percent.

260.    Defendant Jacobson also issued shares of SB-2 stock to various family member and corporations he owned and/or controlled.  The SB-2 stock was issued to various entities and person, including, but not limited to: PC&G, Inc.; Clearwater Mines, Inc.; Karl Jacobson, and; David Jacobson.

261.    Defendant Jacobson further issued 1.4 million Rule 144 shares, valued at $175,000 to his son Karl Jacobson, ostensibly for services rendered to the Company. Jacobson failed to provide evidence of what services had been provided by his son Karl Jacobson.   Three months after the initial issuance these shares were transferred to Jacobson's wife, MaryAnn.

262.    In addition, Atlas, through Defendant Jacobson, made various loans to companies owned and/or controlled by Jacobson.    These transactions were never disclosed by the Company publicly as related party transactions.

263.    No Forms 3, 4 or 5 ("Section 16 Filings") were filed by any Atlas Officer or Director prior to 2006.   Due to the lack of Section 16 Filings, it is unknown whether any sales of Atlas securities were made by Jacobson prior to 2006.   Some or all of the issuances to members of Jacobson's family should have been reported b y Jacobson pursuant to Exchange Act Section 16.   As a result, Atlas's statements concerning compliance with the Exchange Act Section 16 filing requirements were made in Atlas's 10-KSB's for the years ended December 31, 2003, 2004 and 2005.

264.    As Atlas's auditor, CBN was aware that the related party transactions described herein had taken place, and had a duty and responsibility under GAAP, GAAS, and PCAOB standards to note these transactions and inform Atlas of its compliance responsibilities under the securities laws.   The total lack of any documentation pursuant to Section 16 for these related party transactions should have alerted CBN to the fraud risk at Atlas.

**Improper Revenue Recognition is a Presumed Fraud Risk**

265.    AU §316.41 entitled, *A Presumption That Improper Revenue Recognition Is a Fraud Risk,* provides as follows:

*Material misstatements due to fraudulent financial reporting often result from an overstatement of revenues* (for example, through premature revenue recognition or recording fictitious revenues) or an understatement of revenues (for example, through improperly shifting revenues to a later period).  Therefore, the auditor should ordinarily *presume that there is a risk of material misstatement due to fraud* relating to revenue recognition.

AU §316.41. (Emphasis added).

266.    Because Atlas's claimed sale of halloysite in 2004 allowed the Company's gross profit to grow *sixteen fold* and total revenue to increase by a *staggering 239%*, these circumstances were not only glaring red flags, but further, should have been presumed by CBN to constitute material misstatements due to fraud at the Company. This is especially so since Atlas had never sold this product before and the clay was touted by Atlas as essential to the Company's future prosperity and growth.

**Unexplained Items, Missing Documents and Implausible Responses From Management**

267.    Another red flag that arose during CBN's audits of Atlas was the fact that there was significant "[c]onflicting or missing evidential matter," including, "missing documents."  AU § 316.68.  As detailed herein, specific fraud indicators were present at Atlas at least with respect to the Company's volume of halloysite sales.

268.    AU § 329.04-.05, required CBN to analytically review and compare the Company's reported sales in 2003 and 2004 to expectations developed independently by CBN based on Atlas's business.  Atlas's management attributed the astronomical growth to sales where no sales of halloysite had ever been made before.

269.    This explanation was false- as detailed herein, the increase was attributable exclusively to a fictitious sale of halloysite to NaturalNano.  Furthermore, the explanation that halloysite was sold fails to explain why, coupled with that sale, Atlas

gave very lucrative warrants to its customer. Unbeknownst to shareholders, NaturalNano had agreed to provide processing capabilities to Atlas which Atlas never had.

270. CBN knew that the halloysite sale was fiction. It also knew or recklessly disregarded that, despite management's representations, Atlas had no processing capability for its clay. The logical audit response to these conditions would have been to thoroughly investigate the NaturalNano transaction to understand the nature and reasonableness of this alleged sale by gaining an understanding of Atlas's operations and the operations of NaturalNano. CBN should have made inquiries concerning the status of the development by NaturalNano of clay processing capabilities, especially since a cursory review of the contract would have revealed the parties' obligations to exchange monthly reports pursuant to their agreement. Indeed, such inquiries by CBN would have gone hand-in-hand with the need to verify Atlas's ability to sell its clay to the market.

271. In fact, given the multitude of fraud risk factors present at the Company, the implausibility of management's explanation of the Company's dramatic increase in revenues owed to halloysite sales given Atlas's lack of processing capability, and CBN's inability to corroborate management's representations, CBN should have undertaken additional procedures necessary to reduce the risk of misstatement to a low level (*see* AU § 312) that would have uncovered this fraud or, if it was unable to obtain sufficient, competent evidential matter, to either issue a qualified audit opinion or to withdraw from the audit (AU § 316.36).

272. Further, there were no invoices or shipping records in Atlas's files relating to the Company's alleged sale of halloysite as such documents did not exist. In addition, on information and belief, there were no monthly progress reports which Atlas and NaturalNano had agreed to exchange to report on the progress of the development of clay

processing capability.  Had CBN reviewed this transaction by glancing at the contract, they would have been aware of these reporting requirements and should have asked for substantiating documentation.  Had CBN simply made inquiry, as they were obligated to do in view of their position as key accounting personnel, they would have been aware of these obvious red flags.

## CBN VIOLATED GAAS BY FAILING TO OBTAIN SUFFICIENT COMPETENT EVIDENTIAL MATTER

273.    AU § 326.02, *Evidential Matter* states: "[m]ost of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02.  Further, "[t]he independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly."  AU § 326.21 (c). Additionally, AU § 333.02, *Reliance on Management Representations*, states that representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.  In the absence of sufficient competent evidential matter, "an opinion on financial statements would not be warranted." *Id.*

274.    GAAS (AU Section 326 "Evidential Matter") notes that underlying accounting data and all corroborating information available to the auditor (including books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, checks, purchase orders, bills of lading, invoices, records of electronic fund transfers, invoices, contracts, minutes of meetings and reconciliations) constitute

evidence that should be subjected to inquiry, observation, inspection, confirmation, and physical examination.

275.     Here, CBN failed to obtain sufficient competent evidential matter with respect to Atlas's halloysite business and the sale transaction with NaturalNano.  Had CBN performed the audit procedures required by GAAS, it would have determined that the sale which had been recorded in 2004 was fictitious and without substance.  Further, CBN would have learned of the relationship between Atlas and NaturalNano and NaturalNano's agreement to construct a processing facility for Atlas which had not been disclosed by Atlas.  CBN also would have learned that Atlas and NaturalNano were to exchange status reports on the progress of NaturalNano's development of this processing facilities.  This should have then led to an extension by CBN of audit procedures to determine the true nature of the halloysite sale transaction.

276.     Yet, CBN completely ignored the NaturalNano transaction and related documentation altogether.  CBN's work papers did not contain any documentation relevant to Atlas's claimed sale of clay, including the agreement between Atlas and NaturalNano, the purchase order, receipts and/or other documentation.  Further, as described herein, the contract between Atlas and NaturalNano required that the parties "exchange monthly reports outlining technical and commercial progress of each in regards to development.  Such reports shall be prepared and submitted no later than the tenth day following the end of each month."  No such reports were located in the work papers of CBN and CBN made no inquiries as to their existence.  CBN did not even perform a rudimentary review of this critical transaction.

277.     CBN either performed audits which were so deficient that they amounted to no audit at all, or it identified and ignored, or recklessly failed to investigate extremely

questionable halloysite transactions, and made audit judgments that no reasonable auditor would have made if confronted with the same facts.

## CBN VIOLATED GAAS BY FAILING TO TAKE INTO ACCOUNT ATLAS'S WEAK INTERNAL CONTROLS

278.    AU § 319.02 requires the auditor to obtain an understanding of internal controls sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements, and whether they have been placed in operation.  AU § 319.02.  After obtaining this understanding, the auditor assesses control risk for the assertions embodied in the account balance, transaction class, and disclosure components of the financial statements.  AU § 319.03.  The auditor uses the knowledge provided by the understanding of internal control and the assessed level o control risk in determining the nature, timing, and extent of substantive tests for financial statement assertions, AU § 319.05.

279.    As set forth herein, the Special Committee formed to investigate the wrongdoing at Atlas determined that Atlas's internal control over financial reporting and disclosures contained material weaknesses, which led to inadequate and inaccurate disclosures.  Had CBN performed GAAP and GAAS-compliant audits, it would have discovered these deficiencies.

280.    As Atlas later disclosed to the SEC in connection with its investigation of the wrongdoing at the Company, examples of internal controls deficiencies at Atlas included the following:

a.    Atlas had no independent directors on its Board prior to 2007, and thus no independent directors throughout most of the Class Period;

b.    Atlas did not have an audit committee;

c.   Atlas did not maintain adequate corporate records;

d.   Atlas did not properly approve all equity issuances;

e.   At all material times, Atlas did not hold an annual meeting of shareholders;

f.   Atlas did not maintain a related party transaction or conflicts of interest policy;

g.   Atlas did not maintain adequate books and records and did not have adequate

internal control over financial reporting; and

h.   Atlas did not have adequate disclosure controls.

281.   In sum, as Atlas's long-time auditor, CBN had unfettered access to Atlas's books and records throughout the audit periods, and it certainly had knowledge of the requirements of GAAS, as detailed above.  Had CBN conducted GAAS-compliant audits, it would have reacted to the numerous, obvious "red flags" set forth above and, in so doing, would have discovered the truth about Atlas's operations.  Instead, CBN ignored these red flags and knowingly or recklessly failed to employ even the most basic procedures designed to detect fraud or to ensure that the financial statements were free from material misstatement.  Thus, in effect, CBN abandoned its role as "independent auditor" and, in the process, knowingly or recklessly issued unqualified audit opinions on Atlas's materially false and misleading financial statements, which had the effect of artificially inflating Atlas's stock price.  From all of these facts, there is a strong inference that CBN acted with scienter.

## CBN IS TWICE INVESTIGATED BY THE PCAOB

282.   The PCAOB is required by Section 104 of the Sarbanes-Oxley Act to conduct a continuing program of inspections of registered public accounting firms. These inspections assess compliance with the Sarbanes-Oxley Act, the standards of the PCAOB, the rules of the SEC and professional standards including GAAP and GAAS.

283.    On July 25, 2005, the PCAOB published the results of its first inspection of CBN.  In this report, the PCAOB identified issues with CBN's audits that it considered to be deficient.  The deficiencies identified were so significant that the PCAOB stated that "the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."   Deficiencies uncovered by the PCAOB investigation included:

a.   the Firm's failure to identify, or to address appropriately, departures from GAAP that related to potentially material misstatements in the audited financial statements concerning the classification and description of debt;

b.   the failure to perform and document procedures to resolve discrepancies between information in the Firm's work papers and the issuer's disclosures;

c.   the failure to properly consider the reasons for and effects of accounting changes; and

d.   the failure to test the fair value of securities issued in exchange for services, and the failure to evaluate whether the disclosures related to these transactions were adequate.

284.    The PCAOB performed a second inspection of CBN in 2009.  The results of this second inspection were published on June 29, 2009.  Unsurprisingly, the PCAOB once again noted significant deficiencies in CBN's auditing practices including:

a.   the firm's failure to identify, or address appropriately, a departure from GAAP that related to a potentially material misstatement in the audited financial statements concerning the valuation of a beneficial conversion feature related to the issuance of convertible debt;

b.   the failure, in two audits, to perform sufficient audit procedures to test revenue recognition;

c.   the failure to perform sufficient procedures related to the use of the work of specialists;

d.   the failure to perform sufficient audit procedures to test for goodwill impairment;

e.   the failure to perform sufficient audit procedures to evaluate the impact of the opening balances on financial statements and the consistency of accounting principles for the period covered by the firm's audit report; and

f.   the failure to perform sufficient procedures to test compensation expense.

285.   As the PCAOB's inspections reveal, during the Class Period, the CBN Defendants have consistently acted in reckless violation of GAAP, GAAS and PCAOB standards.

## ADDITIONAL SCIENTER ALLEGATIONS

286.   In addition to the allegations set forth above, all Defendants acted with scienter in that defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Atlas, their control over, and/or receipt and/or modification of Atlas' allegedly materially misleading misstatements and/or their associations with the

Company which made them privy to confidential proprietary information concerning Atlas, participated in the fraudulent scheme alleged herein.

287.   As alleged herein, the Atlas Defendants disseminated to the investing public false and misleading press releases and filed false and misleading quarterly and annual reports with the SEC.  The statements made in these documents described Atlas' positive financial performance, but failed to disclose and/or misrepresented adverse material facts.

288.   Furthermore, as illustrated by the Individual Defendants' positions with the Company, they had and used their influence and control to further the scheme alleged herein.   The Individual Defendants had broad responsibilities that included communicating with the financial markets and providing the markets with financial results.  The Individual Defendants were privy to and directed the making of financial projections and results.  By making the misleading statements contained herein, the Individual Defendants knew that they would artificially inflate the value of the Company's securities.  Defendants' actions in doing so resulted in damage to Lead Plaintiffs and the Class.

289.   Chief Executive Officers of Atlas, Defendants Jacobson and Dumont, and Chief Financial Officer, Defendant Suveg, were responsible for the preparation of Atlas' financial statements and for ensuring that the periodic reports filed with the SEC containing such financial statements complied fully with the disclosure requirements of the federal securities laws.  The Individual Defendants signed and/or reviewed Atlas' SEC filings containing the Company's falsely reported financial results, as alleged herein, were the persons responsible for the preparation and filing of Atlas' financial

statements, and had the responsibility to verify the underlying facts of any publicly released financial statements.

290.    In addition, given that Atlas is a relatively small company with only five total officers and directors at all relevant times as reported on each of the Company's annual reports filed on form 10KSB with the SEC, and given that the accounting irregularities involved accounting for the revenues of the Company's core business- halloysite clay sales- the Individual Defendants, as senior executive officers and directors of the Company, approved, knew of, or recklessly ignored the improper conduct complained of herein.

291.    The Individual Defendants, as experienced executives, should have known that revenue should not be recognized before it was earned and realized or realizable. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

292.    In sum, all Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading when made; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein, Defendants acted with a knowing or reckless disregard for the falsity of Atlas' financial statements.

## CLASS ACTION ALLEGATIONS

293.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Atlas common stock during the Class Period and who were damaged thereby.   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

294.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Atlas' common stock was actively traded on the OTC Bulletin Board.   There were 54,173,594 shares of Atlas stock outstanding as of August 6, 2007.   While the exact number of Class Members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Atlas or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

295.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

296.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class has retained counsel competent and experienced in class and securities litigation.

297.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Atlas; and

c.  to what extent the members of the Class has sustained damages and the proper measure of damages.

298.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE INFORMATION

299.     The market for Atlas' securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Atlas' securities traded at artificially inflated prices during the Class Period.  The artificial inflation continued until at least October 8, 2007, the last day of the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired Atlas securities relying upon the integrity of the market price of Atlas' securities

and market information relating to Atlas, and have been damaged by the disclosure of the truth.

300.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Atlas' securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, inter alia:

a.   That the Company's financial statements were not prepared in accordance with GAAP and/or in accordance with the federal securities laws and SEC regulations concerning fair reporting; and

b.   That the Company's seeming success and growth in its halloysite business was, in material part, the result of improper accounting.

301.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Atlas' business, prospects and operations.  Notably, the Atlas Defendants represented that they had 300,000 tons of high quality halloysite and several consumers interested in purchasing this halloysite at a premium, none of these representations are true. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Atlas and its business, prospects and operations,

thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, causing the damages complained of herein upon disclosure of the truth.

## LOSS CAUSATION

302.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Atlas securities and operated as a fraud or deceit on Class Period purchasers of Atlas securities by misrepresenting the Company's financial results, business success and future business prospects as detailed above. Defendants achieved this façade of success, growth and strong future business prospects via improper accounting (prematurely recognizing revenue) in violation of GAAP and by misrepresenting the quality and profitability of the halloysite at the Dragon Mine.

303.    The false financial statements caused and maintained the artificial inflation in Atlas' stock price throughout the Class Period.

304.    Defendants' false and misleading statements had the intended effect and caused Atlas securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $2.98 per share.

305.    Over three years, Defendants improperly inflated Atlas' reported earnings. On October 9, 2007, however, when Defendants' prior misrepresentations and fraudulent conduct were first disclosed and became apparent to the market, Atlas stock fell precipitously as the prior artificial inflation came out of Atlas' stock price. As a result of their purchases of Atlas securities during the Class Period, at artificially inflated prices,

and the diminution in value attributable to the disclosure of the truth, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.,* damages under the federal securities laws.

306.    As a direct result of Defendants' admissions and public revelations regarding the truth about Atlas' previously reported financial results and its actual business prospects for halloysite going forward, Atlas' stock price plummeted. On October 8, 2007, the last day of the Class Period, the Company's stock closed trading at $1.64 per share with 52,700 shares trading that day.  The following day—the day the Company issued its press release revealing the truth about its halloysite operations— Atlas' stock opened trading at $1.06 per share and closed at $.80 a share, or down over 51% from the previous days' close, on a share trading volume of 6,418,299 shares.

307.    This dramatic drop removed the inflation from Atlas' stock price, causing real economic loss to investors who had purchased the stock during the Class Period.  In sum, as the truth about Defendants' fraud and Atlas' business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and Lead Plaintiffs and other members of the Class were damaged.

308.    The timing and magnitude of Atlas' stock price decline negates any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

309.    The economic loss, i.e., damages suffered by Lead Plaintiffs and other members of the Class, was a direct result of and was proximately caused by Defendants' fraudulent scheme to artificially inflate Atlas' stock price and the subsequent significant decline in the price of Atlas' stock when Defendants' prior misrepresentations and other

fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE MARKET DOCTRINE

310.    At all relevant times, the market for Atlas common stock was an efficient market for the following reasons, among others:

a.      Atlas stock met the requirements for listing, and was listed and actively traded on the Bulletin Board, a highly efficient and automated market;

b.      During the Class Period, on average, thousands of shares of Atlas stock were traded on a weekly basis, and shares were traded on each day of the Class Period, demonstrating a very active and broad market for Atlas stock and permitting a very strong presumption of an efficient market;

c.      As a regulated issuer, Atlas filed periodic public reports with the SEC;

d.      Atlas regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.      Atlas was followed by securities analysts who wrote reports that were publicly available and entered the public marketplace; and

f.      Unexpected material news about Atlas was reflected and incorporated into the Company's stock price during the Class Period.

311.    As a result of the foregoing, the market for Atlas common stock promptly digested current information regarding Atlas from all publicly-available sources and reflected such information in Atlas' stock price. Under these circumstances, all purchasers of Atlas common stock during the Class Period suffered similar injury through

their purchase of Atlas common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

312.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Atlas who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder Against All Defendants

313.    Lead Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

314.    During the Class Period, Atlas, NanoClay, the CBN Defendants, and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein;

and (b) cause Lead Plaintiffs and other Class members to purchase Atlas securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

315.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Atlas securities in violation of §10(b) of the Exchange Act and Rule 10b 5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

316.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

317.    Atlas, NanoClay, the CBN Defendants and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous

course of conduct to conceal adverse material information about the business, operations and future prospects of Atlas as specified herein.

318.    Defendants employed devices, schemes and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Atlas's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Atlas and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Atlas securities during the Class Period.

319.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Atlas's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were deliberately reckless in failing to obtain such knowledge by consciously refraining from taking those steps necessary to discover whether those statements were false or misleading.

320.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives (CEOs and CFO) and directors at this relatively small Company during the Class Period and members of the Company's intimate management team and had control thereof; (b) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, sales and internal controls at all relevant times; and (d) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

321.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Atlas securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Atlas's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other Class members acquired Atlas securities during the Class Period at artificially high prices and were damaged thereby.

322.     At the time of said misrepresentations and omissions, Lead Plaintiffs and other Class members were ignorant of their falsity and believed them to be true.  Had Lead Plaintiffs, the other members of the Class and the marketplace known the truth regarding the problems Atlas was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Atlas securities or, if they had acquired such securities during the Class Period, would not have done so at the artificially inflated prices they paid.

323.     By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

324.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

325.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

326.     The Individual Defendants acted as controlling persons of Atlas within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content

and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

327. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

328. As set forth above, Atlas and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the class suffered damages in connection with their purchases of Atlas securities during the Class Period.

### THIRD CLAIM FOR RELIEF

**Violation of Section 20(a) of the Exchange Act
Against Atlas**

329. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

330. Atlas acted as a controlling person of NanoClay within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of Atlas' ownership and contractual rights, participation in and/or awareness of NanoClay's operations and/or

intimate knowledge of the false and misleading statements made by NanoClay and disseminated to the public, Atlas had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of NanoClay, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. Atlas was provided with or had unlimited access to copies of the NanoClay's reports, press releases and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

331. In particular, Atlas had direct and supervisory involvement in the day-to-day operations of NanoClay and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

332. As set forth above, Atlas and NanoClay each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of its position as a controlling person of NanoClay, Atlas is liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the class suffered damages in connection with their purchases of Atlas securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the Class defined herein and certifying Lead Plaintiffs as class representatives and designating Lead Plaintiffs' counsel as Class Counsel;

B.      Awarding Lead Plaintiffs and the members of the Class compensatory damages, including rescissionary damages, where applicable, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct;

C.      Awarding Lead Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and federal statutory provisions sued hereunder, including rescission and the imposition of a constructive trust, pursuant to Fed. R. Civ. P. 65 and any appropriate state law remedies;

E.      Ordering Individual Defendants to forfeit and reimburse Atlas for any bonus or other incentive-based or equity-based compensation received by them, and any profits realized from the sale of securities during the time periods set forth in §304 of the Sarbanes-Oxley Act of 2002; and

F.      Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated:  November 9, 2009

By:     _/s/ B. Newal Squyres_____
B. Newal Squyres (ISB #1621)
Ted C. Murdock (ISB #5431)
**HOLLAND & HART** LLP
101 S. Capitol Blvd., Suite 1400
P.O. Box 2527
Boise, ID 83701
 (208) 342-5000


**LITE DEPALMA GREENBERG
& RIVAS LLC**
Joseph J. DePalma
Katrina Carroll
Jennifer Sarnelli
Two Gateway Center
12th Floor
Newark, NJ 07102-5003
(973) 623-3000
*Attorneys for Lead Plaintiffs*


4655957_1.DOC

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS - 118