Ellen Maycock (*Pro Hac Vice*)
Steven G. Loosle (*Pro Hac Vice*)
KRUSE LANDA MAYCOCK & RICKS, LLC
136 East South Temple
Twenty-First Floor
P.O. Box 45561
Salt Lake City, UT 84155-0561
Telephone:  (801) 531-7090
Facsimile:  (801) 531-7091
Email:  emaycock@klmrlaw.com; sloosle@klmrlaw.com

Kim C. Stanger, ISB No. 5783
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  (208) 344-6000
Facsimile:  (208) 342-3829
Email: kcs@hteh.com

*Attorneys for Chisholm, Bierwolf & Nilson, LLC*

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

#### (BOISE)

| | | |
|---|---|---|
| IN RE: | ) | Civil Action No. 07-428-N-EJL |
| | ) | |
| ATLAS MINING COMPANY, | ) | |
| SECURITIES LITIGATION | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **CBN DEFENDANTS' MOTION TO** |
| | ) | **DISMISS THE SECOND AMENDED** |
| | ) | **COMPLAINT** |
| | ) | |
| | ) | |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II.   DISCUSSION ..............................................................................................................2

    A.  PSLRA Pleading Standards ...................................................................................2

    B.  Fraud Claim of the FAC and the SAC ...................................................................4

    C.  The Additional or Expanded Allegations in the SAC Do Not Cure the
        Defects in the FAC.................................................................................................6

        1.  Additional Details Concerning NaturalNano Transaction........................................6

        2.  Restated Financials for the Year Ending December 31, 2006.................................9

        3.  Conflict of Interest .................................................................................12

        4.  Duty to Correct Overall Impression.....................................................................13

        5.  Characteristics of Management...........................................................................15

        6.  Unauthorized Stock Issuances ...........................................................................16

        7.  Failure to Obtain Backup Documentation to Explain NaturalNano
            Transaction.................................................................................................17

        8.  Atlas's Weak Internal Controls...........................................................................18

        9.  PCAOB Investigation of CBN...........................................................................19

III.  CONCLUSION............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) ...........................9, 10

*DSAM Global*, 288 F.3d 385, 388 (9th Cir. 2002)........................................................2, 12, 15, 17

*In re: Cardinal Health, Inc. Securities Litigations*, 426 F. Supp. 2d 688, 778
    (S.D. Ohio 2006) ...................................................................................................... 20

*In re: Daou Systems, Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)...................................................... 2

*In re: Software Toolworks, Inc. Securities Litigation*, 50 F.3d 615, 628 (9th Cir. 1994)............. 10

*Metzler v. Corinthian*, 540 F.3d 1049, 1070 (9th Cir. 2008) .................................................. 10, 11

*MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)..................................... 20

*Rapaport v. Asia Electronics Holding Company, Inc.*, 88 F. Supp. 2d 179, 184
    (S.D.N.Y. 2000) ....................................................................................................... 13

*Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1008 (S.D. Cal. 2000),
    affirmed 288 F.3d 385 (9th Cir. 2002) ................................................................... 10

*Tellabs v. Maker Issues & Rights*, 127 S. Ct. 2499, 2509 (2007)............................................2, 13

*Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) ........................... 17

**Rules**

FED. R. CIV. P. 9(b) ................................................................................................................... 1

**Statute and Regulations**

15 U.S.C. § 78................................................................................................................1, 2, 13

15 U.S.C. § 7214 .................................................................................................................. 19

17 C.F.R. § 210.2-01............................................................................................................. 13

17 C.F.R. § 240.10b-5.............................................................................................................. 2

**Other**

Random House Dictionary (unabridged ed. 1973) ........................................................................ 2

The lead plaintiffs in this class action have filed their Second Amended Consolidated Complaint ("SAC").  Defendants Chisholm, Bierwolf & Nilson, LLC ("CBN"), Todd Chisholm ("Chisholm"), and Troy Nilson ("Nilson") have moved the Court to dismiss the SAC, and hereby submit their memorandum in support of the motion. CBN, Nilson and Chisholm are sometimes hereafter referred to as the "CBN Defendants."

## I.  INTRODUCTION

CBN previously moved to dismiss Plaintiffs' First Amended Complaint ("FAC") on the grounds that it failed to comply with the pleading requirements of FED. R. CIV. P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA").  In his Report and Recommendation ("Report"), the Magistrate recommended that CBN's motion be granted, and the Court adopted the recommendation and dismissed the FAC on September 25, 2009.

Careful examination of the SAC reveals that Plaintiffs' claims against the CBN Defendants are still based upon the alleged failure to properly account for a single transaction related to the sale of halloysite clay.  This theory of fraud against the CBN Defendants is inescapable from a review of the SAC inasmuch as Plaintiffs' fraud claim, boiled to its essence, is that Atlas fraudulently touted the prospects of its halloysite clay business.  According to the SAC, the CBN Defendants assisted in that fraud by wrongfully recognizing $250,000 in revenue from the alleged sale of clay in 2004.  According to the SAC, the value of Atlas's stock dropped 51% on October 9, 2007, the very day Atlas allegedly disclosed the fraud to the market.  The SAC does not attempt to plead the elements of a fraud claim with respect to any other alleged misrepresentations.

In an attempt to correct the defects in the FAC and portray the CBN Defendants as having acted wrongfully, the SAC adds nine categories of either new or arguably expanded

allegations that pertain to CBN.  As further addressed below, these new or expanded allegations fail to cure the defects in the SAC, and the SAC should be dismissed.

## II.  DISCUSSION

CBN has moved to dismiss the SAC on the grounds that it fails to comply with the pleading standards of Rule 9(b) and the PSLRA.  The question before the court is whether the SAC cures the defects in the FAC such that the SAC is not subject to dismissal.

## A.  PSLRA Pleading Standards

Both Rule 9 and the PSLRA compel careful scrutiny of the SAC.  The PSLRA requires a complaint to "specify" each false statement, including "the reason or reasons why the statement" is false.  The PSLRA also requires that a securities fraud complaint state "with particularity facts giving rise to a strong inference" of scienter. The Supreme Court has defined "inference" to mean a conclusion drawn from facts, and "strong" to mean "powerful or cogent." *Tellabs v. Maker Issues & Rights*, 127 S. Ct. 2499, 2509 (2007).  The dictionary defines the word "cogent" to mean "convincing or believable by virtue of forcible, clear, or incisive presentation."  Random House Dictionary (unabridged ed. 1973).

The issues of falsity and scienter are closely related and sometimes are "combined into a unitary inquiry under the PSLRA."  *In re: Daou Systems, Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (quoting *In re: Vantive Corp. Sec. Litg.*, 283 F.3d 1079, 1091 (9th Cir. 2002)). As noted by the Court in the Report, these heightened pleading standards should be viewed in light of the elements of a fraud claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5.  The elements for such a claim which must be alleged include (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) which proximately caused their injury.  *DSAM Global*, 288 F.3d 385, 388 (9th Cir. 2002).  As noted in the Report, the first three elements of a Section 10(b)

claim are at issue in this case.  In addition, the SAC also puts at issue element number five, which requires a complaint to plead loss causation.

The pleading standards with respect to Plaintiffs' claims have already been outlined by the Court in the Report.  In the Report, the Court noted that the PSLRA's pleading standard is especially stringent with respect to claims against an outside auditor, requiring a mental state approximating "an actual intent to aid in the fraud being perpetrated by the audited company." (Report, p. 9) (citations omitted).  According to the Report, scienter under the PSLRA requires much more than mere misapplication of accounting principles; rather, the accounting practices must have been "so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts."  (*Id.*)  The Report further emphasized that the complaint "must allege specific facts showing that the deficiencies in the audit were so severe that they strongly suggest that the auditor must have been aware of the corporation's fraud."  To satisfy this standard, the complaint must plead "specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored, either deliberately or recklessly." (*Id.* at p. 10.)

In addressing the pleading of scienter in the Report, the Court emphasized that it should take into account "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  (*Id.* at p. 14.) The Report also provides that the state of mind requirement under the PSLRA requires intentional or deliberate recklessness, and it "is not sufficient to plead facts that merely suggest motive, opportunity or recklessness."  (*Id.* at p. 15.)  According to the Court, "a plaintiff must plead a 'highly unreasonable omission, involving not merely simple, or even inexcusable

negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" (*Id.* at p. 15.)  The Court concludes in the Report that Plaintiffs "must allege specific facts that establish that the accountant knew or must have known about a widespread and significant practice of improperly recognizing revenue, such that the accountant acted to intentionally falsify the financial statements." (*Id.* at p. 16.)

The Report addressed whether the FAC described "alleged red flags" which demonstrate that CBN acted with scienter.  The Court rejected Plaintiffs' arguments, noting that the red flags in the FAC do not "come close[] to demonstrating intent, as opposed to mere motive and opportunity." (Report, p. 18) (citations omitted).  The question now before the Court is whether the SAC corrects the defects in the FAC by describing with particularity specific facts and/or red flags which demonstrate that CBN acted with the requisite intent to deceive.

**B.  Fraud Claim of the FAC and the SAC**

The relevant theme of the SAC is the same as the FAC.  Plaintiffs allege that Atlas fraudulently touted the future prospects of its Dragon Mine as a valuable halloysite clay mining business, including the availability and the quality of clay.  According to the SAC, the Atlas Defendants' fraud included misstating sales and potential sales of clay.  Plaintiffs also allege that Atlas entered into a fraudulent sale contract with NaturalNano for the sale of 500 tons of clay, even though there was no ability for clay to be delivered.  Plaintiffs allege that this transaction was collusive, intended only to further permit Atlas to tout its halloysite clay business.  (*See* SAC, ¶¶ 4-14, 47-115, 128-131.)  According to the SAC, Atlas issued a press release on January 19, 2005 in which it claimed to have recognized $250,000 of revenue in 2004 in consideration for future deliveries of clay to NaturalNano.  (*Id.* at ¶ 11.)

The SAC alleges that on October 9, 2007, Atlas filed an 8-K with the Securities Exchange Commission ("SEC") and announced its intent to restate its financials for the years 2004, 2005, and 2006 because the revenue from NaturalNano should not have been recognized because the clay was not delivered. (*Id.* at ¶¶ 128-131.) Atlas announced its intent to treat the $250,000 as unearned revenue and report it as a liability, with the result that its net loss for 2004 would increase from $945,274 to $1,196,274. Atlas also announced in this 8-K that the Dragon Mine lacked "comprehensive . . . third-party evaluation." Atlas further stated that the Mine suffered from "insufficient mine planning, and inadequate processing facilities," and mining activity would be suspended until a "third-party geologic review" was completed. (*Id.* at ¶ 128). According to the SAC, the price of Atlas's stock dropped by 51% on the same day these disclosures were made to the market. (*Id.* at ¶ 129)

On August 27, 2008, Atlas issued another 8-K, this time stating its intent to treat the $250,000 as a deposit for the years 2004 and 2005 and recognizing these monies as income in 2006. (*Id.* at ¶¶ 133-38; *see also* August 27, 2008 8-K, attached as Ex. 4 to CBN's Memorandum to Dismiss FAC.)[1]

In both Complaints, Plaintiffs' primary allegation against CBN is that the audited financial statements for Atlas for the year 2004 improperly included revenue of $250,000 related to the sale of halloysite clay to NaturalNano. (SAC ¶¶ 183-189.)

---

[1] Exhibits 1-4 as referenced herein were attached to CBN's memorandum in support of its motion to dismiss the FAC (Docket #77), and Exhibit 5 as referenced herein was attached to CBN's reply memorandum in support of the motion (Docket #94). CBN hereby incorporates by reference these exhibits.

**C.  The Additional or Expanded Allegations in the SAC Do Not Cure the Defects in the FAC.**

The SAC includes allegations related to CBN that are arguably new or stated in greater detail as compared to the FAC.  As described below, when the pleading standards set forth above are applied, these new or expanded allegations do not cure the defects in the FAC, and the SAC should be dismissed.

**1.      Additional Details Concerning NaturalNano Transaction**

In the FAC, Plaintiffs asserted solely that CBN's recognition of the $250,000 as revenue in the 2004 financial statement was fraudulent because on October 9, 2007, Atlas issued a form 8-K stating its intent to restate its financial statements to treat the revenue received from NaturalNano as a long-term liability rather than as income because no clay had been delivered.  As the Report noted, on August 27, 2008, Atlas issued another form 8-K, now taking the position that the $250,000 received from NaturalNano should be recognized as revenue, albeit in the year 2006 rather than in the year 2004.  Due to the varying proposals concerning how the funds received from NaturalNano should be treated, the Court concluded that the heightened pleading standard for pleading a false statement or omission under the PSLRA could not be met because of ambiguity concerning how accountants may treat this transaction.  (Report, p. 11.)

In an apparent effort to cure the defects in the FAC, the SAC includes additional details concerning the NaturalNano transaction.  The additional details with respect to the NaturalNano transaction are set forth in ¶¶ 72-86 of the SAC, and include the following:  Atlas and NaturalNano entered into a memorandum of understanding providing that NaturalNano would purchase 500 tons of halloysite.  The agreement obligated NaturalNano to build a processing facility at the mine.  NaturalNano also was to receive a warrant to purchase 750,000 shares of Atlas common stock at 40 cents a share.

The agreement carried a term of two years. In connection with the transaction, a purchase order dated December 23, 2004 was issued, which specified the point of delivery as "FOB Point – Mine Site." On December 30, 2004, NaturalNano acknowledged the purchase order in writing and stated that it "may not cancel or delay this order" and "[S]hipments are FOB . . . Dragon Mine, Utah." (*Id.* at ¶ 76.)

NaturalNano made two payments to Atlas for the 500 tons of clay, $125,000 in late 2004 and another in mid-2005, and Atlas recognized $250,000 in revenue in 2004 for this transaction. (*Id.* at ¶ 81 & 128.) The SAC also alleges that NaturalNano never constructed a production facility. (*Id.* at ¶ 85.) The SAC alleges that Atlas should not have recognized in 2004 the $250,000 in funds received from NaturalNano because the clay was never delivered. Rather, Atlas should have recognized these funds as revenue in 2006. (*Id.* at ¶¶ 86, 138, 144-45.)

The SAC does not in any respect resolve the ambiguity concerning how the NaturalNano transaction should have been treated from an accounting perspective. Indeed, when the revenue recognition principles outlined in the SAC are applied to the new details concerning the transaction, the ambiguity is increased. The new details even support a strong argument that the 2004 financial statement properly recognized all of the revenue from the NaturalNano transaction.

The SAC outlines the allegedly applicable revenue recognition principles. According to the SAC, "revenue 'recognition involves consideration of two factors (a) being realized or realizable and (b) being earned. . . .'" The SAC further quotes allegedly relevant accounting principles as follows:

> Revenues are not recognized until *earned*. An entity's revenue earning activities involve *delivering or producing goods*, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. . . .

(*Id.* at ¶ 155.)   The SAC further describes that revenue "generally" is realized when there is evidence of an arrangement, delivery has occurred, the price is fixed or determinable, and collectability is reasonably assured.  (*Id.* at ¶ 156.)

When the revenue recognition principles set forth in the SAC are considered, the new details in the SAC concerning the NaturalNano transaction actually support the conclusion that Atlas properly recognized the $250,000 in revenue in 2004.  This is true because according to the details provided by the SAC, Atlas had no further obligation to do anything for NaturalNano after the deal was struck in late 2004.  The agreement provided that NaturalNano was to build a processing facility at Atlas's mine site, and NaturalNano was obligated to process the clay.  The agreement further provided that the point of delivery was at the mine site.  The agreement also provided that NaturalNano could not cancel the order.  Thus, at the time the transaction was entered into, the only remaining performance was from NaturalNano, not from Atlas.  Atlas had no obligation to deliver or process, and it had earned the revenue at the time the transaction was entered into.  Under the accounting principle relied upon in the SAC, Atlas was not in the business of "*delivering or producing goods*" with respect to the NaturalNano transaction.  (SAC, ¶ 155.)  Clearly, this is why Atlas ultimately chose to recognize the revenue from NaturalNano, albeit in the year 2006 rather than 2004.

The SAC does nothing to state a strong case for any treatment of the NaturalNano revenue that would support its fraud claim.  Based upon the accounting principles as described in the SAC, a sound argument could be made that the revenue could have been recognized in the year 2004 since no performance on the part of Atlas remained, and Atlas actually received the monies.

The SAC does not satisfy the heightened standard for pleading a false statement under the PSLRA with respect to the alleged wrongful recognition of revenue received from NaturalNano.

2.       **Restated Financials for the Year Ending December 31, 2006**

The SAC includes a description of the restatement of Atlas's financial statements for the year ending December 31, 2006, as announced by the company on July 15, 2009.  The changes affected eight categories of accounting entries to the 2006 financial statements:

| | |
|---|---:|
| Decrease in cost of sales for contract mining | $   77,711 |
| Increase in unrecorded liabilities | 7,750 |
| Increase in contract mining production costs | 161,236 |
| Increase in general administrative costs, compensation | 233,881 |
| Decrease in interest income | 112 |
| Increase in realized loss on available for sale securities | 39,219 |
| Increase in a settlement of contract | 250,000 |
| Decrease in miscellaneous income | 3,774 |
| Subtotal | $   118,261 |

(*See* Atlas 10-Q/A filed July 15, 2009, attached hereto as Exhibit 6, p. 23.)  The net impact to the financial statements are summarized in paragraph 145 of the SAC, and include the following: Total assets decreased by $200,430, from $4,309,081 to $4,109,451; total liabilities increased by $26,769, from $855,089 to $881,858; the net loss of the company for the year ending December 31, 2006 increased by $118,261 from $1,992,922 to $2,111,183.  The restated financials for December 31, 2006 included income of $250,000 related to the NaturalNano transaction which had previously been recorded as revenue in 2004.  (*Id.* at ¶ 145, p. 52.) The SAC concludes that "the restated financials confirm the widespread accounting fraud at Atlas."  (*Id.* at 146)  The restated financials as announced by Atlas in July, 2009, fail to cure the defects in the FAC for several reasons.

As the Court has already noted, pleading a fraud claim, and in particular scienter, against an accountant requires "more than a misapplication of accounting principles."  (Report, pp. 15-16) (citations omitted).  This principle should seem obvious in light of the fact that GAAP "is not 'a canonical set of rules that will ensure identical accounting treatment of identical transactions.'"  *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999)

(quoting *Thor Power Tool Company v. Commissioner*, 439 U.S. 522, 544 (1979)).   Rather, GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management."   *Id.*   Courts have noted that financial statements are "the final product of a complex process involving discretion and judgment on the part of the auditor at every stage. Using different initial assumptions and approaches, different sampling techniques, and the wisdom of 20-20 hindsight, few CPA audits [are] immune from criticism."   Courts have further noted that "flexible accounting concepts do not always (or perhaps ever) yield a single correct figure."   *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1008 (S.D. Cal. 2000), affirmed 288 F.3d 385 (9th Cir. 2002) (quoting *Bily v. Arthur Young & Company*, 834 P.2d 745, 762 (Cal. 1992) and *Loveless v. Software Spectrum, Inc.*, 78 F.3d 1015, 1020-21 (5th Cir. 1996)).

In order to turn a disagreement concerning the application of accounting principles into a fraud claim, Plaintiffs must plead specific facts showing that no accountant would have made the judgments that CBN made.   (Report, pp. 15-16.)   Otherwise, a complaint is nothing more than "self-righteous statements" that the accountant's audit was fraudulent because another accountant reached a different conclusion.   *In re: Software Toolworks, Inc. Securities Litigation*, 50 F.3d 615, 628 (9th Cir. 1994).   In the present case, the SAC does not state a single fact which suggests that the restatements made by the company in July 2009 were the result of fraud on the part of CBN or Atlas.   The revisions in the restated financials are not part of a systematic pattern evidencing a scheme to overstate profitability.   Rather, the restatements involve unrelated categories of book entries from which a fraudulent scheme cannot reasonably be inferred.   Even a "litany" of alleged false statements will fail to meet the PSLRA's heightened pleading standard when "unaccompanied by the pleading of specific facts indicating why those statement were false" and part of a fraudulent scheme.   *Metzler v. Corinthian*, 540 F.3d 1049, 1070 (9th Cir. 2008).

The SAC does not even attempt to plead the element of loss causation with respect to the restated financials. This element of a fraud claim is the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." *Metzler,* 540 F.3d at 1062 (quoting *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 342, 125 S. Ct. 1627 (2005)). In order to plead loss causation, a complaint must plead that "the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Id.* at p. 1063. According to the *Metzler* Court, a plaintiff pleads loss causation by alleging that the "share price fell significantly after the truth became known." *Id.* at p. 1062.

The SAC pleads that on October 9, 2007, Atlas corrected allegedly fraudulent prior representations when it revealed to the market that 1) it was suspending mining operations because of the absence of third-party verification of its halloysite resources; 2) it lacked adequate processing facilities for the Dragon Mine; 3) it was suspending mining activities until a third-party geologic review; and 4) it intended to restate its financials for the year 2004 to treat the $250,000 received from NaturalNano as a deposit rather than as earned revenue. According to the SAC, Atlas's stock dropped 51% in value when its fraud was revealed to the market in October, 2007. This is the same fraud and loss causation theory pled in the FAC. (FAC ¶¶ 109-112.) The SAC makes no attempt to plead all the elements of fraud, including loss causation, with respect to the restated financials announced in July, 2009. (*See* SAC, ¶¶ 144-146). Plaintiffs' inability to plead all of the elements of fraud with respect to the restated financials makes the restated financials utterly irrelevant to any claim of fraud against CBN.

In addition, the Court held in the Report that the magnitude of alleged GAAP errors must be assessed to determine whether they are "minor or technical in nature" or "material in light of the company's overall financial condition." (Report, p. 11.) In the Report, the Court concluded that the alleged accounting error of $250,000 in the year 2004 financial statement was not

material in this sense inasmuch as it merely resulted in changing Atlas's net loss from $1.2 million to $950,000. According to the Court, the alleged error "did not result in a gross overstatement of Atlas's revenue, but rather an understatement of its net losses" and accordingly was not significant and widespread with respect to the company's overall financial condition. (*Id.* at p. 13.)

The restatements announced by Atlas in July 2009 relate to only eight categories of entries, and the overall impact on Atlas's financial condition is even less than the accounting error of $250,000 as alleged in the FAC. When the various accounting entries are weighed together, they result in increasing Atlas's net loss by a mere $118,000. In addition, the Court noted in the Report that the audit related to "hundreds of line items." (Report, p. 13, n. 2.) Eight categories of changes to the financials, with minimal dollar impact, hardly qualifies as accounting errors that are widespread and significant such as to suggest accounting fraud. The magnitude of the alleged errors is far less significant than those rejected by the Ninth Circuit in *DSAM Global*.

The SAC does little more than ask the Court to infer a fraudulent scheme because Atlas issued restated financials. This approach is not consistent with case law, and was expressly rejected by this Court when the Court adopted the Report. (Order Adopting Report, p. 9.)

### 3. Conflict of Interest

The SAC asserts that CBN's work was "conflict-tainted." The SAC alleges that CBN did not qualify to serve as an independent auditor because it helped prepare Atlas's financial statements for the years 2000 through 2004. (*Id.* at ¶ 170.)

This allegation, even if true, offers nothing to support an inference that CBN acted with the intent to deceive or was aware of improper revenue recognition practices. The SAC does not describe the specific auditor independence standards or when they were implemented. It should

be noted that stricter auditor independence standards came into place after the enactment of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 78c.  Sometime after the enactment of Sarbanes-Oxley, the SEC implemented new auditor independence standards.  *See* 17 C.F.R. § 210.2-01.  Thus, the conflict of interest rules which the SAC references were not applicable during at least a significant portion of the 2000 to 2004 time period referenced in the SAC.

### 4.       Duty to Correct Overall Impression

The SAC asserts that Atlas represented that its halloysite clay reserves were "a virtual pot of gold" and "the very future of the Company."  (*Id.* at ¶ 202.)  The SAC asserts that "the overall impression created by the financial statements [audited by CBN] was inconsistent with the business realities of the company's financial position and operations."  (*Id.* at ¶ 203.)  According to the SAC, the company represented that it had "functioning halloysite operations" that were "healthy," "profitable" and "viable."  (*Id.* at ¶¶ 5, 11, 14, 87, 228.)  According to the SAC, "Atlas held itself out to be a miner and seller of halloysite clay" even though it had no processing capability.  (*Id.* at ¶ 230.)   The SAC alleges that the financial statements audited by CBN were deceptive and misleading because CBN failed to correct "the overall impression created by the financial statements."  (*Id.* at ¶ 203.)

Two preliminary points should be made with respect to this alleged red flag.  First, the inquiry under the PSLRA is "inherently comparative," and "the court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Tellabs*, 127 S. Ct. at 2510.  In addition, when a company relies upon public filings, press releases and other written statements as a basis for allegations of fraud, the Court need not accept the complaint's characterizations of the statements in these documents if those characterizations contradict the written statements relied upon.  *Rapaport v. Asia Electronics Holding Company, Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If these documents

contradict the allegations of the amended complaint, the documents control and this court need not accept as true the allegations in the amended complaint.")

Plaintiffs' allegations in the SAC that Atlas held itself out as having a "viable" and "profitable" halloysite mining business is at best an exaggeration of the statements found in Atlas's public filings and press releases.  Plaintiffs' characterization in this regard of Atlas's written representations is certainly not the most compelling inference to be drawn from the documents in question.   In its annual reports for the years 2004, 2005 and 2006, Atlas represented that it made no sales of halloysite clay in 2003, 2005 and 2006, and only reported a single sale for the year 2004.  (SAC ¶¶ 71, 98; *see also* Atlas's 2006 form 10-KSB, p. 6, Ex. 3.) Furthermore, in the company's 2004 annual report, although the company described revenues of $250,000 from the sale of halloysite clay, the company also stated that its exploration and development expenses related to the sales in 2004 were $340,657, well in excess of any revenues.  (Atlas 2004 form 10-KSB, Ex. 1, at pp. 7, 18.)  Atlas never represented that it had a currently viable, profitable halloysite clay business.  Rather, the most compelling inference from Atlas's statements at best is that Atlas believed it had a valuable resource which it hoped would be profitable in the future.   Indeed, even when discussing potential sales of clay in its SEC filings, Atlas emphasized that "The sale of product cannot be formalized until we have verified our ability to provide the quality and quantities as required by the potential buyers."  (SAC ¶¶ 105, 112.)

Plaintiffs allege that CBN should have corrected the representations made by Atlas in its public filings and press releases concerning the viability and profitability of Atlas's halloysite clay business.  It should first be noted that there is not a single allegation in the SAC which demonstrates that CBN was even aware of the representations made by Atlas.  Moreover, it is wholly inadequate for Plaintiffs to allege that CBN would have known of such representations

had CBN conducted its audit in a proper manner.  *See DSAM Global*, 288 F.3d at 390-91.  In any event, Plaintiffs' allegations in this regard completely ignore the content of the financial statements audited by CBN.

The financial statements in question for the years 2004, 2005 and 2006 describe a company that was continually losing money and in danger of failing.  The financial statements in no respect describe a business that is "viable" and "profitable."  The financial statements show that in 2004 Atlas suffered a net loss of $946,274, and a net loss of $1,382,038 for the year 2003. They also describe an accumulated deficit of $5,861,240.  (*See* Atlas 2004 form 10-KSB, Ex. 1, pp. 20-21.)  The annual report for the year 2005 showed a net loss for the year of $3,780,318 and an accumulated deficit of $9,649,505.  (*See* Atlas 2005 form 10-KSB/A, Ex. 2, p. 17.)  The annual report for the year 2006 described a net loss for the year of $1,992,922 and an accumulated deficit of $11,642,427.  (*See* Atlas 2006 form 10-KSB for the year ended December 31, 2006, Ex. 3, p. 17.)  Nothing in the financial statements audited by CBN creates the impression of a thriving, healthy business.  Indeed, the year 2004 financial statement included a going-concern qualification, warning investors that the company's continuing losses raised substantial doubts about its ability to remain in business.  (Atlas's 2004 form 10-KSB, Ex. 1, Independent Auditor's Report.)

### 5.      Characteristics of Management

The SAC asserts that the characteristics and influence of management for Atlas presented a glaring red flag to CBN.  Specifically, the SAC alleges that management was dominated by a single person, Defendant William Jacobson.  The Complaint alleges that Jacobson had a great motivation to commit widespread fraud inasmuch as his livelihood was dependent on the stock price and operating results of the company, and he engaged in improper stock issuances and related party transactions in violation of the federal securities laws.  (*Id.* at ¶ 243.)

Plaintiffs' assertions with respect to the characteristics of management do nothing to demonstrate scienter as required by case law and the Report.  As noted in the Report, "it is not sufficient to plead facts that merely suggest motive, opportunity, or recklessness."  (Report, p. 15.)  Rather, Plaintiffs are required to allege "specific facts" that demonstrate that "the accountant acted to intentionally falsify the financial statements." (*Id.* at p. 16.)  Undoubtedly, it is not unusual for a small company to be dominated by a small management circle, even a single person.  Moreover, every corporate manager has the same motivation to commit fraud inasmuch as management's success and financial gain is always tied to the success of the company.

### 6.    Unauthorized Stock Issuances

The SAC alleges that Atlas engaged in numerous unauthorized stock issuances, contrary to the federal securities laws.  According to the Complaint, stock was issued contrary to law to related parties, without adequate disclosure, and without properly valuing the shares.  (*Id.* at ¶¶ 244-264.)  According to the Complaint, had CBN not been reckless in performing its audits, the circumstances related to the stock issuances would have alerted CBN to the risk of fraud.  (*Id.* at ¶¶ 245, 251, 256.)

This red flag fails for the very reasons that Plaintiffs' allegations about the characteristics of management fail.  Plaintiffs do no more than plead motive and opportunity as opposed to specific facts that demonstrate that CBN acted to intentionally falsify financial statements.  Notably, Plaintiffs do not allege that CBN made any false statements or omissions with regard to the stock issuances.  Plaintiffs make no attempt to allege reliance, injury, or the other elements of fraud with respect to the improper stock issuances.  Plaintiffs merely allege that the purported improper stock issuances should have acted as red flags, making CBN aware of the potential for fraud.

The SAC is devoid of specific facts which inform the Court of how the audit was deficient with respect to the stock issuances.  For example, the SAC merely alleges generally that Jacobson improperly valued shares.  (SAC ¶ 250.)  The SAC is devoid of any details concerning how the stock was valued, why it should have been valued differently, or, more importantly, what information was available to CBN concerning the valuation of the stock.

### 7.   Failure to Obtain Backup Documentation to Explain NaturalNano Transaction

The SAC asserts that a red flag that should have warned CBN of Atlas's fraud was the absence of "evidential matter" concerning the NaturalNano transaction.  (*Id.* at ¶¶ 267-277.)  The SAC alleges that a multitude of factors should have caused CBN to investigate the NaturalNano transaction more thoroughly, and had it done so, it would have uncovered Atlas's fraud.

This alleged red flag fails for the same reasons that others fail, as described above, namely, Plaintiffs have not alleged "particular facts" that bear on CBN's judgment in recognizing revenue for the NaturalNano transaction.  Plaintiffs again are relying upon the same argument rejected outright in *DSAM Global*, namely, that had the accountant performed properly, it would have learned of facts alerting it to fraud.  *DSAM Global*, 288 F.3d at 390-91.

Moreover, as Plaintiffs concede, Atlas failed to give CBN the contractual documents related to the NaturalNano transaction.  (SAC ¶¶ 187, 224.)  Atlas withheld this key information despite the fact that it expressly represented to CBN that it had "made available" to CBN all "financial records and related data."  (*See* Letter Agreements from Atlas Mining dated February 2, 2007, January 26, 2006, and January 28, 2005, attached as Exhibit 7.)[2]  The fact that

---

[2] Ordinarily a court may only look at the allegations in the complaint in considering a motion to dismiss.  However, the doctrine of "incorporation by reference" requires a court "to consider documents that were referenced extensively in the complaint."  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  In the SAC, Plaintiffs reference extensively the terms of the agreement with CBN.  (*See* SAC ¶ 171.)  By referencing and describing the

Atlas withheld key information from CBN while representing that it had provided all relevant information seriously undercuts Plaintiffs' fraud claims against CBN.  Atlas's failure to provide all relevant information to CBN underscores that an outside auditor is at the mercy of the audit client from whom all financial information must be received.

The SAC references extensively the audit work papers of CBN related to the NaturalNano transaction, which Plaintiffs now have received from Atlas.  (SAC ¶¶ 224, 187.) Plaintiffs assert that the audit work papers related to the NaturalNano transaction did not include the purchase contract, the purchase order, records of shipment, records of delivery and/or reports about progress of building the processing facility.  (*Id.* at ¶ 187.)  Plaintiffs fail to note that the work papers did include a confirmation from NaturalNano indicating that in fact a balance of $125,000 was owing to Atlas relating to this transaction.  (*See* January 26, 2005 confirmation, Exhibit 8.)[3]  Of the $250,000 related to the NaturalNano transaction, $125,000 was paid in December 2004, and the balance was paid in June of 2005.  (SAC ¶ 128, p. 42.)  The confirmation from NaturalNano confirmed the legitimacy of the revenue paid and owing to Atlas stemming from this transaction.

### 8.    Atlas's Weak Internal Controls

The SAC asserts that CBN violated GAAS by failing to take into account Atlas's weak internal controls.  The Complaint states that Atlas's weak internal controls included the absence of independent directors, no audit committee, inadequate corporate records, failure to properly

---

terms of the agreements between CBN and Atlas, Plaintiffs have incorporated by reference those agreements.  The agreements include the letters attached hereto as Exhibit 7 and the Court may properly consider these documents in addressing the motion to dismiss.

[3] For the same reasons as set forth above, the Court may consider this document because the Complaint references extensively the work papers of CBN related to the NaturalNano transaction.  Indeed, it would be unfair and misleading for the Court to partially consider the incomplete, selective references of Plaintiffs in the Complaint to the accounting work papers related to the NaturalNano transaction, without considering Ex. 8.

approve equity issuances, the absence of annual shareholder meetings, the absence of policies concerning related party transactions, inadequate books and records, and the absence of adequate disclosure controls.  (*Id.* at ¶ 280.)

This supposed red flag again offers no support to Plaintiffs' position.  It is not based upon specific facts that demonstrate that CBN knew that Atlas was fraudulently recognizing revenue.

### 9.     PCAOB Investigation of CBN

According to the Complaint, on two occasions, first on July 25, 2005 and again on June 29, 2009, the Public Company Accounting Oversight Board ("PCAOB") published reports indicating certain deficiencies in CBN's auditing practices.  (*Id.* at ¶ 284.)  Plaintiffs allege that the inspection reports demonstrate that CBN has consistently acted in violation of GAAP and GAAS and PCAOB standards.  (*Id.* at ¶ 285.)  This alleged red flag is a complete red herring.  It fails to support Plaintiffs' fraud claim for several reasons.

First, Plaintiffs' allegation implies that the PCAOB's mere inspection of CBN is a singular, extraordinary event occasioned by CBN's wrongful conduct. (SAC  ¶ 177.) However, as required by Section 104 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7214, PCAOB is required to inspect periodically all accounting firms that conduct audits for public companies. The results of the inspections are made public and reported at www.pcaob.com/inspections/public_reports.  All accounting firms performing audits for public companies are inspected, and even a cursory review of the inspection reports demonstrates that it is not unusual for the board to publish a report noting its disagreement with a firm's interpretation of GAAP with respect to an audit.  Indeed, Atlas appointed PMB Helin Donovan LLP as its auditor to replace CBN.  On October 1, 2009, the PCAOB issued an inspection report for PMB, noting that "the inspection

team identified what it considered to be audit deficiencies." (*See* www.pcaob.com/inspections/public_reports/2009/pmb_helin_donovan.pdf.)[4]

The PCAOB's inspection reports concerning CBN have no bearing on whether CBN has engaged in improper conduct, let alone participated in fraud with respect to Atlas. The reports themselves note that they do not constitute findings for the purpose of imposing legal liability. The reports further stress that even when they describe "perceived departures from GAAP" that is no indication that the SEC has made any determination concerning the GAAP issues. (*See* PCAOB inspection reports dated July 25, 2005 and June 29, 2009, p. 2, attached as Exhibit 9.)

Finally, courts have outright rejected an attempt to plead accounting fraud against an accounting firm based upon events unrelated to the audits in question. In *In re: Cardinal Health, Inc. Securities Litigations*, 426 F. Supp. 2d 688, 778 (S.D. Ohio 2006), plaintiffs attempted to plead fraud against an accounting firm by alleging that it had been sanctioned by the SEC for failure to comply with auditor independence rules and improper professional conduct. Plaintiffs asserted that "few accounting firms have been implicated in as many public company financial scandals" as this firm, evidencing the firm's disregard for the rules and procedures required of public accountants. (*Id.*) The court outright rejected plaintiffs' attempt to show a "pattern of bad behavior" based on other cases in order to infer scienter. (*Id.*) This Court should likewise reject Plaintiffs' attempt to demonstrate scienter based upon events completely unrelated to Atlas.

### III. CONCLUSION

For the reasons set forth above, the Court should dismiss the SAC, with prejudice.

---

[4] The Court may take judicial notice of PCAOB and its inspection reports as public records. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

DATED this 15th day of January, 2010.

KRUSE LANDA MAYCOCK & RICKS, LLC


/s/Steven G. Loosle
Steven G. Loosle
*Attorneys for Chisholm, Bierwolf & Nilson LLC*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 15th day of January, 2010, I electronically filed the foregoing MEMORANDUM IN SUPPORT OF CBN DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

**Charles Matthew Andersen**
cma@winstoncashatt.com

**Thomas A. Banducci**
tbanducci@bwslawgroup.com,kgarcia@bwslawgroup.com,rsoni@bwslawgroup.com,lharris@bwslawgroup.com,wwoodard@bwslawgroup.com,ssmith@bwslawgroup.com

**Courtney R. Beaudoin**
crb@winstoncashatt.com

**Bruce S. Bistline**
bbistline@gordonlawoffices.com

**Angelo J. Calfo**
acalfo@yarmuth.com,srasmussen@yarmuth.com

**Katrina Carroll**
kcarroll@ldgrlaw.com

**Matthew A. Carvalho**
mcarvalho@yarmuth.com,smeyer@yarmuth.com

**Joseph J. DePalma**
jdepalma@ldgrlaw.com

**William G. Dryden**
wgd@elamburke.com,buff@elamburke.com

**W. Adam Duerk**
aduerk@bigskylawyers.com

**Philip Howard Gordon**
pgordon@gordonlawoffices.com,bbistline@gordonlawoffices.com

**Philip M. Guess**
philg@klgates.com,rhonda.hinman@klgates.com,SEDocketing@klgates.com

**Lewis S. Kahn**
lewis.kahn@kgscounsel.com

**Richard A. Kirby**
richard.kirby@klgates.com

**Nathan M. Longenecker**
longenecker@twhlaw.com,fisk@twhlaw.com

**Kim E. Miller**
kim.miller@kgscounsel.com

**Ted C. Murdock**
tmurdock@hollandhart.com,jlcalhoun@hollandhart.com,
boiseintaketeam@hollandhart.com

**Bryan A. Nickels**
ban@hallfarley.com,kat@hallfarley.com

**Laurence M. Rosen**
lrosen@rosenlegal.com

**Jennifer Sarnelli**
jsarnelli@ldgrlaw.com

**Kevin J. Scanlan**
kjs@hallfarley.com,klm@hallfarley.com

**Jennifer F. Sherrill**
jfs@federmanlaw.com

**B. Newal Squyres**
nsquyres@hollandhart.com,sdalonzo@hollandhart.com,
boiseintaketeam@hollandhart.com

**Kim C. Stanger**
kstanger@hawleytroxell.com,sclark@hawleytroxell.com

**Stephen R. Thomas**
srt@moffatt.com,cld@moffatt.com,moffattthomas@hotmail.com,ecf@moffatt.com,
tmh@moffatt.com,sec@moffatt.com

**Thomas G. Walker**
twalker@cosholaw.com,pcarson@cosholaw.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-

CM/ECF Registered Participants via first class mail, postage prepaid, addressed as follows:

Michael A. Swick
Kahn Gauthier Swick, LLC
12 East 41st Street, 12th Floor
New York, NY 10017

/s/Lynn Javadi