Ellen Maycock (*Pro Hac Vice*)
Steven G. Loosle (*Pro Hac Vice*)
KRUSE LANDA MAYCOCK & RICKS, LLC
136 East South Temple
Twenty-First Floor
P.O. Box 45561
Salt Lake City, UT 84155-0561
Telephone:  (801) 531-7090
Facsimile:  (801) 531-7091
Email:  emaycock@klmrlaw.com; sloosle@klmrlaw.com

Kim C. Stanger, ISB No. 5783
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  (208) 344-6000
Facsimile:  (208) 342-3829
Email: kcs@hteh.com

*Attorneys for Chisholm, Bierwolf & Nilson, LLC*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(BOISE)

| | |
|---|---|
| IN RE: | ) |
| | ) |
| ATLAS MINING COMPANY, | ) Civil Action No. 07-428-N-EJL |
| SECURITIES LITIGATION | ) |
| | ) **REPLY MEMORANDUM IN** |
| | ) **SUPPORT OF THE CBN** |
| | ) **DEFENDANTS' MOTION TO** |
| | ) **DISMISS THE SECOND AMENDED** |
| | ) **COMPLAINT** |
| | ) |

        The Lead Plaintiffs in this class action have filed their Second Amended Consolidated

Complaint ("SAC") and Defendants Chisholm, Bierwolf & Nilson, LLC, Todd Chisholm, and

Troy Nilson (collectively "CBN") have moved to dismiss.  CBN hereby submits this reply

memorandum in support of its motion in order to respond to the opposing memorandum of the

Lead Plaintiffs.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

DISCUSSION ......................................................................................................................3

I.    Plaintiffs have Failed to Plead Specific False Statements and the Reasons the
      Statements are False. ...................................................................................................3

      A.   The SAC Fails to Sufficiently Allege Falsity Based upon an Alleged
           Overstatement of Revenues in Violation of GAAP. ..........................................4

      B.   The SAC Fails to Sufficiently Plead Falsity on the Grounds that CBN
           Violated GAAP by Failing to Disclose that Atlas's Halloysite Operations
           Were Not Viable.................................................................................................8

II.   The SAC Fails to Comply with the PSLRA's Pleading Standards for
      Materiality or Magnitude...........................................................................................13

III. The SAC Does Not Plead Particularized Facts Showing a Strong Inference of
     Scienter.....................................................................................................................16

      A.   The SAC Fails to Plead Red Flags that Show that CBN acted with Intent
           to Defraud or Deliberate Recklessness.............................................................17

           1.   Allegations Concerning CBN's Business Model and CBN's
                Relationship with Atlas.............................................................................18

           2.   Allegations Concerning the Special Committee Investigation ...................19

           3.   Allegations Concerning the PCAOB's Investigation .................................19

           4.   Allegations Concerning Jacobson's Violations of the Federal
                Securities Laws and his Looting of Atlas ..................................................20

      B.   The *Suprema* Case Does Not Support Plaintiffs' Position that a Strong
           Inference of Scienter has been Demonstrated in this Case. ..............................22

      C.   The SAC Does Not Plead Independent Fraud Claims Based Upon Any of
           the Red Flags Alleged in the SAC....................................................................24

CONCLUSION...................................................................................................................26

## TABLE OF AUTHORITIES

Statute
Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4................ 1, 3, 5, 7, 13-16, 18, 22, 23


Cases
*Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005)...................................................8

*DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002).............14, 16, 24

*Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1268 (11th Cir. 2006)........................................16

*In re: Burlington Coat Factory*, 114 F.3d 1410 (3rd Cir. 1997) ..................................................7, 8

*In re: Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir. 2005) ............3, 14, 15, 16

*In re: Homestore.com, Inc.*, 252 F. Supp. 2d 1018, 1022-24, 1044 (C.D. Cal. 2003)..................15

*In re: McKesson HBOC, Inc.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) .............................15

*In re: Microstrategy, Inc.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000)........................................15

*In re: Phillip Services Corp.*, 383 F. Supp. 2d 463, 467 (S.D.N.Y. 2004) ...................................15

*In re: Suprema Specialties, Inc.*, 438 F.3d 256 (3rd Cir. 2006)............................................... 22-24

*In re: Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1426 (9th Cir. 1994).....................14

*Provenz v. Miller*, 102 F.3d 1484 (9th Cir. 1996)...........................................................................8

*R2 Investments LDC v. Phillips,* 401 F. 3d 638, 641 (5th Cir. 2005) ..............................................5

*Rapaport v. Asia Electronics Holding Co.,* 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)................10

*Shalala v. Guernsey Memorial Hospital*, 115 S. Ct. 1232 (1995)...................................................7

*Software Toolworks, Inc. v. Paine Webber, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994).....................14

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 127 S. Ct. 2499 (2007) .................................3, 4, 5

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ..........10, 14, 16, 17, 21, 22

**INTRODUCTION**

Plaintiffs have now attempted on multiple occasions to plead a fraud claim against CBN based upon section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78(j)b and Rule 10b-5, 17 C.F.R. § 240.10b-5.  Plaintiffs' fraud claim against CBN, as the auditor for Atlas Mining Company ("Atlas" or the "Company"), is based solely upon the allegation that CBN fraudulently recognized $250,000 in revenue from a single transaction with NaturalNano in the year 2004.  The transaction related to the sale of halloysite clay.  The revenue was actually received by Atlas, but Plaintiffs nonetheless contend that recognizing the revenue in the Company's financial statements was fraudulent.

Plaintiffs' fraud claim must comply with the heightened pleading standard of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA"), which requires that a complaint specify alleged false statements, including the reasons for falsity, and plead specific facts demonstrating a strong inference of scienter.  The Court dismissed Plaintiffs' First Amended Complaint ("FAC"), concluding that it did not comply with the PSLRA.  Plaintiffs have now submitted the SAC, which adds nearly 50 additional pages of allegations, 118 pages in total, all for the purpose of attempting to demonstrate that CBN acted with deliberate recklessness or fraudulent intent in approving the recognition of revenue from a single transaction.

Plaintiffs have not sufficiently pled that CBN is guilty of a making a false statement in approving the recognition of revenue from the NaturalNano transaction.  Even assuming as true the facts pled by Plaintiffs concerning the transaction and the facts pled by Plaintiffs concerning the applicable accounting standards, Plaintiffs have failed to plead a clear violation of Generally Accepted Accounting Principles ("GAAP").   Plaintiffs allege that Atlas should not have

recognized the revenue because it did not deliver halloysite clay to NaturalNano and had no capacity to process clay.  However, Plaintiffs completely ignore the fact, as pled in their own complaint, that the contract required NaturalNano, not Atlas, to process the clay and pick it up. Atlas had no obligation to deliver or process clay, and it earned the revenue as soon as the deal was struck.   Indeed, after careful consideration and input from independent counsel and accountants, Atlas ultimately recognized revenue from this sale even though it never delivered clay and did not process clay, albeit in the year 2006 rather than in 2004.  CBN's opinion recognizing the revenue from the transaction is arguably correct, and Plaintiffs can at best point to multiple possibilities for the accounting treatment of this revenue.   Plaintiffs have no compelling argument that CBN was guilty of a fraudulent statement when it agreed to recognize the revenue.

In order to plead scienter, Plaintiffs must also plead facts establishing an egregious, significant, and widespread inflation of revenue in violation of GAAP.  The SAC completely fails to do so.   It at best describes facts that support multiple possible treatments for the NaturalNano revenue, one of which is the treatment approved by CBN.   Moreover, with or without this revenue, Atlas showed large, on-going losses, both as a whole and with respect to its halloysite clay operations.   Even with respect to the financial statements that recognized the revenue, CBN's audit opinion warned that the Company may fail because of on-going losses. The alleged error in recognizing the revenue merely resulted in an understatement of net losses, and not a fraudulent inflation of profitability.

In order to plead scienter, Plaintiffs must plead specific facts that  demonstrate that CBN was guilty of intentional fraud or deliberate recklessness, and that CBN must have been aware that there was a great danger that investors would be mislead. Given the debatable nature of the alleged GAAP violation and the small magnitude of the alleged violation, there can be no strong

inference that CBN believed that investors would be misled.  The SAC fails to allege a single

specific fact that suggests that CBN acted with deliberate recklessness or fraudulent intent.

**DISCUSSION**

**I.  Plaintiffs have Failed to Plead Specific False Statements
and the Reasons the Statements are False.**

The issue before the Court is whether the SAC adequately pleads a fraud claim against

CBN as required by the PSLRA.  The PSLRA requires a complaint to "specify" each false

statement, including "the reason or reasons why this statement" is false.  It also requires a

complaint to state "with particularity facts giving rise to a strong inference of scienter."  The

issues of falsity and scienter are closely related and sometimes are "combined into a unitary

inquiry under the PSLRA."  *In re: Daou Systems, Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)

(quoting *In re: Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002)).

The relationship between pleading falsity and scienter is especially significant in the

present case.  Plaintiffs contend that CBN was guilty of egregious and obvious accounting

misstatements, and assert that the Court should primarily infer fraud based upon the magnitude

of the alleged false statements.    According to the Supreme Court:

> Congress required plaintiffs to plead with particularity facts that give rise to a
> "strong"—i.e., a powerful or cogent—inference.  *See* American Heritage
> Dictionary 1717 (4th ed. 2000) (defining "strong" as "[p]ersuasive, effective, and
> cogent"); 16 Oxford English Dictionary 949 (2d ed. 1989) (defining "strong" as
> "[p]owerful to demonstrate or convince" definition 16(b)); cf.7 id. at 924
> (defining "inference" as "a conclusion [drawn] from known or assumed facts or
> statement"; "reasoning from something known or assumed to something else
> which follows from it.)"

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).  According to the

Court in *Tellabs*, in assessing whether the requirements of the PSLRA are satisfied, a court must

also take into account "plausible nonculpable explanations for the defendant's conduct, as well

as inferences favoring the plaintiff."  *Id.*  Furthermore, the inference urged by plaintiff "must be

more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."

## A. The SAC Fails to Sufficiently Allege Falsity Based upon an Alleged Overstatement of Revenues in Violation of GAAP.

Plaintiffs allege that CBN is guilty of a false statement because the financial statements it audited erroneously included revenue of $250,000 related to a transaction between NaturalNano and Atlas.  This transaction involved the sale of 500 tons of halloysite clay to NaturalNano. CBN has argued that based on the facts alleged by Plaintiffs, including the facts related to the transaction and the applicable accounting standards, a compelling argument can be made that Atlas's financial statements properly recognized this revenue in 2004.

In opposing CBN's motion, Plaintiffs assert that CBN's contention that the monies from NaturalNano were properly accounted for involves a disputed issue of fact which is not properly the subject of a motion to dismiss.  Plaintiffs assert that the Court must assume that the factual allegations in the SAC are true and, accordingly, CBN's argument must be rejected outright. This position, however, misapprehends both CBN's argument and the standard applicable to motions to dismiss.

CBN agrees that the Court should "accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509.  Indeed, for purposes of this motion, CBN assumes that the facts alleged by Plaintiffs concerning the NaturalNano transaction are true, as set forth in paragraphs 72-86 of the SAC.  These facts include that Atlas and NaturalNano entered into a memorandum of understanding which provided that NaturalNano would purchase 500 tons of halloysite clay. The agreement obligated NaturalNano to build a processing facility at the mine, and the agreement was for a term of two years.  In connection with this transaction, a purchase order dated December 23, 2004 was issued, which specified the point of delivery as "FOB Point— Mine Site."  On December 30, 2004, NaturalNano acknowledged the purchase order in writing

and stated that it "may not cancel or delay this order" and " [S]hipments are FOB . . . Dragon Mine, Utah." (SAC ¶ 76.)  NaturalNano made two payments for the 500 tons of clay, $125,000 in late 2004 and another in mid-2005.  (*Id.* at ¶¶ 81, 128.)  The SAC also alleges that NaturalNano never construed a production facility.  (*Id.* at ¶ 85.)  For purposes of this motion, CBN does not in any respect dispute these facts as alleged by Plaintiffs.

For purposes of this motion, CBN also assumes as true the factual allegations made by Plaintiffs concerning the accounting standards that apply in determining whether the revenue from NaturalNano was properly recognized in the year 2004.  These standards require that revenue be recognized when it is "earned" and when "the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  (*Id.* at ¶ 155.)  These standards further provide that revenue "'generally' is realized when there is evidence of an arrangement, delivery has occurred, the price is fixed or determinable, and collectability is reasonably assured."  (*Id.* at ¶ 156.)  CBN does not dispute these facts.

It is clear both from case law as well as from the PSLRA itself that a court is required to accept as true factual allegations but is not required to accept as true the conclusions or deductions which a plaintiff may draw from the factual allegations.  As one court noted, a court "will not accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'"  *R2 Investments LDC v. Phillips,* 401 F. 3d 638, 641 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2001)).  In *Tellabs*, the court stated that a court should accept the factual allegations as true, but further stated that courts should weigh competing inferences.  The *Tellabs* court defined inference as "a conclusion [drawn] from known or assumed facts or statements."  *Tellabs*, 127 S. Ct. at 2510.  Thus, according to *Tellabs,* a court need not accept as true the inferences or conclusions urged by plaintiff, and must even consider alternative or competing inferences.

It simply is incorrect to assert that this Court is bound by Plaintiffs' argument that the facts they have pled establish a violation of GAAP.  Plaintiffs argue that GAAP was violated and the revenue from NaturalNano was wrongfully recognized because Atlas never delivered clay to NaturalNano and did not have the capability to process clay.  This conclusion, however, is directly contrary to the very facts, which must be assumed to be true, that Plaintiffs outline in the SAC.

Assuming as true the facts alleged in the SAC about the transaction with NaturalNano and the applicable accounting standards, the most compelling inference is that Atlas's initial 2004 financial statement properly recognized the revenue received from NaturalNano.  As set forth in the facts alleged by Plaintiffs, there was an arrangement, namely a contract, between NaturalNano and Atlas.  The contract set forth a price, and not only was collectability reasonably assured, the facts alleged by Plaintiffs demonstrate that the price was actually paid.  Clay was not delivered to NaturalNano; however, the standard outlined by Plaintiffs does not absolutely require that clay be delivered.  Rather, delivery is one of the criteria that is addressed in determining whether revenue has been earned.  In the present case, the transaction outlined in the SAC did not require Atlas to deliver clay before Atlas "earned" the revenue, nor did the contract require Atlas to process the clay.  Rather, the contract required NaturalNano to build a processing plant, process the clay, and pick up the clay.  Plaintiffs cannot and have not identified a single act which Atlas was required to perform after December 2004 before it was entitled to retain the money received from NaturalNano.  Atlas owed NaturalNano no remaining performance after December 2004, and consequently, as dictated by the very accounting standard articulated in the SAC, had "substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  (SAC ¶ 155)

Plaintiffs protest greatly that Atlas had no ability to process clay and never delivered clay to NaturalNano, and therefore could never properly recognize revenue.  Yet Atlas's actions subsequent to 2004 completely undermine Plaintiffs' position.  Atlas, after counseling with special legal counsel and accountants, determined to recognize as revenue all the money received from NaturalNano in 2006, despite the fact that it apparently has never delivered the clay nor does it have a processing facility.  Plaintiffs attempt to dismiss this obvious failure in their logic by asserting that ultimately Atlas chose to recognize the revenue in "settlement of a contract." (Opposing Memorandum p. 19.)  Plaintiffs, however, simply cannot get around the fact that the contract that was settled was the contract between NaturalNano and Atlas, and the distinction which Plaintiffs attempt to draw is meaningless.

The PSLRA requires the complaint to "specify" each false statement, including "the reason or reasons why this statement" is false.  The very factual allegations pled by Plaintiffs create at least ambiguity about potential, alternative accounting treatments for the revenues received from NaturalNano, and Plaintiffs cannot and have not pled with specificity and particularity a false statement or the reasons it is false.  Plaintiffs' failure to do so stems in part from the very nature of GAAP.  As the Supreme Court has noted, "Financial accounting is not a science.  It addresses many questions as to which the answers are uncertain and is a 'process [that] involves continuous judgments and estimates.'"  *Shalala v. Guernsey Memorial Hospital*, 115 S. Ct. 1232 (1995); *see also In re: Burlington Coat Factory*, 114 F.3d 1410, 1421 n. 10 (3rd Cir. 1997) ("GAAP is not a set of rigid rules ensuring identical treatment of identical transactions, but rather characterizes the range of reasonable alternatives that management can use.")

In the present case, Atlas has stated at various times three different approaches to treat the NaturalNano revenue.  Atlas initially chose to recognize $250,000 of revenue received from

NaturalNano in 2004.  On October 9, 2007, Atlas announced that it believed it should not have recognized the revenue from NaturalNano.  (*See* October 9, 2007 Form 8-K, Exhibit 5.) Subsequently, on August 27, 2008, Atlas filed another Form 8-K announcing its belief that the revenue received from NaturalNano should be recognized, albeit in the year 2006 rather than in 2004.  (*See* August 27, 2008 8-K, Exhibit 4.)  Clearly, the strongest inference to be be drawn is that recognizing revenue either in 2004 or 2006 would fall within the range of permissible treatments under the accounting standards and facts pled by Plaintiffs.

Plaintiffs cite several cases, purportedly for the proposition that their conclusions concerning the interpretation of GAAP must be accepted as true, and accounting disputes should not be resolved through a motion to dismiss.  These cases, however, turn on the particular facts and circumstances alleged in the complaints in question.  Unlike these cases, in the present case, CBN does not contest the facts alleged by Plaintiffs concerning the transaction with NaturalNano nor the facts alleged concerning the applicable accounting standards.  In this respect, these cases are distinguishable.  *See, e.g., Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005) (case involving expert witness dispute concerning revenue recognition principles); *In re: Burlington Coat Factory*, 114 F.3d 1410, 1420-21 (3rd Cir. 1997) (dispute concerning applicable accounting standards); *Provenz v. Miller*, 102 F.3d 1484 (9th Cir. 1996) (involving purchase order with contingencies that allegedly were not satisfied before revenue recognized).

## B.  The SAC Fails to Sufficiently Plead Falsity on the Grounds that CBN  Violated GAAP by Failing to Disclose that Atlas's Halloysite Operations Were Not Viable.

The SAC asserts that Atlas misrepresented that its halloysite clay reserves were "a virtual pot of gold" and "the very future of the company."  (SAC ¶ 202.)  The SAC further alleges that Atlas misrepresented that it had "functioning halloysite operations" that were "healthy," "profitable" and "viable."  (*Id.* at ¶¶ 5, 11, 14, 87, 228.)  The SAC further asserts that "Atlas held

itself out to be a miner and seller of halloysite clay" even though it had no processing capability. (*Id.* at ¶ 230.)  Although these alleged misrepresentations, even if made, were not made by CBN, Plaintiffs attempt to blame CBN, asserting that "the overall impression created by the financial statements [audited by CBN] was inconsistent with the business realities of the company's financial position and operations" and CBN failed to correct "the overall impression created by the financial statements."  (*Id.* at ¶ 203)  Since the only false statement which Plaintiffs attribute to CBN is the alleged erroneous treatment of the $250,000 received from NaturalNano, apparently Plaintiffs would contend that this error resulted in creating a false "overall impression" in the financial statements.  In this respect, this alleged false statement is no different than the false statement addressed in section I(A), above.

In moving to dismiss, CBN has asserted that the SAC does not accurately describe Atlas's statements concerning its halloysite business as set forth in Atlas's public statements. More importantly, CBN asserts that 1) CBN did not make the statements about Atlas's halloysite business and there are no particularized facts pled that demonstrate CBN's knowledge of Atlas's alleged fraudulent touting of the halloysite operation; and 2)  the financial statements audited by CBN represented that Atlas was losing large amounts of money, not that Atlas was a viable, healthy, profitable company.

In opposing CBN's motion, Plaintiffs assert that CBN is impermissibly taking issue with their allegations that Atlas fraudulently touted its halloysite business, and the Court must accept the allegations as true.  It must be emphasized that CBN's motion does not turn on whether Atlas did or not fraudulently tout the halloysite business since the only representations made by CBN were in the financial statements.  The financial statements never mention halloysite clay, and show Atlas to be a very unprofitable company.  In any event, the court should take note of the fact that there is a stunning discrepancy between the SAC's characterization of the

representations in Atlas's public statements and the actual language of the statements.  Plaintiffs cannot plead a fraud claim based upon "an isolated statement that stands in contrast to a host of other insufficient allegations."  *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 999 (9th Cir. 2009) (quoting *Metzler Inv. GMBH v. Corinthian Coll., Inc.,* 540 F.3d 1049, 1069 (9th Cir. 2008)).  The Court is also not required to accept Plaintiffs' characterizations of Atlas's public, written statements if the characterizations are not consistent with the written statements. *Rapaport v. Asia Electronics Holding Co.,* 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

For example, in the SAC, Plaintiffs purport to quote from Atlas's 2004 annual report and a January 19, 2005 press release, and state as follows:

> 11.  To create the illusion that its halloysite business was viable, Atlas never disclosed its lack of processing capability and colluded with NaturalNano to create the appearance, beginning with its January 19, 2005 press release and its 2004 10-KSB, that NaturalNano had already purchased "500 tons of *processed* halloysite nanotubes" halloysite from Atlas. . . . These representations were patently false and misleading because neither Atlas nor NaturalNano had any processing capability for this clay.

(SAC ¶ 11) (emphasis in original).  Plaintiffs' description of the January 19, 2005 press release and the 2004 annual report as referenced in the SAC is blatantly inaccurate.

Nowhere does the 2004 annual report include the purported quote that Atlas has sold "500 tons of processed halloysite nanotubes" as alleged by Plaintiffs.  (*See* 2004 Annual Report, Exhibit 1.)  Likewise, the January 19, 2005 press release referenced by Plaintiffs contains no such language.

Indeed, directly contrary to Plaintiffs allegations, the January 19, 2005 press release accurately describes the terms of the transaction between NaturalNano and Atlas as described by Plaintiffs in the SAC, ¶¶ 72-86.  The press release states as follows:

> Atlas Mining Company . . . announced today that the company has sold 500 tons of halloysite clay to NaturalNano Inc. and has agreed to collaborate in the development and implementation of a proprietary separation process. . . .

> Atlas Mining was awarded the supply contract by NaturalNano Inc., a technology firm that develops new processing techniques and commercial applications of natural nanoscale materials. . . .
>
> . . . "[NaturalNano] specialize[s] in processing systems for nano-size materials, and we think that by utilizing their system, we can create an even greater value for our product."  NaturalNano has remitted an initial payment of $125,000 and will process the clay on-site at Atlas Mining's Dragon Mine in Juab County, Utah for its own use.  "The future value of this product is not yet known.  However, we expect to realize over $500 per ton for this order and will end up with a processing method that will bring us even greater value . . . ."  Atlas will have the right to license NaturalNano's proprietary separation process when completed.

(*See* January 19, 2005 Form 8-K and Press Release, attached as Exhibit 10)[1]  Contrary to Plaintiffs' repeated characterizations of Atlas's so-called misrepresentation of the NaturalNano transaction, Atlas accurately described the transaction to the public in this press release.  Atlas informed the public, in the January 19, 2005 press release, that it had entered into a "supply contract" with NaturalNano, that NaturalNano was to build a processing facility, and NaturalNano was to process the clay.  Atlas did not represent that it already had a processing facility and had sold "processed" clay to NaturalNano.  Similar to this press release, all of the Company's annual reports stated that although it had potential buyers of clay, "The sale of product cannot be formalized until we have verified our ability to provide the quality and quantities as required by the potential buyers."  (*See* Atlas 2004 Form 10-KSB, Exhibit 1, p. 7; Atlas 2005 Form 10-KSB/A, Exhibit 2, p. 7; Atlas 2006 Form 10-KSB, Exhibit 3, p. 6.)

In the SAC, Plaintiffs state that Atlas described its halloysite clay business as "profitable," "healthy," and "viable."  (*See, e.g.,* SAC, ¶¶ 5, 11, 14, 87, and 228.)  These characterizations are utterly inconsistent with the actual statements of Atlas as found in its annual reports.  The company's annual reports describe a single sale of halloysite in the year 2004 in the

---

[1] The Court may consider this Form 8-K in connection with this motion to dismiss because it is a public record and the press release is expressly incorporated into the SAC.

amount of $250,000 and expressly state that no sales were made in 2003, 2005, or 2006.  (Atlas 2004 10-KSB, Exhibit 1, pp. 7 & 18; Atlas 2005 10-KSB/A, Exhibit 2, p. 7; Atlas 2006 10-KSB, Exhibit 3, p. 3.)  The company gave further details of the year 2004 sale in the January 19, 2005 Form 8-K and press release, as evidenced by Exhibit 10.  The same annual reports describe expenses related to the halloysite project of $51,140 for 2003; $340,657 for 2004; $760,347 for 2005; and $2,143,161 for the year 2006.  (Atlas 2004 10-KSB, Exhibit 1, p. 7; Atlas 2005 Form 10-KSB/A, Exhibit 2, p. 7; Atlas 2006 Form 10-KSB, Exhibit 3, p. 6).  In other words, Atlas informed the public that over a four year period it made a single sale of unprocessed clay for a total of $250,000 and incurred total expenses related to the clay operations of $3,295,305.  These undisputable facts hardly describe a healthy and profitable halloysite clay operation.

Atlas's annual reports also completely contradict Plaintiffs' statement that Atlas represented its halloysite clay operations as "viable."  Each annual report states as follows:

**WE ARE AN EXPLORATION STAGE COMPANY, AND THERE IS NO ASSURANCE THAT A COMMERCIALLY VIABLE DEPOSIT OR "RESERVE" EXISTS IN ANY OF OUR PROPERTIES.**

. . . .

Additionally, although our timber harvesting and contracting activities have generated revenue, we as a company have not yet generated any profit.  We may not be able to develop these activities to commercially viable enterprises or to obtain additional properties that are commercially viable.  The commodities extracted from our properties may never generate significant revenues or achieve profitability, which will adversely impact our financial condition.

(Atlas 2004 Form 10-KSB, Exhibit 1, p. 21; Atlas 2005 Form 10-KSB/A, Exhibit 2, p. 17; Atlas 2006 Form 10-KSB, Exhibit 3, p. 17).  In short, contrary to Plaintiffs' characterization of Atlas's public statements, Atlas in no respect represented that its halloysite business was "profitable," "healthy," or "viable."

As to CBN, even if the Court agrees that Atlas misrepresented the viability of its halloysite project, there is an obvious disconnect in Plaintiffs' claims.  According to the SAC, the

alleged statements touting Atlas's business were made by Atlas, not CBN.  CBN's only role was to audit financial statements, and the financial statements nowhere mention anything about halloysite clay.  Moreover, rather than showing a viable, profitable business, the financial statements audited by CBN show a business that is failing.  In the year 2004, the very year that some revenue was recognized from the NaturalNano transaction, CBN's audit report warned investors that Atlas's continuing losses raised doubts about its ability to remain in business. (Atlas's 2004 Form 10-KSB, Exhibit 1, Independent Auditor's Report.)

In an attempt to bridge the gap in the logic of their claims, Plaintiffs assert that CBN "knew that the accounting for the halloysite transaction was a key factor that enabled the company to tout its future prospects for the sale of halloysite."  (Plaintiffs' Opposing Memorandum, p. 20.)  Plaintiffs, however, offer no particularized facts which could possibly demonstrate that CBN knew that Atlas was fraudulently touting its halloysite clay prospects in press releases and in its public filings.  Plaintiffs' position boils down to the unusual proposition that CBN, as the auditor, had a duty to monitor and correct the representations made by Atlas in its press releases and public statements.  Plaintiffs offer no legal support for this position.

## II.   The SAC Fails to Comply with the PSLRA's Pleading Standards for Materiality or Magnitude.

Plaintiffs argue that the SAC adequately pleads materiality because the stock price for Atlas dropped 51% when Atlas disclosed on October 9, 2007 that it had no viable halloysite business.  (Opposing Memorandum p. 23.)  Plaintiffs also assert that in any event, materiality is a mixed question of law and fact that should be reserved for the trier of fact, and not resolved in a motion to dismiss.  (*Id.*)  Plaintiffs' arguments misapprehend the materiality or magnitude requirement for pleading accounting fraud under the PSLRA.

Ninth Circuit cases construing the PSLRA clearly state that in order to adequately plead a claim for accounting fraud against an accountant, the plaintiff must satisfy a materiality or

magnitude requirement. The Ninth Circuit has repeatedly noted that failure to comply with GAAP or the publication of inaccurate accounting figures does not alone establish scienter. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (dismissing securities fraud against Price Waterhouse); *Software Toolworks, Inc. v. Paine Webber, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994) (dismissing securities fraud claim in part against Deloitte Touche); *In re: Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1426 (9th Cir. 1994) (dismissing securities fraud claim against Deloitte Touche). In order to bridge the gap between an alleged accounting mistake and a proper claim for fraud under the PSLRA, a plaintiff "must allege enough information so that 'a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'" *In re: Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006, 1016 (9th Cir. 2005) (quoting *In re: McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)). In addressing the magnitude of an accounting error necessary to support a fraud claim, the Ninth Circuit has said the error must have been "egregious." *DSAM,* 288 F. 3d at 390.

In short, Ninth Circuit case law includes a materiality or magnitude requirement for pleading accounting fraud under the PSLRA. This magnitude requirement is necessary in order to show a strong inference of scienter. As the Ninth Circuit has noted, the alleged accounting mistake must be:

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Zucco Partners*, 552 F.3d at 991. This Court has already concluded that CBN's alleged mistake in accounting for a single transaction involving NaturalNano and Atlas does not satisfy the magnitude requirement of the PSLRA. The SAC offers nothing new to alter the Court's conclusion.

Plaintiffs face a heavy burden to plead scienter, and the SAC falls far short in its attempt to do so because it fails to plead an egregious accounting misstatement that was widespread and significant.  Indeed, the new facts alleged in the SAC even demonstrate that it is debatable or at least there is ambiguity concerning whether CBN was in error with respect to the treatment of the revenue received from NaturalNano.  Furthermore, even if CBN's treatment of the revenue was in error, the error was not significant in light of Atlas's overall financial condition.  At worst, the GAAP violation resulted in an understatement of Atlas's net loss, and not an overstatement of earnings as is typically the case in an accounting fraud case.  CBN is not aware of any cases that have held that a single accounting misstatement that resulted in an understatement of a net loss could be a basis for pleading accounting fraud under the PSLRA.

Numerous cases demonstrate that a single GAAP violation that merely understates earnings is not "widespread" or "egregious" so as to infer fraud.  *See, e.g., In re: Daou*, 411 F.3d at 1017 (particularity requirement satisfied as to officers of company when they allegedly "systematically" recognized millions of dollars in revenue before earned); *In re: Homestore.com, Inc.*, 252 F. Supp. 2d 1018, 1022-24, 1044 (C.D. Cal. 2003) (scienter pled with particularity when allegations included numerous transactions and seven quarters of revenue totaling $193 million); *In re: McKesson HBOC, Inc.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) (numerous transactions involving a variety of customers during the class period); *In re: Phillip Services Corp.*, 383 F. Supp. 2d 463, 467 (S.D.N.Y. 2004) (claims based upon "multiple violations" of GAAP); *In re: Microstrategy, Inc.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) (scienter pled by alleging the "pervasiveness and repetitiveness" of GAAP violations).

A single GAAP violation simply fails to satisfy the Ninth Circuit's requirement that GAAP violations be "widespread," "significant," and "egregious."

### III.  The SAC Does Not Plead Particularized Facts
### Showing a Strong Inference of Scienter.

It is clear that misstated accounting figures alone is not enough to plead fraud.  In order to plead accounting fraud under the PSLRA, a plaintiff must plead two things.  First, as noted above, a plaintiff "must allege enough information so that 'a court can discern whether the alleged GAAP violations were minor or technical in nature or whether they constituted widespread and significant inflation of revenue.'"  *In re: Daou Systems, Inc.*, 411 F.3d at 1016. Plaintiffs must also plead specific facts or red flags, meaning "those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investor."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1268 (11th Cir. 2006) (quoting *In re: Suntera Corp. Sec. Lit.*, 199 F. Supp. 2d 1308, 1334 (M.D. Fla. 2002)).

The whole point of pleading a "significant" accounting error and red flags is to demonstrate that the accounting errors were the result of "intentional or deliberate reckless conduct as opposed to ordinary carelessness."  *DSAM Global*, 288 F.3d at 390.  As the Ninth Circuit noted in *Zucco Partners* in addressing an alleged accounting fraud,

> To adequately demonstrate that the "defendant acted with the required state of mind," a complaint must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness."  In *Silicon Graphics,* we defined the "deliberate recklessness" standard, noting that "we continue[ ] to view it as a form of intentional or knowing misconduct."  More specifically, "although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness."  Rather, the plaintiff must plead a "highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

*Zucco Partners,* 552 F.3d at 992 (citations omitted)(emphasis in original) (quoting *Daou,* 411 F. 3d at 1014-15 and *In re Silicon Graphics Inc.,* 183 F. 3d 970, 974, 976 (9th Cir. 1999)).

In *Zucco Partners,* Plaintiffs filed a 130 page complaint alleging fraudulent accounting errors that resulted in an overstatement of earnings of $2.7 million. *Id.* at 988. The complaint described numerous types of allegations that purportedly demonstrated scienter, including 1) statements from six confidential witnesses, 2) facts related to the company's restatement of earnings, 3) the resignations of the company's CFO, members of the audit committee, and the company's auditor, 4) statements in the company's Sarbanes-Oxley certifications, 5) compensation of the individual defendants, 6) stock sales by the individual defendants, and 7) facts related to the company's private placement. *Id.* at 992.

Despite what the Court described as "legion" and "voluminous" allegations, the Court in *Zucco Partners,* held that the complaint failed to plead scienter with particularity. The Court concluded that the more compelling inference was that the company was experiencing problems "controlling and updating its accounting and inventory tracking practices." *Id.* at 1007-08.

According to Plaintiffs' opposing memorandum, the SAC pleads two GAAP violations which allegedly constitute false and misleading statements by Atlas and CBN:

> (1) It materially overstated its revenues due to the halloysite sale that never actually took place; and (2) the company failed to adequately disclose the true nature of its operations, rendering it impossible to make such a sale.

(Opposing Memorandum p. 16.) With respect to every allegation pled by Plaintiffs, the issue before the court is whether those facts establish a strong inference that CBN made these alleged false statements with fraudulent intent or deliberate recklessness

### A. The SAC Fails to Plead Red Flags that Show that CBN acted with Intent to Defraud or Deliberate Recklessness.

Plaintiffs attempt to lay out various other red flags that purportedly put CBN on notice that Atlas's financial statements were fraudulently accounting for the money from NaturalNano. Many of these so-called red flags were addressed in connection with CBN's motion to dismiss the FAC. (*See* Memorandum Opposing CBN's Motion to Dismiss the FAC pp. 4, 11; CBN's

Reply Memorandum in Support of its Motion to Dismiss the FAC pp. 16-18.)  In the Report and Recommendation, the Court has already rejected these red flags, stating that "they do not 'come close[] to demonstrating intent, as opposed to mere motive and opportunity.'"  (Report p. 18.)

Moreover, the entire purpose of the various red flags is to demonstrate that the alleged egregious GAAP violation was made with fraudulent intent.  Since the SAC fails to identify GAAP violations that are egregious, widespread and significant, the discussion of so-called red flags is a rather meaningless exercise.  In any event, CBN will respond to Plaintiffs' discussion of the so-called red flags in the opposing memorandum, focusing primarily on those red flags that were not the object of the parties' arguments in connection with the dismissal of the FAC.

1. **Allegations Concerning CBN's Business Model and CBN's Relationship with Atlas**

Plaintiffs argue that CBN conducted a high-volume accounting practice, aiming to conduct a large number of audits in a short period of time.  Plaintiffs also assert that from 2000 through 2004, CBN not only served as Atlas's auditor, but also prepared Atlas's financial statements.  Plaintiffs contend that these assertions should be a basis for finding that they have demonstrated a strong inference of scienter.  These conclusory assertions fall far short of meeting the standards of the PSLRA.

Plaintiffs offer no particularized facts that support a strong inference of scienter. Plaintiffs do not describe what, if any, other audits competed for CBN's time when the audits were conducted for CBN.  Plaintiffs do not plead how long the audit took or attempt to allege with any specificity that inadequate resources were devoted to the audit.  The SAC also provides no particularized facts with respect to CBN's role as an alleged preparer of Atlas's financial statements.  The SAC offers no details concerning how, when, and where CBN allegedly prepared Atlas's financial statements, or how in doing so it would have learned anything different than would be learned in doing an audit.

The alleged fraud in this matter is based upon Atlas's treatment of the revenues received from NaturalNano.  The purpose of any alleged red flags would be to demonstrate that CBN acted with deliberate recklessness or the intent to defraud when it approved the recognition of revenue from the NaturalNano transaction.  The SAC's conclusory assertions about CBN's business practices and its relationship with Atlas shed no light on CBN's intent with respect to the NaturalNano transaction.  The SAC's allegations concerning CBN's business model and its relationship with Atlas would at best demonstrate negligence, and not the scienter required by the Ninth Circuit.

### 2.  Allegations Concerning the Special Committee Investigation

The SAC asserts that the findings of Atlas's special committee, as set forth in Atlas's August 27, 2008 Form 8-K, also supports a finding of scienter.  Notably, Plaintiffs unsuccessfully made the same argument in opposing CBN's motion to dismiss the FAC.  (*See* Memorandum Opposing CBN's Motion to Dismiss the FAC p. 7; see CBN's Reply Memorandum in Support of its Motion to Dismiss the FAC pp. 19-21; *see also* Atlas Form 8-K dated August 27, 2008, Exhibit 4.)  The findings of the special committee offer no particularized facts from which a strong inference can be drawn that CBN acted with scienter in approving financial statements which recognized $250,000 in revenue in the NaturalNano transaction.

### 3.  Allegations Concerning the PCAOB's Investigation

Plaintiffs contend that CBN's argument that the PCAOB's investigation does not assist Plaintiffs in establishing scienter is "disingenuous."  (Opposing Memorandum p. 37.)

Contrary to the assertions of Plaintiffs, the PCAOB inspections of CBN are completely irrelevant.  The reports shed no light on whether CBN acted with the intent to defraud or with deliberate recklessness when it approved financial statements recognizing $250,000 in revenue from NaturalNano.  The PCAOB reports do not even relate to Atlas and are not findings of

wrongdoing.  The Reports do not contain any particularized facts with respect to the matters inspected by the PCAOB.  CBN viewed the PCAOB's July 25, 2005 inspection report as so insignificant that it didn't even bother to respond.  (*See* July 25, 2005 Report p. 7, Exhibit 9.) CBN did respond to the June 29, 2009 inspection report, and stated as follows:

> While we recognize the constructive intent of this inspection process, we wish to point out that an audit engagement performed in accordance with PCAOB standards requires the exercise of significant professional judgment, and because of the degree or judgment involved, views may differ on matters such as the nature, timing and extent of audit procedures performed and the sufficiency of evidence gathered.  This was especially evident with the comments regarding our testing of revenues for two issuers, and good will for another.  Industry standard methods were used to test such accounts and in our professional judgment, a better method did not exist and the reviewer's suggestions of what procedures they believed the firm should have performed, were unreasonable under the circumstances or vague.  We respectfully disagree with the PCAOB's conclusion that in the audits reviewed by the inspection team, our firm did not obtain sufficient competent evidential matter to support our opinions on the issuer's financial statements.

(Letter from CBN dated May 29, 2009, Exhibit 9.)

Nothing with respect to the PCAOB reports assists Plaintiffs in their burden of pleading particularized facts showing a strong inference of scienter with respect to the NaturalNano transaction.

### 4.    Allegations Concerning Jacobson's Violations of the Federal Securities Laws and his Looting of Atlas

Plaintiffs assert that CBN should have "recognized the overwhelming fraud risk" at Atlas because Jacobson was issuing stock in violation of the securities laws and was engaged in a "concerted scheme . . . to loot the Company."  (Opposing Memorandum pp. 33-34.)  Plaintiffs assert that these allegations are more than mere motive and opportunity, and "confirm actual, ongoing fraud."  (*Id.*)

It must first be noted that the SAC makes no attempt to plead an independent fraud claim against CBN based upon the alleged issuance of securities in violation of federal law or

Jacobson's alleged looting of the company.  (*See* § III(C), below.)  Plaintiffs appear to argue that CBN should have recognized that Jacobson was looting the company, and therefore Jacobson had a strong incentive to misrepresent Atlas's financial condition in the company's financial statements.  (*See* SAC ¶¶ 245, 251, 256.)

Contrary to Plaintiffs' protestations, these allegations about Jacobson's alleged looting of Atlas are nothing more than an attempt to demonstrate scienter based on motive and opportunity, albeit in a fashion very different than typically addressed in case law.  Plaintiffs do not argue, and the SAC offers no support for, the assertion that CBN had a motive and opportunity to commit fraud.  Rather, Plaintiffs assert that because Atlas's management had a motive and opportunity to commit fraud, the Court should find that CBN acted with scienter.  Plaintiffs cite no cases to support this novel position.

Case law does address the question whether motive and opportunity may be a basis for inferring scienter against a company's management.  Specifically, courts have addressed whether management's compensation package may be a basis for inferring scienter.  The Ninth Circuit, however, has stressed that:

> "generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of *Silicon Graphics*" and *Tellabs*.  If simple allegations of pecuniary motive were enough to establish scienter, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."

*Zucco Partners*, 552 F.3d at 1005 (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)).  Similarly, if generalized assertions of management's motive were a basis to infer fraudulent intent against a company's auditor, every downturn in the company's stock price would be a basis for forcing the auditor to defend a securities fraud claim.

In *Zucco* Partners, the court stressed that to infer scienter from management's compensation, there must be allegations "indicating how intimately the bonuses were tied to the company's financials." *Id.* at 1004. The SAC contains no such allegations.

In *Zucco Partners*, the court also noted that unusual or significant stock sales may be circumstantial evidence of scienter against the insiders making the sales. The court, however, noted that details must be pled concerning the amount or percentage of stock sold, the timing of the sales, and whether the sales were consistent with prior trading history. *Id.* The SAC alleges that significant amounts of stock were issued contrary to the registration provisions of the securities laws. However, particularized facts concerning the dollar figure benefit to Jacobson are not pled.

More importantly, facts concerning management's compensation and stock sales, even if pled, have no bearing on the motive and opportunity of CBN to commit fraud. These facts would have no bearing on whether CBN acted with deliberate recklessness or fraudulent intent in approving the recognition of $250,000 of revenue in a single transaction with NaturalNano.

**B. The *Suprema* Case Does Not Support Plaintiffs' Position that a
     Strong Inference of Scienter has been Demonstrated in this Case.**

In an effort to support its position that the SAC satisfies the PSLRA's requirements for pleading scienter, Plaintiffs rely upon the case of *In re: Suprema Specialties, Inc.*, 438 F.3d 256 (3rd Cir. 2006). (*See* Opposing Memorandum p. 25.) Plaintiffs argue that the *Suprema* case "is especially illustrative." The *Suprema* case is very different than the present case, and offers no support for Plaintiffs' position.

According to the court in *Suprema,* the defendant company "reported wildly successful growth in its sales and receivables" over a two-year period. In the year 2000, the company's net sales increased to $278.4 million, reflecting a 58% increase over the prior year, and for the year 2001 net sales increased to $420.3 million, or a 51% increase over the prior fiscal year. The

company also reported that its receivables increased from $36 million at the end of 1999 to $101.8 million by the end of 2001. In the same time frame, industry-wide growth was only 9% per year. In 2001 *Fortune* magazine named Suprema as the twenty-third fastest growing small company in the U.S. and *Forbes* magazine ranked it as the twenty-second best small company. *Suprema*, 438 F.3d at 263-64. Contrary to the information which the company provided to the public, the criminal information filed by the United States government alleged that $700 million of the company's $1.2 billion in net sales between 1996 and 2002 were completely fictitious. *Id.* at p. 266. The complaint alleged that during the class period fictitious transactions were more than two thirds of the company's revenue and nearly all of the company's growth. *Id.* at p. 278.

In *Suprema*, the court recognized that "the mere second-guessing of calculations" of an accountant is not an adequate basis to plead a fraud claim under the PSLRA against an auditor. *Id.* at p. 279. The court concluded that the violation of accounting standards, "pled with particularity," along with the pleading of "significant 'red flags'" may be a basis for pleading a fraud claim against an auditor. *Id.* at 279-80.

The factual allegations pled with particularity in the *Suprema* case are very different than the allegations in the present case. Unlike the present case, in *Suprema*, accounting errors allowed the company to represent itself as a profitable, rapidly growing company, even to the point that national financial publications were touting the company's success. Unlike the present case, in *Suprema* the allegations in the complaint demonstrated $700 million in fictitious sales, representing two thirds of the company's revenue and almost all of the company's growth.

In the present case, Plaintiffs only accuse CBN of erroneously recognizing revenue for a single transaction totaling $250,000. With or without the revenue from this transaction, Atlas was unprofitable as a whole. With or without the revenue from this transaction, the company's public reports described only a single sale of halloysite clay and described millions of dollars of

expenses related to its halloysite clay operations.  Unlike the *Suprema* case, in the present case both the company's as well as CBN's disclosures warned that the company was continually losing money and in danger of going out of business.

In addition, unlike *Suprema*, in the present case Plaintiffs cannot allege with specificity that a false statement was even made and the reasons it was false.  As addressed above, it is debatable based upon the facts pled by Plaintiffs whether any GAAP violation even occurred.

Given the nature and the magnitude of the GAAP violations alleged by Plaintiffs in the present case, as well as the financial condition of Atlas as reported to the public, it simply defies common sense to suggest that CBN should have known there was a danger of misleading investors.  Plaintiffs have failed to demonstrate that particularized facts demonstrate a strong inference of scienter.

## C.  The SAC Does Not Plead Independent Fraud Claims Based Upon Any of the Red Flags Alleged in the SAC.

In order to establish a fraud claim under § 10 of the Exchange Act, plaintiff must plead (1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) which proximately caused their injury.  *DSAM Global*, 288 F.3d at 388. According to Plaintiffs' opposing memorandum, the SAC pleads two GAAP violations which allegedly constitute false and misleading statements by Atlas:

> (1) It materially overstated its revenues due to the halloysite sale that never actually took place; and (2) the company failed to adequately disclose the true nature of its operations, rendering it impossible to make such a sale.

(Opposing Memorandum p. 16.)  Plaintiffs' description of the alleged false statements in the opposing memorandum is consistent with the SAC.  (*See* SAC ¶¶ 153-160.)

In an effort to plead scienter, the SAC also alleges various facts which allegedly should have alerted CBN of a risk of fraud by Atlas.  (*Id.* ¶¶ 240-272.)  The SAC alleges, for example, that CBN should have known that there was a risk of fraud at Atlas because Atlas and its

president, Jacobson, were issuing stock in violation of the securities laws.  (*Id.* at ¶¶ 243-264.) In opposing CBN's motion to dismiss the FAC, Plaintiffs similarly argued that the sale of stock in violation of the securities laws is evidence of scienter.  (Memorandum Opposing CBN's motion to dismiss the FAC, p. 7).

Notably, however, the SAC makes no effort to plead all the elements of a fraud claim as to CBN with respect to the sale of stock in violation of the securities laws.  The SAC does not describe what misstatements or omissions CBN purportedly made with respect to the stock issuances.  With respect to the stock issuances, the SAC fails to identify the materiality of any of CBN's misstatements or omissions during the class period, CBN's scienter, that Plaintiffs relied upon the misstatements or omissions, and that Plaintiffs were injured as a result of these misstatements and omissions.  Most notably, the SAC fails to plead loss causation with respect to any representation or omission from CBN concerning stock issuances.  (*See* SAC ¶¶ 302-309.) The allegations in the SAC about the sale of stock in violation of federal law merely attempt to show that Jacobson had a motive and opportunity to commit fraud, and therefore CBN should have discovered the fraudulent statement about the NaturalNano transaction.

Although not entirely clear, Plaintiffs suggest in their opposing memorandum that they are asserting an independent fraud claim based upon the alleged sale of stock in violation of the securities laws, stating, "These allegations confirm actual, ongoing fraud at Atlas and a concerted scheme by William Jacobson to loot the company."  (Opposing Memorandum p. 34.)  These assertions are misplaced, and the SAC offers no support for an independent fraud claim against CBN based upon the alleged issuance of unregistered stock.  Plaintiffs do not plead the elements of a fraud claim against CBN based upon the sale of stock in violation of the federal securities laws.  Moreover, the allegations about the sale of stock shed no light upon whether CBN could

have acted with fraudulent intent or deliberate recklessness with respect to the revenue from NaturalNano.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the SAC.

DATED this 12th day of May, 2010.

KRUSE LANDA MAYCOCK & RICKS, LLC


/s/Steven G. Loosle
Steven G. Loosle
*Attorneys for Chisholm, Bierwolf & Nilson LLC*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 12th day of May, 2010, I electronically filed the foregoing REPLY MEMORANDUM IN SUPPORT OF THE CBN DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

**Charles Matthew Andersen**
cma@winstoncashatt.com

**Thomas A. Banducci**
tbanducci@bwslawgroup.com,jrose@bwslawgroup.com,lharris@bwslawgroup.com,
wwoodard@bwslawgroup.com,mream@bwslawgroup.com,
jdempsey@bwslawgroup.com,ssmith@bwslawgroup.com

**Courtney R Beaudoin**
crb@winstoncashatt.com

**Bruce S Bistline**
bbistline@gordonlawoffices.com

**Angelo J Calfo**
acalfo@yarmuth.com,srasmussen@yarmuth.com

**Katrina Carroll**
kcarroll@ldgrlaw.com

**Matthew A Carvalho**
mcarvalho@yarmuth.com,smeyer@yarmuth.com

**Joseph J. DePalma**
jdepalma@ldgrlaw.com

**William G Dryden**
wgd@elamburke.com,buff@elamburke.com

**W. Adam Duerk**
aduerk@bigskylawyers.com

**Philip Howard Gordon**
pgordon@gordonlawoffices.com,bbistline@gordonlawoffices.com

**Philip M Guess**
philg@klgates.com,rhonda.hinman@klgates.com

**Lewis S Kahn**
lewis.kahn@ksfcounsel.com,ecf.notices@ksfcounsel.com

**Richard A Kirby**
richard.kirby@klgates.com

**Nathan M Longenecker**
longenecker@twhlaw.com,ira@twhlaw.com

**Kim E Miller**
kim.miller@ksfcounsel.com,ecf.notices@ksfcounsel.com

**Ted C. Murdock**
tmurdock@hollandhart.com,jlcalhoun@hollandhart.com,
boiseintaketeam@hollandhart.com

**Bryan A Nickels**
ban@hallfarley.com,kat@hallfarley.com

**Laurence M. Rosen**
lrosen@rosenlegal.com

**Kevin J Scanlan**
kjs@hallfarley.com,klm@hallfarley.com

**Jennifer F Sherrill**
jfs@federmanlaw.com

**B Newal Squyres**
nsquyres@hollandhart.com,sdalonzo@hollandhart.com,
Boiseintaketeam@hollandhart.com

**Kim C Stanger**
kstanger@hawleytroxell.com,sclark@hawleytroxell.com

**Michael A. Swick**
michael.swick@ksfcounsel.com

**Stephen R Thomas**
srt@moffatt.com,cld@moffatt.com,moffattthomas@hotmail.com,ecf@moffatt.com,tmh
@moffatt.com,sec@moffatt.com

**Thomas G Walker**
twalker@cosholaw.com,pcarson@cosholaw.com

**Mark A Wielga**
wielga@twhlaw.com,fisk@twhlaw.com,casey@twhlaw.com


/s/Lynn Javadi

EXHIBIT 10

```
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>amc_8k011905.txt
<DESCRIPTION>ATLAS MINING COMPANY 8-K AT JANUARY 19, 2005
<TEXT>
```

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 8-K
--------

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act

January 19, 2005
Date of Report
-----------------------------------
(Date of Earliest Event Reported)


ATLAS MINING COMPANY
-------------------------------------------------------
(Exact name of Registrant as Specified in its Charter)


630 EAST MULLAN AVENUE
OSBURN, IDAHO 83849
----------------------------------------
(Address of Principal Executive Offices)


(208) 556-1181
---------------------------------
(Registrant's Telephone Number)

| IDAHO | 000-31380 | 82-0096527 |
|-------|-----------|------------|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |


Check the appropriate box below if the Form 8-K filing is
intended to simultaneously satisfy the filing obligation of the
registrant under any of the following provisions (see General Instruction
A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act
(17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12(b) under the Exchange
Act (17 CFR 240.14a-12(b))

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the
Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the
Exchange Act (17 CFR 240.13e-4(c))
================================================================================

FORWARD LOOKING STATEMENTS

     This Form 8-K and other reports filed by Registrant  from time to time
with the Securities and Exchange  Commission  (collectively the "Filings")
contain or may contain  forward looking  statements  and information
that are based upon beliefs of, and information  currently available to,
Registrant's  management as well as estimates and assumptions made by
Registrant's management. When used in the filings the words "anticipate",
"believe",  "estimate", "expect", "future", "intend",  "plan" or the
negative of these terms and similar expressions as they relate  to
Registrant  or  Registrant's  management  identify  forward  looking
statements.  Such statements reflect the current view of Registrant with
respect to future events and are subject to risks, uncertainties,
assumptions and other factors relating to Registrant's industry,
Registrant's  operations and results of operations and any businesses that
may be acquired by Registrant.  Should one or more of these risks or
uncertainties  materialize,  or should the underlying assumptions prove
incorrect,  actual results may differ significantly from those anticipated,
believed, estimated, expected, intended or planned.

     Although Registrant believes that the expectations reflected in the
forward looking  statements are reasonable,  Registrant cannot guarantee
future results, levels of  activity,  performance  or  achievements.
Except  as  required  by applicable  law,  including the securities laws of
the United States,  Registrant does not intend to update any of the
forward-looking statements to conform these statements to actual results.


ITEM 7.01.   REGULATION FD DISCLOSURE.

     On January 19, 2005 we (Atlas Mining Company) made a press release to
our shareholders and investors to announce a sale of product and a
collaborative agreement with the buyer.  A copy of the release is included
as a part of this report as Exhibit 99.1.
   1


Item 9.01.  FINANCIAL STATEMENTS AND EXHIBITS.

          (c)  Exhibits.


               Exhibit 99.1   Press release dated January 19, 2005.



                              SIGNATURES

Pursuant  to the  requirements  of the  Securities  Exchange  Act of  1934,
the Registrant  has duly  caused  this  report  to be  signed  on its
behalf by the undersigned hereunto duly authorized.

                         ATLAS MINING COMPANY


                         BY: /s/ WILLIAM T. JACOBSON, PRESIDENT

```
                    ------------------------------------
                           WILLIAM T. JACOBSON
```

DATE: January 19, 2005

```
</TEXT>
</DOCUMENT>
```

```
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>2
<FILENAME>amc99_1.txt
<DESCRIPTION>PRESS RELEASE AT JANUARY 19, 2005
<TEXT>
```

Exhibit 99.1     Press Release Dated January 19, 2005.

Atlas Mining Company Enters Into Collaborative Agreement
with NaturalNano Inc.

Osburn, Idaho, January 19, 2005. Atlas Mining Company (OTCBB: ALMI),
announced today that the company has sold 500 tons of halloysite clay to
NaturalNano Inc. and has agreed to collaborate in the development and
implementation of a proprietary separation process.  Atlas and its partner
NanoDynamics will work closely with NaturalNano.

Atlas Mining was awarded the supply contract by NaturalNano Inc., a
technology firm that develops new processing techniques and commercial
applications of natural nanoscale materials. The supply agreement could
make Atlas one of the world's largest providers of a unique mineral that
contains natural nanotubes  hollow tubes only a few millionths of a meter
in diameter, according to NaturalNano spokesman.   Researchers believe the
natural nanotubes can become a central component of a new generation of
nano-engineered products and technologies.

William Jacobson, CEO of Atlas Mining said, "NaturalNano has taken a very
serious interest in our unique Halloysite due to its tubular structure.
They specialize in processing systems for nano-size materials, and we think
that by utilizing their system, we can create an even greater value for our
product." NaturalNano has remitted an initial payment of $125,000 and will
process the clay on-site at Atlas Mining's Dragon Mine in Juab County, Utah
for its own use.  "The future value of this product is not yet known.
However, we expect to realize over $500 per ton for this order and will end
up with a processing method that will bring us even greater value," stated
Jacobson.  Atlas will have the right to license NaturalNano's proprietary
separation process once completed.

The Dragon Mine Halloysite clay contains naturally occurring Halloysite
nanotubes, based on an inorganic molecule composed of aluminum, silicon,
hydrogen, and oxygen, which formed in the earth from hydrothermal
alteration and surface weathering of aluminosilicate minerals. Like carbon
nanotubes, Halloysite nanotubes are long, hollow tubes, allowing them to
store and deliver a variety of materials, with external diameters ranging
from less than 100 nanometers (nm.) up to several microns (or micrometers)
and internal diameters ranging from under 20 nm. to 200 nm. or more.

Unlike carbon nanotubes, the naturally occurring Halloysite nanotubes are
inexpensive, readily available in quantity, environmentally benign, and
safe and easy to process. Halloysite nanotubes don't clump together, making
them ideal for use in electronic fabrication and other high-tech ceramic-
composite applications.  The potential marketplace for naturally occurring
nanotubes crosses numerous industries representing significant potential
revenues.

"It is our intent to work directly with NaturalNano and NanoDynamics to

provide industrial users with a refined and predictable nanotubular
material," concluded Jacobson.

About Atlas Mining Company
--------------------------
Atlas Mining Company is a diversified natural resource company with its
primary focus on the development of the Dragon Mine in Juab County, Utah,
the only known commercial source of Halloysite clay outside of New Zealand.
The unique purity and quality of the Dragon mine Halloysite is unmatched
anywhere in the world and has spawned considerable research into new and
exciting applications for this product. Atlas also holds mining and timber
interests in Northern Idaho, and operates an underground mining contracting
business. Atlas stock trades on the OTC Bulletin Board under the symbol
"ALMI." More information about Atlas Mining Company can be found at
www.atlasmining.com.

About NaturalNano Inc.
----------------------
NaturalNano, a subsidiary of Technology Innovations, LLC based in
Rochester, N.Y., was formed to pursue processing and applications of
nanoscale materials that occur naturally in nature, such as halloysite, or
of materials that can be manufactured at very low cost and in high
quantity.  NaturalNano currently has a team of scientists and engineers
developing new processing methods as well as commercial applications for
halloysite. More information about NaturalNano can be found at
www.naturalnano.com, or by contacting company representatives at 585-214-
8000.

About NanoDynamics, Inc.
------------------------
NanoDynamics, Inc. is a leading company in the field of nanotechnology and
manufacturer of superior nanomaterials that will dramatically improve the
form, function and performance of a wide range of both industrial and
consumer products. The Company is uniquely positioned, utilizing
proprietary and protected technologies, to commercially manufacture
economical, high quality nanomaterials that will enable revolutionary
advancements in industries including electronics, semiconductors, consumer
products, fuel cells, transportation, energy and biotechnology. For further
information, please visit the Company's website at www.nanodynamics.com.


Contact Information
-------------------
John Roskelley, President, First Global Media, 480.902.3110


</TEXT>
</DOCUMENT>