B. Newal Squyres (ISB #1621)
Ted C. Murdock (ISB #5431)
HOLLAND & HART LLP
101 S. Capitol Blvd., Suite 1400
P.O. Box 2527
Boise, ID 83701
Telephone: (208) 342-5000
nsquyres@hollandhart.com
tmurdock@hollandhart.com

Joseph J. DePalma (*Pro Hac Vice*)
Katrina Carroll (*Pro Hac Vice)*
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, 12th Floor
Telephone: (973) 623-3000
jdepalma@litedepalma.com
kcarroll@litedepalma.com

**Attorneys for Lead Plaintiffs**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| IN RE: | Civil Action No. 07-428-N-EJL |
| ATLAS MINING COMPANY, SECURITIES LITIGATION | PLAINTIFFS' SURREPLY IN RESPONSE TO THE REPLY FILED BY THE CBN DEFENDANTS (Dkt. 174) IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS |

Plaintiffs submit this surreply to address new arguments made by CBN at pages 9 through 12 of its reply brief (Dkt. #174), specifically: (1) CBN's mischaracterization that Paragraph 11 contains a "stunning discrepancy" in describing certain representations made by Atlas in its January 19, 2005 press release and 2004 10-KSB, and; (2) CBN's argument that

Atlas fully disclosed the details of the NaturalNano transaction in these public statements. CBN Reply Brief at 9. CBN is wrong on both counts.

Of all of the Second Amended Complaint's ("SAC") allegations describing Atlas's scheme in touting its fictitious halloysite business, CBN selectively takes issue with Paragraph 11, which appears in the introductory section of the Complaint. Though CBN contends that Paragraph 11 contains an inaccuracy concerning statements made by Atlas, CBN fails to reproduce the allegation in its entirety and has extracted certain key language, appearing in bold below, which provides context to the statements made therein. The complete Paragraph 11 provides as follows:

> 11. To create the illusion that its halloysite business was viable, Atlas never disclosed its lack of processing capability and colluded with NaturalNano to create the appearance, beginning with its January 19, 2005 press release and its 2004 10-KSB, that NaturalNano had already purchased "500 tons of *processed* halloysite nanotubes" halloysite from Atlas. **In its own SEC filings, NaturalNano reported in its November 14, 2006 10-QSB that it had purchased "500 tons of *processed* halloysite nanotubes" on December 29, 2004.** These representations were patently false and misleading because neither Atlas nor NaturalNano had any processing capability for this clay.

(Bold emphasis added; italics in original).

Contrary to CBN's flawed interpretation, the quote that Atlas had sold "processed halloysite nanotubules" refers to the disclosure made by *NaturalNano* in its SEC filings, which disclosure is alleged to be the product of collusion with Atlas. This becomes clear when Paragraph 11 is read in context with the surrounding paragraphs (*see e.g.* ¶9 (describing press release as touting sale of halloysite and collusion with NaturalNano); ¶12 (summarizing the transaction relating to warrants given by Atlas to NaturalNano)) and even more clear when read together with the specific allegations in the body of the Complaint which accurately describe the January 19, 2005 press release and 2004 10-KSB and do not include the statement at issue

concerning the "processed halloysite nanotubules." (*See* ¶¶65, 69-71, 78). Contrary to CBN's bald assertion, therefore, the SAC does not contain any inaccuracy concerning Atlas's representations in its January 19, 2005 press release or 2004 10-KSB.

CBN's related argument, also impermissibly raised for the first time on reply, that the language of the January 19, 2005 press release and 2004 10-KSB show that Atlas was truthful concerning its lack of processing capabilities for halloysite, is belied by a multitude of allegations in the SAC, the majority of which are wholly ignored by CBN. These allegations reveal both affirmative misrepresentations and omissions by Atlas concerning its ability to process halloysite clay. The scheme began on September 24, 2004, several months *before* Atlas entered into the collusive transaction with NaturalNano when Atlas specifically began telling the market that "we're now *operational and processing* halloysite." ¶56 (Emphasis added). That same day, Atlas also told the market that it had "*commitments* for about 15,000 tons of clay per year from traditional markets (at about $450 a ton), but feel if we work the technology side we can triple the demand and potentially increase our margins." ¶57 (Emphasis added). By these early statements, therefore, any reasonable investor would believe: (1) that Atlas was already operational and mining its clay, (2) that Atlas had basic processing capability to sell its clay, (3) that Atlas could sell clay, on its own, to "traditional markets," and (4) if Atlas enhanced its technological capabilities, the Company could sell more clay at a greater profit. *See also* ¶64 (1/5/2005 statement that "unique hollow microtubules [were] *currently being produced*" and that its customer NanoDynamics (an entity believed to be related to NaturalNano) "will begin purchasing Halloysite clay from Atlas *immediately*").

As alleged in the SAC, after making these affirmative misstatements in September 2004, Atlas made its announcement in the January 19, 2005 press release and later in its 2004 10-KSB

that it had sold halloysite to NaturalNano and actually received payment for the clay. ¶65. When examining the statements made in the January 19, 2005 press release together with Atlas's other statements at the time, any notion that Atlas truthfully represented the substance of the NaturalNano transaction is simply not supported (or at best, simply raises fact issues that are characteristic of the highly fact-specific "truth on the market defense" inappropriate for resolution on a motion to dismiss (*See* Plaintiffs' Opposition at 13-14)).

Indeed, in the January 19, 2005 press release, Atlas represented that it "*has sold* halloysite clay to NaturalNano" that the agreement was a "supply contract' and that Atlas agreed to collaborate with NaturalNano on a "proprietary separation process." *See* CBN Ex. 10, (Emphasis added). All of these statements were carefully crafted to further the impression of a thriving halloysite business. Atlas's statement that it "has sold halloysite," through its use of the past tense, would lead the reasonable investor to believe that a sale of clay was actually made. Further, the characterization of the agreement as a "supply contract" presupposes that Atlas has the mining and production capability to supply the clay—capabilities that Atlas did not have then and did not even have as of the date the SAC was filed. Thus, these statements in the January 19, 2005 press release serve to bolster the positive statements made by Atlas in September 2004, leading investors reasonably to believe that Atlas could mine the clay and make it sellable. Further, the statements in the release do not even disclose that the sale was *contingent* on NaturalNano's construction of a processing facility, but rather only say that Atlas will cooperate on the new technology and that the processing enhancement by NaturalNano could make the clay more valuable. In sum, though Atlas touted NaturalNano's unique processing capability which could enhance the value of the clay, Atlas never disclosed that it could not supply the clay to NaturalNano and that Atlas did not have its own basic processing capability to even make the

clay a sellable product to any customer. Contrary to CBN's unsupported assertion, Atlas certainly never told the market that it sold "unprocessed halloysite" to NaturalNano. CBN Reply Brief at 12. [1]

The false and misleading nature of Atlas's January 19, 2005 statements are highlighted in the subsequent allegations in the SAC. For example, conspicuously absent from CBN's reply brief is any mention of Atlas's letter to shareholders issued mere days after the January 19, 2005 press release where Atlas affirmatively stated that underground production of halloysite had begun, that its infrastructure was in place, and, incredibly, that Atlas had its own processing plant. ¶ 66. A copy of the January 26, 2005 letter to shareholders (filed with the SEC on January 28, 2005) is attached hereto as Exhibit A. As Atlas noted in the January 26, 2005 release:

> We started in May with a barren piece of ground, and **now have a complete mining infrastructure** with electricity, compressed air, water and septic system, and plant facility. We were able to get some product from the surface exposures and have run some of it through **our processing plant.** Our miners have completed an underground drive to a sizeable halloysite bed (approximately 40,000 tons) 100 feet under the surface. **The bed was developed for production, and we are now to the point where underground production has begun.**
>
> ...
>
> Many people have inquired as to our participation and expertise in the various nano technology fields. Understand that we are a mining and resource company. **We mine and process products** suitable for various nano uses, and remain a potential supplier of both raw and refined nano materials. We'll leave the experimenting to the nanotechnology experts, but will continue seeking every viable distribution channel for our clay...

---

[1] Even if Atlas did make such a statement to the market, that representation in and of itself is false and misleading because, as of the date the SAC was filed, Atlas had never sold halloysite and could not even ascertain the existence of halloysite in its mine.

Atlas even confirmed the importance of sales of halloysite and the production capabilities of the Dragon Mine to its investors, stating in the January 26, 2005 letter to its shareholders that:

> Our stock showed improvement in 2004, and we closed the year with a new high. **As we attract more and more investors across a broader range of sectors, we feel the chances of a steadily increasing stock price in the market will continue. We also know that as the Dragon Mine starts bringing us a positive cash flow we will be able to realize some of the true value of our company. We spent some time in 2004 with the retail brokerage community explaining our program and showing the potential of the Dragon halloysite.** Besides attending at least two broker conferences, we spoke to numerous investors and brokers about our company and its future through direct contact and interviews. **Of course, as a shareholder, I'm certain you already understand our potential.**

(Emphasis added). These statements undercut CBN's attempt to persuade the Court that sales of halloysite were insignificant and immaterial to Atlas's business and future prospects.

In sum, examining the SAC's allegations in totality and according all reasonable inferences to Plaintiffs, any notion that the press release and annual report accurately described the NaturalNano transaction should be summarily dismissed. CBN's motion to dismiss should be denied.

Dated: May 14, 20101

**By:** *_/s/ Ted C. Murdock___________*
B. Newal Squyres (ISB #1621)
Ted C. Murdock (ISB #5431)
**HOLLAND & HART LLP**

**LITE DEPALMA GREENBERG & RIVAS LLC**
Joseph J. DePalma
Katrina Carroll
Two Gateway Center
12th Floor
Newark, NJ 07102-5003
(973) 623-3000

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 14th day of May 2010 I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Joseph J. DePalma — jdepalma@litedepalma.com
Katrina Carroll — kcarroll@litedepalma.com
Jennifer Sarnelli — jsarnelli@litedepalma.com
LITE DePALMA GREENBERG, LLC
Newark, New Jersey

[Attorneys for Lead Plaintiffs]

Kim C. Stanger — kcs@hawleytroxell.com
HAWLEY TROXELL ENNIS & HAWLEY LLP
Boise, Idaho

[Attorneys for CBN and Todd Chisholm and Troy Nilson]

Ellen Maycock — emaycock@klmrlaw.com
Steven G. Loosle — sloosle@klmrlaw.com
KRUSE LANDA MAYCOCK & RICKS LLC
Salt Lake City, Utah

[Attorneys for CBN and Todd Chisholm and Troy Nilson]

Laurence M. Rosen — lrosen@rosenlegal.com
ROSEN LAW FIRM, PA
New York, NY

Thomas A. Banducci — tbanducci@bwslawgroup.com
BANDUCCI WOODARD SCHWARTZMAN, PLLC — kgarcia@bwslawgroup.com
Boise, Idaho — lharris@bwslawgroup.com
rsoni@bwslawgroup.com
[Attorneys for Defendant Atlas Mining Company] — ssmith@bwslawgroup.com
wwoodard@bwslawgroup.com

| | |
|---|---|
| Philip M. Guess<br>Richard A. Kirby<br>K&L GATES LLP<br>Seattle, Washington | philg@klgates.com<br>Rhonda.hinman@klgates.com<br>Richard.kirby@klgates.com |
| [Attorneys for Defendant Atlas Mining Company and Nano Clay Technologies, Inc. | |
| Angelo J. Calfo<br>Matthew A. Carvalho<br>YARMUTH WILSDON CALFO PLLC<br>Seattle, Washington | acalfo@yarmuth.com<br>srasmussen@yarmuth.com<br>mcarvalho@yarmuth.com<br>smeyer@yarmuth.com |
| Bryan A. Nickels<br>Kevin J. Scanlan<br>HALL FARLEY OBERRECHT and BLANTON<br>Boise, Idaho | ban@hallfarley.com<br>kat@hallfarley.com<br>kjs@hallfarley.com<br>klm@hallfarley.com |
| W. Adam Duerk<br>MILODRAGOVICH, DALE, STEINBRENNER & NYGREN, PC<br>Missoula, Montana | aduerk@bigskylawyers.com |
| [Attorneys for Defendant William T. Jacobson] | |
| Nathan M. Longenecker<br>TEMPKIN WIELGA HARDT & LONGENECKER LLP<br>Denver, Colorado | longenecker@twhlaw.com<br>ira@twhlaw.com |
| Stephen R. Thomas<br>MOFFATT THOMAS BARRETT ROCK & FIELDS<br>Boise, Idaho<br><br>[Attorneys for Defendant Robert Dumont] | srt@moffatt.com<br>cld@moffatt.com<br>ecf@moffatt.com<br>moffattthomas@hotmail.com<br>sec@moffatt.com<br>tmh@moffatt.com |
| Thomas G. Walker<br>COSHO HUMPHREY LLP<br>Boise, Idaho | twalker@cosholaw.com<br>pcarson@cosholaw.com |
| Lewis S. Kahn<br>Kim E. Miller<br>KAHN, GAUTHIER SWICK, LLP<br>New Orleans, Louisiana | lewis.kahn@kgscounsel.com<br>kim.miller@kgscounsel.com |

C. Matthew Andersen cma@winstoncashatt.com
Courtney R. Beaudoin crb@winstoncashatt.com
WINSTON & CASHATT
Spokane, Idaho

William G. Dryden wgd@elamburke.com
ELAM & BURKE, P.A. buff@elamburke.com
Boise, Idaho

[Attorney for Defendant Ronald Price]

/s/ Ted C. Murdock
for Holland & Hart LLP

4821177_1.DOC